UNITED STATES DISTRICT
FOR THE DISTRICT OF COLUMBIA

Odillia Mutaka Mwani                           :
P.O. Box 53521                                 :
Nairobi, Kenya                                 :

and

Emmanuel Kioko Muema                           :
P.O. Box 75379                                 :
Nairobi, Kenya                                 :

and

Joseph Mwangi Nganga                           :
P.O. Box 10094                                 :
Nairobi, Kenya                                 :

and

Sarah Kuya Etenyi                              :
P.O. Box 10094                                 :
Nairobi, Kenya                                 :

and

John Kichuma Imbahale                          :
Joyleene & Co.                                 :
P.O. Box 30392                                 :
Nairobi, Kenya                                 :

and

Hellen A. Ojwang                               :
Joyleene & Co.                                 :
P.O. Box 30392                                 :
Nairobi, Kenya                                 :

and

Hudson Ngusale Anyangu                         :
Joyleene & Co.                                 :
P.O. Box 30392                                 :
Nairobi, Kenya                                 :

and

CASE NUMBER  1:99CV00125

JUDGE: Colleen Kollar-Kotelly

DECK TYPE: Civil General

DATE STAMP: 01/15/99

JURY ACTION

FILED

JAN 1 5 1999

NANCY MAYER-WHITTINGTON, CLERK
U.S DISTRICT COURT

Rosemary Njeri                    :
P.O. Box 227                      :
Thika, Kenya                      :

and

Joyce Njoki Miringu               :
P.O. Box 30333                    :
Nairobi, Kenya                    :

and

Jane Nyambura Miringu             :
P.O. Box 30333                    :
Nairobi, Kenya                    :

and

Gatome & Associates               :
P.O. Box 52144                    :
Nairobi, Kenya                    :

and

Rachel Wanjeri Kingara            :
P.O. Box 45455                    :
Nairobi, Kenya                    :

and

James Kimiri Kamau                :
P.O. Box 10094                    :
Nairobi, Kenya                    :

and

Muita & Company, LTD              :
P.O. Box 10094                    :
Nairobi, Kenya                    :

and

Evans Mukunga Muita               :
P.O. Box 10094                    :
Nairobi, Kenya                    :

and

2

Wilfred Ngunjiri Nderitu, Advocate     :
P.O. Box 22162     :
Nairobi, Kenya     :

and

Lilian Nkatha Guantai     :
P.O. Box 73598     :
Nairobi, Kenya     :

and

Stephen Muita Kibiku     :
University of Nairobi     :
Human Anatomy Dept.     :
P. O. Box 30197     :
Nairobi, Kenya     :

and

Francis Ndungu Njenga     :
Mwalimu Sukari Co., LTD     :
P.O. Box 58801     :
Nairobi, Kenya     :

and

Margreat Wambui Miringu     :
P.O. Box 30333     :
Nairobi, Kenya     :

and

Margaret Musoke Wagabi     :
P.O. Box 54756     :
Nairobi, Kenya     :

and

Lucy Kimiti     :
P.O. Box 54770     :
Nairobi, Kenya     :

and

Lucy Wangari Gachagwi                    :
P.O. Box 10094                           :
Nairobi, Kenya                           :

and

Anne N. Kingara                          :
P.O. Box 30877                           :
Nairobi, Kenya                           :

and

Lucy Waithera Mwangi                     :
P.O. Box 10094                           :
Nairobi, Kenya                           :

and

Damau Mbuvu Marangia                     :
P.O. Box 31710                           :
Nairobi, Kenya                           :

and

Bernard Gituto Maiwa                     :
P.O. Box 146                             :
Thika, Kenya                             :

and

Daniel Kimawi Muita                      :
P.O. Box 10094                           :
Nairobi, Kenya                           :

and

Pitalis Juma Osano                       :
P.O. Box 22676                           :
Nairobi, Kenya                           :

and

Charles Maina Banga                      :
RIC Road                                 :
P.O. Box 40350                           :
Nairobi, Kenya                           :

4

and

Edward Waihenya Nuthu                    :
P.O. Box 10094                           :
Nairobi, Kenya                           :

and

Castro Otiende                           :
P.O. Box 56362                           :
Nairobi, Kenya                           :

and

Philip Muriithi Mwai                     :
P.O. Box 73696                           :
Nairobi, Kenya                           :

and

Hedwig Yohanine Kibukosya                :
P.O. Box 49702                           :
Nairobi, Kenya                           :

and

Prisca A. Khatambi Kibukosya             :
P.O. Box 49702                           :
Nairobi, Kenya                           :

and

Fidelis Masyula Ndambuki                 :
P.O. Box 18050                           :
Nairobi, Kenya                           :

and

Eros Chemist LTD                         :
P.O. Box 46676                           :
Nairobi, Kenya                           :

and

Dipak L. Shah                            :
P.O. Box 43504                           :
Nairobi, Kenya                           :

and

Mukul J. Patel                                              :
P.O. Box 46676                                             :
Nairobi, Kenya                                             :

and

Dipak L. Shah                                              :
Sunil Shah                                                 :
t/a Cloud Nine                                             :
P.O. Box 43504                                             :
Nairobi, Kenya                                             :

           Plaintiffs,          :

v.                                                         :

The United States of America                               :
                                                           :
Serve:                                                     :
  Wilma A. Lewis
  US Attorney for the District of Columbia        :
  555 4th Street, NW                               :
  Washington, DC 20001                             :

  and

  Janet Reno                                       :
  Attorney General of the United States           :
  950 Pennsylvania Avenue, NW                      :
  Washington, D.C.  20530

           Defendant          :

and

Usama Bin Ladin                                           :
Qandahar, Afghanistan                                     :

           Defendant          :

and

"al Qaeda", also known as "al Qaida"    :
a worldwide terrorist organization      :
 Qandahar, Afghanistan                  :

        Defendant

and

Sudan, a Foreign State                  :
2210 Massachusetts Avenue, NW           :
Washington, DC 20008                    :

Serve pursuant to SCR 28 USC §1608:     :
  The Honorable Mustafa Osman, Minister    :
  Ministry of External Affairs            :
  Khartum, Sudan                          :
  (Official Language: Arabic)             :

        Defendant            :

and

Afghanistan, a Foreign State            :
360 Lexington Avenue, 11th Floor        :
New York, NY 10017                      :

