# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Odillia Mutaka Mwani, *et al.*　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　Plaintiffs　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
v.　　　　　　　　　　　　　　　　　　:　　　　CA No. 1:99CV00125
　　　　　　　　　　　　　　　　　　:　　　　Judge Colleen Kollar-Kotelly
United States of America, *et al.*　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　Defendants　　　　　　　　　　:

## PLAINTIFF'S BRIEF PURSUANT TO ORDER
## OF JANUARY 7, 2010

Pursuant to the Court's Opinion and Order entered January 7, 2010, docket number ("#") 90 (the "Opinion and Order") plaintiffs submit their brief on the following three questions: (1) under the choice of law principles of the federal common law, what substantive law governs the plaintiffs' claims in this action? (2) if the court concludes that the substantive law of Kenya applies, what specific law (e.g., statutory, constitutional, common law) should be applied? and (3) if the Court concludes that the substantive law of the United States applies, what specific law (e.g., federal common law, federal statute, state common law) should apply?

## 1. Under The Choice Of Law Principles Of The Federal Common Law, What Substantive Law Governs The Plaintiffs' Claims In This Action?

As this Court has ruled:

In this case, the state where the injuries occurred is Kenya. Therefore, (Restatement (Second) of Conflicts of Law §§ 146 and 175 dictate) that Kenyan law should apply to Plaintiff's claims unless some other state has a "more significant relationship" to the occurrence and the parties under the principles in § 6 (of the Restatement).

Opinion and Order, at 8. As the Court further noted, Section 6 states that the factors

relevant to the choice of the applicable rule of law include:

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those
states in the determination of the particular issue, [1]
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

The first issue now before the Court, therefore, is whether, applying those seven

factors, the United States has a more significant relationship to the claims in this case

than Kenya. Plaintiffs submit that it does.

*(a) The Needs Of The Interstate And International Systems*

> Probably the most important function of choice-of-law rules is to make the
> interstate and international systems work well. Choice-of-law rules, among other
> things, should seek to further harmonious relations between states and to facilitate
> commercial intercourse between them. In formulating rules of choice of law, a
> state should have regard for the needs and policies of other states and of the
> community of states.

Restatement (2d) Conflicts, § 6, Comment d.

Nothing in that explication points to application of Kenyan, rather than American, law.

Undeniably, "harmonious relations" between Kenya and the United States will be fostered by

Kenya's recognition that American judicial resources were allocated to the resolution of claims

of Kenya's own injured citizens.  The application of American law by an American court to

advance those claims will not offend a foreign state interested in the pursuit of claims by its own

citizens.

---

[1] In *Reed v. Islamic Republic of Iran* 439 F.Supp.2d 53 (D.D.C. 2006), a Foreign Sovereign Immunities
Act claim, Judge Urbina characterized factor (c) as "the most important of these factors." At 65.

*(b) The Relevant Policies Of The Forum*

The Embassy bombing was designed to be and was in fact an attack on the United States. That the location in Nairobi was a vagary of sadistic opportunity is evident from the companion attack on the American Embassy in Dar Es Salaam, Tanzania. The plaintiffs in this case are tragic innocent victims of a terrorist organization's malevolent attack on the United States, and in particular on its seat of government in the District of Columbia.

> In this case, there is no doubt that the defendants "engaged in unabashedly malignant actions directed at [and] felt in this forum." *Id.* The plaintiffs' allegations and evidence were that bin Laden and al Qaeda orchestrated the bombing of the American embassy in Nairobi, not only to kill both American and Kenyan employees inside the building, but to cause pain and sow terror in the embassy's home country, the United States. Nor were the plaintiffs' allegations and evidence of contacts with the United States limited to the Nairobi bombing. The plaintiffs described an ongoing conspiracy to attack the United States, with overt acts occurring within this country's borders.

*Mwani v. bin Laden* 417 F.3d 1, 13 (D.C. Cir. 2005).

As Judge Urbina concluded in *Reed, supra*, "the law of the United States applies rather than the law of the place of the tort or any other foreign law. This is because the United States has a "unique interest" in having its domestic law apply in cases involving terrorist attacks on United States citizens. *See Dammarell v. Islamic Republic of Iran,* 2005 WL 756090, at *20 (D.D.C. 2005). While *Reed* involved the interest of the United States in providing legal redress for its own citizens, the Restatement principle in issue turns less on the interests of the individual plaintiffs than on the nature and the true target of the attack. In *Oveissi v. Islamic Republic of Iran* 573 F.3d 835 (D.C. Cir. 2009), the District of Columbia Circuit emphasized that the United States was not the object of an assassination. As the Court explained:

> We have no doubt that the United States has a strong interest in applying its domestic law to terrorist attacks on its nationals, especially when, as was the case

in *Dammarell*, the attacks are "by reason of their nationality." But Gholam Oveissi was not an American national; nor has the plaintiff suggested that the defendants knew Oveissi had an American grandchild or that the United States or its nationals were in any other way the object of the attack. To the contrary, plaintiff's counsel conceded at oral argument that there is no evidence that Oveissi's assassination was intended to affect the United States. *See* Oral Arg. Recording at 4:52-5:03. Moreover, the plaintiff's international terrorism expert testified that assassinations like this one "were intended to silence the Iranian regime's critics *and to deter French intervention in Lebanon....*" Hence, if any country was the object of the attack, it was France. Accordingly, all of the relevant choice-of-law factors point to the application of French law to the plaintiff's claims (emphasis in original).

As *Mwani, supra*, makes clear, there is no doubt that the United States was the object of the Embassy attack. The United States thus has a unique interest in applying its domestic law to claims arising out of that attack.

*(c) The Relevant Policies Of Other Interested States And The Relative Interests Of Those States In The Determination Of The Particular Issue*

There any evidence that Kenya's interests in the attack on American embassies exceed the interests of the United States, as described above. The government of Kenya has expressed no objection to these proceedings either formally in this case or diplomatically.

There is no reason to conclude that the Kenyan government has any interest in the application of Kenyan law, to the exclusion of American law, in this case. As is discussed in the following section, there is nothing in the most pertinent formulations of Kenyan law that would suggest that application of American law would offend the needs and policies of Kenya. The government of Kenya takes no adverse position on the application of American law.

The citizens of Kenya – as represented by the five hundred plaintiffs in this case – make clear their acceptance of the application of American law to their claims.

*(d) The Protection Of Justified Expectations*

In *U.S. Aviation Underwriters, Inc. v. Pilatus Business Aircraft, Ltd.* 582 F. 3d 1131, 1144 (10th Cir. 2009), the Court wrote: "The Restatement's commentary explains the 'protection of justified expectations' principle primarily refers to the expectations of parties in their pre-litigation conduct, and this principle is of little or no importance in the field of torts." That analysis clearly applies to the claims in this tort case.

*(e) The Basic Policies Underlying The Particular Field Of Law*

> This factor is of particular importance in situations where the policies of the interested states are largely the same but where there are nevertheless minor differences between their relevant local law rules. In such instances, there is good reason for the court to apply the local law of that state which will best achieve the basic policy, or policies, underlying the particular field of law involved.

Restatement, *supra*, at § 6, Comment h. This factor weighs in favor of neither jurisdiction.

*(f) Certainty, Predictability And Uniformity Of Result*

With respect to claims arising out of the 1998 Embassy bombings, application of American substantive common law raises no concerns about certainty, consistency or uniformity because no other claims arising out of those acts of terrorism are pending in any other court. More broadly, adoption of an overarching principle that attacks on the United States – wherever they take place – will be subject to American federal common law is far more likely to lead to certainty, predictability and uniformity than application of the local law of any of hundreds of forums in which terrorist attacks against Americans can take place.  Moreover,

> In a rapidly developing area, such as choice of law, it is often more important that good rules be developed than that predictability and uniformity of result should be

assured through continued adherence to existing rules. Predictability and uniformity of result are of particular importance in areas where the parties are likely to give advance thought to the legal consequences of their transactions.

Restatement, supra, at § 6, Comment i.

The claims in this case do not support any suggestion that "the parties (gave) advance thought to the legal consequences of their transactions."

*(g) Ease In The Determination And Application Of The Law To Be Applied*

While there is no doubt that American courts regularly determine foreign law, *see* Fed.R.Civ.P. 44.1, it is easier for any court to determine and apply its own law. *Kenna v. So-Fro Fabrics, Inc.* 18 F.3d 623, 626. (8th Cir. 1994). Plaintiffs set out below the applicable substantive Kenyan law, as well as the applicable substantive American law. Nothing in those sections suggests that Kenyan law will be as easy to determine and apply as the American law.

**2. If The Court Concludes That The Substantive Law Of Kenya Applies, What Specific Law (e.g., Statutory, Constitutional, Common Law)[2] Should Be Applied?**

---

[2] As in the United States, the Kenyan Constitution is the supreme law of the land. Constitution of Kenya, Art. 3 (2004) (Kenya) (declaring the Constitution to be the supreme law and providing that its provisions prevail where there are conflicts of laws); *see* also Charles Mwalimu, *The Kenyan Legal System* 23 (1988), and *see Okunda v. Republic*, 9 I.L.M. 556 (1970) (Kenya), and *see In the Matter of an Application by Evan Maina* (Miscell) Case no. 7/1969 cited in Yash P. Ghai, *Reflections on Law and Economic Integration in East Africa* 34-35 (1976).
   The sources of Kenyan law are specifically set out in the Judicature Act (1998) Cap. 8 § 3 (Kenya) and include: the Constitution; the National Assembly's legislative acts; specific Acts of the British Parliament before independence and the establishment of the Republic of Kenya in 1963; English common law and doctrines of equity in force at the beginning of colonial law; African customary law as a guide in civil matters; and Islamic law in some matters of personal law affecting Muslims. Kenyan court decisions also operate as a source of law. *Mwalimu, supra,* note 160, at 25. One commentator addresses the relationship between customary and statutory law in Kenya as follows: "the recognition of customary law as a source of Kenyan law is hedged in with limitations. Although at independence customary law was recognized as a source of law, the English base of Kenyan law was retained, and customary law was to be applied only upon the terms of state law. It was therefore subject to the 'repugnancy clause' whose retention to date subordinates customary law to state law and reinforces the view that customary law is inferior to received law...." Kamau, W., *Law, Pluralism And The Family In Kenya: Beyond Bifurcation*

No provisions of the Kenyan Constitution are implicated by the substantive issues now before the court. The applicable Kenyan law on personal injuries claims in the nature of the claims brought in this case will be drawn from both statutory law and common law.

Applicable statutory law is found in both Part II of the Law Reform Act and of the Fatal Accidents Act.

Part II of the Law Reform Act sets out the rules applicable to the survival of a cause of action, and sets out the damages available in such an action. A copy of Part II of the Law Reform Act is appended hereto as **Plaintiffs' Exhibit ("PX") A-1**. The Fatal Accidents Act [3] provides for recovery of damages "proportioned to the injury resulting from the death to the persons respectively for whom and for whose benefit the action is brought." **PX A-2**.

The Fatal Accident Act provides for claims by dependents for loss of dependency, *i.e.*, loss of income they would otherwise have received from the deceased in his lifetime. *Khamis Rajab v. Kenya Ports Authority* High Court at Mombasa [4] (1994). **PX B-1**.

In *George Kangangi Kabutu v. Samwel Maina Mutugi* ( High Court at Embu 2009), **PX B-2**. The court explained the calculation of damages resulting from death as follows:

---

*Of Formal Law And Custom,* International Journal of Law, Policy and the Family 138 (August, 2009).

[3] Geat Britain traces its first Fatal Accidents Act to 1846.

[4] Kenya has five levels of courts: the Court of Appeal for Kenya; the High Court of Kenya; the Khadis' Courts; the Resident Magistrates' Courts; and the District Magistrates' Courts. The Court of Appeal and the High Court are the two highest courts, and they share a common Chief Justice. "The Court of Appeal shall have jurisdiction to hear and determine appeals from the High Court in cases in which an appeal lies to the Court of Appeal under any law." Appellate Jurisdiction Act, Chapter 9, Part 3.1 (1977).

> In assessing damages for lost years therefore, such damages should not be calculated solely or even mainly, on the basis of the length of life that is lost. The question thus resolves itself into that of fixing a reasonable figure to be paid by way of damages for the loss of a measure of happiness and productivity and the loss of dependency on the part of the deceased's dependants."

In *Kamau v. Wathigo* (High Court at Narkuru 2005) the court explained:

> "As it were, there is no material upon which this court can rely on to reach a finding as to what monthly income the deceased earned for his medical practice. In the circumstances of this case, I will consider the last salary that the deceased earned before he retired from the Ministry of Health as the basis of assessing the quantum that is to be paid to the estate of the deceased. As to the multiplier, in the circumstances of this case, and also considering that the deceased was conducting business which he utilized skills he acquired on account of medical learning and experience, I would apply a multiplier of ten (10) years.

And *see Kamau v. Wathigo* (High Court at Nakuru 2005) **PXB -3,** *Bhogal v. Benawra and 2 Others* (High Court at Nairobi 2004) (same), **PX B-4.**

Typically, plaintiff's personal injury damages claims are characterized as either "general" or "special." *See, e.g., Ng'Ang'a v. Kenya Power & Lighting Company Ltd.* (High Court at Nairobi 2006), **PX B-5.** With respect to general damages, the High Court at Nakuru, in *Mwangi Kamau v. Kimemia et.al.* (High Court at Nakuru 2004) explained that:

> The duty of this Court in assessing the damages payable to the Plaintiff for pain, suffering and loss of amenities is to, insofar as possible, compensate the Plaintiff for the injuries that he suffered. This Court is aware that an award of General damages may not restore the plaintiff's health to what it was prior to the accident, but it would to some extent ameliorate the pain and distress suffered by the Plaintiff as a result of losing his bodily functions. **PX B-6.**

The court should, in assessing general damages, take into account the severity of the injury, and the plaintiff's resulting condition. *Alexander Kipkoech Kosgey v. Frederick Towet & 4 Others* (High Court at Nakuru 2005). **PXB-7.** As the Court explained: "The plaintiff was no longer a normal human being after the said accident. He could no longer walk, nor could he use

8

his limbs normally."

In *Attorney General v. Joseph Waiyera* (Mombasa Court of Appeal 1983), the court included loss of future earnings as an element of general damages. **PX B-8**.

"Special damages'" refers to out of pocket expenses and loss of earnings actually incurred up to the date of trial. *Attorney General, supra, and see Makube v. Nyamuro* (Court of Appeal Kisumu 1983) (damages for assault claim), **PX B-9,** and *see Kigika Developers Ltd v Nairobi City Commission* (High Court at Nairobi 1986) (economic loss recoverable for tort). **PX B-10.**

Broadly speaking, therefore, under Kenyan statutory and common law, wrongful death and personal injury plaintiffs may be entitled to damages for pain and suffering, loss of expectation of life, future medical expenses, funeral expenses, general damages and special damages. Business loss claims are based on common law principles.

Punitive damages have been awarded in Kenya in limited categories of cases: typically, defamation, and outrageous constitutional violations by government officials. Whether the facts of this case would sustain an award of punitive damages is arguably a case of first impression under Kenyan law. *See, e.g., Kigika, supra.*

**3.  If The Court Concludes That The Substantive Law Of The United States Applies, What Specific Law (e.g., Federal Common Law, Federal Statute, State Common Law) Should Apply?**

This Court explained in *Mwani v. Bin Ladin* 244 F.R.D. 20, 24, 69 Fed.R.Serv.3d 146 (D.D.C.,2007)that:

> The ATCA, in its entirety, reads: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States...." Those claiming

jurisdiction under the ATCA must allege facts sufficient to establish that: (1) they are aliens; (2) they are suing for a tort; and (3) the tort in question has been committed in violation of the law of nations or a treaty of the United States... (internal citations omitted).

The third prong of that formulation evokes this Court's inquiry into the source of substantive law because, as the Court pointed out, "... the ATCA is a jurisdictional statute and does not create an independent cause of action, nor does it afford any procedural guidance as to the manner in which damages should be calculated." At 25. The Opinion and Order sets out in detail both the tort claims relevant to this issue, at 1-2, and the three alternatives identified in this Circuit in Judge Bork's concurring opinion in *Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, (C.A.D.C.1984) for the application of substantive American law to those claims. *Id.,* at 3. [5]

The Supreme Court's majority decision in *Sosa v. Alvarez-Machain,* 542 U.S. 692, 729, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) seems to point with caution to federal common law. That decision takes its first step toward suggesting that ATCA tort claims have their genesis in common law by declaring:

Sosa would have it that the ATS was stillborn because there could be no claim for relief without a further statute expressly authorizing adoption of causes of action.

---

[5] In the same year, on remand from *Filartiga v. Pena-Irala,* 630 F.2d 876, 884 (2d Cir.1980), the trial court wrote:

The Court of Appeals decided only that Section 1350 gave jurisdiction. We must now face the issue left open by the Court of Appeals, namely, the nature of the "action" over which the section affords jurisdiction. Does the "tort" to which the statute refers mean a wrong "in violation of the law of nations" or merely a wrong actionable under the law of the appropriate sovereign state? The latter construction would make the violation of international law pertinent only to afford jurisdiction.

*Filartiga v. Pena-Irala* 577 F.Supp. 860, 862 (S.D.N.Y.,1984). The *Filartiga* trial court concluded that substantive international law as a part of federal common law applied. At 863. But the court also acknowledged that "(t)he international law described by the Court of Appeals does not ordain detailed remedies but sets forth norms." *Id.* And *see* discussion below on the inapplicability of international law to rules of decision related to remedies and damages.

[6]*Amici* professors of federal jurisdiction and legal history take a different tack, that federal courts could entertain claims once the jurisdictional grant was on the books, because torts in violation of the law of nations would have been recognized within the common law of the time.... We think history and practice give the edge to this latter position.... [7] The jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time. At 714, 724.

The majority then addresses Justice Scalia's challenge in his concurrence to a conceptual common law which permits some constrained trial court discretion to find common law violations which were not previously recognized. [8] As the Court explained:

> ...(W)e now adhere to a conception of limited judicial power first expressed in reorienting federal diversity jurisdiction, see *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), that federal courts have no authority to derive "general" common law.

> Whereas Justice SCALIA sees these developments as sufficient to close the door to further independent judicial recognition of actionable international norms, other considerations persuade us that the judicial power should be exercised on the understanding that the door is still ajar subject to vigilant doorkeeping, and thus open to a narrow class of international norms today. *Erie* did not in terms bar any judicial recognition of new substantive rules, no matter what the circumstances, and post- *Erie* understanding has identified limited enclaves in which federal courts may derive some substantive law in a common law way. For two centuries we have affirmed that the domestic law of the United States recognizes the law of

---

[6] That approach parallels Judge Bork's view that "it is essential that there be an explicit grant of a cause of action before a private plaintiff be allowed to enforce principles of international law in a federal tribunal." *Tel-Oren, supra,* at 801.

[7] The Opinion and Order, in its choice of law analysis, notes the Supreme Court's adoption of common law analysis. At 5.

[8] Justice Scalia's concern has no dispositive application here, because plaintiffs' international law claims can be traced to one of "Blackstone's three primary offenses." *Sosa,* at 724. And *see* this Court's opinion in *Mwani, supra,* at 22. Judge Edwards' passing discussion in *Tel-Oren* of the "requisite nexus between the domestic and the international tort," at 788, is also no barrier here, because there can be no challenge to the assertion that plaintiffs' injuries were the direct result of the international law violation.

nations …. [9] It would take some explaining to say now that federal courts must avert their gaze entirely from any international norm intended to protect individuals.