Serve pursuant to 28 USC §1608:         :
  The Honorable Alim Razam, Minister      :
  Ministry of Foreign Affairs             :
  Kabul, Afghanistan
  (Official language: Dari)               :


## COMPLAINT


**COME NOW** plaintiffs ODILLIA MUTAKA MWANI, EMMANUEL KIOKO MUEMA,

JOSEPH MWANGI NGANGA, SARAH KUYA ETENYI, JOHN KICHUMA IMBAHALE,

HELLEN A. OJWANG, HUDSON NGUSALE ANYANGU, ROSEMARY NJERI, JOYCE NJOKI

MIRINGU, JANE NYAMBURA MIRINGU, GATOME & ASSOCIATES, RACHEL WANJERI

KINGARA, JAMES KIMIRI KAMAU, MUITA & COMPANY, LTD., EVANS MUKUNGA

MUITA, WILFRED NGUNJIRI NDERITU, LILIAN NKATHA GUANTAI, STEPHEN MUITA

KIBIKU, FRANCIS NDUNGU NJENGA, MARGAREAT WAMBUI MIRINGU, MARGARET

MUSOKE WAGABI, LUCY KIMITI, LUCY WANGARI GACHAGWI, ANNE N. KINGARA,

LUCY WAITHERA MWANGI, DAMAU MBUVU MARANGIA, BERNARD GITUTO MAIWA,

DANIEL KIMAWI MUITA, PITALIS JUMA OSANO, CHARLES MAINA BANGA, EDWARD

WAIHENYA NUTHU, CASTRO OTIENDE, PHILIP MURIITHI MWAI, HEDWIG YOHANNINE

KIBUKOSYA, PRISCA A. KHATAMBI KIBUKOSYA, FIDELIS MASYULA NDAMBUKI, EROS

CHEMIST, LTD., DIPAK L. SHAH, MUKUL J. PATEL AND DIPAK SHAH AND SUNIL SHAH,

T/A CLOUD NINE,  by and through undersigned counsel and, pursuant to F.R.C.P. 7, 23, and 57 and

Local Rule 203, and for a cause of action, do hereby state and aver as follows:


## JURISDICTION

As to defendant United States of America, jurisdiction is founded on 29 USC §§ 1346, 1350,

1356 and 2201.

As to defendants Usama Bin Ladin and "Al Qaeda," jurisdiction is founded on 28 USC §

1350.

As to foreign state defendants, jurisdiction is founded on 28 USC § 1330.


## VENUE

As to the defendant United States of America, venue is proper pursuant to 28 USC § 1402.

As to defendants Usama Bin Ladin and "Al Qaeda," venue is proper pursuant to 28 USC §

1391(d).

As to the foreign state defendants, venue is proper pursuant to 28 USC § 1391(f)(4).

<u>CLASS ACTION ALLEGATIONS</u>

This action arises out of the August 7, 1998 bombing of the American Embassy in Nairobi, Kenya ("the Bombing").  The bombing was carried out by defendant Usama Bin Ladin ("Bin Ladin"), by, through and in conspiracy with a worldwide terrorist organization known as *al Qaeda*.  Bin Ladin and *al Qaeda* received logistical, financial and other support from Sudan and Afghanistan, during and subsequent to public declarations by Bin Ladin and *al Qaeda* of their intent to assault American facilities.  Over two hundred (200) Kenyans were killed by the Bombing and over four thousand Kenyans were injured as a result of the Bombing.

Actions and inactions by the United States of America, principally through the Department of State, created circumstances which permitted the Bombing and subsequently caused and exacerbated the loss and injury sustained by Kenyan victims.

The class of plaintiffs is or will be comprised of (1) all Kenyans who were killed or injured in the Bombing, including surviving family members and estates or representatives, and (2) all businesses which were damaged or which sustained loss or injury.  That class -- or those sub-classes -- consists of over 4000 Kenyans.  Joinder is impracticable.

Virtually all questions of law and of fact will be common to all class members.  The conduct or status of each individual class member will be irrelevant to the claims themselves.  With the exception of the calculation of damages, all of the material legal and factual issues in this action will be directed at the actions and inactions of the defendants, and each component of those actions and inactions will be equally pertinent to each class member.  Plaintiffs can envision no affirmative defense the applicability of which will vary among class members.

The claims of the plaintiffs are typical of the claims of the class. Named plaintiffs include (1) the families of Kenyans killed in the Bombing; (2) Kenyans who were injured in the Bombing; and (3) owners and employees of businesses damaged by the Bombing.

The named plaintiffs will fairly and adequately protect the interests of the class. The retainer agreement into which the named plaintiffs have entered ensures that decision-making will accord with elemental principles of fairness. Moreover, the team assembled to represent the plaintiffs and the class members assures the class members of fair, ethical and competent representation. The representation team consists of an American law firm, a Kenyan law firm, and a litigation support corporation with offices in the United States and in Nairobi, Kenya.

In contrast, the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for defendant United States and defendants Sudan and Afghanistan. At the same time, because of the multiplicity of prospective international and American forums, determinations adverse to one or more prospective class members would, as a practical matter, adversely dispose of the interests of other prospective class members.

Further, the complaint demands injunctive and declaratory relief applicable to the class as a whole.

As noted above, common questions of law and fact predominate over any questions affecting only individual members. Members of the class have no practical interest in individually controlling the prosecution of separate actions. Costs and expenses alone are prohibitive. No such litigation has

yet commenced.  Though the issues to be litigated are intricate and complex, and are most effectively resolved in a single forum, the management of the class will entail no significant difficulties.  Though large, the class size is not unmanageable, and the representation team here and in Kenya is fully prepared to fulfill its obligations to the class and to the court.

Thus, a class action is superior to other available methods for the fair and efficient adjudication of the controversy, and is, in fact, the only judicial mechanism by which the citizens of Kenya can pursue their claims.

## PARTIES

1.      ODILLIA MUTAKA MWANI is an adult citizen of Kenya.

JOSEPH MWANGI NGANGA is an adult citizen of Kenya.

SARAH KUYA ETENYI is an adult citizen of Kenya.

JOHN KICHUMA IMBAHALE is an adult citizen of Kenya.

HELLEN A. OJWANG is an adult citizen of Kenya.

HUDSON NGUSALE ANYANGU is an adult citizen of Kenya.