Substantive rules of decision, at least to the extent that they relate to remedies and damages, necessarily look to domestic law under *Sosa*. "The Sosa Court expressly held that the creation of a private damage remedy is an act of judicial lawmaking. The tort remedy in ATS litigation does not come from international law. It is pure domestic law." Castro, WR, *The New Federal Common Law Of Tort Remedies For Violations Of International Law* 37 RULJ 635, 643-44 (Spring 2006).

"As there is no existing federal common law of torts that could impose civil liability, DOD's warning of civil liability under the laws of the United States can only be a reference to state tort law." *Saleh v. Titan Corp.* 580 F.3d 1, 27,n. 12 (C.A.D.C.,2009). In the District of Columbia, the Restatement of Torts is a primary source of law on virtually every issue related to a tort claim,  including in particular substantive law on assault, *see, e.g., Jackson v. District of Columbia* 412 A.2d 948, 955 (D.C., 1980), and damages and remedies. *See, e.g., Daka, Inc. v. McCrae* 839 A.2d 682, 699 (D.C.,2003).

Because, "as a general matter, the Supreme Court and this Court have often turned to the Restatement (Second) of Torts for assistance in developing standards [10] in a variety of tort cases," *Connecticut v. American Elec. Power Co., Inc.* 582 F.3d 309, 327 (2d Cir. 2009), the

---

[9] Judge Bork questioned broad reliance on the "unexceptional" proposition that international law is part of the common law of the United States. *Tel-Oren, supra*, at 420-21. He contends, however, that international law, unlike contract and tort, does not "by itself" afford individuals the "right to ask for judicial relief." At 421.

[10] *See* Tracy Bishop Holton, *Causes of Action to Recover Civil Damages Pursuant to the Law of Nations and/or Customary International Law*,  21 Causes of Action 2d 327 at §§ 49-51 (2005) for a survey of damages awards under the ATCA.

Restatement offers a source for substantive law which is consistent with both state law and any

residual federal common law on torts in violation of international law.


Respectfully submitted,


Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*:  (202) 466-3883
*Fax*:     (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com


Danielle M. Espinet # 478553
*Rolinsk & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:     (240) 632-0906
*Email*: despinet@rolinski.com

# PART II - SURVIVAL OF CAUSES OF ACTION

Effect of
death on
certain
causes of
action. L.N.
87/1964.
Cap.32. 22
and 23
Geo.5, c. 36.

**2.**(1) Subject to the provisions of this section, on the death of any person after the commencement of this Act, all causes of action subsisting against or vested in him shall survive against, or, as the case may be, for the benefit of, his estate: Provided that this subsection shall not apply to causes of action for defamation or seduction or for inducing one spouse to leave or remain apart from the other or to claims for damages on the ground of adultery.

(2) Where a cause of action so survives for the benefit of the estate of a deceased person, the damages recoverable for the benefit of the estate of that person -

(a) shall not include any exemplary damages;

(b) in the case of a breach of promise to marry, shall be limited to such damage, if any, to the estate of that person as flows from the breach of promise to marry; and

(c) where the death of that person has been caused by the act or omission which gives rise to the cause of action, shall be calculated without reference to any loss or gain to his estate consequent on his death, except that a sum in respect of funeral expenses may be included.

(3) No proceedings shall be maintainable in respect of a cause of action in tort which by virtue of this section has survived against the estate of a deceased person unless either -

(a) proceedings against him in respect of that cause of action were pending at the date of his death; or

(b) proceedings are taken in respect thereof not later than six months after his executor or administrator took out representation.

(4) Where damage has been suffered by reason of any act or omission in respect of which a cause of action would have subsisted against any person if that person had not died before or at the same time as the damage was suffered, there shall be deemed, for the purposes of this Act, to have been subsisting against him before his death such cause of action in respect of that act or omission as would have subsisted if he had died after the damage was suffered.

(5) The rights conferred by this Part for the benefit of the estates of deceased persons shall be in addition to and not in derogation of any rights conferred on the dependents of deceased persons' by the Fatal Accidents A

PLAINTIFF'S
EXHIBIT
A-1
FEN040 000-631-4939

Carriage by Air Act, 1932, of the United Kingdom, and so much of this Part as relates to causes of action against the estates of deceased person's shall apply in relation to causes of action under those Acts as it applies in relation to other causes of action not expressly excepted from the operation of subsection (1).

(6) In the event of the insolvency of an estate against which proceedings are maintainable by virtue of this section, any liability in respect of the cause of action in respect of which the proceedings are maintainable shall be deemed to be a debt provable in the administration of the estate, notwithstanding that it is a demand in the nature of unliquidated damages arising otherwise than by a contract, promise or breach of trust.

Action maintainable against person causing death through wrongful act. **3.** Whenever the death of a person is caused by a wrongful act, neglect or default, and the act, neglect or default is such as would (if death had not ensued) have entitled the person injured to maintain an action and recover damages in respect thereof, then in every such case the person who would have been liable, if death had not ensued, shall be liable to an action for damages notwithstanding the death of the person injured and although the death was caused under such circumstances as amount in law to felony.

PLAINTIFF'S
EXHIBIT

A-2

PENGAD 800-631-6989

Action to be
for benefit of
family of
deceased.

49 of 1956,
s.2,
L.N.300/1956,
L.N.173/1960

**4.**(1) Every action brought by virtue of the provisions of this Act shall be for the benefit of the wife, husband, parent and child of the person whose death was so caused, and shall, subject to the provisions of section 7, be brought by and in the name of the executor or administrator of the person deceased; and in every such action the court may award such damages as it may think proportioned to the injury resulting from the death to the persons respectively for whom and for whose benefit the action is brought; and the amount so recovered, after deducting the costs not recovered from the defendant, shall be divided amongst those persons in such shares as the court, by its judgment, shall find and direct:

Provided that not more than one action shall lie for and in respect of the same subject matter of complaint, and that every such action shall be commenced within three years after the death of the deceased person.

(2) In assessing damages, under the provisions of subsection (1), the court shall not take into account -

(a) any sum paid or payable on the death of the deceased under any contract of assurance or insurance, whether made before or after .the passing of this Act;

(b) any widow's or orphan's pension or allowance payable or any sum payable under any contributory pension or other scheme declared by the Minister, by notice published in the Gazette, to be a scheme for the purpose of this paragraph.

Action by persons beneficially interested. 21 of 1966, 1st Sch.

**7.** If at any time, in any case intended and provided for by this Act, there is no executor or administrator of the person deceased, or if no action is brought by the executor or administrator within six months after the death of the deceased person, then and in every such case an action may be brought by and in the name or names of all or any of the persons for whose benefit the action would have been brought if it had been brought by and in the name of the executor or administrator, and every action so brought shall be for the benefit of the same person or persons as if it were brought by and in the name of the executor or administrator.

# REPUBLIC OF KENYA

## IN THE HIGH COURT OF KENYA
## AT MOMBASA

### CIVIL CASE NO. 621 OF 1994

**KHAMIS RAJAB:::::::::::::::::::::::::::::::::::::::: PLAINTIFF**

V e r s u s

**KENYA PORTS AUTHORITY ::::::::::::::::::: DEFENDANT**

# J U D G M E N T

This case arises out of Industrial Accident. The Plaintiff was an employee of the defendant at the port of Mombasa. On 25.2.99 the parties entered consent as to liability. The defendant admitted liability on the basis of 100%. The matter is now before the court for formal proof and assessment of damages. The evidence for plaintiff who died on 30.3.95 after suit was filed was given by his widow, PW1, who said that the plaintiff was admitted at Pandya Hospital for one month. Was unconscious and was never able to walk properly or do anything for himself. The medical report shows that he could walk with a drop . He was discharged after one month and the widow took him home. He later developed epilepsy and was confined to bed all the time. He became bedridden and was dependant on his family for assistance with personal matters. He was retired and put on pension. Before he took employment he used to work as a cook. He would



EXHIBIT
B-1

www.kenyalawreports.or.ke

2

have taken up such a job after retiring.  She said he used to earn 3000/-
evidence of widow as not disputed.  There is also evidence that while sick at
home the deceased used to visit clinic once a month and the family used to
hire a taxi for transport.

In his submissions counsel for the plaintiff proposed for loss of
expectation of life Shs. 100.000/- pain and suffering for a period of 2 years
before death.  On the authority of **Civil Suit no. 66 of 1997** Shah
Commissioner of Assize in this case the plaintiff died after 8 months of pain
and suffering Shs.300.000/- was awarded.  In this case Mr. Anjawalla asks
for 1 million.

**Loss of dependency for period of 10 years X 2/3 X 3000 X 2 = 240,000/-.**

Counsel for defendant suggests for dependancy multiplier at the age
of 57 should be 5 years instead of 10 years but for cooks work I am of the
view that everything being equal a cook can continue working to very
advanced age.  Therefore the 10 year multiplier will bring the age to 67.
This is quite reasonable age for a cook.  Special damages claimed are not
objected to and the same are awarded in the sum of Shs.3500/- on the whole
the damages under Law Reform Act for the benefit of the estate fall under
the following heads :

a)     *Loss of expectation for life.*
b)     *Pain and suffering and loss of amenities before death.*
c)     *Special damages*

Under the Fatal Accident Act there is claim by dependants for loss of
dependency namely loss of income they received from deceased in his
lifetime.  The evidence available is that as a cook he would have earned Shs.

3

3000/- per month. This is not disputed. During the time the deceased was ill
the widow said that they were receiving money from the defendant by way
of compensation and after retirement pension was paid. However payment
ceased after death. From the evidence available and guided by authorities
submitted 1 find that the claim of loss of expectation of life a sum of
100.000/- is sufficient. For pain and suffering and loss of amenities for 2
years an award of 600,000 adequate to compensate for pain and
inconvenience suffered for the period of 2 years, considering that no amount
of money can really compensate for pain and suffering in any case. Special
damages not disputed amount o Shs.3500/-. For dependency 1 have already
said that the multiplier of 10 years is not too long for a cook and therefore
the dependency is Shs.240,000/- being 2/3 of income for 10 years. The total
therefore amounts to:

| | |
|---|---|
| **Pain and Suffering** | **600.000** |
| **Loss of expectation of life** | **100.000** |
| **Dependancy** | **240.000** |
| **Special Damages** | **3.500** |
| | **943,500/-** |

Judgment is therefore entered for the sum of Shs. 943,500/- plus
interest and costs.

Dated this 31.5.2000.

Read in the presence of Mr. Anjarwalla.

**J. KHAMINWA**
**COMMISSIONER OF ASSIZE**

4

www.kenyalawreports.or.ke

George Kangangi Kabutu v Samwel Maina Mutugi [2009] eKLR



**REPUBLIC OF KENYA**

**IN THE HIGH COURT OF KENYA**

**AT EMBU**

**Civil Case 7 of 2001**

GEORGE KANGANGI KABUTU....................PLAINTIFF

**VERSUS**

SAMWEL MAINA MUTUGI.......................DEFENDANT

**JUDGMENT**

The plaint herein dated 17/1/2001 was filed by J.K. Kibicho & Co. Advocates on behalf of George Kangangi Kabutu who was suing as the legal representative of Joel Muriuki (deceased.) He has sued one Samuel Maina Mutugi. The named plaintiff passed away subsequently during the pendency of this suit and one Gladys Wangui Kangangi was substituted as the plaintiff before the matter was set down for formal proof. The defendant failed to file any defence after being duly served and the matter proceeded by way of formal proof. The substituted plaintiff – Gladys Wangui Kangangi was the deceased's mother. She said that the deceased was about 20 years of age and he had just completed his O level before he died. She told the court that the deceased was hit by a motor vehicle on 14/11/99 at Kabonge area on the Kagumo-Karatina Road. The motor vehicle which was involved in the accident was KZJ 100 which was said to have been owned by the defendant herein.

PW2 one David Kibaara said that he was at Kabonge market when the accident in question occurred. He told the court that the deceased was hit while off the road. He was the deceased's brother. The defendant though properly served with the summons and plaint and subsequently with the hearing notice failed to file a defence interlocutory Judgment was therefore entered against him and the matter proceeded by way of formal proof. Counsel for



EXHIBIT

B-2

**George Kangangi Kabutu v Samwel Maina Mutugi [2009] eKLR**

www.kenyalaw.org

the plaintiff filed a written submission and urged the court to find that the defendant was 100% liable for the accident. Indeed, evidence was adduced to the effect that the defendant was charged with the offence of causing death by dangerous driving and convicted. In the absence of any other evidence to the contrary, my finding is that the defendant was entirely to blame for the accident in which the deceased lost his life. He will shoulder liability at 100%.

This then brings me to the issue of damages. The plaintiff produced the receipts in support of the claimed special damages. I will therefore award her the 30,150/= claimed as special damages. On the issue of general damages, I have been guided by the submission filed by counsel for the plaintiff and the law applicable. I am nonetheless in extreme difficulty in assessing the damages awardable for lost years. The practice is for the court to take the earning of the deceased (or expected earnings), multiply the same with the years he would have been expected to earn the same, less expenses etc. (i.e the multiplier and multiplicad less expenses).

In my view however, this formular is not cast in stone. It is impossible for instance in this case to decide on how much the deceased's future earnings would be. He is said to have sat for his O levels. No evidence whatsoever was adduced to prove that assertion. It was said that he hoped to be a teacher one day. Is mere hope sufficient in this case to calculate future earnings? I don't think so. In the present era of joblessness even for university graduates, it is impossible to contemplate with certainty prospects of a teaching career for the deceased herein, and even assume that amount of money he could have earned. It is also difficult to assume his life expectancy given the perils and constant dangers and other hazards looming over our lives and health these days. Indeed it is said that life expectancy in some parts of this country has fallen to below 40 years of age. I am of the view that the right conclusion is not to be reached by applying what may be called the statistical or actuarial test and arithmetic calculations are to be avoided in circumstances such as these. It would be fallacious to assume, for this purpose, that all human life is continuously an enjoyable and productive thing, so that the shortening of it calls for compensation to be paid to the deceased's estate on a quantative basis. The ups and downs of life, its pains and sorrows which include possibilities of affliction by diseases, joblessness etc have to be allowed for in the estimates. In assessing damages for lost years therefore, such damages should not be calculated solely, or even mainly, on the basis of the length of life that is lost. The question thus resolves itself into that of fixing a reasonable figure to be paid by way of damages for the loss of a measure

2

**George Kangangi Kabutu v Samwel Maina Mutugi [2009] eKLR**

of happiness and productivity and the loss of dependency on the part of the deceased's dependants.

In this regard therefore, I will award the damages which are in my view practicable given the circumstances of the deceased as at the time he passed on and those prevailing currently. It is with this in mind that having entered Judgment in favour of the plaintiff as against the defendant at 100% liability make the following award:-

(a)     Special damages as claimed in the plaint – Ksh.30,150

(b)     Loss of expectation of life        - Ksh.100,000

(c)     Lost years           - Ksh.300,000

(d)     Pain and suffering          - Ksh. 20,000

**TOTAL**            **Ksh. 450,150**

The plaintiff will also get the costs of this suit plus interest at court rates.

**W. KARANJA**

**JUDGE**

Delivered, signed dated at Embu this 1st day of July 2009.

**In presence of:-Mr Ngenge for Plaintiff.**

**Zipporah Wanjiru Kamau v James G Wathigo & another [2005] eKLR**



## REPUBLIC OF KENYA
## IN THE HIGH COURT OF KENYA AT NAKURU

### Civil Suit 393 of 1996

ZIPPORAH WANJIRU KAMAU............................................PLAINTIFF

### VERSUS

JAMES G. WATHIGO...........................................1ST DEFENDANT

JOHN NJIMBA WATHIGO....................................2ND DEFENDANT

### JUDGMENT

The plaintiff Zipporah Wanjiru Kamau, has filed this suit on behalf of the estate of Ruel Kamau Gikonyo – deceased (*hereinafter referred to as the deceased*) against the defendants James G. Wathigo and John Njimba Wathigo seeking to be paid damages, both special and general on account of the death of the deceased which resulted from a road traffic accident involving motor vehicle registration number KAE 633M, (*hereinafter referred to as the said motor vehicle*) owned by the 1st defendant but driven by the 2nd defendant wherein the deceased was travelling as a fare paying passenger. The plaintiff averred that the said accident, which occurred along Thika-Nairobi road was caused by the negligence of the 2nd defendant who drove the said motor vehicle in such a careless and reckless manner that the same overturned resulting in the deceased sustaining injuries which proved to be fatal. The plaintiff holds the 1st defendant vicariously liable for the acts of the 2nd defendant. As a result of the said accident the plaintiff averred that, she, as the widow of the deceased and the children of the deceased suffered loss and damage. The plaintiff is therefore seeking to be paid damages under the **Law Reform Act and the Fatal Accidents Act** on behalf of the deceased estate. The defendants filed a defence. They denied that the deceased was a passenger in the said motor vehicle and put the plaintiff to strict proof thereof. They

www.kenyalaw.org

EXHIBIT
B-3

**Zipporah Wanjiru Kamau v James G Wathigo & another [2005] eKLR**

further denied that the said accident was caused due to their negligence and put the plaintiff to strict proof thereof. They consequently denied that they were liable to the plaintiff in damages, either special or general. The defendants urged the court to dismiss the plaintiff's suit with costs. Issues having been agreed, this case was duly fixed for hearing before this court.

At the hearing of the case, liability was compromised by the consent of the parties. The parties agreed to apportion liability at the ratio of 80:20 in favour of the plaintiff and as against the defendant; The plaintiff was therefore to bear 20% liability whilst the defendant was to bear 80% liability. Evidence was thus taken to determine the quantum of damages that is to be paid to the estate of the deceased. In this regard, the plaintiff is the only person who testified. She stated that she was a widow of the deceased. According to her testimony, the deceased died on the 28th of September 1995 as he was traveling in the said motor vehicle along Thika-Nairobi road. The deceased prior to his death was running a Medical clinic at Kibendera Trading Centre, Murang'a called Tegemea Medical Clinic which he had opened after he had retired as a clinical officer employed by the Ministry of Health upon attaining the age of fifty years. At the time of his retirement the deceased was earning a salary of Kshs 6,265/= *(letter of the Ministry of Health produced as Plaintiffs Exhibit No. 1)*. The plaintiff further testified that the deceased left behind four children – namely Wangoi Kamau who was born in 1977, Loice Mumbi Kamau born in 1979, Geoffrey Gikonyo Kamau born in 1981 and Wachira Kamau born in 1985. The birth certificate of Wangoi, Wachira and Mumbi were produced in evidence as Plaintiffs Exhibits number 2(a) (b) & (c). She testified that at the time of his death, the deceased used to reside with the children two of whom were in secondary school whilst the other two were in primary school. The plaintiff used to reside at their farm at Solai undertaking some farming activity to augment the family income. In total, the monthly expenditure of the family was Kshs 10,000/=.

She testified that the deceased paid the school fees of the children who went to school. She further testified that she obtained letters of administration which granted her authority to administer the deceased's estate *(certificate of confirmation of grant produced as plaintiff's exhibit No. 3)*. After the burial of the deceased, the plaintiff went to Thika police station where she was issued with a police abstract report of the

www.kenyalaw.org

**Zipporah Wanjiru Kamau v James G Wathigo & another [2005] eKLR**

accident. She paid Kshs 100/= to obtain the said abstract report (*police abstract report and receipt produced as plaintiff's exhibit No. 4(a) and 4(b)*). She also obtained the death certificate (*produced as plaintiff's exhibit No. 5*). She testified that she used Kshs 10,000/= as funeral expenses. The other expenses incurred during the funeral were offset by her relatives. She prays that the court awards her appropriate damages to enable her provide for her children. She further testified that at the moment she was residing at their Solai farm which measures eight acres. She conceded that all her children were now aged over eighteen years and apart from the last born Wachira, all the other children were engaged in some economic activity where they were earning a living. She testified that currently she did not earn any income. She testified that although she would have wished her last born to be educated upto University level, in her current circumstances, she lacked financial resources to fulfil her wish. She confirmed that the deceased was fifty-two years of age at the time of his death.