ROSEMARY NJERI is an adult citizen of Kenya.

JOYCE NJOKI MIRINGU is an adult citizen of Kenya.

JANE NYAMBURA MIRINGU is an adult citizen of Kenya.

RACHEL WANJERI KINGARA is an adult citizen of Kenya.

JAMES KIMIRI KAMAU is an adult citizen of Kenya.

EVANS MUKUNGA MUITA is an adult citizen of Kenya.

WILFRED NGUNJIRI NDERITU is an adult citizen of Kenya.

EMMANUEL KIOKO MUEMA is an adult citizen of Kenya.

LILIAN NKATHA GUANTAI is an adult citizen of Kenya.

STEPHEN MUITA KIBIKU is an adult citizen of Kenya.

FRANCIS NDUNGU NJENGA is an adult citizen of Kenya.

MARGREAT WAMBUI MIRINGU is an adult citizen of Kenya.

MARGARET MUSOKE WAGABI is an adult citizen of Kenya.

LUCY KIMITI is an adult citizen of Kenya.

LUCY WANGARI GACHAGWI is an adult citizen of Kenya.

ANNE N. KINGARA is an adult citizen of Kenya.

LUCY WAITHERA MWANGI is an adult citizen of Kenya.

DAMAU MBUVU MARANGIA is an adult citizen of Kenya.

BERNARD GITUTO MAIWA is an adult citizen of Kenya.

DANIEL KIMAWI MUITA is an adult citizen of Kenya.

PITALIS JUMA OSANO is an adult citizen of Kenya.

CHARLES MAINA BANGA is an adult citizen of Kenya.

EDWARD WAIHENYA NUTHU is an adult citizen of Kenya.

CASTRO OTIENDE is an adult citizen of Kenya.

PHILIP MURIITWI MWAI is an adult citizen of Kenya.

HEDWIG YOHANNINE KIBUKOSYA is an adult citizen of Kenya.

PRISCA A. KHATAMBI KIBUKOSYA is an adult citizen of Kenya.

FIDELIS MASYULA NDAMBUKI is an adult citizen of Kenya.

DIPAK L. SHAH is an adult citizen of Kenya.

MUKUL J. PATEL is an adult citizen of Kenya.

EROS CHEMIST LTD is a corporation which, at all times pertinent hereto,

did, engaged in and transacted business in Nairobi, Kenya.

DIPAK SHAH and SUNIL SHAH, T/A CLOUD NINE is a corporation which, at all times pertinent hereto, did, engaged in and transacted business in Nairobi, Kenya.

GATOME & ASSOCIATES is a corporation which, at all times pertinent hereto, did, engaged in and transacted business in Nairobi, Kenya.

MUITA & COMPANY, LTD.,is a corporation which, at all times pertinent hereto, did, engaged in and transacted business in Nairobi, Kenya.

2.      Defendant United States of America ("the United States") undertakes actions and declines or fails to undertake actions, by and through its agencies and instrumentalities.  To the extent pertinent to the allegations of this Complaint, the responsibilities of the agencies of the United States are as follows:

(a) The Department of State is the lead agency in handling terrorist incidents abroad involving United States interest.  It participates in appropriate analysis and dissemination of intelligence; manages security programs for non-military U.S. Government facilities abroad; coordinates emergency planning and crisis management for United Sates missions abroad; and generally develops and implements policies to deal with international terrorism, including international conventions and bilateral agreements;

(b) The Central Intelligence Agency ('CIA") represents the other agencies in the Intelligence Community when they are not direct participants: manages systems for collection, analysis and dissemination of intelligence relative to terrorist threats; maintains intelligence liaison with other governments; participates in incident management support teams as appropriate; and performs other functions; and

(c) The Department of Defense performs substantial services in support of emergency planning for posts abroad and plays a lead role in executing such plans: provides expertise regarding terrorist weapons of all types, including nuclear and CAR; participates in collection, analysis and dissemination of intelligence regarding

terrorist plans and activities; provides special units that might be
called upon to intervene in terrorist episodes abroad; and generally
manages security programs for military facilities abroad.

The Department of Justice ("Justice Department"), the Federal Bureau of

Investigation ('FBI"), the Federal Aviation Administration ("FAA"), the Department of Treasury

("Treasury Department"), the Department of Energy, the National Security Council and the Office of

the Vice President have, or in the past have had, responsibilities related directly or indirectly to anti-

terrorism actions or inactions of the United States.

3.      Defendant Usama Bin Ladin, also known as Usama bin Mohammed bin Awad Bin

Ladin, and also known as Usama Bin Laden, was born in Saudi Arabia.  The government of Saudi

Arabia revoked his citizenship in 1994.  Bin Ladin resided in Sudan from 1991 through 1996.  He

relocated to the Taliban's capital of Qandahar, in Afghanistan, and established there a new base of

operations for co-defendant *al Qaida*.

4.      Defendant *al Qaida* -- the Base -- was founded by co-defendant Bin Ladin in

Afghanistan in or after December 1979.  It is also known as "Al Qaeda."  Bin Ladin controls and

directs its activities.  *Al Qaida* is a terrorist group as defined in 22 USC § 2652 f(d), and its base of

operations is in Afghanistan.

*al - Qaida* has assisted in numerous terrorist operations around the world, including a

1995 assassination plot against Egyptian President Mubarak.  It provided a safehouse for World Trade

Center bomber Ramzi Yousef, and attacked United States soldiers in Yemen and Somalia during

Operation Restore Hope.

14

5.    Sudan is a foreign state which, in 1997, was one of seven governments designated by the United States Secretary of State as state sponsors of terrorism.  Sudan has served as a financial base for bin Ladin and *al Qaida*.

6.    Afghanistan is a foreign state which has served as an operational base for terrorist operations for Bin Ladin and for *al Qaida*.

## FACTS COMMON TO ALL COUNTS

7.    Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs one through 6 of the complaint.

### The Historical Scope Of The Threat of Terrorism To United States Facilities Abroad

8.    Commencing approximately in 1970, politically-inspired actions directed against American officials and premises abroad involved the use of tactics and weapons which were dramatically more violent and damaging than prior incidents.  The assaults became bloodier and the casualty toll became higher.

9.    By 1980, rogue states waged undeclared war by sponsoring and supporting terrorism. The United States and other nations experienced the expansion of the threat from physical violence against diplomats to the beginnings of calculated terror campaigns, and psychological conflict waged by nation or sub-group against nation, with an ever-broadening range of targets, weapons and tactics.