As stated earlier at the beginning of this judgment, the issue of liability was compromised between the parties. The only issue left for the determination of this court is what damages, if any, should be paid to the estate of the deceased. Having carefully read the pleadings filed and considered the evidence adduced by the plaintiff and the submissions made by counsel for the plaintiff and the defendant, certain issues are not in dispute. For instance, the fact that the deceased's body was transported from Thika to Solai where he was buried. The plaintiff testified that she used Kshs 10,000/= as funeral expenses. This claim was not challenged by the defendants. I will therefore award her claim of Kshs 10,000/= as funeral expenses. Further it was not disputed that she paid Kshs 100/= to obtain the police abstract report from Thika police station. I will award her the Kshs 100/=. In total, I will award the plaintiff the sum of Kshs 10,100/= as special damages.

On quantum, under the **Fatal Accident's Act** the following considerations are taken into account in assessing the quantum payable to the estate of the deceased under this head; The deceased was aged fifty two years at the time of his death. He had retired from the civil service upon attaining the age of fifty years. His last salary before retirement was Kshs 6,265/=. He worked as a clinical officer with the Ministry of Health before his retirement. For two years before his death, he was running a medical

www.kenyalaw.org

**Zipporah Wanjiru Kamau v James G Wathigo & another [2005] eKLR**

clinic at Kibendera Trading Centre, Murang'a District. The clinic was called Tegemeo Medical Clinic. No evidence was however adduced to establish how much the deceased earned in his medical practice. The plaintiff testified that the monthly expenses of the family added up to Kshs 10,000/=. That could be so, but it does not prove that the deceased earned the said sum of Kshs 10,000/= from his clinic. Part of the said expenditure could have been realised from the produce of the farm at Solai. It is unfortunate that the plaintiff did not deem it necessary to adduce evidence to establish the income of the deceased when he was running the clinic at Kibendera, Murang'a District. As it were, there is no material upon which this court can rely on to reach a finding as to what monthly income the deceased earned from his medical practice. In the circumstances of this case, I will consider the last salary that the deceased earned before he retired from the Ministry of Health as the basis of assessing the quantum that is to be paid to the estate of the deceased. That amount is Kshs 6,265/= (*See Plaintiffs Exhibit No. 1*).

As to the multiplier, in the circumstances of this case, and also considering that the deceased was conducting a business which he utilised the skills he acquired on account of medical learning and experience, I would apply a multiplier of ten (10) years. Both the plaintiff and the defendants have submitted that the dependency ratio to be applied should be $^2/_3$. I will adopt the agreed dependency ratio.

In the premises therefore, the deceased's estate is awarded loss of dependency under the Fatal Accidents Act as follows:-

Kshs 6265/= x 10 years x 12 months x $^2/_3$ = Kshs 501,200/=

I will not make any award under the **Law Reform Act** in view of the Court of Appeal decision of **Kemfro Africa Ltd t/a "Meru Express Services (1976) & Anor – vs- Lubia & Anor (No 2) [1987] KLR 30** where it was held that a court has to take into account the award made under the **Law Reform Act** when making an award under the **Fatal Accidents Act**. The result of such taking into account is that the amount awarded under the **Law Reform Act** will have to be deducted from the amount awarded under the **Fatal Accidents Act** in the final award to be made to the plaintiff.

In the premises therefore judgment is entered for the plaintiff as against the defendants jointly and severally as hereunder:

www.kenyalaw.org

4

*Zipporah Wanjiru Kamau v James G Wathigo & another [2005] eKLR*

www.kenyalaw.org

(i)      **On Liability**

Liability is apportioned at the ratio of 80:20 in favour of the plaintiff and as against the defendant.

(ii)     **On quantum**

| | | |
|---|---|---|
| (a) General damages ........... | Kshs 501,200/= | |
| (b) Special damages ........... | Kshs  10,100/= | |
| Sub total | 511,300/= | |
| *less 20% contribution* | 102,260/= | |
| Total | 409,040/= | |

(iii)    Costs of the suit.

(iv)    Interest on the special damages shall be applied from the date of filing suit but interest on the general damages shall be applied from the date of the delivery of this judgment.

**DATED at NAKURU this 3rd day of October 2005.**

**L. KIMARU**

**JUDGE**

5

1) Running Down Cause
2) Passenger, female adult aged 23 years old in 2000
3) Collision between two vehicles
4) Injuries:
        Fatal
5) Liability:  100% Jointly and severally against the 3rd defendant.
6) Quantum:-
    I)  Law Reform Act
        a)  Pain and suffering      Ksh.   10,000/-
        b)  Loss of expectation of life  Ksh.   70,000/-
        c)  Lost years
            40,000/- x 12 x 20 x1/4    Ksh.2.400,000/-
    II)  Special Damages (agreed)   Ksh.  112,307.80/-
                Total           Ksh.2.582.357.80/-
7) Case law:-
    i)  Margaret Josephine Orwa v University of Nairobi
    ii)  Zarina A. Shariff v Noshi P. Sethna
        1963 EA 239. page 250-251
    iii)  Najma Kazuo Miwa v Thomas Wanyoike Kariuki
        Hccc 13993/98 Unreported Ang'awa,J.
8) Advocates:
    Wekesa advocate for the plaintiff
    M. Ngarua Advocate for the 1st and 2nd defendant
    P. Simoni advocate for the 3rd defendant

## REPUBLIC OF KENYA

## IN THE HIGH COURT OF KENYA AT NAIROBI

## CIVIL CASE NO. 1615 OF 2001

SATWIDNER SINGH BHOGAL ..........................       PLAINTIFF

### VESUS

SATWINDER KAUR BENAWRA & TWO OTHERS ...DEFENDANTS

### JUDGMENT

The parties in this case are as follows:-

Satwinder Singh Bhogal is the administrator of the estate of

Jaspreet Kaur Bhogal deceased.

www.kenyalawreports.or.ke



EXHIBIT

B-4

The plaint should have therefore read.

> Satwinder Singh Bhogal
>  (suing on behalf of the estate
> of Jospreet Kaur Bhogal) ....... The plaintiff.

The plaintiff is related to the deceased as the father to his late daughter.

Jaswinder Kaur Benarwa is then sued as the registered owner of a vehicle registration number KAG 686D.  The said vehicle was driven by Sundip Singh the 2nd defendant herein.  They are the 1st and 2nd defendant respectively.

Manjit Singh Brar was the driver of motor vehicle No.KAD 431E.

According to the evidence and the plaint, the deceased Jaspreet Kaur Bhogal was in the vehicle being driven by Sundrip Singh.

A collision occurred along the Limuru road between the village Market and he Runda turn off – but at a dip.   As a result of the said collision Jaspreet sustained injuries and was rushed to the Aga Khan hospital Nairobi.  She was admitted to causality at 8.15 p.m. but expired at 9.45 p.m.

3

Her father, the plaintiff herein sued he drivers of the two

vehicles in negligence and claimed damages of the wrongful death of

his daughter.

The three defendants entered appearance and filed defence

denying negligence.

The advocate for the plaintiff stated that the deceased was a

passenger.  An accident occurred and the three defendants are to be

held liable.

A)    LIABILITY.

On the 24.2.04 the parties entered into agreed issued.

I would answer the following facts in the affirmative.

1) That the plaintiff is indeed the administrator of the estate of

the deceased.  Ext. P1.

Grant of letter of administration instestate dated 24.5.01

refers.

2) That Jaspreet Kaur Bhoggal was a lawful authorized

passengers in motor vehicle registration KAG 686D.

It seems that Jaspeet told her father she was going to the

Parklands Sports Club.  She appeared to have  then left

with a young man the 2nd defendant in this case and had an

4

accident.  I can only presume and indeed  confirm that she

was in the said vehicle with his consent.

I have no evidence to the contrary on this.

3) There was indeed an accident that occurred on the 8.9.00.

A police abstract was in fact produced, Ext P2 confirming

this.

`The issue that is left is:-

> "whether the defendant are liable for the
> accident and are negligent as pleaded in
> the plaint?"

From the evidence before the court, the advocate for the 3rd

defendant admitted that he did to file a notice under order 21 r1 CPR.

Namely,

> "Where a defendant desires to claim
> against another person who is already party
> to the suit:-
> a)    That he is entitled to contribution or
>       indemnity
> b)    _____
> c)    _____
> the defendant may without leave issue and
> service on such other person a notice
> making such claim or specify such question
> or issue."

The advocate for the 1st and 2nd defendant likewise admitted that

he too did not file this notice.

www.kenyalawreports.or.ke

5

There is no time limit in filing such notice.  Nonetheless the advocate for the 3rd defendant implied that such notice is not necessary.

I find that on the issue of liability an accident did occur.  This involved two motor vehicles.  The said accident having occurred, the defendant are liable jointly and severally at 100% in favour of the plaintiff.

I do so on the grounds of the non-compliance of order 1 r 21 CPR.

There is a case law of:-

Zarina A Shariff v Noshin P. Sethna

1963 EA 239

On the issue of joint tortfessor that the plaintiff spoke of.

I find indeed that the issue there was on the discretion of the court.

B)   QUANTUM

The claim before me is that under the Law Reform Act and Special Damages only.

a)   Law Reform Act

i)   Pain and suffering

The deceased was rushed to the Aga Khan hospital. She sustained injuries and was admitted to the casualty department at 8.15 p.m. She expired at 9.45 a.m.

I would award a sum a sum of Ksh.10,000/-.

b)   Loss of expectation of life

The deceased was a young girl with a bright future. I would award a sum of Ksh.70,000/-.

c)   Lost years

The deceased herein was a student in Britain. The plaintiff produced proof of her studies.

A witness was called to give evidence on the similar career that he had and the salary he currently earns.

The career is in information technology. The witness earned a sum of Ksh.54,156/- gross.

The deceased was perusing a degree in Business Information Systems.

I would agree that the salary be Ksh.40,000/-, after the statutory deductions.

www.kenyalawreports.or.ke

d)    Multiplier

The advocate for the plaintiff relied on the case law of:-

>  Margaret Josephine Orwa
>  V
>  University of Nairobi & Another
>  Hccc 2571/93 Juma,J.

Where a 41 year old University Assistant Professor who die din

a traffic road accident was given a multiplier of 15 years.

>  2)    Najma Kazuo Miwa
>         V
>         Thomas Wanyoike Kariuki
>         Hccc 1393/1998
>         Unreported Ang'awa,J.

Where the deceased a passenger aged 21 years old was given

a multiplier of 20 years.

I find in this case a multiplier of 20 years be sufficient.

Under lost years the advocate for the 1st and 2nd defendant

prayed that I apply ¼ dependency.

I would accordingly award-

Ksh.40,000/- x 20 x 12 x ¼  = Ksh.2.4 million

Special damages

The parties agreed to Ksh.112,307/80 in total accordingly

being  medical expenses together with burial expenses.

I accordingly confirm this.

8

In summary

1)    Passenger female adult aged 23 years old in 2000
2)    Injuries:
           Fatal

3)    Liability:       100% jointly and severally against the 3rd
                       defendants.

3)    Quantum:-

      1)    Law Reform Act

            a)    Pain and suffering      -Ksh.    10,000/-

            b)    Loss of
                  expectation of life     -Ksh.    70,000/-

            c)    Lost years
                  40,000/- x 12 x 20 x ¼  -Ksh.2.400,000/-

      II)   Special Damages
            Agreed                        Ksh.   112,307.80/-

            Total                         Ksh.2.582.357.80

I awards the costs of this suit to the plaintiff.  I award interest on

Special Damages from the date of filing of this suit interest on

General Damages from the date of this judgment.

Dated this 11th day of June, 2004 at Nairobi.


                       M.A. ANG'AWA
                       JUDGE

*Wekesa & Co. Advocates for the plaintiff*
*Kipkorir, Titoo and Kiara Advocates for the 1 st and 2nd defendants*
*Simani & Co. advocates for he 3 rd defendant*

**Charles Kimani Ng'ang'a v Kenya Power & Lighting Company Limited [2006] eKLR**



### REPUBLIC OF KENYA

### IN THE HIGH COURT OF KENYA

### AT NAIROBI (NAIROBI LAW COURTS)

### Civil Suit 10 of 1998

**CHARLES KIMANI NG'ANG'A** ...................................................**PLAINTIFF**

**[Suing as next-of-kin and representative of NG'ANG'A KIMANI – injured minor]**

**-VERSUS-**

**KENYA POWER & LIGHTING COMPANY LIMITED** ..............**DEFENDANT**

### JUDGMENT

#### A. INJURY OCCASIONED BY LOOSE ELECTRIC-WIRE SHOCKS: THE PLEADINGS

The plaint in this suit was originally filed on *7th January, 1998*. An amended plaint was subsequently filed, on *5th October, 1999*. And a re-amended plaint, dated *27th February, 2003* was later filed.

The plaintiff pleads that at all material times, the defendant was the owner and supplier of electricity at Kahawa West Shopping Centre, inclusive of a sub-station, No. 3255 situated thereat. On 11th February, 1995 the plaintiff's son, who was then aged 14 years, was a lawful pedestrian within Kahawa West Shopping Centre and was injured by electric shock caused by loose-hanging electric wire, and this happening was attributable to negligence on the part of the defendant's agents or servants. It is pleaded that the injury to the plaintiff occurred because the defendant's field attendants who were responsible for the safe flow of electric power at the Kahawa West Shopping Centre, had been negligent. It is pleaded further, or in the alternative, that electric power sub-station No. 3255 which was the property of the defendants, had been constructed close to a corridor used by passers-by. It is pleaded that electricity had escaped from the sub-station, on or about *11th February, 1995* due to the snapping of a wire, as a consequence of which the entire transformer became electrically alive, and the plaintiff's son who was passing by was burnt by a hanging wire, and sustained severe physical injuries and shocks.

www.kenyalaw.org



**Charles Kimani Ng'ang'a v Kenya Power & Lighting Company Limited [2006] eKLR**

The plaintiff pleads that the keeping of electricity in the defendant's transformer and electric mains constituted a *non-natural user* of the land, electricity being a dangerous thing, and so the defendants are to be held liable to the plaintiff for the escape of the electricity. The plaintiff avers that the defendant failed to ensure that electricity would not escape from the transformer or electric mains; and in this way the defendant created and maintained a *public nuisance* which caused injuries to the plaintiff's son.

As particulars of negligence, it is pleaded that the defendant had failed to keep power checks, or to ensure that the electric wires were insulated; that the defendant failed to give any warning of loose, live, hanging electric wire from the transformer; that the defendant failed to ensure that youngsters in the neighbourhood did not touch or play with uninsulated, loose, live electrical wires; that the defendant failed to take safety precautions to ensure that passers-by would not be injured by the flow of electricity; that the defendant failed to maintain the sub-station switch-gear in good and sound mechanical condition; that the defendant allowed or permitted the presence of a defective and dangerous sub-station in the middle of a shopping centre; that the defendant failed to fence or provide guards around the sub-station, for the protection of the public from any danger arising there from; that the defendant failed to take adequate, or any measures, by way of inspection, maintenance or repair, for ensuring that the sub-station was safe to the public.

Particulars of injuries to the plaintiff's son occasioned by electric shocks as aforesaid, are set out thus: burns on both hands; blisters on the right leg; blisters on the left leg; infection on the left leg; scars on both hands and on left leg; wounds on the left leg; wounds on both hands; loss of memory; inclination to fainting; loss of concentration. The plaintiff pleads that as a result of the said electric shocks, his son was traumatized and suffered post-traumatic stress, disorder and psychiatric complications leading to loss of memory and lack of concentration. The son was treated with antibiotics and had wound dressing over a number of weeks. The plaintiff's son had, just one day after the incident, developed an inclination to faint, poor vision, and nightmares.

It is pleaded that the plaintiff had suffered *special damages*, while the son had suffered *general damages*, as a consequence of the incident leading to this suit. The plaintiff's special damages are shown as: (i) police abstract – Kshs.100/=; (ii) medical expenses – Kshs.85,790/=; (iii) medical reports – Kshs.68,500/= - totalling to Kshs.154,390/=. The plaintiff further pleads that to-date, medical treatment for his son is still continuing, and so there would be proof of current costs, as part of the special damages. A claim was also being made for general damages. The plaintiff prayed for costs, and interest at Court rate.

The defendant's statement of defence dated *29th January, 1998* and filed on *9th February, 1998* was not amended following the amendments to the plaint; and therefore it still represents the defendant's up-to-date pleadings.

The defendant denied that an electricity incident had taken place on 11th February, 1995 involving one *Ng'ang'a Kimani* who was then aged 14 years and was a pedestrian and that the cause was loose, hanging electric wires at the Kahawa West Shopping Centre in Nairobi. It is then pleaded that, without prejudice to the foregoing assertion, even if an accident took place in which the plaintiff touched a loose, hanging electric wire the same would not have been due to the defendant's, but the injured person's negligence.

2

**Charles Kimani Ng'ang'a v Kenya Power & Lighting Company Limited [2006] eKLR**

The defendant stated as acts of negligence on the part of the plaintiff's son the following: climbing the electric post to the location of the transformer and electric wire; touching the wire which the injured boy should have known was live and dangerous; going into an enclosed area where the wire and the transformer were; failing to notice that the wire was not insulated, and that therefore, it was dangerous.

The defendant pleaded that there were no pleadings for medical expenses as special damages; and so the defendant would object to evidence being adduced to prove medical expenses.

*B. TESTIMONIES*

(a) *The Plaintiff's Case*

The matter came up before me on 25th May, 2005 when the plaintiff was represented by learned counsel *Mr. Mariaria*, while the defendant was represented by *Mr. Masika. Mr. Mariaria* introduced the plaintiff's case, and led P.W.1, *Patrick Ng'ang'a Kimani*, through the evidence-in-chief.

P.W.1 testified that he lives at Kamae, in the Kasarani area of Nairobi. He testified that he was 23 years of age, and had no memory of what had befallen him when he was 14 years old – i.e. the electrical-shock incident which has led to the instant suit. He used to attend school then, some nine years ago, but he later dropped out of school. He could not recall what cause led to his leaving school. He did not even know whether he had ever been ill in his life. He recalled that in 1997, he used to attend Kahawa Primary School. He testified that today he has no work engagement, and spends his time with his mother and father (*Charles Kimani*) at home.

Upon cross-examination by learned counsel, *Mr. Masika*, P.W.1 testified that he spends all his time at home while some of his age-mates are involved in informal jobs such as bicycle repairing. He testified that he is able to feed himself, as well as to bathe and to dress up, but his sister was the one who would make up his bed after he has slept in it. He averred that there had been a time (which he could not remember) when he could not feed himself. Although there are friends who come to visit the witness, he does not go to visit them. He recalled that in school, he had progressed up to Primary Standard 8 level; but he did not remember whether he had taken any examinations at that level. He said his memory was poor; in 1997 he was a student in Standard 8; he did not know why he had left school. He testified that he was not feeling ill at the moment, and he reckoned that he had no health problem. He said he liked dealing with figures; and he knew that five plus five was *ten*; and ten plus ten was *fifteen*.

P.W.2 was *Charles Kimani Ng'ang'a*. the plaintiff herein. He averred that he lived at Kamae in Kahawa West, Nairobi, and *Patrick Ng'ang'a Kimani* was his son, born in 1981 and was now 22 years of age.