10.    A series of damaging suicide vehicle bombings against United States installations in the Middle East culminated with the second attack against the Embassy of Beirut, Lebanon on

15

September 20, 1984.  Failure to use a truck to block the Beirut embassy driveway was a significant contributing factor to that attack.

      11.     The Department of State's response to the growth of terrorism and violence directed at United States installations abroad was haphazard and ineffective.

      12.     In 1985, the Secretary of State convened the Advisory Panel on Overseas Security ("the Advisory Panel") to examine the issues that related to diplomatic security in the United States and abroad.

      13.     In June 1985, the Advisory Panel, chaired by Admiral Bobby R. Inman, USN (Ret.) issued a comprehensive and detailed report ("The Inman Report").

      14.     The Inman Report contained a series of well-documented findings, including the following:

         a.     The success of the Beirut attacks ensured that tactics similar to the use of vehicle bomb assaults on United States facilities abroad would be repeated.

         b.     The threat of terrorist attacks on United States Embassies was unlikely to abate in the near or in the foreseeable future.  United States Embassies would continue to be primary targets for acts of terrorism.

         c.     Location of Embassies was the paramount consideration in the avoidance of terrorist penetration and assault of every kind.  Being on the busiest or most fashionable street or corner was a liability.  Many United States Embassies were located directly along busy public roads.

         d.     The use of explosive - laden vehicles had proven to be a particularly devastating weapon.

16

e.      Perimeter defenses against incursions of a suicide vehicle are effective only when there is sufficient space to prevent the vehicle from gaining close access to an Embassy building.

f.      The United States had sustained material failures in its overseas security program because of, inter alia: (i) inordinate delays in effecting physical security improvements; (ii) failure to provide timely notice of threat information; and (iii) seriously insufficient training.

g.      The Department of State had failed to adopt uniform security standards, and such failures included perimeter security standards.

h.      126 of the Department of States' 262 overseas posts required replacement in order to meet prudent security standards.

i.      The collection of intelligence from a wide variety of sources is critical to an effective defense against terrorist attack.  It would be "... foolhardy...," however, to make security decisions on the basis of an expectation of advance warning of peril.  It is vital that security personnel understand that, in some situations, there will be no advance warning of a specific threat.

j.      The procedures to pass terrorist threat alerts to overseas posts required modifications.

k.      The Department of State failed to train either its personnel, or local or related security personnel properly.

l.      Inadequate training contributed to operational deficiencies in security.

m.      The training of regional security officers was inadequate.

n.      The Department of State failed to train Company Commanders and Post Security Officers.

o.      Training is critical to security operations.

15.     The Inman Report contained a series of detailed recommendations, including the following:

17

a.      Those responsible for the various aspects of the security program, whether in the United States or abroad should be held to a standard of accountability.

b.      A substantial building program should be undertaken to correct the security deficiencies of United States overseas facilities.

c.      The United States should revise physical security standards to include state-of-the-art physical security concepts.  The standards should provide minimum requirements for all posts and enhanced requirements as threat conditions increase.

d.      The United States should improve its intelligence collection and dissemination and improve its cooperation with allies on the collection and the dissemination of terrorist threat information.

e.      Performance standards for local guard services should be established, manuals prepared, and training for the guards and program managers should be upgraded substantially.  The Department of State should improve its training of Foreign Service Personnel to deal with terrorism.

f.      The training program should be much more ambitious and consistent, and should include field exercises and simulations.

16.     Few of the recommendations in the Inman Report were followed.

17.     Terrorist incidents continued.  From 1985 to 1995 no fewer than 322 international terrorist incidents took place.  From 1987 to 1997, there were 234 attacks on United States' diplomatic installations.

The Threat Posed By Bin Ladin and *al Qaida*
To United States Facilities Abroad

18.     Bin Ladin is and has been known by the United States to be one of the most significant sponsors of terrorist groups.  Bin Ladin financed, recruited, transported and

trained Arab nationals who volunteered to fight in Afghanistan.  During the war in Afghanistan, Bin

Ladin founded *al Qaida* to serve as an operational hub for like-minded extremists.


19.     The main training complex for Bin Ladin and "al-Qaida" in Afghanistan supports as

many as 600 terrorists.

Sudan has served as an additional base of operations for Bin Ladin and "al - Qaida."

After arriving in Sudan in 1991, Bin Ladin helped found the Al - Shamal Islamic Bank with an

investment of fifty million dollars ($50,000,000.00).  Bin Ladin's Wadi Al - Aqiq import-export firm

and Taba Investment Company secured a near monopoly over Sudan's major agricultural exports of

gum, corn, sunflower and sesame products, in conjunction with Sudanese government officials.

After his expulsion from Sudan in 1996, Bin Ladin maintained virtually all of his

business contacts with the Sudanese military and civilian establishments.


20.     In August 1996, Bin Ladin and *al Qaida* issued a statement outlining his

organization's goals: drive US forces from the Arabian Peninsula, overthrow the Government of

Saudi Arabia, "liberate" Muslin holy sites in "Palestine," and support Islamic revolutionary groups

around the world.  To these ends, his organization sent trainers throughout Afghanistan as well as to

Tajikistan, Bosnia, Chechnya, Somalia, Sudan and Yemen and trained fighters from numerous other

countries including the Philippines, Egypt, Libya, and Eritrea.   Bin Ladin also has close associations

with the leaders of several Islamic terrorist groups and probably has aided in creating new groups

since the mid-1980s.  He has trained their troops, provided safehaven and financial support, and

probably helps them with other organizational matters.

Since August 1996, Bin Ladin has been increasingly vocal in expressing his approval

of and intent to use terrorism.  He claimed responsibility for attempting to bomb US soldiers in

Yemen in late 1992 and for attacks on them in Somalia in 1993, and his organization aided the Egyptian *al-Gama'at al-Islamiyya* in its assassination attempt on Egyptian President Mubarak in Ethiopia in 1995.  In November 1996 he called the 1995 and 1996 bombings against US military personnel in Saudi Arabia "praiseworthy acts of terrorism."  At the same time, he called for further attacks against US military personnel, saying: "If someone can kill an American soldier, it is better than wasting time on other matters."