P.W. 2 testified that, on *11th February, 1995* he had gone out from home, leaving his car behind to be washed. As he was walking back home, at about 12.00 noon he came by a crowd of people talking excitedly; and he then learned that the subject – matter was his own son, *Patrick Ng'ang'a Kimani* who had had a mishap. His son was later, at about 5.00 p.m.,

3

**Charles Kimani Ng'ang'a v Kenya Power & Lighting Company Limited [2006] eKLR**

taken to Ogwedhi Clinic which was about one kilometre from his home.  When P.W.2 saw his
son at Ogwedhi Clinic, at about 8.00 p.m. the son could not recognise him.  The son had
injuries on the hands and feet.  He had been accorded treatment at the Clinic, and P.W.2 took
him home.  After further medication had been dispensed at home, it was realised that the
injured son was not improving; and even after three days he was unable to recognise anybody
including his siblings.  P.W.2 then took the son to a medical doctor, *Professor Peter
Odhiambo* whose clinic was at Continental House in the City Centre.  *Professor Odhiambo*
attended to the patient, and gave medication.  This doctor later prepared a medical report,
dated 1st February, 1996 (Plaintiff's Exhibit No. 3).

P.W. 2 later resorted to a different doctor, *Dr. Munene.*  He too provided treatment, and
subsequently gave a medical report, dated 16th September, 1998 (Plaintiff's Exhibit No. 4).
*Dr. Munene* recommended psychiatric attention, and so the patient was committed to *Dr.
Okonji* who also prepared a medical report, dated 9th June 2003 (Plaintiff's Exhibit No. 2).
The defendant's insurance company, Kenindia Assurance Company Limited, had wanted the
patient to be seen by their doctor, *Dr. Shah.  Dr. Shah* examined the patient and prepared a
medical report dated 10th September, 1998 (Plaintiff's Exhibit No. 6).

A further medical opinion was still required; so the patient was seen by *Dr. Mulunga,* who
also prepared a report (Plaintiff's Exhibit No. 5*). Dr. Munene* again saw the patient several
times.  And Kenindia Assurance Company Limited arranged for yet another doctor, *Professor
Roberti,* to see the patient.  *Professor Roberti* examined the patient for many hours, and
prepared a report dated 5th October, 2001 (Plaintiff's Exhibit No. 1).

The plaintiff testified that his son had been attending Kahawa Primary School before the
accident, which occurred in 1995.  The son thereafter endeavoured to attend school, but
dropped out.  The school report (Plaintiff's Exhibit No. 7), dated 22nd October, 1998 showed
that the boy had had average academic performance before the accident, but his performance
dropped dramatically after the accident; and he had to repeat a class due to poor performance.
His performance in Standard 6 had been very poor, even though he was allowed to proceed to
Standard 7, purely on grounds of age; and in 1995 he went to Standard 8, but could not
concentrate on his studies and did not take the main examination of that year, the Kenya
Certificate of Primary Education (K.C.P.E.).

The plaintiff testified that his son had not recovered to-date; he was now aged 22 but had no
useful occupation or vocation; he is still ailing; he is incapable of living with any amount of
fire close-by.  The plaintiff averred that recently, the son had disappeared from home without
anyone's knowledge, and a search led to his place of escape in Nyahururu.

P.W.2 testified that it was some three kilometres from his house to the spot where the
electrical accident had taken place.  He had himself seen the electrical wire which had caused
injury to his son; it was on the ground; this wire had developed short-circuit.  Photographs
had been taken of the scene of the accident some three days after the incident (Plaintiff's
Exhibits 8A, 8B, 8C); and these showed that the said fallen electrical wire was naked, all the
way from the transformer to the ground.  Only several days after the accident did the
defendant's workers or agents come along to insulate the naked wires.  The incident had been
reported to the defendant, who on 27th February, 1995 conducted investigations and prepared
findings (Plaintiff's Exhibit No. 9).  The defendant's report is duly signed by its senior

4

**Charles Kimani Ng'ang'a v Kenya Power & Lighting Company Limited [2006] eKLR**

engineer, and it was supplied to the plaintiff after he had been called to the offices of the defendant. The report stated that a high-voltage earth wire had low-voltage conductors and this had led to the transformers being live, and thus dangerous.

P.W.2 testified that he had incurred large expenses in the treatment of his son; he produced a bundle of receipts and invoices (Plaintiff's Exhibit No. 12). He testified that he was still, even at this moment, incurring further costs in the treatment of the son; and that before filing suit he had already spent as much as Kshs154,390/=. The son still attends clinics from time to time, and every three-to-six months it is necessary to have medical attention. These days such regular medical care is provided at the Kenyatta National Hospital, and transport costs amount to Kshs.200/= on each such occasion; and for each attendance the sum of Kshs.120 is paid to the hospital. He estimated that every year he spends Kshs.640/= in having medical care for the son at Kenyatta Hospital. He testified that he had been the one bearing these costs, and that the defendant has not carried the burden. *Dr. Munene* had recommended such medical consultations some five years ago, and they have continued since then.

### (b) Defendant Closes Case

After counsel for the plaintiff, on 17th November, 2005 closed the plaintiff's case, counsel for the defendant did the same, noting that the parties had already reached agreement on liability. The defendant adduced no evidence.

### C. CONSENT JUDGMENT ON LIABILITY, AND CONTENTION ON QUANTUM OF DAMAGES: SUBMISSIONS FOR THE DEFENDANT

On *14th January, 2003* counsel in this matter appeared before *Lady Justice Rawal,* who recorded a consent judgment in the following terms:

*"By consent, judgement be entered in favour of the plaintiff in the ratio of 30%: 70% on liability. The issue of quantum of damages claimed to be heard and determined".*

This was the starting point in the defendant's submissions, dated and filed on 7th December, 2005.

Learned counsel *Mr. Masika* acknowledges that the plaintiff's son had been electrocuted by a loose, hanging electric wire, and the injuries sustained, as described in the medical reports by *Professor R.F. Ruberti, Dr. Charles K. Munene, Dr. Okonji. Dr. Gregory K. Mulunga* and *Prof. Peter A. Odhiambo*, included: brain damage; burns on right hand; burns on left hand; burns on right foot.

Learned counsel submitted that the burns sustained by the plaintiff's son "were very minor and healed within a short period of time". He submitted that from medical examinations involving a CT scan and EEG, the outcomes were within normal limits – and so it should be concluded that the patient had not suffered severe brain damage. Relying on *Professor R. F. Ruberti's* report, counsel contended that the fainting episodes which the patient had developed had been treated and have since stopped. Counsel submitted that in *Professor Ruberti's* assessment, the patient's permanent invalidity stood at between 20%-30%; and that

5

**Charles Kimani Ng'ang'a v Kenya Power & Lighting Company Limited [2006] eKLR**

in the patient's appearance and testimony in Court, it could not be concluded that he had suffered severe brain damage.

The foregoing submissions led learned counsel to the conclusion that the sum of Kshs.600,000/= would be adequate compensation for pain and suffering and loss of amenities.

*Mr. Masika* relied on certain authorities; such as *Bashir Ahmed Butt v. Uwais Ahmed Khan* (1982-88) 1 K.A.R. 1, in which an infant plaintiff aged 7 ½ years had suffered a fractured skull, lost two teeth, bled from the nose, was unconscious for ten hours, was hospitalised for four days, and spent a further month at home, in bed. The infant's permanent disability was assessed at 50%. The High Court, in that case, awarded Kshs.400,000/= which the Court of Appeal reduced to Kshs.300,000/=.

In *Harshid F. Patel v. Agembo Dulo & Another,* Nairobi HCCC No. 1408 of 1980, the plaintiff suffered cerebral concussion, large cuts to the forehead and palm, large haemotoma around his eye and the right cheek. Some ten months after the accident, the plaintiff complained of pain in the hand and teeth, loss of sense of smell and taste, forgetfulness, and lack of sleep. There was psychiatric evidence that his permanent brain damage was in the range 20%-30%. General damages for pain, suffering and loss of amenities were assessed at Kshs.500,000/=.

In *Mercy Njeri Mwangi v. Joseph K. Githaru & Another,* Nairobi HCCC No. 1395 of 1983 the plaintiff was five years old at the time of the accident, and 13 at the time of trial. Due to a traffic accident she sustained severe brain damage and head injury, and remained deeply unconscious for one week. She suffered from bouts of epilepsy, she became anti-social and was generally regarded as being out of her mind. She could not observe simple personal hygiene and did not attend school. General damages for pain, suffering and loss of amenities were awarded, in the sum of Kshs800,000/=.

In *Mugo Kariuki v. Joseph M. Mukundi & Another,* Nairobi HCCC No. 1547 of 1984 the plaintiff, a six- year old child attending primary school was involved in a road accident and was admitted in hospital in a condition of deep unconsciousness caused by head injuries. For five days he remained in that state. He had been an average student, but deteriorated in performance. He remained with a high chance of developing epilepsy. He was awarded general damages in the figure of Kshs.250,000/=.

In *S. J. Chege & Another v. Johanna W. M. Vesters & Another* (1982-88) 1 K.A.R. 1197, the 1st respondent suffered brain concussion, fracture of the 7th cervical vertebrae, fracture of four ribs, fracture of the scapula, comminuted compound fracture of the right humerus, compound fracture of the right olecranon, closed fracture of mid-shaft right femur, compound fracture of the left femur, compound fracture of the left tibia, compound fracture dislocation of the right ankle and fracture of the right patella. She was admitted in Intensive Care Unit for 14 days and was unconscious for 10 days. The trial Judge had awarded the 1st respondent Kshs.910,000/= in general damages for pain, suffering and loss of amenities; but the Court of Appeal reduced this to Kshs550,000/=.

In *Dickson Nyamai & Another v. Monique M. Futi & Another* (1990) 2 K.A.R. 165 the respondent, then aged 19, suffered severe injuries in a road accident, which led to paralysis of

www.kenyalaw.org

6

**Charles Kimani Ng'ang'a v Kenya Power & Lighting Company Limited [2006] eKLR**

the lower limbs, neurological damage, and impairment of sight and hearing. She also lost the possibility of child bearing. At the time of trial she was still unconscious; she was deeply comatose, as a result of generalised closed-head injury. General damages for pain, suffering and loss of amenities were assessed at Kshs700,000/= by the High Court and was upheld by the Court of Appeal.

As regards *special damages* counsel submitted that the damages, claimed as Kshs154,390/= could not be claimed except by adding up the total sum shown on the receipts which had been submitted. Counsel also disputed the sufficiency of proof of the claimed sum of Kshs640/=, for transport and consultation fees. The claim for Kshs1,000,000/= for future medical expenses was also contested as it had not been pleaded, nor proved.

Learned counsel urged that English authorities should not be the reference point, in determining the requisite levels of awards in Kenya. The Court of Appeal in *Butler v. Butler* (1984) K.L.R. 225 had thus held (p.234):

*"... awards by foreign Courts do not necessarily represent the results which should prevail in Kenya, where the conditions relevant to the assessment of damages, such as rents, standard of living, levels of earnings, costs of medical supervision and drugs, may be different. Some degree of uniformity, however, is to be sought in awards of damages and the best guide is to pay regard to recent awards in comparable cases in local Courts".*

Learned counsel urged that the proper awards in this case are:  Kshs800,000/= as general damages – less 30% contribution of Kshs240,000/= leaving  a balance of *Kshs.560,000/=.*

*Mr. Masika* disputed the plaintiff's claim for Kshs.9,500,000/=, as not being grounded on valid parameters: "No doctor whose medical report was presented in Court stated that the plaintiff needs future medical expenses".

Learned counsel submitted that special damages in the sum of Kshs.154,390/= were introduced into the case only in 2003 – some eight years ago; and so the claim is time-barred.

D. *QUANTUM OF DAMAGES: PLAINTIFF'S SUBMISSIONS*

*(a)  Special Damages*

Learned counsel *Mr. Mariaria* submitted, on the basis of the evidence, that *Patrick Ng'ang'a Kimani* had continuously received medical attention following the electrical-shock accident which he had suffered on 11th February, 1995. The bundle of receipts tendered in evidence, counsel submitted, showed that a certain sum of money prayed for in the re-amended plaint had been spent in securing medical attention for the plaintiff's son – and on that evidence there had been no contest and no cross-examination. The plaintiff was therefore praying for the sum of Kshs154,390/= in special damages.

*(b)  General Damages*

Learned counsel urged that general damages are a pecuniary compensation which will make good the loss suffered by the plaintiff as far as money can provided recompense, for a wrong

7

**Charles Kimani Ng'ang'a v Kenya Power & Lighting Company Limited [2006] eKLR**

committed by the defendant. The injury suffered by *Patrick Ng'ang'a Kimani* in this case, it was submitted, was the natural result of the defendant's acts of negligence.

*Mr. Mariaria* submitted that all the doctors' reports produced by consent of the parties – save for the one by *Dr. R.B. Shah* – are in agreement that the plaintiff had suffered brain damage due to the electrical shock he sustained on 11th February, 1995 due to the negligence of the defendant. The several doctors, namely *Dr. Geoffrey K. Mulunga, Professor R.F. Ruberti, Dr. M.M.O. Okonji, Professor Peter A. Odhiambo and Dr. Charles K. Munene*, counsel submitted, all agree that the plaintiff had suffered brain damage as a result of the electric shock.

PW 2 had testified that *Patrick Ng'ang'a Kimani* had suffered several recurrent fainting attacks, poor vision and impaired intelligence, and the evidence is supported by the findings made by *Professor Peter A. Odhiambo* in his medical report of 1st February, 1996 – one year after the accident. The psychiatrist *Dr. M.M.O Okonji* had written in his medical report that the plaintiff who had been a normal average pupil upto Standard 5 level in primary school prior to 11th February, 1995 when he suffered electric shock, was now operating academically at a nursery–to–pre-unit level, as a result of the accident. *Dr. Gregory K. Mulunga* stated in his report of 26th January, 1999 that upon examination of *Patrick Ng'ang'a Kimani* he formed the opinion that the injured boy was suffering a severe post-traumatic stress disorder after the electric shock. The injured boy, this doctor remarked, appeared to have lost all interest in life, and was merely drifting on. The same view was held by *Professor R.F. Ruberti*, a consultant neurosurgeon who conducted an examination on 5th October, 2001. This doctor remarked that the injured boy was mentally slow and had lost interest in life. *Patrick Ng'ang'a Kimani* deteriorated in his school work until he dropped out of school. *Professor Ruberti* and *Dr. Okonji* were in agreement that the electric shock had affected *Patrick Ng'ang'a Kimani* mentally; and they were both of the view that the boy's deterioration in academic standards was a consequence of brain damage which had occasioned a permanent invalidity of the order of 20% - 30%.

Counsel submitted from the evidence that *Patrick Ng'ang'a Kimani's* appearance in Court as PW1, had shown that he was an incapacitated young man of 22 now, who remembered very little and had a level of intelligence and alertness which fell below that of a normal average person of his age. His father (PW2) gave evidence that he has not recovered from the accident, and has been returning to hospital for medical examination at least twice a year. PW2 testified that the young man suffers memory lapses, looks confused, and is not capable of caring for himself. Counsel submitted, on the evidence, that as a result of the electrical accident, *Patrick Ng'ang'a Kimani* had suffered brain damage leading to neurosis which is recognized as mental illness, and for this injury the young man was entitled to damages.

Counsel submitted that the said electric-shock accident, for *Patrick Ng'ang'a Kimani*, led to loss of pleasure and other amenities of life; he lost his enjoyment of life, as well as all forms of concentration and sense of purpose. It was submitted that the young man had lost the capacity and power to earn a living, and may for ever depend on his parents.

Learned counsel urged that the Court, in awarding general damages, should consider loss of future prospective earnings, as *Patrick Ng'ang'a Kimani* has been rendered incapable of earning a living in any capacity. Counsel urged that the Court do take into account that

8

**Charles Kimani Ng'ang'a v Kenya Power & Lighting Company Limited [2006] eKLR**

*Patrick Ng'ang'a Kimani* may not marry and set up a family of his own, and he will probably always need the aid of an assistant.

Counsel urged that the Court should rely on an English case on brain damage, *W.H. Stewart v. War Office*, 1951 C.A. No. 174. He noted that in the *W.H Stewart* case an award of the equivalent of Kshs.2,451,000/= had been made in 1951. Counsel urged the Court to start from that baseline, and consider the intervening *"large and comparative permanent changes in real money value"*. The plaintiff's prayer was for an award of Kshs.9,500,000/= as general damages incorporating lost future prospective earnings, and in addition a sum of Kshs.1,000,000/= as future medical expenses. The plaintiff also prayed for special damages in the sum of Kshs.154,390/=, and costs.

E. *ANALYSIS AND DECREE*

There is not too much difference on the facts, as between the parties. The electric-shock accident, in respect of which consistent and well-supported evidence has been given, changed the life of a boy, *Patrick Ng'ang'a Kimani*; it ruined his prospects for having formal education, of developing a vocation, of earning a livelihood, of enjoying the amenities of life, of establishing his own family. He also suffered pain and disability, and has remained dependent since then. The most serious aspect of his tribulation is the *brain damage* which he suffered, as a consequence of which he has been unable to manage his own life as an independent person. It is, I believe, the fact that all these factual matters are common cause, which led the parties, on 14th January, 2003 to agree on a consent judgment which was duly entered by *Lady Justice Rawal.*

In this relatively lengthy matter the question before the Court was only one: how much money should the injured be paid in damages?

I would dispose of the issue of *special damages* at once. It is common cause that the plaintiff had to carry the prolonged burden of medial care for the injured, and in his pleadings he asked for *Kshs.154,390/=*, a modest sum also supported by receipts and invoices, and not controverted in any evidence emanating for the defendant. I will, therefore grant that amount.

It is not disputed that to-date, *Patrick Ng'ang'a Kimani* still has to undergo periodic medical attention, and it cannot be known how many more times he will require such care in the future. This element, in my judgment, is not amenable to special damages; I will, therefore, take it into account as I make an award of *general damages.*

It is already determined that the defendant shall bear 70% of the liability for the injury to *Patrick Ng'ang'a Kimani*; the plaintiff shall bear 30% of the liability. But what is the *amount* of the full liability? This is the most controversial issue in these proceedings, and there is no doubt each party is in its or his proposition, concerned in the first place to *lessen its own burdens*. The defendant relies on a large range of case authorities, and proposes that the full scale of liability should be no more than *Kshs.600,000/=*. The plaintiff claims as much as *Kshs.9,500,000/=*. From such a colossal discrepancy in pecuniary claims, I would see *prima facie* a failing on the part of counsel to lay trust in *regular assessment* founded on juristic principles. Such principles would carry validity not of just because they invoke some favourable decision of the past; their validity must rest on the nexus between *legal argument*,

9

**Charles Kimani Ng'ang'a v Kenya Power & Lighting Company Limited [2006] eKLR**

and *economic reality*; for without that nexus, no decision of the Court otherwise founded will be well-enough anchored to carry viable criteria.

I did not see the legal foundation from which counsel for the plaintiff could readily cite the English 1951 case, *W.H Stewart v. War Office*, and then propose that this Court should work *upwards from there*. In the same way I saw no basis for the figure of Kshs.600,000/= which counsel for the defendant proposed.

It is a trite proposition that general damages are compensatory in nature. This means that the *facts* of each case are all-important. Once a certain position of liability-allocation is accepted (as in the present case), the mode of compensation to an injured party is squarely dependent on the *facts* of that particular case. Those fact are, I would consider, integrally linked to the *social environment* in which the accident occurred, and to the *social and economic realities* of the country in question. For this reason alone it is unacceptable that the *Stewart* case could be applied in this country in the automatic manner proposed by learned counsel for the plaintiff.