On August 23, 1996, Bin Ladin and *al Qaeda* issued a pronouncement or "fatwah" that efforts should be pooled worldwide to kill Americans.  Specifically, defendants Bin Ladin and *al Qaeda* issued a Declaration of Jihad entitled "Message from Usamah Bin - Mohammad Bin - Ladin to his Muslim Brothers in the Arabian Peninsula: Declaration of Jihad Against the Americans Occupying the Land of the Two Holy Mosques; Expel the Heretics from the Arabian Peninsula."

21.     In or about February 1998, Bin Ladin and *al Qaeda* and other terrorist organizations acting under the banner of the "World Islamic Front" issued a declaration that Muslims should kill Americans, including civilians, anywhere in the world where they could be found.

22.     The statements set forth in paragraphs 20 and 21 of the Complaint were issued from the Hindu Kush mountains in Afghanistan.

23.     The statements set forth in paragraphs 20 and 21 of the Complaint were publicly made.

20

24.    The statements set forth in paragraphs 20 and 21 of the complaint were published and communicated to the United States, Sudan and Afghanistan.

25.    The statements described a mission, purpose and policy of Bin Ladin and *al Qaeda* which had been in place and which had been pursued since 1992.

26.    The governments of the United States, Sudan and Afghanistan were and should have been familiar with the missions, purposes and policies of Bin Ladin and *al Qaeda* since 1992.

27.    By the mid - 1990's the CIA was tracking the movements and finances of both Bin Ladin and "al - Qaeda" in the hope of preventing the anticipated attacks.  The CIA repeatedly told the Department of State and officials in the Nairobi Embassy that there was an active terrorist cell in Kenya connected to Bin Ladin.  In 1996, the CIA, FBI and other agencies set up a "bin Laden station" at the CIA's Counter-Terrorist Center.

28.    In 1996 the Honorable Prudence Bushnell arrived in Nairobi and assumed her post as United States Ambassador to Kenya. Upon her review of information made available to her by the CIA and the Department of State, Ambassador Bushnell raised concerns with the Department of State about security at the Nairobi Embassy.

29.    In 1997, the CIA investigated no fewer than three terrorist threats in Nairobi.  An informant in one of the investigations advised the CIA that a terrorist group was plotting terrorist attacks against Americans, and was plotting to blow up the American Embassy in Nairobi.

30.    In November 1997, one Mustafa Mahmoud Said Ahmed, an Egyptian citizen, entered an East African Embassy and told CIA officers that he knew of a group that was planning to detonate a bomb - laden truck inside the underground parking garage of the Nairobi Embassy.

31.    In 1997, the United Sates had growing indications that the Nairobi Embassy was a target of terrorist plots, and that terrorists hostile to American interests were active in Kenya.

32.    In 1997 or 1998, General Anthony C. Zinni, Commander of the United States Central Command, after a personal inspection of the Nairobi Embassy, advised the Department of State by cable that the Nairobi Embassy was a tempting and easy target for terrorists.  General Zinni offered to send security specialists to the Nairobi Embassy, but the Department of State rejected his offer.

33.    On December 15, 1997, Ambassador Bushnell advised the Department of State that the Nairobi Embassy was "extremely vulnerable to a terrorist attack."

34.    On December 24, 1997, Ambassador Bushnell advised the Department of State that the Embassy's location was a "... cause for serious concern...," and she requested a review of the Embassy's security status.

35.    In January, the Department of State acknowledged that it understood Ambassador Bushnell's concerns.

36.   In the Spring of 1998, Ambassador Bushnell sent a personal letter to the Secretary of State.  The letter pleaded for additional security, and insisted that the Department of State's inaction was "endangering the lives of embassy personnel."

37.   The Department of State knew and should have known that the presence of a "significant bin Ladin network in Kenya" would be so serious a threat the Nairobi Embassy would be evacuated.

38.   Ambassador Bushnell's requests were ignored or rejected.

39.   The recommendations of the Inman Report were ignored and not implemented.

40.   In or about March 1998, the Department of State updated its security assessment of the Nairobi Embassy, recommending new security measures including the installation of a new fence around the front parking lot, upgrading perimeter surveillance, and construction of a fence in front of the Embassy's front entrance.

41.   In or about March 1998, funds for a special roll - down door for the underground parking garage were approved.  In May 1998, funds for a similar door for the front entrance of the building and for a new perimeter fence were approved.

42.   The Department of State failed and refused to take any step other than installation of the garage door.

43.     The Department of State allocated three million dollars ($3,000,000.00) to improvements at the Nairobi Embassy, but demanded that virtually all of those monies be expended in cosmetic interior remodeling unrelated to security improvements.

44.     The Department of State knew and understood that local law enforcement officials could not and did not provide security for the Nairobi Embassy.

45.     The United States, by and through the Department of State, failed and refused to implement decisions made to improve security, including but not limited to the failure to make physical improvements to the Nairobi Embassy and the failure to improve the training.  Such failures were apparent to Bin Ladin and to *al Qaeda* and increased their interest in the Nairobi Embassy as a target.

46.     The United States, through the Department of State ignored a series of warnings identifying the seriousness of the threat to the Nairobi Embassy and to the surrounding area.

47.     The United States, through the Department of State failed and refused to notify employees, agents or officials responsible for operational security of the seriousness of the threat to the Nairobi Embassy and to the surrounding area.

48.     In 1997, the security systems and procedures at the Nairobi Embassy made no provision for (a) large vehicular bomb attacks; (b) transnational terrorism; or (c) the dire consequences that would result from (a) or (b).

49.     In 1997, the Department of State's Emergency Action Plan made no provision for a bomb - laden vehicle attack which was and which should have been anticipated.

50.     In 1997, the United States' failure to implement the Inman Report constituted a failure to take the steps necessary to prevent the Bombing.

51.     In 1997, the Department of State did not fully apply its own security standards. Administratively - implemented exceptions to those standards masked a dangerous level of exposure to the use of bomb - laden vehicle attacks.

52.     In 1997, personnel inside the Nairobi Embassy, and embassy guards, were not trained to react properly to such attacks.

53.     In 1997, perimeter guards at the Nairobi Embassy had not been provided with appropriate equipment, and the Embassy was not equipped with appropriate alarm systems.

54.     In 1997, the Department of State had failed to obtain or attempt to obtain more control over the rear parking lot.