I take it that the plaintiff's son herein was seriously injured by electric shock, and the defendant is largely to blame for the accident. The injured boy was an average pupil, 14 years of age, at the time of the accident. The boy dropped out of school, and so has missed out on proper formal education. The injured boy suffered nervous injuries which have made it impossible for him to enjoy a normal life. From the evidence, the boy is not aware of the incident that befell him in 1995, and he says he feels just alright, in terms of health. Of course, the injured boy needs medical attention from time to time. These is also clear evidence that the boy became a wholly dependent person, in the aftermath of the electrical accident.

The conclusion to be drawn about the injured boy, I think, is that great opportunities of life did not open out to him, partly on account of the electrical accident. It cannot be known how he could have used such opportunities if he had not been injured. Therefore it is not, in my opinion, rational or realistic, to seek to create a wholesale transformation in the life of the injured, purely by means of *money*, because of the unfortunate accident. It would only make sense, I think, to provide for those *hardships in his life* which are the *proximate outcome* of the injuries occasioned by the accident. On that principle alone, the proposition of the figure of Kshs.9,500,000/= as made by counsel for the plaintiff, is untenable.

Secondly, reliance on the English case *W.H. Stewart v. War Office* is not tenable. The award in that case was made in the context of a highly structured, industrial and urban economy and society in which *money awards* may be the only basis for normal living by an injured party. I trust that it is not inapt to say here that I am not wholly ignorant of the structure of the English society and economy, having read widely about it, and having lived in that society as an advanced research student for several years. On the basis of this background, I will here take judicial notice that the structured, highly monetized economy of England, a phenomenon of common notoriety, is an inappropriate basis for assessing general damages in the matter now before me. Kenyan society, compared to English society, has a more loose-textured economy, in which a given monetary award, depending on how it is planned and utilized, can more readily help to set up appropriate economic safety-nets for an injured person such as *Patrick Ng'ang'a Kimani*. In Kenya a more socially-oriented family system still prevails, in

**Charles Kimani Ng'ang'a v Kenya Power & Lighting Company Limited [2006] eKLR**

the context of which a realistic award of damages can and should be employed to provide considerable security for a person such. as *Patrick Ng'ang'a Kimani*

Being guided by the foregoing principles, and bearing in mind the awards in general damages which have been made by the Courts of Kenya over the years, I will award Kshs.2,500,000/= in general damages for negligence, covering also future medical care.  On the basis of the consent judgment of 14th January, 2003 only *70%* of that figure will be payable to the plaintiff.  As already indicated, I have granted the prayer for *special damages*, and this particular item shall be paid with interest at Court rate, from the date of filing suit.  The defendant shall bear 70% of the plaintiff's costs payable with interest at Court rate with effect from the date of filing suit.

*It is so decreed.*

Dated and Delivered at Nairobi this 17th day of February, 2006

J. B.OJWANG

JUDGE

Coram: Ojwang, J.

For the plaintiff:   Mr. Mariaria, instructed by M/s Mariaria & Co., Advocates

For the Defendant: Mr. Masika, instructed by M/s Manthi Masika & Co., Advocates

www.kenyalaw.org

11

Kamau v Kimemia & another [2004] eKLR



**Citation:** Kamau v Kimemia & another [2004] eKLR

### REPUBLIC OF KENYA
### IN THE HIGH COURT OF KENYA AT NAKURU
### CIVIL SUIT NO. 192 OF 2001

SAMWEL MWANGI KAMAU.........................PLAINTIFF

VERSUS

JOSEPH M. KIMEMIA............................1ST DEFENDANT

GERALD MAINA NGARI......................2ND DEFENDANT

### JUDGMENT

The Plaintiff, Samuel Mwangi Kamau, filed suit against the Defendants praying for judgment to be entered against the Defendants jointly and severally for special and general damages arising out of a road traffic accident that occurred on the 13th of February 2000.  In his Plaint, the Plaintiff stated that whilst he was riding his bicycle along Nyeri-Nyahururu road, the 2nd Defendant, who was the driver of motor vehicle registration number KAC 368 B Toyota Hilux, which was owned by the 1st Defendant, drove the said motor vehicle in such a negligent manner that he cause the same to violently veer off the road and hit the Plaintiff as a result of which the Plaintiff sustained severe injuries.  The Defendants filed a defence denying the Plaintiff's claim. When this suit came up for hearing the Plaintiff and the Defendants agreed to compromise the Plaintiff's claim on liability.  The parties agreed that liability in negligence was to apportioned at the ratio of 80:20 as against the Defendant and in favour of the Plaintiff.  The effect of the said consent on liability is that the Defendant was to bear 80% liability whilst the Plaintiff was to bear 20% liability.

This Court took the Plaintiff's evidence for the purposes of assessing the damages to be paid to the Plaintiff.  The Plaintiff called one witness, himself.  The

EXHIBIT
B-6

Kamau v Kimemia & another [2004] eKLR

Plaintiff testified that as a result of the accident, he was injured on his left hand. The hand was posteriorly dislocated. The Plaintiff as a consequence was unable to lift his hand, neither could he use the said hand to do any manual work. The Plaintiff further testified that his left leg was fractured in two places. His right hand was bruised and further his head was injured. After the accident, it was the Plaintiff's testimony that he lost consciousness and only came to when he was admitted at the Nakuru Provincial General Hospital. The Plaintiff was admitted at the said hospital for a period of nearly two months. At the hospital the Plaintiff's leg was put on traction and plaster. The Plaintiff remained with the plaster from the month of February to the month of November.

The Plaintiff further testified that his left hand was put on traction and he was required to put the said hand on a sling. The Plaintiff later attended physiotherapy sessions to enable him  use his left hand again. The Plaintiff produced the discharge summary as Plaintiff's Exhibit No. 1. The P3 form issued by the Police and duly filled by the Doctor at Nakuru Provincial General Hospital was admitted in evidence as Plaintiff's Exhibit No. 2. A medical report prepared by Dr. Kiamba was admitted in evidence as Plaintiff's Exhibit No. 3. The Plaintiff further testified that when he was injured, he was aged 17 years. He was then a form three student at Pondo Secondary School.   It was his further testimony that he stopped schooling as he was forced to undergo treatment for a very long time. The Plaintiff testified that for now his leg had properly healed. He also testified that he could use his right hand without any problem. He also admitted that he could still go back to school and complete his studies.

The issue for determination by this Court is the quantum of damages that should be paid to the Plaintiff as a result of the injuries that he sustained in the road traffic accident. As stated at the beginning of this judgment the parties to this suit have agreed to apportion liability at the ratio of 80% and 20% in favour of the Plaintiff and as against the Defendant. According to the discharge summary issued to the Plaintiff by the Nakuru Provincial General Hospital, the Plaintiff sustained depressed fracture of the skull (*on the right temporal region*  ), fracture of the right tibia and fibula. The Plaintiff was in a confused state when he was admitted at the said hospital but was in a good general condition when he was discharged. The Plaintiff also sustained bruises on both

Kamau v Kimemia & another [2004] eKLR

upper arms.   Dr Kiamba, who prepared the medical report assessed the injuries sustained by the Plaintiff as hereunder:

(i)      *Head injury   – As a result of the head injury the Plain   tiff has a paralysis of the left upper limb due to intra cranial haemorrhage and depressed fracture of the left temporal bone.   It in the assessment of the Doctor this was a permanent disability.*

(ii)     *Fracture of the right tibia and fibula which had malunited resulting in a permanent deformity.   According to his prognosis the Plaintiff would be unable to walk for long distances.*

(iii)    *Laceration and bruises on the forehead and right hand which had healed but left prominent scars.*

The degree of permanent disability was assessed at 50%.   In his submission on the general damages to be awarded, the Plaintiff proposed the sum of Kshs 2,000,000/=. He relied on the decision of **Milicent Wangui Wamutegi & Others –versus- Stephen Njuguna Gatuhi Nairobi HCCC No. 2357 of 1990**  (unreported) which was delivered on the 26th of July 1991 and an award of Kshs 100,000/= General damages for pain suffering and loss of amenities made.   According to the Plaintiff, the injuries sustained by the Plaintiff in the said case were comparable to the injuries that he has sustained in the instant case.

On their part, the Defendants submitted that the Plaintiff ought to be paid Kshs 300,000/= General damages.   The Defendants relied on the case of **Wilfred Ndumba Kirimi            –versus- James Kiogora HCCC No. 147 of 1993** (*unreported*) and **Jane Wambui Gacihi –versus- Peter Mwangi Kiriki & Anor HCCC No. 1719 of 1995** (*unreported*).   I have considered the submissions on quantum made by the parties to this suit.   The duty of this Court in assessing the damages payable to the Plaintiff for pain, suffering and loss of amenities is to, in so far as possible, compensate the Plaintiff for the injuries that he suffered.   This Court is aware that an award of General damages may not restore the Plaintiff's health to what it was prior to the accident but it would to some extent ameliorate the pain and distress suffered by the Plaintiff as a result of loosing his bodily functions.   In the instant case the Plaintiff sustained a depressed fracture of the skull that resulted in the Plaintiff's left hand being permanently disabled.

www.kenyalawreports.or.ke

Kamau v Kimemia & another [2004] eKLR

According to his evidence the Plaintiff was unable to lift up the said hand or use it to undertake any manual work. The Plaintiff also fractured his tibia and fibula which had reunited but had resulted in the Plaintiff having deformity of the said leg due to the malunion of the said fracture. The Plaintiff also sustained soft tissue injuries on his upper limbs.

I have considered the comparable decisions that were availed to me by the Counsel for the Plaintiff and Counsel for the Defendant. It is my finding that the decision of **Milicent Wangui Wamutegi** *(supra)* is to some extent applicable in this case. In the said case, the Plaintiff sustained more severe injuries than the Plaintiff in this case. Doing the best that I can, and considering the injuries that the Plaintiff sustained especially the fact that the Plaintiff may not use his left hand again, I assess the general damages to be awarded to the Plaintiff for pain, suffering and loss of amenities to be Kshs 1,000,000/=. The Plaintiff did not prove any special damages. He shall be paid the costs of this suit. Interest shall be payable from the date of this judgment. The said award of Kshs 1,000,000/= shall be reduced by 20% being the liability that the parties agreed was to be borne by the Plaintiff. The Plaintiff shall therefore be awarded the sum of Kshs 800,000/= General damages for pain suffering and loss of amenities. The costs shall also be paid on the basis of the consent on liability that was agreed upon by the parties to this suit.

**DATED at NAKURU this 22nd day of October, 2004.**

**L. KIMARU**

**AG. JUDGE**

**Alexander Kipkoech Kosgey v Frederick Towet & 4 others [2005] eKLR**



## REPUBLIC OF KENYA

## IN THE HIGH COURT OF KENYA AT NAKURU

## CIVIL CASE NO. 467 OF 1995

ALEXANDER KIPKOECH KOSGEY..............PLAINTIFF

VERSUS

FREDRICK TOWET.............................1ST DEFENDANT

STEPHEN SOI.....................................2ND DEFENDANT

JACKSON MARITIM.............................3RD DEFENDANT

JOSEPH KIPKORIR MUTAI
T/a NGERERIT DAIRY FARMERS............4TH DEFENDANT

KABARAK LIMITED.............................5TH DEFENDANT

### JUDGMENT

The plaintiff herein filed suit against the defendants jointly and severally seeking to be compensated for the injuries that he allegedly sustained when motor vehicle registration number KWZ 586 and a Combine Harvester registration number KAA 253K were involved in an accident and collided thereby causing the plaintiff to sustain serious injuries. The plaintiff blames both the drivers of motor vehicle registration KWZ 586 and Combine Harvester registration number KAA 253K for causing the said accident. The 1st, 2nd, 3rd and 4th defendants duly entered appearance and filed a defence denying that their motor vehicle registration number KWZ 586 was to blame for the said accident. The 1st to 4th defendants blamed the driver of the Combine Harvester for causing the said accident. The 5th defendant also filed a defence. It denied that its Combine Harvester registration number KAA 253K caused the said accident. Instead the 5th defendant blamed the driver of motor vehicle registration number KWZ 586 for the said accident. The 1st, 2nd, 3rd and 4th defendants were served to attend court during the hearing of the case. However they choose not to

www.kenyalawreports.or.ke

PLAINTIFF'S
EXHIBIT
B-7

**Alexander Kipkoech Kosgey v Frederick Towet & 4 others [2005] eKLR**

attend court during hearing. This court was satisfied that the said defendants had been properly served. It ordered the case to proceed, the absence of the 1st to 4th defendants notwithstanding.

PW1 Dr Wellington Kiamba testified that on the 7th of July 2003 he examined the plaintiff with a view of preparing a report of the injuries that the said plaintiff had sustained. According to the history that he obtained, the plaintiff had been involved in a road traffic accident on the 19th of November 1993. PW1 also perused the medical records that were written when the plaintiff was undergoing treatment. He saw the treatment cards from Tenwek Hospital, the Physiotherapy department and the P3 form filled by Dr Sittonik on the 8th of March 1993. PW1 also physically examined the plaintiff. His examination revealed that the plaintiff had paresis of the lower limbs. The plaintiff also had claw hands. There was a reduction of the muscle power in the lower limb and muscle tone. There was tenderness on the posterior aspect of the neck. He was of the opinion that the spinal injury that the plaintiff has sustained had resulted in paresis and atonic bladder. PW1 testified that nothing could be done to restore the full functions especially of the lower limbs. He assessed the degree of permanent disability to be 75% under the **Workmen's Compensation Act**. The report was produced as plaintiff's exhibit No. 1. PW1 was paid Kshs 5,000/= to prepare the report. The receipt of Kshs 3,000/= which he issued when part payment was made was produced as plaintiff's exhibit No. 2. He charged Kshs 5,000/= to attend court (*receipt produced as plaintiff's exhibit No. 3*).

PW1 conceded that he prepared the report from the medical records that were availed to him by the plaintiff. He admitted that from the medical records the plaintiff last saw a doctor in May 2002. He reiterated that the plaintiff was discharged from the clinic when no improvement of his condition was noted. He testified that the plaintiff was fifty nine years when the accident occurred and sixty nine years when he was examined by PW1. He conceded that the age of the plaintiff contributed to a slight degree to the slowness of the healing process. It was his testimony that the injuries in question reduced the life expectancy of the plaintiff by quickening his aging process.

PW2, the plaintiff testified that on the 19th of November 1993 he was travelling in motor vehicle registration number KWZ 586 from Nakuru to Kericho. The time was

2

**Alexander Kipkoech Kosgey v Frederick Towet & 4 others [2005] eKLR**

between 8.15 p.m. to 8.30 p.m. when the accident occurred. The motor vehicle he was travelling in (*KWZ 586*) collided with the Combine Harvester at Salgaa. The plaintiff testified that he lost consciousness upon impact. It was his testimony that he had fallen down and injured his back during the accident. He was first taken to the Provincial General Hospital and later taken to Nakuru Nursing Home. He was again transferred to Tenwek Mission Hospital for further treatment. After the accident a report was made to the police. The plaintiff was issued with a P3 form. The P3 form which was duly filled by the doctor was produced as plaintiff's exhibit No. 4. The police abstract report was produced as plaintiff's exhibit No. 5.

The plaintiff testified that he paid for his medical treatment (*bundle of receipts produced as plaintiff's exhibit No. 6*). The total amount paid was Kshs 19,892/=. He testified that he was seeking to be paid compensation for the injuries that he had sustained as he could not do any work since the accident. He further testified that he was 70 years old. He stated that the motor vehicle he was travelling in was being driven by one Mutai and was owned by a group called Ngererit Dairy Farmers. It was his testimony that at the time of the accident he was sitted in the front cabin near the left door. He suddenly saw the combine harvester being driven on their lane and immediately thereafter the accident occurred. He said that the Combine Harvester was bigger than the road. It was his testimony that although the driver could see the Combine Harvester, he could not see its full dimensions. There were no lights on the Combine Harvester which could have given an indication to the driver of the motor vehicle he was travelling in the full dimensions of the said Combine Harvester especially as the same was being driven on the road at night. He further testified that although the driver of the said motor vehicle tried to take evasive action by driving off the road, the Combine Harvester was too close thus making the accident inevitable.

The plaintiff testified that he did not know how the motor vehicle could have overtaken the Combine Harvester. Although he admitted that he did not know the driver of the Combine Harvester, he stated categorically that the said Combine Harvester was owned by the 5th defendant. He testified that he did not know if any one was charged with a traffic offence after the said accident. He blamed the driver of the Combine Harvester for the accident. He stated that he had sued the driver of the motor

www.kenyalawreports.or.ke

3

**Alexander Kipkoech Kosgey v Frederick Towet & 4 others [2005] eKLR**

vehicle that he was travelling in so that he could be a witness in the case. He reiterated that the accident took place on the lane which the said motor vehicle was being driven at. He further testified that the lights of the Combine Harvester were in the middle of the Harvester.

PW3 Joseph Kipkorir Mutai testified that he was the driver of motor vehicle registration number KWZ 586. It was his testimony that on the 19th of November 1993, as he was driving the said motor vehicle along Nakuru-Kisumu road near Salgaa, the said motor vehicle was involved in an accident with a Combine Harvester registration number KAA 253K. It was at night. PW3 had switched the lights of his motor vehicle to dim as there were other motor vehicles coming from the front. He stated that he saw the Combine Harvester when he was about ten to fifteen metres to it. He tried to avoid colliding with it by driving off the road but due to the short distance, the blade of the Combine Harvester collided with the motor vehicle as a result of which he sustained injuries and lost consciousness.

He confirmed that the plaintiff was also injured during the accident. At the time the accident occurred, he stated that he was driving on his right lane. He denied that he was driving on the wrong lane. At the time the accident occurred, he reiterated that he was driving the motor vehicle at about 40 KPH.   He testified that when he saw the Combine Harvester, he tried to slow down the vehicle and go off the road but he was unsuccessful as the distance was too short. He further testified that the Combine Harvester had covered part of his lane as he was driving the said motor vehicle. He stated that he did not see the Combine Harvester at the time as he had been blinded by the lights of an     on coming motor vehicle. He then decided to dim his lights and drive the said motor vehicle slowly. He denied that he was driving the said motor vehicle at a very high speed. He blamed the Combine Harvester for causing the accident. He denied that he had colluded with the plaintiff to give false testimony. He stated that he broke eight ribs during the accident. He reiterated that it was the driver of the Combine Harvester who caused the accident. The plaintiff then closed his case.

The 5th defendant closed its case without offering any evidence. The plaintiff and the 5th defendant agreed by consent to file written submissions on liability and quantum. Both the plaintiff and the 6th defendant filed their submissions. I have read

4

**Alexander Kipkoech Kosgey v Frederick Towet & 4 others [2005] eKLR**

the pleading filed in this case. I have also carefully considered the evidence that was adduced in this case. I have also read the written submissions filed together with the decided cases that the parties have relied on. The issue for determination by this court is who between the owners of motor vehicle registration number KWZ 586 and motor vehicle registration number KAA 253K was to blame for the said accident that occurred on the 19th of November 1993? The other issue for determination is what will be the quantum as to damages payable to the plaintiff, if this court finds liability in his favour?

In the pleadings filed in court, the plaintiff blames both the drivers of motor vehicle registration number KWZ 586 and motor vehicle registration number KAA 253K for the injuries that he sustained when the said motor vehicle collided. In their defences the 1st to 4th defendants (*the owners of motor vehicle registration number KWZ 586*) blamed the driver of the Combine Harvester registration number KAA 253K for the said accident. On its part the 5th defendant (*the owner of the Combine Harvester registration number KAA 253K*) blamed the driver of motor vehicle registration number KWZ 586 for causing the said accident. As stated at earlier in this judgment, although the 1st to 4th defendants were served to attend the hearing of this case, they did not attend court. The 5th defendant did not call any witnesses to support the averments made in its defence.