55.     The United States, through the Department of State, knew and should have known that Kenyan citizens are, on a daily basis, in the Nairobi Embassy and in the area surrounding the Nairobi Embassy.

25

56.    The United States, through the Department of State, knew and should have known that a terrorist attack on the Nairobi Embassy would endanger the lives, health and safety of Kenyan citizens in the Nairobi Embassy and in the area surrounding the Nairobi Embassy.

57.    At no time did the United States advise, inform or disclose to plaintiffs the existence of the threat of a terrorist attack on the Nairobi Embassy.

58.    At no time did the United States advise, inform or disclose to plaintiffs the seriousness of the threat of a terrorist attack on the Nairobi Embassy.

59.    At no time did the United States advise, inform or disclose to plaintiffs its understanding that terrorist tactics included the likely use of a bomb - laden vehicle with sufficient explosive power to inflict serious damage to the areas surrounding the Nairobi Embassy.

60.    At no time did the United States advise, inform or disclose to plaintiffs that the United States refused to undertake recommended security measures.

61.    At no time did the United States advise plaintiffs that the Nairobi Embassy was an easy and likely target for a terrorist attack.

62.    The United States withheld from plaintiffs information which would have caused plaintiffs to take actions to protect themselves from the effects of a terrorist attack on the Nairobi Embassy.

The Vehicle Bomb Attack On The Nairobi Embassy

63.     Defendants Bin Ladin and *al Qaeda*, in 1998, conspired, and planned to commit a vehicular bomb attack on the United States Embassy Compound in Nairobi, Kenya.  On August 7, 1998, by and through their agents, Bin Ladin and *al Qaeda* carried out their planned vehicular bomb attack.

64.     As a result, over 200 Kenyans were killed and over 4000 Kenyans were injured. Plaintiffs and the prospective class members sustained injury and damage as a result of that attack.

65.     Mohammad Sadeek Odeh ("Odeh") was and is an agent and operative for Bin Ladin and *al Qaeda* in all matters related to the bombing attack.

66.     On or about August 1, 1998, Odeh was advised that all *al Qaeda* members had to leave Kenya by Thursday, August 6, 1998, the day before the embassy bombing.  On or about August 2, 1998, Odeh traveled from Mombassa, Kenya to Nairobi for a meeting with other members of *al Qaeda,* including an explosives expert and the leader of *al Qaeda*'s Kenyan cell.  Odeh, who was using a false passport, stayed with the other *al Qaeda* members at the Hilltop Hotel.  On or about August 5, 1998, Odeh prepared to travel to meet with Bin Laden.

67.     Prior to leaving Kenya, Odeh was told by other *al Qaeda* members that members of the terrorist organization located in Afghanistan were in the process of relocating to avoid retaliation from the United States.

68.    The Embassy building was constructed under the supervision of the Foreign Buildings Operations in the early 1980's. It was located at the intersection of two of the busiest streets in Nairobi, near two mass transit centers. It lacked sufficient setback from the streets and from adjacent buildings. The Embassy was surrounded by a 2.6 meter high steel picket vertical bar fence. An outer perimeter was established beyond the fence with a line of steel bollards, ranging 5 meters to 18 meters in distance from the outer walls of the chancery. The window frames were not anchored into the core structure.

69.    On August 7, 1998, at approximately 10:30 a.m. local time, agents for Bin Ladin and *al Qaeda* driving in a truck detonated a large bomb in the rear parking area, near the ramp to the basement garage, of the American Embassy in Nairobi. A total of 213 people were killed, of whom 44 were American Embassy employees (12 Americans and 32 Foreign Service National employees). Ten Americans and eleven FSNs were seriously injured. Over 200 Kenyan civilians were killed and over 4000 were injured by the blast in the vicinity of the embassy.

70.    Damage to the embassy was massive, especially internally. Although there was little structural damage to the five story reinforced concrete building, the explosion reduced much of the interior to rubble -- destroying windows, window frames, internal office partitions and other fixtures on the rear side of the building. The secondary fragmentation from flying glass, internal concrete block walls, furniture, and fixtures caused most of the embassy casualties.

71.    The majority of the Kenyan casualties resulted from the collapse of the adjacent Ufundi Building, flying glass from the nearby Co-op Bank Building and other buildings located within a two to three block radius.

72.    Other casualties were pedestrians, riders or motorists in the crowded streets next to the embassy.

73.    The local-hire contract guards at the rear of the Embassy saw the truck pull into the uncontrolled exit lane of the rear parking lot just as they closed the fence gate and the drop bar after a mail van had exited the embassy's garage.  The drop bar paralleled a series of steel bollards which encircled the embassy outside the steel grill fence that surrounds the chancery.  The truck proceeded to the embassy's rear access control area but was blocked by an automobile coming out of the Co-op Bank's underground garage.  The blocking auto was forced to back up,  allowing the truck to come up to the embassy drop bar.

74.    When one of the two terrorist occupants of the truck demanded that the guards open the gates, they refused.  One of the terrorists then began shooting at the chancery and the other tossed a flash grenade at one of the guards.  The guards, who were unarmed, ran for cover and tried to raise the Marine Security Guard at the command post (Post #1) on a hand held radio and by a phone in the nearby guard booth.  They were unsuccessful; the embassy's single radio frequency was occupied with other traffic; the telephone was busy.  In the several seconds time lapse between the gunshots/grenade explosion and the detonation of the truck bomb, many embassy employees went to the windows to observe what was happening.  Those who did were either killed or seriously injured.

75.    Neither the post's Emergency Action Plan, nor any relevant drills had prepared employees for actions to take in the event of a vehicular bomb or firearms being discharged in the immediate vicinity of the embassy.  Had the employees been trained to lie on the floor and seek cover when they heard the grenade blast, some lives could have been saved.

76.     The embassy had only one radio frequency and no alert alarms for use by perimeter guards.  There was a time lapse between the time the guards saw the truck enter the rear parking lot and the detonation of the bomb.

77.     Following the Bombing the United States, by and through its agencies, took and maintained complete and exclusive control over the Embassy Compound, and over the surrounding areas.  Kenyans were denied access, and their movements and actions were restricted by the United States.

78.     Following the Bombing the United States, by and through its agencies, directed and controlled rescue, relief and medical operations.