The only evidence that was put before this court for the purposes of determining liability was that of the plaintiff. According to the plaintiff (PW2) he was a passenger in motor vehicle registration number KWZ 586. On the material day, the said motor vehicle was being driven from Nakuru to Kericho. It was at night. When the said motor vehicle reached a place called Salgaa, it was involved in an accident with a Combine Harvester registration number KAA 253K owned by the 5th defendant. The plaintiff testified that the said accident occurred between 8.15 pm and 8.30 pm. The driver of the said motor vehicle he was travelling was driving the motor vehicle on his lane. The accident took place on their lane. He testified that the harvester was bigger than the road. He stated that although the driver of motor vehicle registration number KWZ 586 saw the Combine Harvester he could not estimate its full dimensions as the lights of the Combine Harvester were in the middle of the said Combine Harvester. He stated that it was the driver of the Combine Harvester who caused the accident as he

5

**Alexander Kipkoech Kosgey v Frederick Towet & 4 others [2005] eKLR**

was driving the said vehicle at night without giving any warning to other road users of its full dimensions.

PW3, the driver of motor vehicle registration number KWZ 586 testified that he was driving the said motor vehicle on its lane. Immediately before the accident occurred, he had dimmed the lights as there were many oncoming vehicles. One of the oncoming motor vehicles had temporarily blinded him. It was his testimony that he realised that the oncoming vehicle was a Combine Harvester when he was about ten to fifteen metres from it. He reduced the speed of his motor vehicle to about 40 km/h. He also attempted to drive the motor vehicle off the road in a bid to avoid the collision. He was unsuccessful because he stated that the two motor vehicles were too close. He testified that the accident did occur on his lane. He blames the driver of the Combine Harvester for the accident.

I have evaluated the evidence that was adduced in this case as regards the circumstances under which the accident took place. The evidence adduced by the plaintiff was not controverted. Certain facts emerged from the said evidence which makes the finding of this court on who was to blame for the said accident inevitable. The driver of the combine harvester was driving the said combine harvester at night on a highway. There was no indication that the said combine harvester was under escort by another motor vehicle which could have warned the other road users of the dimensions of the said combine harvester. The plaintiff did testify that the lights of the combine harvester was in the middle of the said harvester. The blades of the combine harvester was thus not visible to other road users especially if they had dimmed their lights as was done by PW3. I think there is a traffic law that mandates owners of motor vehicles with wide dimensions to have the said motor vehicles driven under escort. Such motor vehicles are prohibited from being driven on the highway at night. In the circumstances of this case, it is evident that the driver of the combine harvester was to blame for the accident. He ought not to have been driving the said combine harvester on a highway at night. I therefore find the 5th defendant, the owner of the said combine harvester, solely liable for the said accident. Liability for the said accident attaches to it at 100%.

www.kenyalawreports.or.ke

**Alexander Kipkoech Kosgey v Frederick Towet & 4 others [2005] eKLR**

On quantum, according to the evidence of Dr Wellington Kiamba (PW1) the plaintiff had sustained severe cervical spine injury that resulted in the subluxation of the C5-C7 resulting into quad-paresis and atonic bladder. The injury had resulted in the plaintiff sustaining a paresis of the lower limbs. The plaintiff also had claw hands. There was reduction in the muscle power in the lower limb and muscle tone. There was tenderness on the posterior aspect of the neck. The plaintiff had undergone treatment at various hospitals. The normal functions of his lower limbs could not be restored. He assessed the degree of permanent disability to be 75% under the **Workmen's Compensation**. The medical report was produced as plaintiff's exhibit No. 1. In the said report, PW1 opined that the spinal injury had resulted into quad-paresis and atonic bladder. Physiotherapy was done for a prolonged period at various hospitals and muscle power and tone restored in the upper limbs. At the time of examination (*on 7th of July 2003*) the plaintiff still had paresis of the lower limbs and could not walk without support. Attempts to restore the full functions of the lower limbs had failed.

The plaintiff has submitted that he should be awarded Kshs 3,000,000/= as general damages. He had relied on two cases in support of his submissions; **Joel Kipruto Chepkwony –versus- Ager Kipkosgey Philemon Nakuru HCCC No. 333 of 1999** (*unreported*) and **Magdaline Chebet Sigei –versus- Joseph Njogu Mwaura Nakuru HCCC No. 183 of 1999** (*unreported*).

On its part the 5th defendant has submitted that the plaintiff should be awarded Kshs 1,500,000/=. It has relied on the case of **Nichodemus Owuor Ondondo –vs- Chemelil Sugar Co. Ltd. Nairobi HCCC No. 3217 of 1997** (*unreported*). I have read the said decisions. There is no doubt that the plaintiff sustained serious injuries in the said accident that resulted in his undergoing medical treatment for a very long time. His bodily functions were drastically reduced as a result of the said injuries. The plaintiff was no longer a normal human being after the said accident. He could no longer walk without support, nor could he use his limbs normally. Taking into consideration all the factors in this case, especially the age of the plaintiff, and doing the best that I can, I will assess the general damages to be paid to the plaintiff for pain, suffering and loss of amenities at Kshs 2,000,000/=.

www.kenyalawreports.or.ke

7

**Alexander Kipkoech Kosgey v Frederick Towet & 4 others [2005] eKLR**

The plaintiff produced receipts proving that he had paid        Kshs 19,892.00 to be attended to at various health facilities for treatment for the injuries he sustained in the said accident.  I will also award him Kshs 8,000/= that he paid to Dr Kiamba to prepare the medical report and secure his attendance in court.

In premises judgment is entered for the plaintiff against the 5th defendant as hereunder:

(i)        **On Liability**

The 5th defendant shall bear 100% liability.


(ii)       **On quantum**

(a)  General damages for pain, suffering
and loss of amenities ......Kshs   2,000,000.00

(b)  Special damages  ...        Kshs     27,892.00

TOTAL   2,027,892.00

(iii)       The plaintiff shall have the costs of the suit.

(iv)       Interest shall be applied at the usual court rates.

**DATED at NAKURU this 13th day of May 2005.**


**L. KIMARU**

**JUDGE**

www.kenyalawreports.or.ke

**ATTORNEY GENERAL**
**V**
**JOSEPH WAIYERA**

Court of Appeal at Mombasa
Simpson CJ, Law JA and Hancox Ag JA
28th January 1983

**CIVIL APPEAL NO. 45 OF 1982**

(Appeal from the High Court at Mombasa, Schofield Ag J)

3rd March 1983.  The following judgments were delivered:

Cases referred to:

*Marali v Kenatco*  HCCC 1179 of 1971
*Oluoch v Robinson*  [1973] EA 108
*Smith v Manchester Corporation*  [1974] 17 KIR 1
*Moeliker v Reyrolle*  [1977] 1 All ER 10
*Butt v Khan*  (1982-88) 1 KAR 1
*Pickett v British Railways Engineering Ltd*  [1980] AC 136
*Chambers v Karia*  [1979] (*Kemp & Kemp*  Case 1-107)
*Haji v Batweid*  HCCC 856 of 1979
*Juma v Kenya Glassworks*  Civ App 1 of 1980
*Lalji v Toka*  Civ App 46 of 1980
*Bishop, Re*  [1981] CLY Case 604
*Maisden, Re*  [1981] CLY Case 605
*McCloskey, Re*  [1981] CLY Case 601

*C W Gatonye*  for the Attorney General
*P S Talati*  for the respondent

3rd March 1983.  The following judgments were delivered:

**HANCOX Ag JA**

This is an appeal and cross-appeal from the decision of the learned acting
judge at Mombasa awarding damages to the respondent in respect of injuries
and loss sustained in a traffic accident on 21st December. 1978.  The



www.kenyalawreports.or.ke

www.kenyalawreports.or.ke

Attorney General was sued under the Government Proceedings Act, Cap 40, as the other vehicle involved was a Ministry of Education lorry and its driver an employee of that Ministry.  No issue of liability arose on the appeal or the cross-appeal.

Schofield Ag J awarded the respondent, a senior electrical technician, damages totaling Shs. 682,627/=, and the other plaintiff, his employers, the East African Power and Lighting Company, Shs. 26,910/= for damage to their vehicle which the respondent was driving at the time of the accident. They are not a party to this appeal.

The award of Schofield Ag J in favour of the respondent was as follows:-

| | | |
|---|---|---|
| (i) | Loss of promotion to section Assistant Engineer: four years @ Shs. 1,600/- per month | Shs. 76,800/- |
| (ii) | Loss of promotion to first assistant engineer: four years @ Shs. 3,500/- per month | Shs. 168,000/- |
| (iii) | Loss of promotion to construction engineer: four years @ 6,000/- per month | Shs. 288,000/- |
| | (making Shs. 532,800/-, not 522,800) | |
| (iv) | Skull fracture and eye injury | Shs. 100,000/- |
| (v) | Scars | Shs. 20,000/- |
| (vi) | Damage to three teeth | Shs. 10,000/- |
| (vii) | Special damages (of which Shs. 4,257/- were pleaded, and Shs. 25,660/- for 'loss of promotion' were not pleaded, but apparently became an issue by consent) | Shs. 29,857/- |
| | (not Shs. 682,657/- as stated in the judgment) | Shs. 692,657 |

The total period covered by the supposed losses of promotion equaled the 12 years used as a multiplier by the judge earlier in his judgment.

The first three of these heads of damage were vigorously attacked by Mr Gatonye, now appearing for the Attorney General as the appellant, and the remaining four criticized as much too low by Mr Talati who now appears for the respondent.  A to items (i), (ii) and (vii) above, the basis of Mr Gatonye's attack was that loss of future promotional prospects and earnings can never come under the heading of special damages, the definition of

www.kenyalawreports.or.ke

which he cited from *MacGregor on Damages,* and can at most be 'taken into account' as loss of future prospects which is entitled to as part of his general damages against a defendant. I understood Mr Talati to concede that in his method of calculation the judge had adopted a fundamentally wrong approach, though he maintained his client was entitled to at least this much, if a proper assessment on the evidence of the loss of his earnings had been made and the correct multiplier taken.

For my part I have no hesitation in saying that loss of earnings on future promotion can never be part of an award of special damages, for the simple reason that they are not quantifiable or ascertainable at the date of trial. The term 'special damages' means 'out of pocket expenses and loss of earnings actually incurred up to the date of trial'. As to this aspect of general damages in this case, while the evidence may have suggested that the plaintiff might have achieved promotion but for his injuries, it did not go so far as to say that he would have done so. All his superior, Mr Keitany, said was:

> 'He was in line for promotion before the accident. The accident more than anything else was the contributing factor to him missing promotion. Other thing being equal, if he had continued with his course I cannot see what would have prevented him from reaching construction engineer.'

Earlier he said:

> 'The speed of promotion is not automatic. It depends on individual performance.'

This is a far cry away from the case of *Chambers v Karia (kemp & Kemp Case 1-107)* cited by Mr Talati, where promotion was stated to be 'inevitable'. While I would regard loss of possible promotion as a legitimate factor to be taken into consideration in assessing general dmages, where it can be shown that a person has reasonable prospects of promotion in the ordinary course of events. I would not go to the extent of the mathematical exactitude, which the judge applied in his case, by fixing the precise dates and periods of each promotion. This was speculative and not warranted on the evidence. As the respondent himself said:

> 'The reason I feel the accident affected my promotion because of the

length of time I have been without promotion. I have not asked anyone if that is so but it is my feeling. *A number of us have been promoted, a number of us have not been.* There is no laid down procedure for promotion after three years. We have seen people being hired from outside to take positions we could be promoted to.'

The emphasis is mine. As law JA said in *Oluoch v Robinson* [1973] EA at 113B, in relation to prospective increments (a matter which in some circumstances might be regarded as less uncertain than prospective promotion):

'I cannot personally accept that submission [that the respondent would have received increments had he not been injured]. The respondent had not right to automatic increments, but only to the grant of increments being considered.

For this reasons I am of the view that the judge erred in a specific figure to the respondent as 'the benefit of lost promotion' as part of the general damages. By the same token that part of the special damages which was expressed by the judge to be loss of income from February, 1981 to the date of hearing, at Shs. 1,600/- per month, being the extra amount the respondent would have earned if he had progressed to second assistant engineer, which was based on the evidence of the Coast Area Manager, must also go. As I said, his evidence does not justify that finding, and, accordingly the appeal against the Shs. 25,600/- for this period [February 1981 to May 1982] as part of the special damages must in my view succeed. This leaves untouched Shs. 4,257/- special dmages figure, which was admitted at the outset of the trial.

The foregoing does not, of course mean that the respondent is not entitled to anything for loss of prospects by way of future earnings. Far from it. While I do not accept Mr Talati's submission that the respondent's average loss per month is Shs. 2,000/- as from now, I do consider that he has a claim, or an additional claim, for loss of earning capacity should he ever lose his present job. In *Smith v Manchester Corporation* [1974] 17 KIR at 8, Scarman LJ, and he then was, quoted in *Moeliker v Reyrolle* [1977] 1 All ER 9 (a case cited by both counsel to us0 said it was wrong to describe that sort of earning capacity as a possible loss. He said:

'It is an *existing* loss; the plaintiff is already wakened t that extent,

www.kenyalawreports.or.ke

though fortunately she is protected for the time being against suffering any financial damage because she does not, at present, have to go into the labour market.'

That passage seems to me to fit this case. The respondent has overcome his injuries and, to his credit, is obviously a hard working man, performing his job reasonably well, so he is not imminently in danger of being thrown on to the labour market. But there was credible evidence from Mr Keitany that there is a real risk of early retirement. After advertising to his right eye being impaired and the lack of feeling on that side of his head, he said:

'We hope there is no relapse, but if there is any change it could result in early retirement ... I he goes blind in one eye the chances of his early retirement will be enhanced greatly.'

It was open to the judge to make a finding of lost earnings based on this evidence, and I apprehend that it is equally open to this court to do so now. There was evidence that the normal retiring age is 55. That was accepted by both counsel in this court (Mr Gatonye with some reluctance) as it was by Sachedeva J in *Marali v Kenatco* HCCC 1179 of 1971 (where the plaintiff was 34 years of age at the date of the accident and where the affected eye was virtually a total loss). I consider it is a fair inference, on the unchallenged evidence of Mr Keitany in this respect, that there is a real risk, not merely a speculative or fanciful one (see Browne LJ in *Moeliker v Reyrolle* (supra) at 16) that the respondent will, at some time before the end of this working life, i.e. age 55, be thrown on the labour market. He is therefore, in my judgment, entitled to damages under this head. To assess them is not easy task. As Browne LJ continued:

'I do not think one can say more by way of principle than this. The consideration of this head of damages should be made in two stages

1.      Is there a 'substantial' or 'real' risk that a plaintiff will lose his present job at some time before the estimated end of his working life?

2.      If there is (but not otherwise) the court must assess and quantify the present value of the risk of the financial damage which the plaintiff will suffer if that risk materializes, having regard to the degree of the risk, the time when it may materialize, and the factors, both

favouorable and unfavourable, which in a particular case will, or may, affect the plaintiff's chances of getting a job at all, or an equally well paid job.

It is impossible to suggest any formula for solving the extremely difficult problems involved in the second stage of assessment. A judge must look at a particular case and do the best he can.

Assessing the evidence as best I can take the view that there is a real likelihood of the respondent being out of job (that is to say losing the present one and being unable to get another) at 45, that is in about eight years' time. The 'lost years' (see O'Connor LJ in *Chambers v Karia*  (supra) would therefore be ten, and I think that is the right multiplier/multiplicand to apply ('plucked from the air' to use Law JA's dictum).  The only available evidence of his earnings is that he was at the date of the trial receiving Shs. 3,940/- per month.  He would get a reduced pension on early retirement, but there was not evidence as to how much that would be.  Neither is there any evidence as to what the respondent's expenses would have been on himself for the lost years (*Pickett v British Rail* [1980] AC 136).  Another consideration is the income, which the respondent can expect to receive from such part of the damages, which he may invest, leaving the principal untouched.  With this in mind, and the likelihood of his receiving a pension if he is retired prematurely, I would take the sum of Shs. 3,200/- per month as his prospective loss, and multiply it by 120 months, and I would give the respondent shs. 384,000/-under this head.

I now turn to the cross-appeal, which involved the by no means easy task of assessing in money terms compensation for the severe injuries, pain suffering and loss of amenities of life which the respondent sustained.  Mr Gatonye accepted that the figure of Shs. 30,000/- which the learned judge gave, was possibly too low by 'Shs. 10,000/- or 20,000/-', but not sufficiently or demonstrably so that that part of the award could be said to be made on wrong principles, so as to justify interference by this court (an 'entirely erroneous estimate'), see Law JA in *butt v Khan*  (1982-88) 1 KAR 1.

Mr Talati cited numerous authorities relating to the impairment or loss of any eye, fractures of the skull, coupled with scars and damage to teeth.  I take the following statement of the Respondent's injuries from the report of

www.kenyalawreports.or.ke

Mr Rasik Patel of 22 February, 1980, which cited the findings of the doctor who examined him on admission to hospital:

'1.    Concussion and severe shock due to loss of blood.
2.    Multiple cut – lacerated wounds on the forehead, right side face, lower chin, neck, right shoulder and right ear.
3.    X-rays showed multiple linear fractures of the skull – and also of frontal bone on the right side involving the upper orbital margin and fracture base skull.
4.    He had CSF Rhinnorrhea (leakage of the cerebro-spinal fluid from the nose) due to a fracture of the base skull.
5.    The two right lower incisor teeth and one left upper incisor tooth were broken.'

It will be sufficient to refer briefly to some of these authorities. In *Haji v Batweid* HCCC 856 of 1979, the first plaintiff received a head injury, lacerations, an injury to his right knee, and was left with residual giddiness and lack of ability to concentrate. Kneller J awarded him a total of Shs. 125,000/- general damages. In *Juma v Kenya Glassworks* Civ App 1 of 1980, Kneller J's award for shs. 50,000/- for total loss of vision in one eye was, by a majority, increased on appeal to Shs. 70,000/-. In *Butt v Khan* Law JA, with whom Wambuzi JA agreed, held that Shs. 400,000/- was too much for a child who suffered a severely fractured skull, lost two teeth and had 50% residual permanent disability (though that conclusion was in part based on the disparity between shs. 20/- and the pound sterling). In *Lalji v Toka* Civ App 46 of 1980 the combined court adopted a figure of Shs. 75,000/- as adequate damages for injury to the plaintiff's jaw and teeth.

As to the English cases, in *Re Marsden (Kemp & Kemp* Case 3-683/1/4), Stg.2,500 was awarded for scaring and consequent disfigurement in 1981; similarly in *Re Bishop (Kemp & Kemp* Case 3-682/1/3). In *Re McCloskey (Kemp & Kemp* Case 5-411), a fracture of the skull coupled with a loss of hearing in one ear resulted in an award of Stg.10,000/-.

Taking all these cases into account I consider the correct approach in this case is to award a global sum in respect of the respondent's pain, suffering and residual injuries. In my view, for all these injuries, the gravest being to his eye, the award of Shs. 130,000/- to the respondent was manifestly too low. I would award him Shs. 225,000/- under this head.

www.kenyalawreports.or.ke

In the result I would allow the appeal to the extent of substituting an award of Shs. 384,000/= for the figure of Shs. 533,800/- (which should be 532,800/- awarded by the learned judge under the heading of general damages for loss of future earnings, and of reducing the reward of special damages from Shs. 29,857 to Shs. 4,257/-. I would also allow the cross-appeal to the extent of substituting an increased sum of Shs. 225,000/- for the Shs. 130,000/- given by the High Court. The total of these amount to Shs.613,257/-; which represents the damages to which, in my opinion, the respondent is entitled in this case.