79.     The actions set forth in paragraphs 77 and 78 of the Complaint interfered with the rights and privileges of plaintiffs, interfered with their ability to secure their personal safety or health, or to mitigate their injuries, and led to and caused further injury and loss.

80.     The actions set forth in paragraphs 78 and 79 of the Complaint constituted treatment of Kenyans which was adversely disparate with the treatment of United States citizens, and property.

## CAUSE OF ACTION AGAINST DEFENDANT UNITED STATES

81.     Plaintiffs and the prospective class plaintiffs are entitled to redress and relief against defendant United States as follows:

30

<u>COUNT ONE</u>
(Negligence/Breach of Duty)

82.     Plaintiffs adopt and incorporate by reference as if specifically set forth herein the averments of paragraphs one through 81 of the Complaint.

83.     The United States Embassy in Nairobi was, in 1996 and in 1997 and in 1998 an inherently-dangerous facility.

84.     The United States, by and through its agencies and instrumentalities, knew, and should have known, that in 1996 and in 1997 and in 1998 the Nairobi Embassy was an inherently-dangerous facility.

85.     The danger which threatened the Nairobi Embassy necessarily and unavoidably threatened all Kenyans who visited the Embassy, or who worked or were otherwise present in or traveling through the area surrounding the Embassy.

86.     The United States owed a duty to plaintiffs and to prospective class members to exercise due, reasonable and prudent care with respect to security at the Nairobi Embassy. The United States, by and through its agencies and instrumentalities, failed to exercise due, ordinary and prudent care.

87.     The actions and inactions of the United States failed to meet its own standards, and failed to meet the standard of care applicable to the provision of security in and around the Nairobi Embassy.

31

88.     The United States, by and through its agents and instrumentalities, failed to properly train its personnel, and failed to properly train local guards, and failed to provide the minimum type and quality of equipment necessary to provide security.

89.     The United States, by and through its agents and instrumentalities, failed to take reasonable, prudent and proper steps to improve the physical security of the Nairobi Embassy.

90.     The United States, publicly and privately, explicitly and by implication, held itself out to the people of Kenya as a nation which undertook any and all conduct necessary to preserve and promote its security and the security of its facilities.  Plaintiffs believed that the United States had undertaken all conduct necessary to preserve and promote the security of the Nairobi Embassy.

91.     The United States negligently or wilfully failed and refused to disclose to plaintiffs information which would have enabled plaintiffs to avoid injury and loss from the Bombing .

92.     The United States, by and through its agents and instrumentalities, undertook complete responsibility for all conduct intended to respond to and mitigate or alleviate the loss and injury caused by the Bombing.  In the course of that conduct, the United States negligently failed to timely secure the rescue and the medical treatment of plaintiffs.

93.     As a direct, proximate, foreseeable and consequential result of the actions and inactions of the United States, as set forth herein, plaintiffs and prospective class members suffered loss, injury and damage, including but not limited to wrongful death, personal injury, pain and suffering, lost income and emotional distress.

94.     Resort to administrative remedies pursuant to 28 USC §§ 2401 and 2675 would be fruitless.  The sole administrative remedy ostensibly available to prospective class members who are not named plaintiffs is so costly and impractical that it is illusory.

COUNT TWO
(Declaratory Judgment)

95.     Plaintiffs adopt and incorporate by reference as if specifically set forth herein the averments of paragraphs one through 94 of the Complaint.

96.     Section 14.2(a) of 28 CFR Part 14, promulgated by the Department of Justice, purports to mandate the procedures necessary to exhaust administrative remedies as a precondition to initiation of an action under 28 USC §§ 2671 *et seq*.  Those regulations are designed to and as a practical matter of fact do preclude the initiation of a tort-based class action against the United States, and is in derogation of F.R.C.P. 23.

97.     The regulation is inconsistent with and improperly exceeds the scope of the statute it purports to implement.

98.     The regulation denies to prospective class plaintiffs the ability to pursue claims against the United States, and thus constitutes a deprivation of such plaintiffs' constitutional right and entitlement to due process of law.

99.     The regulation is void.

33

100.    The administrative procedure which precludes the administrative filing by the equivalent of class action representative is repugnant to F.R.C.P. 23 and to the due process of law, and is void.

101.    Plaintiffs are entitled to a decree and order which requires the Department of State, and any other appropriate Federal agency, to accept as an administrative claim a filing on General Form 95 or its equivalent from or through plaintiffs and their counsel in this action, whether or not signed by each prospective class member, and whether or not the individual damages of each prospective class member has itemized his, her or its damages, loss or injury.

## COUNT THREE
(Violations of International and Kenyan Law)

102.    Plaintiffs adopt and incorporate herein by reference as it specifically set forth herein the averments of paragraphs one through 101 of the Complaint.

103.    The actions and inactions of the United States, by and through its agency and instrumentalities, violated elemental principles of international law, and interfered with the Protection of Fundamental Rights and Freedoms of the Individual, as set forth in Chapter V of the Constitution of Kenya, at sections 70, 72, 74, 75, 76, 80, 81, and 82(2).

## COUNT IV
(Permanent Injunction and Constructive Trust)

104.    Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs one through 103 of the Complaint.

34

105.    The United States, by and through the Department of Justice, has undertaken to identify, locate, attack and seize the assets and funds, wherever located, of Bin Ladin and *al Qaeda*.

106.    Those assets and funds, by principles of equity, and conscience, have been converted to the use and benefit of the plaintiffs and the prospective class members.

107.    Those assets and funds are and should be held by the United Sates in trust for the use, benefit and enjoyment of the plaintiffs and the prospective class members.

**WHEREFORE**, by all these presents, counsel for plaintiffs prays for the following relief as to defendant United States:

1.    Certification of this case as a class action pursuant to F.R.C.P. 23;

2.    Certification of plaintiffs as representatives of the class pursuant to F.R.C.P. 23;

3.    An order designating counsel of record for plaintiffs as counsel for the class and all sub-classes;

4.    Judgment in favor of plaintiffs and the class and against the United States in the amount of one billion dollars ($1,000,000,000.00);

5.    A decree and order declaring that plaintiffs and their counsel are the legal representatives of the class for purposes of the filing of an administrative claim, and

that such filing shall be considered by the appropriate Federal agency notwithstanding the absence of signatures by each class member and notwithstanding the absence of itemized damages applicable to each class member;

6.    A decree and order directing the United States to directly pay the medical bills incurred by plaintiffs and class members as a result of the Bombing, and to provide medical treatment for all injuries incurred as a result of the Bombing;

7.    A decree and order imposing a constructive trust on any funds or assets of Bin Ladin or *al Qaeda* collected or seized by the United States, and an injunction enjoining the United States from disbursing or distributing such assets or funds without further order of this Court;

8.    An award of costs and fees; and

9.    Such other and further relief as the Court may deem just and proper.

## CAUSES OF ACTION AGAINST BIN LADIN AND *AL QAEDA*

108.    Plaintiffs and the prospective class plaintiffs are entitled to redress and relief against defendants Bin Ladin and *al Qaeda*.