As regards costs, both the appellant and the respondent have had a measure of success, and I would accordingly allow the appeal, with costs and allow the cross-appeal, with costs.

**SIMPSON CJ:**

I have had the advantage of reading in draft the judgment of Hancox Ag JA. I agree with it and with the orders proposed. As Law JA also agrees the appeal is allowed with costs to the extent of substituting Shs. 384,000/- for the amount awarded by the learned judge under the heading of general damages for loss of future income and substituting Shs. 4,257/- for the award of Shs. 29,857/- in respect of special damages. He cross-appeal is allowed with costs to the extent of substituting Shs. 225,000/- for the awarded of Shs. 130,000/- made by the learned judge for pain, suffering and loss of amenities. The total award is therefore Shs. 613,257/-.

**LAW JA:**

I agree with the judgment prepared by Hancox Ag JA which I have read in draft and I concur in the orders proposed by Simpson CJ.

Makube *v* Nyamuro                                          1

# Makube *v* Nyamuro

Court of Appeal, at Kisumu                         March 29, 1983        5
Law JA, Kneller & Hancox Ag JJA

Civil Appeal No 8 of 1983

*Evidence - of a witness of tender years - evidence of person aged sixteen*     10
*years - meaning of tender years - whether evidence of such person requires*
*corroboration.*

*Damages - quantum of - assessment of damages - personal injury-pain*
*and suffering - loss of sight in right eye - principles applicable - relevant*
*authorities - factors taken into consideration.*      15

*Appeal - Court of Appeal - powers of - finding of fact - when appellate*
*court can interfere with findings of fact - guiding principles.*

*Tort - trespass to the person - assault - battery - definition of - distinction*
*of - proof of - onus - intentional and unintentional assault - pleading of.*
                                                           20

The appellant, an infant, sued through his father as next friend for damages
for the loss of his right eye after it was hit by a rope that the respondent,
his teacher, was using to whip him. The appellant, who was aged fourteen
years, and two other pupils, gave evidence that he had suffered the injury
as a result of the deliberate act of the respondent. The respondent denied    25
assaulting the appellant and stated that the injury had arisen out of accident.
The trial judge rejected the appellant's evidence and dismissed his claim
on the basis that it had not been satisfied that the respondent's act had
been deliberate to the extent of holding him liable in a civil suit. The
appellant appealed, submitting, *inter alia*, that it had been a misdirection   30
for the trial judge to refer to the appellant and the other two pupil witnesses
as children of tender years whose evidence required corroboration.

**Held:**

1. A court on appeal will not normally interfere with the finding of fact by    35
   a trial court unless it is based on no evidence, or on a misapprehension
   of the evidence, or the judge is shown demonstrably to have acted on
   wrong principles in reaching his conclusion.

2. The onus of proof of intention or negligence on the part of the defendant
   lies on the plaintiff. Under the rules of pleadings, the particulars of the   40
   alleged negligence must be pleaded and without particulars the claim
   is mere statements disclosing no cause of action. However in some
   cases such as this one involving an intentional assault, the omission to

*check for more decisions at : www.kenyalawreports.or.ke*


PLAINTIFF'S
EXHIBIT

B-9

**2**               Kenya Law Reports         **[1983] eKLR**

plead a negligent trespass to a person is not material. The onus of proving          1
wilful assault and battery was fully discharged against the respondent's
allegation of an accident.

3. Trespass may be intentional or unintentional. If it is unintentional it
may yet be negligent (as distinct from the tort of negligence) or it may          5
be pure accident or misadventure. If the latter, there is no liability
(*Fowler v Lanning* [1959] 1 All ER 290).

4. While 'assault' is frequently the generic term used to cover both assault
and battery, the two are distinct torts; assault being an overt act indicating
an immediate intention to commit a battery and a battery being the          10
direct application of force to the person of another without lawful
justification and both constitute a species of trespass known trespass to
the person.

5. Upon the evidence, it was clear that the appellant had been injured out
of an assault and battery ensuing from an intentional act of the          15
respondent.

6. The evidence of the witnesses aged sixteen years was not evidence of
children of tender years but of young persons which did not require
corroboration.

7. While the evidence of children of tender years would require          20
corroboration as a matter of law in criminal cases, this was neither a
criminal case, nor were the children of tender years.

8. (*Obiter* Hancox JA) Where the cause is one of a tort which is also a
crime (in this case assault) and there is an express mention of criminal
responsibility in the pleadings, it is not entirely improper for the court          25
to treat it in the same way as a criminal prosecution.

9. (*Obiter* Hancox JA) If the evidence of a child of tender years is admitted
by the court under section 19 of the Oaths and Statutory Declarations
Act (cap 15) because he does not understand the nature of the oath,
then that evidence would require corroboration as a matter of law by          30
virtue of section 124 of the Evidence Act (cap 80). In the absence of
special circumstances a child of the age or apparent age of under fourteen
years should be treated within this section (*Kibangeny Arap Kolil v R*
[1959] EA 92 at p 94).

10. (*Obiter* Hancox JA) There was no basis for the judge's finding that          35
the boys were of tender years at the time of giving evidence. Even if
the judge thought so, on *voir dire* the procedure would have been to
carry out an inquiry before receiving the evidence.

11. (*Obiter* Hancox JA) If witnesses are found to be of tender years, it is
prudent to look for corroboration (*Erukana Kyakukagira v AG of          40
Uganda* [1959] EA at page 155).

**Makube *v* Nyamuro**                                          3
**(Law JA, Kneller & Hancox Ag JJA)**

**Cases** ...................................................................................... 1
1. *Kibangeny Arap Kolil v R* [1959] EA 92 at 94
2. *Erukana Kyakulagira v AG of Uganda* [1959] EA 152 at 155
3. *Weaver v Ward* 80 ER (KB) 284
4. *National Coal Board v Evans (JE) & Co (Cardiff) Ltd* [1951] 2 All ER        5
   310 at 317
5. *Davies v Saunders* 1770 2 CHIT 639
6. *Fowler v Lanning* [1959] 1 All ER 290
7. *Patel v AG* HCCC 602 OF 1960 (Uganda) (unreported)
8. *Lukiya Nasejje v HH The Kabaka's Government* HCCS 6 OF 1960        10
   (Uganda) (unreported)
9. *Akongo Ayo v AG* HCCS 6 of 1967(unreported)
10: *Janet Axamo v Soroti Town Council* HCCC 469 of 1970 (Uganda)
11. *Safina Bogga v AG* HCCS 519 of 1970 (Uganda) (unreported)
12. *Visensiyo Kyohbera v West Mengo District Association* HCCC 697 of    15
    1970 (unreported)
13. *Kimathia v Bhamra Tyre Retreaders* [1971] EA 81
14. *Lubia and Lubia v Kenfro Africa Limited and Gathogo Kamini* Nairobi
    HCCS 2382 of 1979 (unreported)
**Texts** ..................................................................................... 20
1. Armitage, A. Dias, RWM. (Eds) (1975). *Clerk & Lindsell on Torts*
   London: Sweet & Maxwell Ltd, 14th Edn para 679
2. Heuston, RF. (1977) *Salmond on the Law of Torts*, London: Sweet &
   Maxwell Ltd, 17th Edn p 121.
3. Wilkinson, M. (1973) *Quantum of Damages for Personal Injuries*, 3rd    25
   Edn pp 49-541.
**Statutes** ...............................................................................
1. Oaths and Statutory Declarations Act (cap 15) section 19
2. Evidence Act (cap 80) section 124
**Advocates** ............................................................................. 30
Mr Osoro for Appellant
Mr Bwokora for Respondent

March 29, 1983, Hancox Ag JA delivered the following Judgment.    35
This is a very sad case in which the infant plaintiff sued by his father and
next friend for damages for the loss of his right eye during an incident at
his school on October 18, 1979. The defendant was his Swahili teacher
and also, at times, his handiwork teacher. I say "incident", because the
manner of its taking place was disputed on the facts. Aganyanya Ag J    40
finding these in favour of the defendant (now the respondent) and he
dismissed the action. The plaintiff now appeals to this court against that
dismissal.

*check for more decisions at : www.kenyalawreports.or.ke*

**4**                    **Kenya Law Reports**              **[1983] eKLR**

The boy, to whom I shall refer as "Bundi" was, it appears, aged fourteen
at the material time, said in effect that his teacher was always picking on
him and had in the past whipped him. On the day in question the teacher
returned to mark the class Swahili exercises and Bundi collected his book.      5
As he returned to go the teacher whipped him three times with a piece of
rope, the third blow causing this tragic injury.

The learned judge remarked that the other two pupils called on his behalf
as witnesses did not fully support his story. Koroso Marube, PW 2, his        10
brother, said that there was an altercation between Bundi and the teacher
as to Bundi's writing, whereupon the teacher pushed him to the desk and
whipped him three times round the neck, while Charles Mageto, PW 6,
said that on being told by Bundi that he had forgotten one letter the teacher
held him by the neck and whipped him three times with the rope. Both         15
agreed that immediately afterwards Bundi urinated on himself. Koroso
said that the teacher used to instruct other pupils how to work, but not
Bundi, and Charles said that he "only caned the plaintiff and not other
pupils," thus supporting Bundi's suggestion of victimisation. They all
agreed that on this particular morning there was a Swahili lesson in the     20
classroom and not an arts and crafts lesson.

The defendant denied any assault and said it was an accident; that he was
teaching arts and crafts to Standard 3; and that he was collecting the ropes
made by his pupils from sisal and stretching each to see who made the        25
longest for marking purposes. As he did so Bundi, who previously had a
white spot on his eye, (not confirmed by the other witnesses) "crossed"
him and the piece of rope which he then had struck him in the eye. Bundi
did confirm that when they had handiwork lessons, which they had the
previous day (which was a Wednesday), the pupils used to make ropes          30
from sisal, which were inspected by the teacher who then gave them to
the pupils to take home. The respondent however said handicraft was
taught on Tuesdays and Thursdays.

While there were differences between the pupils, this is sometimes only      35
to be expected where an accident takes place in front of several witnesses
and some see and depose to some things and others see and depose to
other things. Moreover, Bundi was clearly *in extremis* after this happened
and, speaking for myself, I would not take too harshly against him any
shortcomings in his evidence. Nevertheless the judge disbelieved Bundi      40
and rejected his evidence, and accepted that of the teacher. He accordingly
dismissed the claim for assault, as the case had been pleaded. He did so
on the basis that he was not satisfied that the defendant's admitted act

Makube *v* Nyamuro                                    5
(Law JA, Kneller & Hancox Ag JJA)

was deliberate "to the extent of holding the defendant liable in a civil          1
suit". I note that the defence purported to deny that the defendant was
criminally responsible for the plaintiff being maimed, but I take it that
such denial is intended to and does not include any civil liability, an assault
being a crime as well as a tort. I also note the defendant's version of the      5
facts was nowhere put forward in the defence.

However, a Court of Appeal will not normally interfere with a finding of
fact by the trial court unless it is based on no evidence, or on a
misapprehension of the evidence, or the judge is shown demonstrably to           10
have acted on wrong principles in reaching the findings he did. I therefore
now turn to the criticisms made in the memorandum of appeal that he so
misdirected himself in material respects that the decision ought not to
stand.
                                                                                 15
The case for Bundi was very ably presented by Mr Osoro, who did not
appear at first instance. The first ground in his memorandum of appeal
was that there was a misdirection when the judge held that all three boys,
the plaintiff, Koroso, who was his brother, and Charles Mageto, were
children of tender years and that it was "necessary" that their evidence be      20
corroborated by other evidence of an independent nature implicating the
defendant. It is possible that, since an assault can be a tort as well as a
crime, and since there was express mention of criminal responsibility in
the pleadings, that the learned judge thought the case should be treated in
the same way as a criminal prosecution.                                          25

If that were so then if the evidence of a child of tender years is admitted
by the court under section 19 of the Oaths and Statutory Declarations
Act, cap 15, because he does not understand the nature of an oath, then
that evidence requires corroboration as a matter of law by virtue of section    30
124 of the Evidence Act chapter 80. Mr Osoro dwelt on both these sections,
and he also referred us to *Kibangeny Arap Kolil v R* [1959] EA 92 at p 94,
a criminal case, where this court's predecessor said that in the absence of
special circumstances a child of the age or apparent age of under fourteen
years should be treated as within the section.                                   35

Unfortunately there was no specific finding made by the learned Judge
that any of these boys were children of tender years, and it seems from
the record they were not, because although at the very beginning of the
plaintiffs' evidence he said he was aged fourteen, later on he said he had       40
told the staff at Keroka that he was fourteen years old in 1979 and was in
Std III. Moreover the Out-Patient card dated October 18, 1979 states that
Bundi was then fourteen years old, as does the police P3 form dated
*check for more decisions at : www.kenyalawreports.or.ke*

October 24. Since both the other three boys were also in Std III at the     1
material time, even though Koroso, PW 2, according to Mr Bwokara,
who appeared for the teacher, both in the court below and in this court,
was the younger brother of Bundi, it is a reasonable inference on the
evidence that the three boys were of comparable ages at the material time.     5
This means that the plaintiff, Bundi, was at least sixteen, when giving his
evidence, with Charles Mageto, PW 6, who had progressed to Standard
IV of similar age, and Koroso slightly younger. There would therefore
seem to have been no basis whatsoever for the learned judge's finding
that these boys were of tender years, at the time of giving evidence. Indeed     10
had he thought so, on the *voir dire*, that is to say his visual observation of
them when each came to give evidence, I think he would have carried out
the usual enquiry before receiving the evidence of such witnesses. While
as a matter of law the evidence of children of tender years in a criminal
case would require corroboration, this was neither a criminal case, nor     15
were the children of tender years. Even so, had they been of tender years
it would have been prudent to look for corroboration, as is indicated by
the second authority Mr Osoro cited, namely *Erukana Kyakulagira v AG
of Uganda* [1959] EA 152 at p 155 where the two children were aged nine
and seven respectively. In these circumstances I have no doubt that the     20
reference by the learned judge to the necessity for corroboration of the
evidence of the boys, and of each of them, was a misdirection.

Mr Bwokara sought to argue that the question of corroboration was
immaterial in any event, because the trial judge disbelieved the plaintiff's     25
case that there was an assault. But it would nevertheless have arisen, had
corroboration been necessary, in order to arrive at a proper finding as to
whether what the teacher did amounted to an assault, or was an accident,
as he said.

The next ground argued by Mr Osoro was that the learned judge having     30
made one error, went on to commit another, in that having erroneously
required corroboration he failed to examine the available evidence to see
if it amounted to corroboration. Mr Osoro referred to instanced material
which he said could have amounted to corroboration had the learned judge     35
thought about it. First was Mr Amiami, PW 5, a clinical officer of eighteen
years' experience and who had an appropriate diploma. It is quite obvious,
Mr Osoro said, from this witness' evidence, that considerable force was
used to inflict the damage to the plaintiff's eye, with severe bleeding, the
tissues destroyed and the vision already lost. It was at the very least     40
consistent with an assault and inconsistent with the blow having occurred
by pure chance as the teacher described. Moreover the initial error in
requiring corroboration led the learned judge, so Mr Osoro submitted,

**Makube v Nyamuro**
**(Law JA, Kneller & Hancox Ag JJA)**                    7

into the error of treating Koroso and Charles Mageto as needing          1
corroboration when in fact they themselves could have corroborated Bundi.

Mr Osoro continued by saying that, furthermore, the learned judge failed
to evaluate the evidence before him, that had he done so he would          5
inevitably have made a finding in favour of the boy. For one thing it was
very material to decide whether the class that was taking place that
morning, namely Thursday October 18, 1979, was a Swahili class or an
Arts and Crafts class. The defendant's own witness Lucy Obiero said that
Arts and Crafts were taught twice a week, on Wednesday and Fridays,       10
towards lunch time. This accorded with Bundi's evidence. The teacher,
however, said that handiwork took place on Tuesdays and Thursdays,
and was thus being taught on October 18. This in turn leads to another
point, because the Arts and Crafts lessons took place in a field, the sample
ropes made by the pupils being constructed by them out of sisal, whereas  15
the Swahili lessons took place in the classroom. Obviously it was very
material, in a case of this kind, with disputed facts, that the place where
the incident occurred should be certain so that all the surrounding
circumstances could be clear.
                                                                          20

I do not think there was any merit in Mr Osoro's criticism of the judge's
mention of the police not coming to testify. He just mentioned this matter,
probably because it was referred to by the counsel, and there is in my
opinion no justification for saying that the judge took this against the
plaintiff. Neither do I think the point about the gap in the medical      25
attendances of the plaintiff merits serious consideration; obviously he
would need to be examined as to his condition immediately before the
action came on. I do not think there is any justification either for Mr
Bwokara's criticism that this was done purely with a view of enhancing
the expected damages.                                                     30

Finally Mr Osoro said that the judge paid too much attention to differences
in detail between the boys' evidence. It was quite obvious, he said, that
where events happen quickly, then different stages of the sequence of
events would have been seen by the witnesses. Any minor differences      35
should not be too closely criticised as they were only to be expected.
Were there not differences on the sequence and in details it might be
grounds for suspicion.

As regards quantum, we were referred to a local case where Cotran J      40
awarded a woman Kshs 60,000 for the loss of an eye as a result of an
assault in April 1978. He submitted the figure should be greater for a
child who had, amongst other things, lost his schooling because of the
*check for more decisions at : www.kenyalawreports.or.ke*

loss of an eye. In any event the judge should have estimated the damages,      1.
so that in the event of the appeal being allowed that matter could have
been fully canvassed.

Mr Bwokara supported the judge's conclusions and asks us to dismiss the      5
appeal. He said that the plaintiff's case from the beginning was that the
teacher had a personal grudge and was taking it out on the boy. This he
said was not supported by the evidence, and it was up to the plaintiff to
prove the malice which he had alleged, the onus being fairly and squarely
on him, and this he had not done. The judge had exhaustively examined      10
the evidence in the course of his judgement, and since the incident took
place in the presence of all the three boys, there should not have been the
differences in the evidence that there were. The whole matter, he said,
was a frame-up. As regards damages, in the event of the court allowing
the appeal he submitted that they should not even come to Kshs 10,000.      15

I have considered the submissions with anxious care, and I would hesitate
long before differing from the learned judge's findings of fact, particularly
in this case because he clearly took so much trouble in dealing with the
evidence. Nevertheless I have very regretfully come to the conclusion      20
that had the judge not misdirected himself on the legal necessity for
corroboration of the evidence of the three boys he would then have been
left with three substantive witnesses as to fact, plus other evidence which
Mr Osoro indicated in his submissions as supportive of them. Had he
correctly appreciated that these were not children of tender years and did      25
not require corroboration, in my view he would have approached the
evidence from a different standpoint. Then there is the other material factor
to which I have referred, namely whether this was a Swahili class or a
handicraft class, and, following on from that, whether the incident took
place in the classroom or out in the field. This conflict was never resolved.      30
All these matters, I regret to say, are so unsatisfactory, that it leads me to
the conclusion that if the judge had correctly directed himself he would
inevitably have reached a different finding on liability from that to which
he did.
                                                                              35
I would hold on the evidence in this case that the only reasonable
conclusion is that this injury was inflicted as the result of an intentional
act by the defendant in the course of an assault and battery.