36

## COUNT FIVE
(Wrongful Death, Assault, Battery)

109.    Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs one through 108 of the Complaint.

110.    Bin Ladin is the alter ego of *al Qaeda*.

111.    Bin Ladin has exclusive control over all of the actions of *al Qaeda*, and directed all of the actions of *al Qaeda* related to the Bombing.

112.    Bin Ladin and *al Qaeda* wilfully, maliciously and with a depraved indifference to life, caused to be placed at the Nairobi Embassy and detonated, explosives sufficient to cause the loss, injury and damage set forth in this Complaint.

113.    As a direct and intended and foreseeable consequence of the actions of Bin Ladin, and *al Qaeda*, over 200 Kenyans were killed.

114.    As a direct and intended and foreseeable consequence on the actions of Bn Ladin, and *al Qaeda*, over 4000 Kenyans sustained personal injury, loss, pain and suffering, lost income and emotional distress.

115.    As a direct and intended and foreseeable consequence of the actions of Bin Ladin and *al Qaeda* dozens of businesses were destroyed, and damaged.

## COUNT SIX
### (Violations of International and Kenyan Law)

116.    Plaintiffs adopt and incorporate herein by reference as it specifically set forth herein the averments of paragraphs one through 115 of the Complaint.

117.    The actions and inactions of the Bin Ladin and *al Qaeda*, violated elemental principles of international law, and interfered with the Protection of Fundamental Rights and Freedoms of the Individual, as set forth in Chapter V of the Constitution of Kenya, at sections 70, 72, 74, 75, 76, 80, 81, and 82(2).

**WHEREFORE**, by all these presents, counsel for plaintiffs prays for the following relief as to defendants Bin Ladin and *al Qaeda:*

1.    Certification of this case as a class action pursuant to F.R.C.P. 23;

2.    Certification of plaintiffs as representatives of the class pursuant to F.R.C.P. 23;

3.    An order designating counsel of record for plaintiffs as counsel for the class and all sub-classes;

4.    Judgment in favor of plaintiffs and the class and against Bin Ladin and *al Qaeda*, jointly and severally, in the amount of one billion dollars ($1,000,000,000.00) as compensatory damages;

5.    An award of punitive damages in an amount to be proven.

6.   A decree and order imposing a constructive trust on any funds or assets of bin Ladin or *al Qaeda*;

7.   An award of costs and fees; and

8.   Such other and further relief as the Court may deem just and proper.

### CAUSES OF ACTION AGAINST SUDAN AND AFGHANISTAN

118.   Plaintiffs and the prospective class plaintiffs are entitled to redress and relief against defendants Sudan and Afghanistan for claims arising out of violations of international law.  Sudan and Afghanistan have waived sovereign immunity, or, in the alternative, sovereign immunity is inapplicable to the claims of this case, and such claims arise out of commercial activies among Sudan and Bin Laden and *al Qaeda* and among Afghanistan and Bin Ladin and *al Qaeda*.

### COUNT SEVEN
(Wrongful Death, Assault, Battery)

119.   Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs one through 118 of the Complaint.

120.   Sudan engaged in extensive commercial activities with Bin Ladin and *al Qaeda*. Sudan provided continuous and substantial support to Bin Ladin and *al Qaeda* at a time when Sudan new and should have known that such support would result in an attack similar to the Bombing.

39

121.    Alfghanistan engaged in extensive commercial activities with Bin Ladin and *al Qaeda*. Afghanistan provided continuous and substantial support to Bin Ladin and *al Qaeda* at a time when Afghanistan new and should have known that such support would result in an attack similar to the Bombing.

122.    Bin Ladin and *al Qaeda* wilfully, maliciously and with a depraved indifference to life, and in part as a result of the support provided by Sudan and Afghanistan, caused to be placed at the Nairobi Embassy and detonated, explosives sufficient to cause the loss, injury and damage set forth in this Complaint.

123.    As a direct and intended and foreseeable consequence of the actions of bin Ladin, and *al Qaeda*, over 200 Kenyans were killed.

124.    As a direct and intended and foreseeable consequence on the actions of bin Ladin, and *al Qaeda*, over 4000 Kenyans sustained personal injury, loss, pain and suffering, lost income and emotional distress.

125.    As a direct and intended and foreseeable consequence of the actions of Bin Ladin and *al Qaeda* dozens of businesses were destroyed, and damaged.

## COUNT EIGHT
(Violations of International and Kenyan Law)

126.    Plaintiffs adopt and incorporate herein by reference as it specifically set forth herein the averments of paragraphs one through 125 of the Complaint.

40

127.     The actions and inactions of the Sudan and Afghanistan, violated elemental principles of international law, and interfered with the Protection of Fundamental Rights and Freedoms of the Individual, as set forth in Chapter V of the Constitution of Kenya, at sections 70, 72, 74, 75, 76, 80, 81, and 82(2).

**WHEREFORE**, by all these presents, counsel for plaintiffs prays for the following relief as to Sudan and Afghanista:

1.     Certification of this case as a class action pursuant to F.R.C.P. 23;

2.     Certification of plaintiffs as representatives of the class pursuant to F.R.C.P. 23;

3.     An order designating counsel of record for plaintiffs as counsel for the class and all sub-classes;

4.     Judgment in favor of plaintiffs and the class and against Sudan and Afghanistan, jointly and severally, in the amount of one billion dollars ($1,000,000,000.00) as compensatory damages;

5.     An award of costs and fees; and

4.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Respectfully submitted,

Philip M. Musolino, #294652
MUSOLINO & DESSEL
1615 L Street, N.W, #440
Washington, DC 20036
Tel. No. (202) 466-3883

January 15, 1999                    Counsel for Plaintiffs

42