Before dealing with the quantum I propose to say a few words about the      40
other possibility that arose in this case, namely that the defendant's act
was a trespass to the person, unintentional yet negligent, on the defendant's
part. This matter was never pleaded (as in my opinion it could have been)

**Makube *v* Nyamuro**                                    **9**
(Law JA, Kneller & Hancox Ag JJA)

as an alternative cause of action, possibly joining the school as a co-       1
defendant, but it was touched on in the appeal, and it may therefore be of
assistance to set out that which I apprehend to be the law on this aspect of
the case.

5

While 'assault' is frequently the generic term used to cover both assault
and battery, they are two distinct torts, the one being an overt act indicating
an immediate intention to commit a battery (*Clerk & Lindsell* 14th Edition
para 679), and a battery being the direct application of force to the person
of another without lawful justification; and that includes intentionally to       10
bring any material object into contact with another person (*Salmond on
Torts* 17th Edition page 121). Both constitute that species of trespass known
as trespass to the person. The common law liability for trespass was strict:
"No man shall be excused of a trespass ... Except it
may be judged utterly without his fault" (*Weaver v Ward*        15
80 ER 284)".

In the same case (which was cited with approval in *National Coal Board
v Evans (JE) & Co (Cardiff) Ltd* [1951] 2 All ER 310 at p 317), it was
said:       20

"As if a man by force takes my hand and strikes you,
or, if here the defendant had said that the plaintiff ran
across his piece when it was discharging ... so that it
appeared, it was inevitable, and that the defendant had
committed no negligence ..."       25

it would be an accident "purely accidental", *Davies v Saunders* 1770 2
CHIT 639.

That is what the defendant teacher had said here. It was a pure accident
"as the plaintiff was crossing". It is perfectly plain on the authorities, the       30
most recent of which appears to be *Fowler v Lanning* [1959] 1 All ER
290, that trespass may be intentional or unintentional. If it is unintentional
it may yet be negligent (as distinct from the tort of negligence) or it may
be pure accident or misadventure. If the latter, there is no liability, see the
authorities above quoted; but if the former, ie unintentional yet negligent,       35
it was laid down in *Fowler v Lanning* (a shooting case) by Diplock J (as
he then was) that the onus of proving negligence lay on the plaintiff, and
that he must give particulars thereof. He said, at P 298 B to C:

"If, as I have held, the onus of proof of intention or
negligence on the part of the defendant lies on the       40
plaintiff, then, under the modern rules of pleading, he
must allege either intention on the part of the defendant,
or, if he relies on negligence, he must state the facts
*check for more decisions at : www.kenyalawreports.or.ke*

**10**                    **Kenya Law Reports**              **[1983] eKLR**

which he alleges constitute negligence. Without either                                    1
of such allegations the bald statement that the defendant
shot the plaintiff in unspecified circumstances with an
unspecified weapon in my view discloses no cause of
action. This is no academic pleading point. It serves to                                  5
secure justice between the parties."
and further on:
"But I have today to deal with the pleading as it stands.
As it stands, it neither alleges negligence in terms nor
alleges facts which, if true, would of themselves                                        10
constitute negligence; nor, if counsel for the plaintiff is
right, would he bound at any time before the trial to
disclose to the defendant what facts he relies on as
constituting negligence."
                                                                                         15
However, since I have reached the conclusion, on my own evaluation of
the evidence, that this was an intentional assault, the omission to plead a
negligent trespass to the person is not material in this case. The plain fact
is that those legally advising the plaintiff chose to put his case on the
footing of intentional, and not unintentional, trespass. In my judgment                  20
the evidence established this allegation on the balance of probabilities,
and accordingly, the appellant is entitled to succeed.

I return to the aspect of the quantum of damages. The decision of Cotran
J, which was cited, is distinguishable in that the judge expressly found                  25
that the female plaintiff suffered from an unsightly deformity, which would
occasion loss of earning power and diminish her marriage prospects. There
are no such considerations in this case. Doing the best I can on the available
material, I would award to the plaintiff Kshs 30,000 as damages for the
tort of assault and battery that the defendant committed against him. As                  30
to costs, the appellant is entitled to his costs in the appeal and in the High
Court, and I would so order.

**Law JA.** I have read in draft the judgment prepared by Hancox Ag JA. I
agree with him that had the learned trial judge not misdirected himself as               35
to the necessity for corroboration of the evidence of the plaintiff and the
other two boys, he must have found in favour of the plaintiff. These
witnesses were not children of tender years, but young persons aged
sixteen. Their evidence did not require corroboration, it was consistent,
and in my view fully discharged the onus of proving a wilful assault and                 40
battery, as against the respondent's unsupported story of a pure accident.

As regards damages, it was not proved that the appellant's schooling came
*check for more decisions at : www.kenyalawreports.or.ke*

**Makube v Nyamuro**                                                11
**(Law JA, Kneller & Hancox Ag JJA)**

to an end because of his injury. He was apparently, normally occupied as      1
a herdsman, and there is no evidence that the loss of sight in one eye will
interfere with that or other agricultural pursuits. I consider that he would
adequately be compensated with an award of Kshs 30,000 for loss of the
sight of one eye, pain and suffering.                                         5

In the circumstances of this case, as the plaintiff is now approaching the
age of majority, there is no need to make the usual orders as to the
investment of any damages which may be recovered from the respondent.
Such damages may be paid to the plaintiff's father and next friend, to be    10
applied for the plaintiff's benefit, any balance remaining being paid to
him on reaching the age of eighteen years.

I agree that this appeal, must be allowed, with costs both in this court and
in the High Court. As Kneller and Hancox Ag JJA agree, it is so ordered.     15
The judgment and decree of Aganyanya Ag J are set aside, and as Hancox
Ag JA agrees, a judgment and decree awarding the plaintiff general
damages of Kshs 30,000 substituted.

**Kneller Ag JA.** I agree with Hancox Ag JA that the appellant and his       20
witnesses proved on the balance of probabilities the wilful assault and
battery upon him by the respondent. Their account of the event, on a
simple reading of all the evidence, begins with the merit of seeming to be
the more likely way it happened but this was lost sight of by the learned
judge requiring unwanted consistency in the recollection of what happened    25
about two and a half years before the appellant and his classmates and
over and about that corroboration which was not required and which he
did not discover though it was, in fact, all there.

These are sufficient reasons for not being persuaded that the trial judge's   30
assessment of the credibility of the parties and witnesses, based on the
usual advantage he has in having seen and heard them, should prevail.

Only one local earlier award of damages was cited and that was unhelpful
because the facts were far from similar. We are not confined to the paucity   35
of material put before the judge or this court.

Ideally the issue of damages should be referred to the High Court judge at
Kisii for submissions and decision for he could then see the appellant and
call for further medical or other evidence if he thinks it necessary but we   40
have been implored by both parties to do this here.

A boy aged 10 ½ years who suffered an injury to an eye which had to be
*check for more decisions at : www.kenyalawreports.or.ke*

removed was awarded Kshs 500 for pain and suffering (a low sum because        1.
the nerve of that eye was also destroyed) and Kshs 35,000 for the loss of
the eye by Jones J in the High Court of Uganda in 1961: *Patel v AG*
*HCCC 602 of 1960*. He awarded a thirteen year old girl Kshs 45,000
general damages for the loss of an eye in an accident in 1966: *Lukiya*        5
*Nasejje v HH The Kabaka's Government* HCCS 6 of 1960. Rusell Ag J
chose a figure of Kshs 35,000 in 1967 for a girl aged twelve who lost an
eye in an accident and took into account the possibility and fear that
something might happen to the good eye. No evidence was led however
of pain and suffering: *Akongo Ayo v AG* HCCC 6 of 1967. General damages      10
of Kshs 40,000 for pain and suffering was Musoke J's award in 1971 for
a girl aged eleven who lost the sight in her left eye when it was injured:
*Janet Asamo v Soroti Town Council* HCCC 469 of 1970. The same award
of Kshs 40,000 for a school girl aged eleven for the loss of her left eye
was given by Phadke J in 1970 in *Safina Bogga v AG* HCCS 519 of 1970.         15
Musoke J put it up to Kshs 45,000 for a school boy aged seven who lost
his right eye when he caught it on a hook on a lavatory door at his school
in 1971: *Visensiyo Kyohbera v West Mengo District Association* HCCC
697 of 1970 and in 1971 Youds J raised it to Kshs 50,000 for a schoolgirl
of fifteen who lost an eye as the result of the negligence of her school. It  20
would have been greater had she not refused to have it removed and
replaced with an artificial one.

These are decisions of a court in a neighbouring country (*Quantum of*
*Damages for Personal Injuries* by Michael Wilkinson, 1973, 3rd Edition,       25
pages 49 to 54) and of about a decade or more ago. They are awards of a
foreign court and helpful as a guide but no more because conditions in
Kenya now are very different from those in Uganda between 1959 and
1972 (see Law JA in *Kimothia v Bhamra Tyre Retreaders* [1971] EA 81
(CA-K)). The value of money has fallen very greatly since 1959 (almost        30
everywhere in the world) and as a consequence awards of damages in
Kenya have increased.

The only recent Kenya award I have had brought to my notice is one of
Kshs 150,000 by Cockar J on March 9, 1982 in *Lubia and Lubia v Kemfro*       35
*Africa Limited and Gathogo Kamini* Nairobi HCCS 2382 of 1979.

Olive Lubia was eight years old at the time of the accident and twelve at
the time of the trial. She sustained a fracture on the right side of her frontal
bone and her right eye was destroyed in the accident.                         40

It was replaced with a glass eye which the learned judge noticed was not
the same as the other one and dribbled tears when she gave evidence. He

**Makube v Nyamuro**                                                    13
**(Law JA, Kneller & Hancox Ag JJA)**

was referred to English decisions between 1974 and 1980 relating to       1
awards of damages for girls of the same age for the loss of one eye and
they range from Kshs 90,000 to Kshs 200,000. The injury was not shown
to have affected Alex's progress at school but it would probably affect
her marriage prospects and her chances of a good job in a difficult labour    5
market. The learned judge also considered the young girl's feelings about
the cosmetic effect of being one-eyed. A notice of intended appeal was
filed in this suit in March this year so I will say no more about it.

The appellant was a youth of fourteen when the respondent injured his     10
eye and he lost sight in it there and then. The shock was such that he
urinated over himself and he leant in agony over a desk. Nothing can be
done to restore his sight in that eye. When he reads his left eye waters.
This (and more particularly an understandable desire to avoid meeting
the respondent again) probably led to his ceasing to attend this school. He    15
could have and still mitigate damages by having treatment and or spectacles
for the left eye and attending a school which does not employ the
respondent. He was not doing well at school before this happened and he
had had to repeat class 2 but the fact that he herded his father's cattle
when he was not at school does not mean he was bound to return to this    20
task had the respondent not given him a marked distaste for that school.
All children save those of the rich in that area have this chore to perform.
The plaintiff's advocate submitted the damages should be Kshs 60,000,
at least, and the defendant's put it lower than Kshs 10,000.
                                                                          25
Weighing one thing with another and doing the best I can on the material
before us I would assess the appropriate award of damages for this injury
at Kshs 60,000 for the loss of sight in one eye, pain and suffering. I regret
having to differ with the majority of the court, but I have to add, with
great respect, that I think my figure may still be on the low side.        30

The appellant succeeds in this court in having the judgement of the High
Court reversed so he should have his costs here and below.

                                                                          35




                                                                          40


*check for more decisions at : www.kenyalawreports.or.ke*

Kigika Developers Ltd v Nairobi City Commission

# Kigika Developers Ltd v Nairobi City Commission

High Court, at Nairobi October 14, 1986
Shields J
Civil Case No 3923 of 1985

*Land – compulsory acquisition of – acquisition by local authority for public purposes – acquisition done contrary to Land Acquisition Act (cap 295) – claim of damages by owner of land – how damages for compulsory acquisition assessed— failure of local authority to approve development plans – whether damages for economic loss may be awarded for such failure – object of town planning legislation.*

*Damages – general damages – exemplary damages – for compulsory acquisition of land – land acquired unprocedurally by local authority for public purposes - assessment of damages for compulsory acquisition – whether a proper case for award of award exemplary damages.*

*Tort – breach of statutory duty – malicious or negligent abuse of power - failure of local authority to approve development plans for land – whether owner of land entitled to recover economic loss for such failure.*

The plaintiff purchased a piece of land in Nairobi with the intention of developing it. The defendant, which was charged with the functions of a local authority, took over the plaintiff's land for its own public purposes without following the procedure provided in the Land Acquisition Act (cap 295) for doing so.

The plaintiff sued the defendant claiming compensation and exemplary damages for unlawful acquisition of its land, trespass, economic loss from the refusal by the defendant to approve its development plans and for economic loss. The defendant's defence was struck out and a formal proof hearing was held.

**Held:**

1. The court treated the defendant's unlawful acquisition as a compulsory purchase and it would award damages as if the land had been acquired under the Land Acquisition Act (cap 295).

2. Following the decision in the case of *New Munyua Sisal Estates Ltd v Attorney-General* [1972] EA 88, the compensation for the compulsory acquisition would be reckoned as the market value of the land and an additional 15% of that value.

3. Though the defendant was under a statutory duty to approve or disapprove the plaintiff's development plans for the land, the town planning legislation was enacted to protect the public interest and not land developers. Consequently, the plaintiff did not have an action for breach of statutory duty and it could not claim damages for the defendant's alleged refusal or neglect to approve the plans.

4. The tort of malicious or negligent abuse of power is still a nascent tort. Each tort is different and since the matter is one of policy, each can be decided in a different way from the next one.

5. Following the policy considerations set out in *Castle v Stockton Waterwork* LR 10 QB 453, the plaintiff was not entitled to damages for economic loss caused by the failure of the defendant to approve the building plans whether that failure was negligent or malicious.

6. This was not an appropriate case for making an award for exemplary damages.

*Case ordered to proceed for assessment of the market value of the land.*

**Cases**

1. *New Munyu Sisal Estates Ltd v Attorney General* [1972] EA 88
2. *Davis v Browly* [1908] 1 KB 170


PLAINTIFF'S
EXHIBIT
B-10

3. *David v Abdul Kadhi* [1963] 1 WLR 864
4. *Cutler v Wandsworth Stadium Ltd* [1949] AC 398; 1 All ER 544
5. *Sparton Steel & Alleys Ltd v Martin & Co* [1972] 3 WLR 502; 3 All ER 557
6. *Rylands v Fletcher*
7. *Kenya Ports Authority v East African Power & Lighting Co Ltd* [1982] KLR 410
8. *Castle v Stockton Waterworks* LR 10 QB 453

**Statutes**
1. Land Acquisition Act (cap 295)
2. Factories Act (cap 514)

**Advocates**
*Mr Munene* for the Plaintiff.

October 14, 1986, **Shields J** delivered the following Ruling.

This matter originally came before me on an application to strike out the defence. I struck out the defence but as the action was somewhat unusual I refused to give judgment, but directed that the case be set down for Formal Proof.

When the case came before me for Formal Proof, the Advocates for the parties had not properly thought out the case, but after some discussion in Court and a ¹/₂ days adjournment the issues became clear to both Judge

**Kigika Developers Ltd *v* Nairobi City Commission
(Shields J)**

and Counsel and I have had much assistance from the Advocates.
Briefly the facts are these –

The Plaintiff purchased land in NAIROBI with the
intention of developing it. Unfortunately the defendants
took over this land for its own public purposes without
following the Statutory Procedure as laid down in the
Land Acquisition Act (cap 295) and dispossessed the
plaintiff. This type of semi forcible dispossession is not
a new thing in Kenya and the Court have found a remedy
for it. The Courts treat the unlawful acquisition as a
compulsory purchase and award damages as if the land
had been acquired under the Land Acquisition Act (cap
295) that is the Market Value of the lands and 15%

This method of dealing with compensating this wrong was the method
decided upon by the late Mr Justice Chanan Singh in *New Munyua Sisal
Estates Ltd vs Attorney General* [1972] EA 88. This case has never been
dissented from, Counsel for both parties agree that the decision is correct
and for my long experience in the State Law Office, I know that it has
been used as the appropriate method of settling many claims where
Government has taken land unlawfully or under the guise of Management
Orders to settle the landless I propose to apply its principles to this case.
By doing so I believe I am satisfying 3 of Mr Munenes claims which he
categorized as follows:-
(1) Unlawful acquisition of LR 219/16
(2) Trespass
(3) Breach of an agreement to offer to exchange land
for Land Acquired.

I propose to hear evidence of the value of the lands, assess its market
value to which I shall add the appropriate 15%.

Mr Munene has 2 further claims which I shall now consider. The first
claim amounts to a sum of over 12 Million shillings damages. Particulars
of this claim which is alleged to have arisen from the unlawful refusal or
neglect of the defendants to approve of the plaintiffs development plans

for the said plot, are set out in Paragraph 10 of the Amended Plaint. Can the plaintiff claim damages for this? I think not. Admittedly the defendants were under a Statutory duty to approve or disapprove of these plans. Does a refusal to act whether malicious or not gives rise to a claim in damages? The English Court of Appeal in *Davis v Browly Corporation* [1908] 1KB 170 decided that it did not. This decision criticized by the Privy Counsel in *David v Abdul Kadhi* [1963] 1 WLR 864. This was a decision on delict in Roman Dutch Law but the comments of the Board are relevant. They pointed out that there had been considerable development in the law relating to actions for damages since Davis & Browly and the decision might have to be reconsidered in the light of such developments. These developments can be found in the House of Lords decision in *Cutler v Wandsworth Stadium Limited* [1949] AC 398. As I understand this decision there is an action for damages for breach of Statutory duty causing injuries to a person for whose benefit the Statutory duty has been imposed. Thus a factory Worker who is injured because of a breach of Statutory duty under the Factories Act (cap 514), can sue for damages caused by reason of the breach because the Factories Act was enacted for the protection of Factory Workers. The Town Planning Legislation however was enacted to protect the public interest and not the land developers, consequently the plaintiff does not have an action for breach of Statutory duty which duty arises out of this legislation. The plaintiff has further difficulty in respect of this claim. The damages alleged is not physical injuries to a person or property, it is "economic loss" only. The Courts and the Faculties of Law in Universities have long pondered the question whether the Courts can compensate by an award of damages economic loss only. The diversity of views on this subject can be seen by reading the judgments in *Sperton Steel & Alleys Limited v Martin & Company (Contractors)* [1972] 3W LR 502. Our Court of Appeal and Mr Justice Kneller ( as he was then ) have decided that an action based on *Rylands v Fletcher* does not lie when the only injuries is "Economic Loss" (*Kenya Ports Authority v KP&L Company Limited* (in) App No 41/1981. Can an unlawful failure to approve building plans be actionable when the only injuries is "economic loss". The Tort of malicious or negligent abuse of power is as one writer puts it still A nascent tort. Each Tort is different and since the matter is one of policy, each can be decided in a different way from the next one. Were I told to hold that the defendants were liable in this case, I should have to hold the City Council liable to these when they would have been employed on the plaintiffs proposed development to potential suppliers and to potential Maisonnettes purchasers. The policy consideration set out by Mr Justice Blackburns in *Castle v Stockton Waterwork* LR 10 QB 453 apply to this claim of the plaintiff and I am prepared to hold further that the plaintiff cannot review damages for economic loss caused by the failure (be it negligent or malicious) to approve his building plans. I accordingly refuse to award any part of the special damages claimed in paragraph 10 of the Amended Plans.

As to Exemplary Damages, I do not believe this is a case for the same. No word of such damages was made in the New Munyua Sisal case and I do not propose to give any here. I shall accordingly, hear evidence only in the value of the land in 1981.