# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Odillia Mutaka Mwani, *et al.*    :
             :
    Plaintiffs     :
             :
v.           :   CA No. 1:99CV00125
             :   Magistrate Judge John M. Facciola
United States of America, *et al.*   :
             :
    Defendants    :

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

This court conducted an evidentiary hearing in this matter from January 31, 2011 to February 3, 2011. [1] The testimony was adduced from Nairobi, Kenya.  Testimony was taken from the following witnesses: Jane Kawira Naivasha; Protus Manyasa Buluma; Dipak Shah; Wilfred Ngunjiri Nderitu; Noah Thuo Kimani; Charles Makori Mogi; Kioko Muema; Castro Otiende; and Joan Mwendi Kiema-Ngunnzi.  This court admitted into evidence the following exhibits:  Photographs,(Plaintiffs' Exhibit ("PX") 1; Video of Bombing Site August 7, 1998, PX2; April 9, 1999 report from the Department of State, PX 3; January 8, 1999 Report, Accountability Review Board, PX 4; Report: An Assessment of Recovery Strategies of the 1998 Nairobi Bomb Disaster Victims: A Case Study of Teachers Service Commission (TSC) from Ms. Kiema-Ngunnzi, PX 5; a study" Psychological Effects of the Nairobi U.S. Embassy

---

[1] There are four transcripts of the proceedings:  all proceedings on January 31, 2011 ("Transcript I"); all proceedings on February 1, 2011 ("Transcript II"); the morning proceedings on February 2, 2011 ("Transcript III"); the afternoon proceedings on February 2, 2011 ("Transcript III"); and all proceedings on February 3, 2011 ("Transcript IV").  No evidence was adduced on February 3, 2011.  Pursuant to order of this court, plaintiffs filed with their proposed findings of fact and conclusions of law witness duly-sworn declarations clarifying transcription ambiguities.

Bomb Blast on Pregnant Women and their Children published in World Psychiatry, PX 6. and a drawing of the site, PX 7.

On the basis of that evidence, the court makes the following findings of fact and conclusions of law:

**FINDINGS OF FACT**

On August 7, 1998, defendants Usama bin Laden and al Qaeda ("Defendants")[2] exploded a massive truck bomb at the United States Embassy in Nairobi, Kenya.

In its 1999 commissioned Compilation of Data related to the Terrorist Events, captioned The Bombings of the United States Embassies in Dar Es Salaam, Tanzania and Nairobi, Kenya, PX 3, the US State Department analyzed some of the technical aspects of the bombing blast. As the 1999 compilation explained:

> At approximately 10:30AM on Friday, August 7, 1998, two vehicle bombs detonated nearly simultaneously at United States embassies in Dar Es Salaam, Tanzania and Nairobi, Kenya.

> The United States Embassy in Nairobi, Kenya was located on a half-acre site in downtown Nairobi at the busy intersection of two main thoroughfares, Moi and Haille Selassie Avenues.   Behind the embassy was the four-story Ufundi Cooperative House, with numerous offices and a secretarial school, and the 23-story high-rise Cooperative Bank building….

> At the rear of the embassy was a parking lot shared with the adjacent Cooperative Bank. …(After entering the parking area), one of the terrorists began shooting at the chancery and the other tossed a flash grenade at the guard….  Approximately 10 seconds after the grenade exploded, the bomb in the vehicle detonated….

> The explosion killed 213 people, including 44 embassy employees…..  Many of these fatalities were due to occupants going to the windows after the grenade exploded to see what was happening outside.

---

[2] All other defendants have been dismissed from this action.  On September 28, 2006, a default was entered against defendants. Docket Number ("#") 80.

Other casualties were pedestrians and motorists in the crowded streets next to the embassy. Vehicles caught fire; at least eight bus passengers died. In total, 20 persons were blinded, and 50 have severely limited sight from lacerations incurred from flying shards of glass; the actual count of eye injuries is in the hundreds, but the severity of many will not become apparent for some time. The shock of the explosion broke glass in buildings and vehicles within at least a quarter-mile radius.

The collapse of the Ufundi building confirms the extreme hazard posed by building collapse. The majority of the fatalities were persons trapped and crushed under the weight of the building after falling several stories….

Given the types of injuries most prevalent in these incidents, non-penetrating fragment impact is probably the most appropriate injury model for severe injuries. A radius of 200 feet indicates that all people within a one-half block radius (not protected by buffering walls) were vulnerable to injury from flying debris…. For glass injuries, the radius is 1000 feet. Reports indicate that injuries due to glass fragments extended somewhat further out than this model predicts.

PX 3, at (Bates) 9265, 9273, 9275, 9277, 9278, 9279, 9280. And *see,* generally, *In re Terrorist Bombings of the U.S. Embassies in E. Afr. (Fifth Amendment Challenges),* 552 F.3d 177, 213-14 (2d Cir.2008), *aff'g United States v. Bin Laden,* 132 F.Supp.2d 168 (S.D.N.Y.2001).

All witnesses were and are citizens of Kenya.

Ms. Naivasha testified credibly as follows: Ms. Naivasha's husband Abel Mutegi Njiru was killed in the Embassy bombing. They had been married for three and a half years.

Ms. Naivasha has six brothers and two sisters, and was raised in a Kenyan town about 250 kilometers outside of the capital city of Nairobi. She received her "A" level, or high school level education there, and attended Griffins Secretarial College in Nairobi for two and a half years. She did not complete her college courses initially because of financial constraints and, later, because of the death of her husband.

In 1983 Ms. Naivasha began a temporary job as a receptionist in Nairobi with an insurance company then called Minet ICDC, and now called AON Kenya. Ms. Naivasha later

became a permanent employee with that company, where she is employed today.

Ms. Naivasha met her husband at work.  He was a client of the firm, and they began dating. Their son was born in 1994. They were married on March 2, 1996, and began to live together after their marriage.  They rented a home in a home in a good neighborhood with good schools. The family stayed in that home until Mr. Njiru's death.

Her husband was a high school teacher and a writer, and brought in most of the family income.

They lived a happy married and family life.  Ms. Naivasha testified that "I received the best love that I could get from a husband….(H)e would always be out looking for me and if I'm well….I kept saying I had the best marriage ever." Transcript I, at 18.  They traveled together, and shared hobbies.  Ms. Naivasha reviewed her husband's writing, and attended the theatre with him on weekends. They were only apart for one week during their marriage, and that separation was "hard." Transcript I, at 21.  They had planned on three children.  Ms. Naivasha was pregnant with their second child on the day her husband died.

Their son, who was three years and 11 months old on the day of the Embassy bombing, was doing well in school.  Mr. Njiru was a good father and "friend" of his son, who was attending the school in which Mr. Njiru taught.

In the morning of the Embassy bombing, their lives were "very happy.  Nothing seemed like would go wrong…." Transcript I, at 23.  That day was a school holiday, so Mr. Njiru was at the Ufundi Cooperative House near the American Embassy.  He told Ms. Naivasha that he going to see a doctor that morning because he had the flu.  Ms. Naivasha was at work a couple of kilometers from the American Embassy.

She and others at her office heard a loud bang but attributed it to a strike that was taking place. But by 3:00PM Ms. Naivasha began to worry because her husband had not contacted her, even though he always called her during the day to talk about events taking place.  She tried to go to the area of the American Embassy because she and her colleagues had heard that the Embassy had been attacked, but she could not get close to the scene.  There were people "everywhere," id, at 26, and vehicles leaving the scene, and dust.  She returned to her office, "collected herself," id., at 27, and called the doctor, but was told that her husband had left to go to his office around 10:00AM.

She left work early and went home. She called her family, who came over to her house. She testified that: "We watched as we waited for him to, hopefully, come home. But we continued watching. We continued watching. And 8:00, 9:00, 10:00 he hadn't called, he hadn't come. 11:00, midnight he hadn't come…. I was hoping he was somewhere helping out with the victims"  Id., at 27.

The family then decided to start searching the hospitals. They divided into teams of three. Ms. Naivasha searched hospitals for three days.  The scenes at the hospitals were "traumatic," with "blood everywhere," and with the constant sound of ambulances and with people crying. Id., at 28.  At the end of each day, Ms. Naivasha would return home.  Her son asked: "Where's daddy? Did you come home with daddy?" Id., at 28. The day after the embassy bombing, Ms. Naivasha had a miscarriage.

By Sunday, two days after the bombing, the rescue operation was continuing.  Ms. Naivasha could not continue searching hospitals. She was "traumatized," she could not sleep. Id., at 34. On Monday, she stayed in her house while her relatives continued the search.  That day,

her brother-in-law said that they should start checking the mortuaries.  On Tuesday, Ms. Naivasha heard an announcement that the rescue operation had been ended.

On Wednesday, her sister and brother in law approached the house, and Ms. Naivasha could tell from their expressions that her husband's body had been found.  They explained that the body had been found "in the rubble," and that a leg and an arm had been severed, and that his head was "completely smashed up."  Id., at 42.  Ms. Naivasha was "completely blind" by the news, and went to her bedroom to cry.  Id., at 42.  She testified that she wasn't in her "right mind," id., at 43, and she did not view the body because she wanted to remember her husband as he was when he was alive.

Financially, the loss of her husband compelled Ms. Naivasha to cancel the exam she had scheduled for September to advance her schooling.  In four months she was forced to leave her home, and relocate to a one bedroom "slum" with an outside latrine.  Id., at 47. She placed her son in a less expensive school.  She continues to struggle financially without her husband.  Her happy life changed completely as a result of her husband's death.

Emotionally, she suffered from headaches, sleeplessness and depression.  She was "stigmatized" by friends, who, consistent with certain elements of African culture, wondered what she had done to bring tragedy upon herself and her husband. Id., at 48.  Her son has suffered from the loss of his father, and is taunted at school because he doesn't have a father. Ms. Naivasha has assumed the role of both mother and father to her son.

Ms. Naivasha still remembers the tragic events surrounding her husband's death.  She still cries a great deal at the painful memories.  She testified: "I'm wondering why did it happen. We would be together now.  We'd have another two children…. It's just that emptiness that I

cannot explain."  Id., at 53-54.

Mr. Buluma testified credibly as follows:

Mr. Buluma is 51, married with five children. He cannot see properly because of injuries he sustained at during the Embassy bombing. He was accompanied to the hearing by his youngest son.

He was raised in western Kenya until he was 15. He has two brothers and three sisters. He attended grammar school and completed his "A" studies in seminary, and followed up with seminary in Nairobi, and attendance at the University of Nairobi, where he received a certificate in religious studies. He subsequently completed certificate courses in management and strategic planning, and community participation.

He took a position in 1985 as a project coordinator with a non-governmental organization in Nairobi the purpose of which was to improve life in the Nairobi slums.

In 1990, he took a job as an insurance salesman in Nairobi, and, when that company sold its business, he joined, in 1996, a real estate valuation and property management company called Muyoti and Associates as a salesman.  That company's offices are directly across from the American Embassy.  He worked at that company on the day of the Embassy attack, on the third floor.

Mr. Buluma took pride in and enjoyed his work.  He was paid on salary and commissions, so his monthly income fluctuated between 120,000 and 150,000 Kenyan schillings ("KSH"). He was the sole support of his immediate family, and consistent with the African custom of the "extended family," provided financial support to many other family members. Transcript I, at 67-69.  Prior to the attack on the Embassy he was happy and healthy.

At about 10:00AM on August 7, 1998, Mr. Buluma heard a small blast, and with others approached the window in his office.  When the second blast followed, he was knocked down, felt the concussion, and was in pain. He was bleeding from his chest, he could not breathe properly, his eyes "were not working," Id., at 71, glass had torn through his clothes, and he was in pain. There was dust and smoke, and "blood everywhere."  Transcript I, at 72.

Everything in the office had "fallen down," id., at 71, and he and others were crawling on the floor to escape. He felt "trapped." Id., at 71.

He was pulled out by others, after 15 to 30 minutes.  He unsuccessfully tried to remove the pieces of glass from his body.  Before he went into the ambulance, he saw other victims, some of whom were in very bad condition.  He testified that he saw some victims who "had their whole face burned, and you could see meat, nothing else." Id., at 75.

At the hospital, "some people were just piled there." Id., at 76. It was a bad scene, and he was traumatized.  His vision was still poor, and he was given painkillers.  Pieces of glass were removed from his body, and he was sent home.

Mr. Buluma has very little or no vision in his left eye, and he has limited, or 20% vision in his right eye, because pieces of glass were blown into his eyes by the bomb blast and concussion.

Mr. Buluma has suffered from headaches and nervousness at loud sounds since the attack on the Embassy, and received psychiatric treatment.  He feels "dead," and "debilitated" from what he suffered and what he saw. Id., at 83, 85.  He suffers from sleeplessness.

His business was destroyed, the company eventually closed, and he lost his job, and can no longer support his family.  He is regarded as "disabled,"  and, "in this part of the world, (t)hey

cannot think of employing a disabled person." Id., at 85.  In African society, they "resent"

victims of events such as the bombing, and do not believe that you can work effectively.  Id., at

85. He has unsuccessfully sought other employment.  He sometimes views himself as a

"beggar." Id., at 88, 93.

Mr. Shah testified credibly as follows:

Mr. Shah was born and raised in Nairobi, and has one brother and one sister.  He went to

Great Britain to pursue degrees in chemicals and business studies.  Because of a family illness,

he returned to Nairobi in 1976 before completing his studies.  He is married, with two children.

On his return to Nairobi, he found a vacant shop and, with his brother, opened a

menswear store.  His family had in the past imported some clothes for a family business.  Mr.

Shah was a 50% owner with his brother of the new business, which they called "Cloud Nine",

and which operated around the corner from the American Embassy.

By 1998, the business was netting annual profits of 500,000 KSH.  There were three

employees.  The business had many regular customers, including prominent officials and their

family.  Neither Mr. Shah not his brother intended to expand, because they were "quite happy"

with the business as it was in 1998.  Transcript I, at 107.

On August 7, 1998, Mr. Shah was in the back of the shop.  He heard two blasts, and felt a

tremor in the floor, like an "earthquake." Id., at 110.  The shop windows shattered, and power

was immediately cut off. Mr. Shah feared that the building was going to collapse.

Mr. Shah went outside "and was just walking around in a daze." Id., at 111. Mr. Shah

saw many victims of the bombing.  Many of the injuries were in the faces.  He saw victims with

glass embedded in their heads.  He saw intestines, brains, eyeballs.  He saw dead bodies and

seriously injured victims.  He saw "blood everywhere."  Id., at 119.

He lost his business because the business in the area "just died." Id., at 122.

Mr. Shah suffers from sleeplessness, and, since the embassy attack, has had problems with ordinary tasks such as texting and keyboarding.  He will not go to the movies or other public events because of the fear caused by the Embassy attack.  "Not a day goes by" without Mr. Shah thinking of those scenes.  Id., at 119. Mr. Shah testified that "(i)t was just too much.  I try to block a lot of it out … but it doesn't work.  I try to forget it but no way.  You can't forget it."  Id., at 124.

Mr. Nderitu testified credibly as follows:

Mr. Nderitu is a Kenyan attorney who is a survivor of the attack on the American Embassy.  He was born in Nyeri, Kenya.  He is married and has three children.

At age 7, he and his family moved to Nairobi.  He began his university training at the University of Nairobi in 1985, and received an honors degree in law in 1988.  He completed one year of post-graduate education in 1989.  He was admitted to the Kenya bar in 1989.  In 2005, he commenced post-graduate studies in international human rights law.

In 1989, he accepted a position at the Nairobi law firm of Vohra & Gitao.  In 1991, he moved to the firm of AGN Kamao and Kimani.  Both firms were general practice law firms.

In 1993, he accepted a position with the UN High Commissioner for Refugees, and he remained for two years.  He then accepted a position as a senior associate with the law firm of Maina Murage & Company Advocates, where he focused on corporate law and property transactions.  Up to that point in his legal career, he believes he was regarded as hard working, honest and well-respected.  He had no problems with memory, or concentration.

He opened his own practice in 1996.  He started "very modestly," with a secretary and a shared clerk. Transcript II, at 10.  Within two years, his practice had grown to four full-time employees.  Mr. Nderitu was both the manager and a practitioner.  He was, by his own estimate, very focused and very good at organization.  In addition to his work with his firm, he has been assigned as defense counsel at the UN International Criminal Tribunal in Arusha, Tanzania.

In 1997, he moved his firm's offices to the seventh floor of the NHC House, overlooking the American Embassy and the Ufundi Cooperative, not more than 30 meters from the Embassy.

He was very satisfied with and proud of his professional achievements.

On August 7, 1998, Mr. Nderitu was in his office on the phone with a client when he heard a loud explosion.  Immediately after he heard another blast, and "saw something glittering in the sky."  Transcript II, at 15.  He testified that he felt like somebody had "cut through my head" on the right side." Id., at 15.  It's like somebody had cut through me with (an) ax or somebody had just grabbed my head and banged it against a stone." Id., at 15.  He testified that it "was something I had never felt before.  It was just too massive." Id., at 15.

The windows, window frames and partitions in his office were destroyed. Power went off.  He was in pain from the pieces of glass and from cuts to his head. He was filled with fear.

When he went outside, he saw many victims with injuries.  A good Samaritan drove him to a hospital.  The hospital could not cope with the flood of patients from the Embassy bombing.

Mr. Nderitu was placed on a stretcher, but after some time passed, he concluded that he had been forgotten.  He was losing blood, and was in great pain, so he got off the stretcher and told a nearby doctor that without any assistance he – Mr. Nderitu – was going to die.

He was taken to the operating room, where he received stitches to his head and to his ear

without anesthetic.  The stitching did not stop all of the bleeding.

He was returned to a ward, but could not rest because of the overpowering smell of raw blood everywhere, and because people searching for missing loved ones would come to his bed, lift the covers, and leave.  Wards were crowded with six patients apiece.

Because he wasn't being treated, he snuck out of the hospital and returned home.  Blood was seeping through his bandages.  When his daughter saw him, she began crying.  He was in constant pain, and constant anxiety.

He received additional stitching from a private doctor, but remained away from work for a month.  He could not rebuild his practice, which was netting about $2,000 per month in net profits.

He further testified that he suffered serious memory loss, loss of ability to retain information, and loss of concentration.  His administrative abilities have been weakened, he is less efficient, and he must work much harder to perform tasks he performed easily before the Embassy bombing.  His demeanor has also changed.  He is now more irritable, and more aggressive. His skills as an attorney – his chosen and loved profession – have been permanently diminished.

Mr. Kimani testified credibly as follows:

His wife of eight years Felistas Naeni Thuo was killed in the Embassy attack.

Mr. Kimani had six brothers and sisters, though three have died.  He was raised in a small village in central Kenya.  He moved to Nairobi in 1985, at age eighteen.  He got a degree in welding and pipe fitting in Nairobi at that time.

He met his future wife while they were both looking for jobs in Nairobi in 1989.  It was,

he testified, "love at first sight." Transcript II, at 52.  Felistas was pretty, sweet, humble and loving.  She loved Mr. Kimani, he testified, even though he was a very poor man at the time.

Felistas gave birth to their daughter Sheila in 1989, and they were married in a rural ceremony in 2000.  They moved into an apartment in a "(n)ot very good section of Nairobi." Id., at 54.  Because Felistas got a job before he did, Mr. Kimani stayed home with his daughter and continued to look for work.

Felistas was hired as a secretary by Consolidated Insurance Brokers in Nairobi.  Her goal was to obtain promotions, and eventually, go back to school.  Their office was near the American Embassy.

Mr. Kimani got a job in 1991.  A year later, he opened his own printing and stationery business.  When he started, he was serving as a broker, because he had no equipment of his own. His business became very successful.  He was netting about 200,000 KSH per month.  His office was near the American Embassy.

They moved into a much larger home in a far better neighborhood.  In 1994, they had their second daughter.  He spent all of his available time with his family.  He and his wife went to work together, and returned together.  They went to church together, and chatted together in the mornings and evenings.  They spoke many times over the phone during the day.  On Sundays, the family took short trips and outings.  They dreamed of buying their own building together.  Mr. Kimani's life was, as he testified, "a bed of roses."  Id., at 61.

On the morning of August 7, 1998, Felistas dressed first, and asked Mr. Kimani how she looked.  He remembers telling her "you look marvelous."  Id., at 69.  That morning, she left for her office without him, telling him to find her later in the city.

He arrived in his office later.  Felistas called him that morning, at the office, and asked him to come by her office because a vendor had "some beautiful ties" to sell. Id., at 69.  While he reached in his drawer for money to bring to his wife's office, he heard a loud gust of wind, and everything in his office collapsed.  The phone line went dead.

He decided to walk to her office to tell her what happened in his office, because he was still under the impression that the impact was restricted to events in his office building.

As he headed toward the American Embassy he saw many people running in the opposite direction.  They were covered with blood.  He saw one body burned beyond recognition.  He saw one body pierced by a piece of wood. He "pushed on."  Transcript II, at 73.  He now knew he had to find his wife.

He went to the pile of rubble, and he heard people crying inside.  He tried to remove pieces of concrete with his hands, but could not move the heavy pieces.  There was chaos everywhere, he testified.

Mr. Kimani testified that he wanted to believe that his wife was only hurt, and that she was still alive.  So he decided that he would search the hospitals.  Because there were no available vehicles, he walked 10 kilometers to Kenyatta National Hospital.  He testified that the hospital was in disarray.  He went from bed to bed in the nine floor hospital, lifting sheets in his search for his wife. He went to three other hospitals, following the same procedure, and was unsuccessful.  He returned to each of the first two hospitals, again with no success.

He returned home, and, when he saw his daughter in the morning, she asked him, "where is mommy?" he told his daughter:  "She will come home.  But it never happened." Transcript II, at 78.

He went to Nairobi Hospital, where one of her colleagues told him that he had heard Felistas cry out for help.  Mr. Kimani waited and prayed.

On Sunday, a colleague approached with a piece of cloth, and asked Mr. Kimani if he recognized it.  Mr. Kimani said that it was the fabric Felistats was wearing the morning she last left for work.  The colleague began to depart without saying another word, but his companion asked where he had gotten the fabric, and the colleague whispered to the companion.  That is when Mr. Kimani was told that his wife's body was at the mortuary.  Mr. Kimani then went to the mortuary with members of his family.  He testified that:

> We arrived there and entered the cold rooms where the bodies are kept.  And it was a scene you would not want to ever see again. It was a scene, it's something that even today makes one shiver with fear. Those bodies were aligned in rows. Others were heaped. And even in (em)bracing with your next of kin, it was (a) very, very, very hard task.

> So I went from one side to the other looking for her. And on the way, there were hundreds and hundreds of bodies badly mutilated.  Badly,  badly, badly mutilated. Some had no limbs, some had no heads, some had their stomachs opened. Some had, some were crushed to something very tiny. … And at the end,  I saw where she was….

Transcript II, at 79-80. Mr. Kimani testified that he found her by the piece of fabric, and that his wife was unrecognizable except for her feet.  Her head was crushed.

Mr. Kimani returned home to tell his daughters that their mother had gone to be with God. But his daughter asked: "why didn't you come back with her?".  Id., at 81.  He told her he tried.  He asked her to be strong and not to cry.  During the burial, his daughter asked him for his permission to cry for her mother, so Mr. Kimani and his two daughters went to a small room and cried for Felistas.

Mr. Kimani began to drink heavily, and lost interest in living.  He stopped

working, and exhausted the family savings.  He did not want to be in the family home.

His daughter asked him why he let their mother die.

After a year, he stopped drinking, but his family continues to struggle.  His older

daughter has behavioral problems at home and at school.

Mr. Kimani cannot forget the images from the mortuary.  He has remarried, but

he has not overcome the loss of his wife, Felistas.

Mr. Mogi testified credibly as follows:

He was born in a small town 350 kilometers from Nairobi.  When he was 21, he went to

India to pursue degrees in economics and labor welfare.

He returned to Kenya, and looked for work in Nairobi, taking odd jobs.  He started a

stationery supply business with one client in 1996, and was successful. By 1997, he had two full-

time employees, and had built a house and purchased two cars with the profits from his new

business. His office was across from the American Embassy. He was very proud of his business,

and planned to expand the business by importing computer parts.

In 1998, he lived with his wife and two children in a four bedroom home in Nairobi.

He was in the lobby of his office building when a loud explosion knocked him down.  He

saw many bleeding people running from the Embassy.  He was bleeding and was in great pain.

He was carried to a car with others and taken to a hospital, where he was eventually treated and

released. As a result of the bombing, his face is physically scarred.

Mr. Mogi's business was destroyed by the bombing.  His income has dropped from

$5,000 per month to $1,000 per month.  His health deteriorated, and his relationship with his

wife deteriorated and ended. He has been in therapy, but cannot get medical insurance, and must

expend 4,000 KSH per month for medications.

According to Mr. Mogi, there is nothing left of his business, or of his plan for the future.

Mr. Muema testified credibly as follows:

Mr. Muema is a 37 year old native of Nairobi.  He and his brother and four sisters were raised by their parents, who traveled to various parts of Kenya.

Mr. Muema was a student at the University of Nairobi in 1998.  He was on a public minibus stopped at a traffic light at an intersection by the American Embassy on the morning of August 7, 1998. He heard a small blast, and turned to look in that direction.  After a few moments, he saw blasts of fire. He felt sharp pain, and felt that something was "very wrong." Transcript III, at 9.  The bus engine switched off, and there was momentary silence.  He began to lose his eyesight. He could not see, but tried to find the door to the minivan.  He was the only passenger to leave the minivan.  He could hear people  screaming and horns blaring.  There was "pandemonium." Id., at 13.

He began running on the street, away from the Embassy. He was frightened to death, afraid that he would be hit by a vehicle.  He was "numb," "traumatized," and bleeding profusely. Id., at 12-13.  A good Samaritan took him by car to a hospital, where he waited quite a while to be treated. His eyesight had not returned.  People passing by in the hospital would say to him "I'm sorry,"  causing him to be more concerned about his possible injuries.  Many patients were being brought to that hospital from the Embassy site, and due to the volume of patients, Mr. Muema was not treated at that hospital.

His parents arrived, and drove him to a second hospital.  He was admitted into a ward, but was not seen by a doctor until the following day.  He could not see, but he could hear his

sister crying.

He was discharged from the second hospital, and scheduled to see an American eye specialist.  The following day, he was examined by that specialist. His vision had still not returned. He underwent exploratory eye surgery the following day.  The surgery was accompanied by "excruciating pain."  Transcript III, at 26.  He was under a local anesthetic, thinking: "three days ago I was perfectly well and right now people are opening up my eye. Id., at 27.  The following day Mr. Muema was informed by his father  that the left eye could not be saved, because pieces of glass had entered that eye.  He began to think that he would have been better off if he had been killed, because he did not know how he could survive as a blind man.

On August 24, 1998, his left eye was removed.  Partial vision in his right eye did not return for months.  He slept through most of those days.

He has been fitted for a prosthetic left eye, but has not found a suitable permanent prosthesis.  He has no depth perception, and suffers from double vision.  He considers himself to be disfigured.

Mr. Otiende testified credibly as follows:

He is a 44 year old married father of four daughters. He received a degree in land economics from the University of Nairobi in 1991.

Mr. Otiende started work in 1993 in a land appraisal office near the American Embassy.

On August 7, 1998, he heard a small blast.  He then lost consciousness, awaking in a stairwell.  He was bleeding profusely. He walked to his family doctor and received stitching, and took public transportation home.  He has suffered permanent scarring, despite subsequent plastic surgery.

He has observed that people now react to him with fear because of the scarring.  He also has observed that some people in Kenya regard him as unlucky, or as a bad omen, because he is a victim of the Embassy bombing.

Ms. Kiema-Ngunnzi testified credibly about her academic and professional background. Transcript III,  at pp. 74-91.  She has studied extensively the effect of the Embassy attack on employees of the Teachers Service Commission ("TSC"), whose offices were nearby and were destroyed in the bombing.  She has prepared a comprehensive report, PX 5, consistent with another report on the psychological effects of the bombing on pregnant women, PX 6, and has concluded that her research is applicable to all victims of the bombing.

She was qualified and accepted as an expert in the field of sociology with a particular emphasis on the impact on social groups or individuals of disasters. *Id*., at 91.

Ms. Kiema-Ngunnzi testified to a reasonable degree of professional certainty that there is a serious and harmful stigma associated with being a victim of the Embassy bombing, and that the stigma has not changed.  The stigma results in the loss of economic opportunities, and social ostracization. Ms. Kiema-Ngunnzi explained that victims of the Embassy bombing are referred in a demeaning sense as the "bomb people."

Ms. Kiema-Ngunnzi testified to a reasonable degree of professional certainty that victims of the Embassy bombing are regarded as bad omens who will bring bad fortune to those in contact with the bombing victim, and she testified that the bad omen perception is consistent with certain aspects of Kenyan culture and belief.

Ms. Kiema-Ngunnzi testified to a reasonable degree of professional certainty that victims of the Embassy bombing themselves are viewed by other Kenyans in a negative light simply

because of their status as victims of the Embassy bombing.

Ms. Kiema-Ngunnzi testified to a reasonable degree of professional certainty that the children of victims of the Embassy bombing are viewed in a negative light by other Kenyans.

Ms. Kiema-Ngunnzi testified to a reasonable degree of professional certainty that victims of the Embassy bombing themselves are likely to continue to accept Kenyan society's perception of them as disabled, unlucky and inferior in some way.

Ms. Kiema-Ngunnzi testified to a reasonable degree of professional certainty that the stigma was not related to physical injury.

Ms. Kiema-Ngunnzi testified to a reasonable degree of professional certainty that each victim of the Embassy bombing suffered long-term or permanent psychological injury from the scenes that they observed during the bombing and in its aftermath.

Ms. Kiema-Ngunnzi testified to a reasonable degree of professional certainty that each victim of the Embassy bombing suffered long-term or permanent post-traumatic stress disorder.

Ms. Kiema-Ngunnzi testified to a reasonable degree of professional certainty that each victim of the Embassy bombing suffered and continues to suffer serious emotional, psychological, social, cultural, and economic  injury.

This court credits the opinions of Ms. Kiema-Ngunnzi.

## CONCLUSIONS OF LAW

### I.  CHOICE OF LAW

**A. Under The Choice Of Law Principles Of The Federal Common Law,
American Substantive Law Governs The Plaintiffs' Claims In This Action**

As the district court ruled:

In this case, the state where the injuries occurred is Kenya. Therefore,
(Restatement (Second) of Conflicts of Law §§ 146 and 175 dictate) that Kenyan
law should apply to Plaintiff's claims unless some other state has a 'more
significant relationship' to the occurrence and the parties under the principles in §
6 (of the Restatement).

January 7, 2010 Opinion and Order, docket number ("#") 90, at 8. As the district court

further noted, Section 6 states that the factors relevant to the choice of the applicable rule

of law include:

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those
states in the determination of the particular issue, [3]
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

The first issue, therefore, is whether, applying those seven factors, the United

States has a more significant relationship to the claims in this case than Kenya. Plaintiffs

submit that it does.

---

[3]  In *Reed v. Islamic Republic of Iran,* 439 F.Supp.2d 53, 65 (D.D.C. 2006), brought under the Foreign
Sovereign Immunities Act, Judge Urbina characterized factor (c) as "the most important of these factors."

*(a) The Needs Of The Interstate And International Systems*

> Probably the most important function of choice-of-law rules is to make the interstate and international systems work well. Choice-of-law rules, among other things, should seek to further harmonious relations between states and to facilitate commercial intercourse between them. In formulating rules of choice of law, a state should have regard for the needs and policies of other states and of the community of states.

Restatement (2d) Conflicts, § 6, Comment d.

Nothing in that explication points to application of Kenyan, rather than American, law.

Undeniably, "harmonious relations" between Kenya and the United States will be fostered by

Kenya's recognition that American judicial resources were allocated to the resolution of claims

of Kenya's own injured citizens. The application of American law by an American court would

not offend harmonious relations with Kenya.

*(b) The Relevant Policies Of The Forum*

The Embassy bombing was designed to be and was in fact an attack on the United States.

That the location in Nairobi was a vagary of sadistic opportunity is evident from the companion

attack on the American Embassy in Dar Es Salaam, Tanzania. The plaintiffs in this case are

tragic innocent victims of a terrorist organization's malevolent attack on the United States, and in

particular on its seat of government in the District of Columbia.

> In this case, there is no doubt that the defendants "engaged in unabashedly malignant actions directed at [and] felt in this forum." *Id.* The plaintiffs' allegations and evidence were that bin Laden and al Qaeda orchestrated the bombing of the American embassy in Nairobi, not only to kill both American and Kenyan employees inside the building, but to cause pain and sow terror in the embassy's home country, the United States. Nor were the plaintiffs' allegations and evidence of contacts with the United States limited to the Nairobi bombing. The plaintiffs described an ongoing conspiracy to attack the United States, with overt acts occurring within this country's borders.

At 65.

*Mwani v. bin Laden* 417 F.3d 1, 13 (D.C. Cir. 2005).

As Judge Urbina concluded in *Reed, supra*, "the law of the United States applies rather than the law of the place of the tort or any other foreign law. This is because the United States has a 'unique interest' in having its domestic law apply in cases involving terrorist attacks on United States citizens." *See Dammarell v. Islamic Republic of Iran,* 2005 WL 756090, at *20 (D.D.C. 2005).  While *Reed* involved the interest of the United States in providing legal redress for its own citizens, the Restatement principle in issue turns less on the interest of the individual plaintiffs than on the nature and the true target of the attack.  In *Oveissi v. Islamic Republic of Iran* 573 F.3d 835 (D.C. Cir. 2009), the District of Columbia Circuit emphasized that the United States was not the object of an assassination.  As the Court explained:

> We have no doubt that the United States has a strong interest in applying its domestic law to terrorist attacks on its nationals, especially when, as was the case in *Dammarell*, the attacks are "by reason of their nationality." But Gholam Oveissi was not an American national; nor has the plaintiff suggested that the defendants knew Oveissi had an American grandchild or that the United States or its nationals were in any other way the object of the attack. To the contrary, plaintiff's counsel conceded at oral argument that there is no evidence that Oveissi's assassination was intended to affect the United States. *See* Oral Arg. Recording at 4:52-5:03. Moreover, the plaintiff's international terrorism expert testified that assassinations like this one "were intended to silence the Iranian regime's critics *and to deter French intervention in Lebanon....*"  Hence, if any country was the object of the attack, it was France. Accordingly, all of the relevant choice-of-law factors point to the application of French law to the plaintiff's claims (emphasis in original).

As *Mwani, supra*, makes clear, there is no doubt that the United States was the object of the Embassy attack. The United States thus has a unique interest in applying its domestic law to claims arising out of that attack.

*(c) The Relevant Policies Of Other Interested States And The Relative Interests Of Those States In The Determination Of The Particular Issue*

There is no evidence that Kenya's interests in the attack on American embassies exceed the interests of the United States, as described above. The government of Kenya has expressed no objection to these proceedings either formally in this case or diplomatically.

There is no reason to conclude that the Kenyan government has any interest in the application of Kenyan law, to the exclusion of American law, in this case. As is discussed in the following section, there is nothing in the most pertinent formulations of Kenyan law that would suggest that application of American law would offend the needs and policies of Kenya. The government of Kenya takes no adverse position on the application of American law.

The citizens of Kenya – as represented by the five hundred plaintiffs in this case – make clear their acceptance of the application of American law to their claims.

*(d) The Protection Of Justified Expectations*

In *U.S. Aviation Underwriters, Inc. v. Pilatus Business Aircraft, Ltd.* 582 F. 3d 1131, 1144 (10th Cir. 2009), the Court wrote: "The Restatement's commentary explains the 'protection of justified expectations' principle primarily refers to the expectations of parties in their pre-litigation conduct, and this principle is of little or no importance in the field of torts." That analysis clearly applies to the claims in this tort case.

*(e) The Basic Policies Underlying The Particular Field Of Law*

> This factor is of particular importance in situations where the policies of the interested states are largely the same but where there are nevertheless minor differences between their relevant local law rules. In such instances, there is good reason for the court to apply the local law of that state which will best achieve the basic policy, or policies, underlying the particular field of law involved.

Restatement, *supra*, at § 6, Comment h.

*(f) Certainty, Predictability And Uniformity Of Result*

With respect to claims arising out of the 1998 Embassy bombings, application of American substantive common law raises no concerns about certainty, consistency or uniformity because no other claims arising out of those acts of terrorism are pending in any other court. More broadly, adoption of an overarching principle that attacks on the United States – wherever they take place – will be subject to American federal common law is far more likely to lead to certainty, predictability and uniformity than application of the local law of any of hundreds of forums in which terrorist attacks against Americans can take place.  Moreover,

> In a rapidly developing area, such as choice of law, it is often more important that good rules be developed than that predictability and uniformity of result should be assured through continued adherence to existing rules. Predictability and uniformity of result are of particular importance in areas where the parties are likely to give advance thought to the legal consequences of their transactions.

Restatement, supra, at § 6, Comment i.

The claims in this case do not support any suggestion that "the parties (gave) advance thought to the legal consequences of their transactions."

*(g) Ease In The Determination And Application Of The Law To Be Applied*

While there is no doubt that American courts regularly determine foreign law, *see* Fed.R.Civ.P. 44.1, it is easier for any court to determine and apply its own law. *Kenna v. So-Fro Fabrics, Inc.* 18 F.3d 623, 626. (8th Cir. 1994). Plaintiffs set out below the applicable substantive Kenyan law, as well as the applicable substantive American law.  Nothing in those sections suggests that Kenyan law will be as easy to determine and apply as the American law.

**B. If The Court Concludes That The Substantive Law Of Kenya Applies, Kenyan Statutory and Common Law[4] Should Be Applied**

No provisions of the Kenyan Constitution are implicated by the substantive issues now before the court. The applicable Kenyan law on personal injuries claims in the nature of the claims brought in this case will be drawn from both statutory law and common law.

Applicable statutory law is found in both Part II of the Law Reform Act and of the Fatal Accidents Act.

Part II of the Law Reform Act sets out the rules applicable to the survival of a cause of action, and sets out the damages available in such an action.[5] The Fatal Accidents Act[6] provides for recovery of damages "proportioned to the injury resulting from the death to the persons respectively for whom and for whose benefit the action is brought."

The Fatal Accident Act provides for claims by dependents for loss of dependency, *i.e.*,

_____

[4] As in the United States, the Kenyan Constitution is the supreme law of the land. Constitution of Kenya, Art. 3 (2004) (Kenya) (declaring the Constitution to be the supreme law and providing that its provisions prevail where there are conflicts of laws); *see* also Charles Mwalimu, *The Kenyan Legal System* 23 (1988), and *see Okunda v. Republic*, 9 I.L.M. 556 (1970) (Kenya), and *see In the Matter of an Application by Evan Maina* (Miscell) Case no. 7/1969 cited in Yash P. Ghai, *Reflections on Law and Economic Integration in East Africa* 34-35 (1976).

The sources of Kenyan law are specifically set out in the Judicature Act (1998) Cap. 8 § 3 (Kenya) and include: the Constitution; the National Assembly's legislative acts; specific Acts of the British Parliament before independence and the establishment of the Republic of Kenya in 1963; English common law and doctrines of equity in force at the beginning of colonial law; African customary law as a guide in civil matters; and Islamic law in some matters of personal law affecting Muslims. Kenyan court decisions also operate as a source of law. *Mwalimu, supra,* note 160, at 25. One commentator addresses the relationship between customary and statutory law in Kenya as follows: "the recognition of customary law as a source of Kenyan law is hedged in with limitations. Although at independence customary law was recognized as a source of law, the English base of Kenyan law was retained, and customary law was to be applied only upon the terms of state law. It was therefore subject to the 'repugnancy clause' whose retention to date subordinates customary law to state law and reinforces the view that customary law is inferior to received law...." Kamau, W., *Law, Pluralism And The Family In Kenya: Beyond Bifurcation Of Formal Law And Custom,* International Journal of Law, Policy and the Family 138 (August, 2009).
[5] Copies of the statutes and the case law cited in this subsection are appended to Plaintiff's Brief Pursuant to Order of January 7, 2010, # 93.

loss of income they would otherwise have received from the deceased in his lifetime. *Khamis Rajab v. Kenya Ports Authority* High Court at Mombasa[7] (1994).

In *George Kangangi Kabutu v. Samwel Maina Mutugi* ( High Court at Embu 2009),  The court explained the calculation of damages resulting from death as follows:

> "In assessing damages for lost years therefore, such damages should not be calculated solely or even mainly, on the basis of the length of life that is lost. The question thus resolves itself into that of fixing a reasonable figure to be paid by way of damages for the loss of a measure of happiness and productivity and the loss of dependency on the part of the deceased's dependants."

In *Kamau v. Wathigo* (High Court at Narkuru 2005) the court explained:

> "As it were, there is no material upon which this court can rely on to reach a finding as to what monthly income the deceased earned for his medical practice. In the circumstances of this case, I will consider the last salary that the deceased earned before he retired from the Ministry of Health as the basis of assessing the quantum that is to be paid to the estate of the deceased. As to the multiplier, in the circumstances of this case, and also considering that the deceased was conducting business which he utilized skills he acquired on account of medical learning and experience, I would apply a multiplier of ten (10) years."

And *see Kamau v. Wathigo* (High Court at Nakuru 2005), *Bhogal v. Benawra and 2 Others* (High Court at Nairobi 2004) (same).

Typically, plaintiff's personal injury damages claims are characterized as either "general" or "special". *See, e.g., Ng'Ang'a v. Kenya Power & Lighting Company Ltd*. (High Court at Nairobi 2006). With respect to general damages, the High Court at Nakuru, in *Mwangi Kamau v. Kimemia et. al.* (High Court at Nakuru 2004) explained that:

---

[6] Great Britain traces its first Fatal Accidents Act to 1846.

[7] Kenya has five levels of courts: the Court of Appeal for Kenya; the High Court of Kenya; the Khadis' Courts; the Resident Magistrates' Courts; and the District Magistrates' Courts.  The Court of Appeal and the High Court are the two highest courts, and they share a common Chief Justice.  "The Court of Appeal shall have jurisdiction to hear and determine appeals from the High Court in cases in which an appeal lies to the Court of Appeal under any law."  Appellate Jurisdiction Act, Chapter 9, Part 3.1 (1977).

The duty of this Court in assessing the damages payable to the Plaintiff for pain, suffering and loss of amenities is to, insofar as possible, compensate the Plaintiff for the injuries that he suffered.  This Court is aware that an award of General damages may not restore the plaintiff's health to what it was prior to the accident, but it would to some extent ameliorate the pain and distress suffered by the Plaintiff as a result of losing his bodily functions.

The court should, in assessing general damages, take into account the severity of the injury, and the plaintiff's resulting condition.  *Alexander Kipkoech Kosgey v. Frederick Towet & 4 Others* (High Court at  Nakuru 2005).  As the Court explained: "The plaintiff was no longer a normal human being after the said accident. He could no longer walk, nor could he use his limbs normally."

In *Attorney General v. Joseph Waiyera* (Mombasa Court of Appeal 1983), the court included loss of future earnings as an element of general damages.

"Special damages"' refers to out of pocket expenses and loss of earnings actually incurred up to the date of trial. *Attorney General, supra, and see Makube v. Nyamuro*   (Court of Appeal Kisumu 1983) (damages for assault claim), and *see Kigika Developers Ltd v Nairobi City Commission* (High Court at Nairobi 1986) (economic loss recoverable for tort).

Broadly speaking, therefore, under Kenyan statutory and common law, wrongful death and personal injury plaintiffs may be entitled to damages for pain and suffering, loss of expectation of life, future medical expenses, funeral expenses, general damages and special damages.  Business loss claims are based on common law principles.

Punitive damages have been awarded in Kenya in limited categories of cases: typically, defamation, and outrageous constitutional violations by government officials.  Whether the facts of this case would sustain an award of punitive damages is arguably a case of first impression under Kenyan law. *See, e.g., Kigika, supra*.

28

**C. If The Court Concludes That The Substantive Law Of The United States Applies, federal and state common law Should Apply**

The district court's January 7, 2010 Opinion and Order set out in detail both the claims relevant to this issue, at 1-2, and the contours for determining the three alternatives for the application of substantive American law to those claims.  *Id*., at 3.  But there is no clear guidance in Alien Tort Claim Act ("ATCA") jurisprudence to simplify the choice among alternatives.

As early as 1984, on remand from *Filartiga v. Pena-Irala,* 630 F.2d 876, 884 (2d Cir.1980), the trial court wrote:

> The Court of Appeals decided only that Section 1350 gave jurisdiction. We must now face the issue left open by the Court of Appeals, namely, the nature of the "action" over which the section affords jurisdiction. Does the "tort" to which the statute refers mean a wrong "in violation of the law of nations" or merely a wrong actionable under the law of the appropriate sovereign state? The latter construction would make the violation of international law pertinent only to afford jurisdiction.

*Filartiga v. Pena-Irala* 577 F.Supp. 860, 862 (S.D.N.Y.,1984). The *Filartiga* trial court concluded that substantive international law as a part of federal common law applied. At 863.

But the court also acknowledged that "(t)he international law described by the Court of Appeals does not ordain detailed remedies but sets forth norms." *Id*.  *See* Tracy Bishop Holton, "Causes of Action to Recover Civil Damages Pursuant to the Law of Nations and/or Customary International Law," 21 *Causes of Action 2d* 327 at §§ 49-51 (2005) for a survey of damages awards under the ATCA.

## II.  AMOUNT AND APPLICATION OF DAMAGES

This action was filed on behalf of 523 Kenyan plaintiffs.  Plaintiffs properly seek damages for both past and future economic injury. … "(A) plaintiff may recover damages for

past economic losses if such losses are 'reasonably proved,' while a plaintiff may recover for future harm only by a reasonable certainty or preponderance of the evidence." *Hill v. Republic of Iraq,* 328 F.3d 680, 684 (D.C. Cir. 2003).

Plaintiffs seek economic compensatory damages for the wrongful death of 15 plaintiffs. Plaintiffs also seek damages for injuries associated with serious bodily injury for 44 plaintiffs. Those injuries are comprised of loss of vision or hearing, internal injuries and one miscarriage. Plaintiffs also seek emotional distress damages on behalf of all plaintiffs, and, in particular, plaintiffs seek damages resulting from the social stigma which attaches in Kenya to each plaintiff's status as a victim of the bombing.

Plaintiffs seek business loss damages for 117 plaintiffs, as well as losses for the remaining plaintiffs for various personal injury claims.

Plaintiffs also seek punitive damages, which may be awarded in a bellwether proceeding. *See, e.g., Silivanch v. Celebrity Cruises, Inc*. 333 F.3d 355, 359 (2d Cir.2003) (describing trial court ruling that "(a)ny punitive damages awarded in the bellwether trial would be allocated by the court among the various plaintiffs."), and *see .In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation,* 2009 WL 3347214, fn.59 at 6, and accompanying text (S.D.N.Y.,2009) (discussing whether facts adduced at bellwether trial satisfied New York law on punitive damages awards).

> [T]o obtain punitive damages under District of Columbia law, [plaintiffs] must "prove, by a preponderance of the evidence, that the [officers] committed a tortious act, and by clear and convincing evidence that the act was accompanied by conduct and a state of mind evincing malice or its equivalent.

*Butera v. District of Columbia,* 235 F.3d 637, 657 (D.C. Cir. 2001). Punitive damages are available under claims brought pursuant to the Alien Tort Claims Act. As the court in *Chavez v.*

*Carranza,* 2006 WL 2434934* 10-11 (W.D. Tenn. 2006) determined:

> Finally, the award of punitive damages in this case is at the low end of the range of awards in other cases involving violations of the TVPA and ATCA. *See Doe v. Saravia,* 348 F. Supp. 2d 1112, 1158-59 (E.D.Cal. 2004)(listing punitive damages awards in TVPA and ATCA cases ranging from $1 million to $35 million). Plaintiffs note that in a case factually similar to this one, a jury awarded three Salvadoran torture survivors punitive damages in the amounts of $5 million, $10 million, and $5 million, respectively, against former General Vides Casanova, who served as Director General of El Salvador's National Guard from 1979 to 1983. The jury also awarded two of the survivors $10 million each against former General Guillermo Garcia, who served as Minister of Defense of El Salvador during the same period…. (*Arce v. Garcia,* Case No. 99-8364, Final J. (S.D.Fla. July 31, 2002)). In *Arce,* as here, the defendants were held liable under a theory of command responsibility for the torture inflicted by Salvadoran military personnel under the defendants' command. *See Arce v. Garcia,* 434 F.3d 1254, 1257-59 (11th Cir.2006). In light of the awards in *Arce* and other comparable cases, as well as the other two factors discussed above, the Court does not find the punitive damages award to be grossly excessive.

Plaintiffs claims for compensatory damages are identical to the extent that they seek damages for the stigma associated with being a bombing victim, as well as for the psychological injury associated with the horrors of the bombing and the aftermath. Plaintiffs claims are also identical to the extent that they seek damages for post-traumatic stress disorder ("PTSD"). Ms. Kiema-Ngunnzi testified persuasively and to a reasonable degree of professional certainty that there is a serious and harmful stigma associated with being a victim of the Embassy bombing, and that the stigma has not changed. The stigma results in the loss of economic opportunities, and social ostracization. She testified to a reasonable degree of professional certainty that victims of the Embassy bombing are regarded as bad omens who will bring bad fortune to those in contact with the bombing victim, and she testified that the bad omen perception is consistent with certain aspects of Kenyan culture and belief.

Ms. Kiema-Ngunnzi also testified that victims of the Embassy bombing themselves are

viewed by other Kenyans in a negative light simply because of their status as victims of the Embassy bombing.

Ms. Kiema-Ngunnzi also testified that the children of victims of the Embassy bombing are viewed in a negative light by other Kenyans.

Ms. Kiema-Ngunnzi testified that victims of the Embassy bombing themselves are likely to continue to accept Kenyan society's perception of them as disabled, unlucky and inferior in some way.

Ms. Kiema-Ngunnzi also testified that each victim of the Embassy bombing suffered long-term or permanent psychological injury from the scenes that they observed during the bombing and in its aftermath.  That testimony was consistent with the testimony of the witnesses, who described horrific scenes at the bombing site, in the public thoroughfares, at the hospitals, and at the mortuaries.

Ms. Kiema-Ngunnzi also testified that each victim of the Embassy bombing suffered long-term or permanent post-traumatic stress disorder.

Similar non-economic claims, though they may differ in some respects among individual plaintiffs, do not make lead to the conclusion that they are unrelated. *See, e.g., Medicare Beneficiaries' Defense Fund v. Empire Blue Cross Blue Shield* 938 F.Supp. 1131, 1147 (E.D.N.Y.,1996) ( emotional distress damages claims to not defeat commonality for purposes of class action certification), and *see Orange v. District of Columbia,* 59 F.3d 1267, 1274 (D.C. Cir. 1995) (recognizing stigmatic injuries to reputation and future employment opportunities). Plaintiffs claims for economic compensatory damages vary by category. But, again in the class action context:

the necessity of determining monetary damages on an individual basis does not preclude a commonality finding. *Gunnells v. Healthplan Servs., Inc.,* 348 F.3d 417, 428 (4th Cir.2003) ("Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality."); *see also* 5 MOORE'S FEDERAL PRACTICE § 23.23[2] (2004) ("The need for an individualized determination of damages suffered by each class member generally does not defeat commonality.").

*Does I through III v. District of Columbia* 232 F.R.D. 18, 26 (D.D.C.,2005), rev'd in part on other grounds *Doe ex rel. Tarlow v. District of Columbia,* 489 F.3d 376, 376 U.S.App.D.C. 368 (D.C.Cir. 2007).

Plaintiffs claims for punitive damages are identical. *See Butera, supra*, at 657, and *see*

*State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 418, 424, 428, 123 S.Ct. 1513,

1521, 1524, 1526, 155 L.Ed.2d 585 (2003) (standards for punitive damages).

The core bellwether issue is whether a ruling derived from evidence adduced at a

bellwether proceeding is binding, and if so, to what extent.

This is how the bellwether trial is used today. Cases are chosen, not quite randomly, for trial on a particular issue. The results of the trials are not binding on the other litigants in the group. The outcomes can be used by the parties to assist in settlement, but the parties can also ignore these results and insist on an individual trial. There was a time, however, when courts experimented with binding bellwether trials. Those experiments were prematurely ended, perhaps due to the influence of a Fifth Circuit decision holding bellwether trials unconstitutional on Seventh Amendment grounds.

In a binding bellwether trial procedure, the court will choose a random sample of cases to try to a jury. The judge may then bifurcate the cases into liability and damages phases, or perhaps even trifurcate them into liability, causation, and damages phases. The parties will try each bellwether case before a jury that will render a verdict in that case. Finally, the results of the bellwether trials will be extrapolated to the remaining plaintiffs. The underlying principle of such an extrapolation is that the bellwether plaintiffs are typical of the rest of the plaintiff group such that the results of the bellwether trials represent the likely outcome of their cases as well.

Alexandra, DL, *Bellwether Trials* 76 Geo. Wash. L. Rev. 576, 581 (April 2008).

Where, as here, liability is not in issue, and where, again as here, damages resulted from

a single tortious event, the main issue before the court is the extent to which adduced evidence is generically applicable to all plaintiffs, or whether each plaintiff must produce some evidence, in some form, of damages.

Plaintiffs produced reliable generic testimony from an expert witness. *See, e.g., In re Lorazepam & Clorazepate Antitrust Litigation*, 205 F.R.D. 369, 376 -77 (D.D.C. 2002) (opinion testimony on damages of multiple claimants); *see* also *Daliberti v. Republic of Iraq,* 146 F. Supp. 2d 19, 21 (D.D.C. 2001) (expert testimony on emotional and mental injuries). With respect to the generic evidence, no statistical evidence is necessary. In the course of assessing "troubling causation or liability issues common to the universe of claimants," the court in *Chevron, supra,* explained:

> The notion that the trial of some members of a large group of claimants may provide a basis for … for resolving common issues or claims is a sound one that has achieved general acceptance by both bench and bar. References to bellwether trials have long been included in the *Manual for Complex Litigation. See* MANUAL FOR COMPLEX LITIGATION § 33.27-.28 (3d ed.1995)…. appropriate cases.

> A bellwether trial designed to achieve its value ascertainment function for settlement purposes or to answer troubling causation or liability issues common to the universe of claimants has as a core element representativeness-that is, the sample must be a randomly selected one of sufficient size so as to achieve statistical significance to the desired level of confidence in the result obtained. Such samples are selected by the application of the science of inferential statistics.

At 1019.

That number of representative plaintiffs accords with the number of bellwether trials set by district courts. *See, e.g., In re Prempro Products Liability Litigation* Slip Copy, 2010 WL 703151 E.D.Ark.,2010 (four bellwether trials for approximately 125 individual, class action, and other federal cases transferred to district court by the Judicial Panel for Multidistrict Litigation

("MDL"), where the cases arose out of the sale or use of prescription hormone therapy medications), *In re Vioxx Products Liablity Litigation* Slip Copy, 2010 WL 724084 (E.D.La.,2010) ( six bellwether trials in MDL Vioxx litigation), *In re Guidant Corp. Implantable Defibrillators Products Liability Litigation* Slip Copy, 2009 WL 5195841 (D.Minn.,2009) (six bellwether trials in MDL cases addressing claims for injuries alleged to have been caused by certain defective implantable defibrillator devices and pacemakers*), In re Levaquin Products Liability Litigation* Slip Copy, 2009 WL 5030772 (D.Minn.,2009)(nine bellwether trials for 240 MDL cases arising out of use of Levaquin drugs) *In re Fosamax Products Liability Litigation* Slip Copy, 2009 WL 4042769 (S.D.N.Y.,2009)**.** (three bellwether trials in MDL products liability litigation concerning the osteoporosis drug Fosamax), *U.S. ex rel. Loughren v. UnumProvident Corp.*604 F.Supp.2d 259 (D.Mass.,2009) (bellwether trial of six claimants in *qui tam* False Claims Act action involving an "enormous number" of claims," at 260).

Those bellwether trials, moreover, each involved vigorously contested liability issues, as well as complex damages calculations, all of which were to be submitted to a jury for disposition.

This court thus concludes as a matter of law that the evidence adduced at the hearing is sufficient to apply claims of stigma, psychological injury, and PTSD to all plaintiffs.

This court also concludes as a matter of law the non-economic injury suffered by decedents spouses and family representatives in the form of the horror of their search for and their ultimate discovery of the bodies of their deceased spouses is sufficiently common to be applied to each similarly-situated plaintiff.

Thus, all that remains at this stage is to calculate the amount of the damages.  The calims are not necessarily subject to a determination with mathematical precision, nor must they be. *See e.g., Hadad v. United Arab Emirates, et.al*   2006 WL 826098*18, n.18 and accompanying text (D.D.C. 2006),  *aff'd*   496 F.3d 658 (DC Cir. 2007) *cert.den.* 552 U.S. 1310 (2008) (discussing amount of awards for damages to reputation and associated emotional distress).  As to the claims of stigma, psychological injury and PTSD, the court finds and concludes that the injuries have been sustained for a period of thirteen years, and will continue for a period of no less than an additional seven years.  It is not unreasonable to conclude that such injuries will last for 20 years from the date of this uniquely-malevolent tort.  Taking into account the variance in income between the United States and Kenya, the court awards each plaintiff $50,000 per year for twenty years, equal to an award to each plaintiff of one million dollars (1,000,000.00) for each plaintiff for stigma, psychological injury and PTSD.

For each claim of wrongful death, the court awards the sum of five million dollars ($5,000,000) to each plaintiff.

The court awards punitive damages in an amount equal to the award of compensatory damages.

Respectfully submitted,


_____/s/_____

Philip M. Musolino #294652
Musolino & Dessel PLLC
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*:  (202) 466-3883
*Fax*:    (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com


**CERTIFICATE OF SERVICE**

I certify that an electronic copy of this motion was served on all ECF parties through the ECF system this 18th day of April 2011.

_____/s/_____

Philip M. Musolino

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Odillia Mutaka Mwani, *et al.*                    :
                                                                  :
        Plaintiffs                                         :
                                                                  :
v.                                                                :          CA No. 1:99CV00125
                                                                  :          Magistrate Judge John M. Facciola
United States of America, *et al.*              :
                                                                  :
        Defendants                                      :

### DECLARATION OF JANE KAWIRA NAIVASHA

I, Jane Kawira Naivasha, under penalty of perjury under the laws of the United

States, do hereby declare, swear and affirm that the following is true:

1. I was a witness in this case in Nairobi, Kenya on January 31, 2011.

2. I have been provided with a transcript of my testimony by counsel for plaintiffs in this

case.

3. I have reviewed the transcript in order to complete any testimony which the court

reporter described as unintelligible or otherwise not able to be transcribed or needed

clarification or correction.

4. I have set out below each of the corrections. The corrections set out below are true and

accurate. For convenience I have included a reference to the transcript by date, page(s)

and line(s).

5. Copies of those pages of the transcript to which corrections are made are attached

hereto.

| Page | Line | Original | Correction |
|------|------|----------|------------|
| 10 | 24 | insurance exams, which by the time my husband was saying I | Insurance exams, which by the time my husband died I |
| 26 | 24 | couldn't see Ufundi itself had come down. | could see Ufundi itself had come down. |
| 43 | 11 | I'm very weak | I was very weak |
| 54 | 4 | feel, yeah | fill, yeah |

Further declarant saith not.

Jane Kawira Naivasha

Date: 15 / 04 / 2011

1                    UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF COLUMBIA

3   ODILLIA MUTAKA MWANI, et al.,   ) Civil Action No.
                              )

4          Plaintiffs,        ) 1:99CV00125

5     v.                      )

6   UNITED STATES OF AMERICA, et al.,  ) January 31, 2011
                              ) 9:37 a.m.

7                              )
          Defendants.        ) Washington, D.C.

8   ------------------------------------

9

10

11

12            TRANSCRIPT OF PROCEEDINGS OF TRIAL

13                   DAY 1

14       BEFORE THE HONORABLE JOHN M. FACCIOLA,

15    UNITED STATES DISTRICT MAGISTRATE JUDGE

16

17

18

19

20

21   COURT REPORTER:   PATRICIA A. KANESHIRO-MILLER, RMR
22                Certified Realtime Reporter
                  Official Court Reporter
23                Room 4704B, U.S. Courthouse
                  Washington, D.C. 20001
24                202-354-3243

25

```
1    A.   Was with the then Minet ICDC.

2    Q.   Can you spell that, please.

3    A.   M-I-N-E-T ICDC.  ICDC, I-C-D-C.  Insurance brokers.

4    Q.   Is that your current employer?

5    A.   Yes, it is my current employer, but names have changed.

6    Now is it called AON Kenya.

7            THE REPORTER:  Repeat the name.

8            THE WITNESS:  AON Kenya.

9            BY MR. MUSOLINO:

10   Q.   What was your first job at the insurance company?

11   A.   I was a receptionist, yes.

12   Q.   And how long did you have that position?

13   A.   I had that position -- I had that position from 1993, I

14   guess, to 1994 -- I don't remember the month -- but the

15   following year a technical job of insurance.

16   Q.   By technical job of insurance, you mean what?

17   A.   The core business.

18   Q.   The core business, C-O-R-E?

19   A.   Yes.

20   Q.   And what in particular -- was this a promotion?

21   A.   Not really.  My boss really thought that I had a lot of

22   potential, yeah, and he wanted me to move up the rank.  And at

23   that time I also enrolled to study the insurance, to take the

24   insurance exams, which by the time my husband was saying I

25   couldn't continue, I couldn't continue, and that's how I got
```

```
 1            BY MR. MUSOLINO:
 2     Q.   Slow down.  Keep your voice up.
 3     A.   Okay.
 4     Q.   Okay.
 5     A.   So I went back to -- we went back to work.  And at about
 6     3:00 I knew there was something that was wrong because my
 7     husband always would get in touch with me if there is anything
 8     that is happening in the country, even a strike, if there's
 9     any commotion.  He would always make sure he's gotten in touch
10     with me.  But about 3:00 he had not called me.  And then I
11     remembered -- okay, before then, we heard that it was the
12     American Embassy that had been bombed, but we couldn't -- we
13     were not allowed to go down to the scene.  And there was so
14     many vehicles that were coming up.  There was people
15     everywhere.  There was dust.  So we're not allowed to go close
16     to the scene.  But about four I remembered that my husband was
17     in the next building to where -- to the American Embassy
18     immediately after.  And I remember telling my colleague,
19     Robert, I need to go down there to confirm whether it is
20     actually the American Embassy because my husband goes to the
21     next-door office.  And we walked through people, we waded
22     through people.  But we still couldn't get too far.  I could
23     just look from a distance, from a distance to see, but I still
24     couldn't see Ufundi itself had come down.
25            And from then on I had to -- I came back to the
```

-26-

1    until we laid his body to rest.  Of course, the African way,

2    it takes a little while.  It took about a week.

3    Q.  So there was a funeral about a week later?

4    A.  Yeah, there was a funeral a week later at the same church

5    where we got married.  Then we proceeded to the burial site.

6    Q.  You attended both --

7    A.  Yes, I did.  I did.

8    Q.  What role did you play in either the memorial service or

9    the --

10   A.  Well, being the wife to the deceased, I didn't play -- I

11   needed a lot of support, I'm very weak.  But what I wanted was

12   that my husband would have a decent burial.  So I really

13   didn't play a big role.  So much of it was done by my

14   relatives.

15   Q.  During this period, can you tell me whether -- what your

16   emotional state was?

17   A.  The first thing that --

18       THE REPORTER:  Your Honor, I can't understand --

19       THE COURT:  We've lost you.  Please, hold it.  Stop.

20   There is interference on the line.  So, please go back two or

21   three questions and try again.

22       MR. MUSOLINO:  Okay.  Are we connecting now, Judge?

23       THE COURT:  Yeah, but please keep your voices up.

24   There is a whooshing sound, and it is hard to hear you over

25   it.

-- 43 --

1   would -- I would, you know -- it's just that emptiness that I

2   cannot explain.  It's a void that I think I couldn't explain

3   how it feels because it's like having a hole that you cannot

4   feel, yeah.  It's amazing that it's still -- I still go

5   through the emotions, I still go through so much of it.  I

6   think probably because I was young.

7           MR. MUSOLINO:  Your Honor, I don't have any further

8   questions of this witness.  If the Court has any questions.

9           THE COURT:  I have none, no.  Thank you.

10          Thank you, ma'am.

11          MR. MUSOLINO:  Thank you.  Can she be excused, Your

12   Honor?

13          THE COURT:  She may be excused.

14          MR. MUSOLINO:  Thank you, Your Honor.

15          Can I take a moment to walk outside?

16          THE COURT:  Why don't we give our reporter -- let's

17   give our reporter ten minutes.  We'll reassemble at 11:15,

18   United States time.

19          MR. MUSOLINO:  Are we going to keep the connection?

20          THE COURT:  Yes, we are.

21          (Brief recess taken)

22          THE COURT:  You may proceed, Counsel.

23              **PROTUS MANYASA BULUMA,**

24   having been first duly sworn to tell the truth, the whole

25   truth and nothing but the truth, was examined and testified as

                                                          -54-

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Odillia Mutaka Mwani, *et al.* | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | CA No. 1:99CV00125 |
| | : | Magistrate Judge John M. Facciola |
| United States of America, *et al.* | : | |
| | : | |
| Defendants | : | |

## DECLARATION OF PROTUS MANYASA BULUMA

I, Protus Manyasa Buluma, under penalty of perjury under the laws of the United States, do hereby declare, swear and affirm that the following is true:

1. I was a witness in this case in Nairobi, Kenya on January 31, 2011.

2. I have been provided with a transcript of my testimony by counsel for plaintiffs in this case.

3. I have reviewed the transcript in order to complete any testimony which the court reporter described as unintelligible or otherwise not able to be transcribed.

4. I have set out below each of the corrections by setting out in full my testimony. The corrections set out below are true and accurate. For convenience I have included a reference to the transcript by date, page(s) and line(s).

5. Copies of those pages of the transcript to which corrections are made are attached hereto.

| Page | Line | Original | Correction |
|---|---|---|---|
| 55 | 13 | Augustine is A-U-G-A- --- -G-U-S-T-I-N-E; | Augustine is A-U-G-U-S-T-I-N-E; |
| 56 | 23 | Yeah. My little brother is called Mourice Buluma. | My elder brother is called Maurice Buluma. |
| 56 | 25 | M-O-U-R-I-C-E | M-A-U-R-I-C-E |

| 58 | 3 | B-U-A-G-O-M-A | B-U-N-G-O-M-A |
|----|----|---------------|---------------|
| 58 | 5 | B-U-A-G-O-M-A | B-U-N-G-O-M-A |
| 63 | 19 | I joined an agency called Myuoti & Associates. | I joined an agency called Muyoti & Associates. |
| 68 | 1 | brother-- because my brother died in '85, my mother in '84. | brother-- because my father died in '85, my mother in '84. |

Further declarant saith not.

Protus Manyasa Buluma

Date: 15 | APRIL | 2011

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3   ODILLIA MUTAKA MWANI, et al.,        ) Civil Action No.
                                         )
4          Plaintiffs,                   ) 1:99CV00125
                                         )
5      v.                                )
                                         )
6   UNITED STATES OF AMERICA, et al.,    ) January 31, 2011
                                         ) 9:37 a.m.
7                                        )
           Defendants.                   ) Washington, D.C.
8   ---------------------------------------

9

10

11

12          TRANSCRIPT OF PROCEEDINGS OF TRIAL

13                      DAY 1

14      BEFORE THE HONORABLE JOHN M. FACCIOLA,

15   UNITED STATES DISTRICT MAGISTRATE JUDGE

16

17

18

19

20

21   COURT REPORTER:   PATRICIA A. KANESHIRO-MILLER, RMR
22                     Certified Realtime Reporter
                       Official Court Reporter
23                     Room 4704B, U.S. Courthouse
                       Washington, D.C. 20001
24                     202-354-3243

25

                                                            -1-

1   follows:

2                    DIRECT EXAMINATION

3        BY MR. MUSOLINO:

4    Q.   Can you state and spell your full name, please.

5    A.   Yeah.  My name is Protus Manyasa Buluma.  Protus is

6    P-R-O-T-U-S; Manyasa is M-A-N-Y-A-S-A; Buluma is B-U-L-U-M-A.

7    Q.   Can you tell the Court who is sitting next to you?

8    A.   It's my son, my last-born son.  I'm with him because he

9    helps me.  I cannot see properly.

10   Q.   And his name, can you give the Court his name?

11   A.   His name is Augustine Baraka Buluma.

12   Q.   Could I ask you to spell your youngest son's name, also?

13   A.   Augustine is A-U-G-A- -- -G-U-S-T-I-N-E; Baraka is

14   B-A-R-A-K-A; Buluma I spelled before.

15   Q.   Can you, Mr. Buluma, tell me your current age?

16   A.   My age?

17   Q.   How old are you?

18   A.   I am now 51 years old.

19   Q.   And you're familiar with the 1998 bombing attack of the

20   U.S. Embassy in Nairobi; are you not?

21   A.   I do.

22   Q.   Can you tell me, just in one sentence, why you're familiar

23   with that embassy attack?

24   A.   Our office was located right opposite the embassy that was

25   bombed.

1  Q.   Were you injured as a result of the bombing?

2  A.   I was injured.

3  Q.   Let me go back a little bit and see if you can't explain a

4  little bit about yourself and your background first before we

5  get to the bombing event.  Okay?

6       Where were you born?

7  A.   I was born in the western part of Kenya, in Busia

8  District.

9  Q.   And that district is spelled how?  How do you spell that

10  district?

11  A.   B-U-S-I-A.

12  Q.   And were you raised there?

13  A.   I was raised there until the age of 15.  Then I came to

14  Nairobi.

15  Q.   Okay.  Were you raised by your parents?  Were you raised

16  by your mother and father?

17  A.   Correct.

18  Q.   Did you have brothers and sisters when you were growing

19  up?

20  A.   I do.

21  Q.   And can you tell me who your brothers and sisters are,

22  their names and their ages?

23  A.   Yeah.  My little brother is called Mourice Buluma.

24  Q.   M-O-R-R-I-S?

25  A.   M-O-U-R-I-C-E.

1    Q.   And how long were you at the seminary?

2    A.   I was in the seminary for "A" level, and then I joined

3    St. Augustine Senior Seminary in Buagoma District.

4    Q.   Spell that district, please.

5    A.   B-U-A-G-O-M-A.

6    Q.   Okay.

7    A.   And then after that I joined Thomas Aquinas Seminary in

8    Nairobi.   Then I went to Nairobi University.

9    Q.   And when did you go to Nairobi University, do you

10   remember?

11   A.   I just went there for one year --

12   Q.   For one year.

13   A.   -- to complete my course.

14   Q.   And did you end up with a degree from Nairobi University?

15   A.   A certificate in religious studies.

16   Q.   Do you remember what year that was?

17   A.   1984.

18   Q.   And a certificate in religious studies, what has been the

19   effect of that?

20   A.   Well, that is from the University of Nairobi, and it

21   actually entitles me to -- it's just like any other higher

22   degree, because at that time Nairobi was not offering a degree

23   in religious studies, but it was a course that enabled me to

24   teach high school at a higher level.

25   Q.   Teach religious studies in high school?

—58—

1    Q.   Is that correct?

2    A.   Yes.

3    Q.   And you were in that position until 1989.  What did you do

4    after 1989?

5    A.   I joined American Insurance Company.

6    Q.   Where was the office?

7    A.   The office was here in Nairobi.  I think they sold their

8    business.

9    Q.   Okay.  What position did you have there with the insurance

10   company?

11   A.   I was a salesman.

12   Q.   You were an insurance salesman?

13   A.   Yes.

14   Q.   Okay.  And how long were you in that position?

15   A.   I started with them in 1990.  Up until 1996.

16   Q.   And in 1996 did you change jobs?

17   A.   I did.

18   Q.   And tell me what job you went into in 1996?

19   A.   I joined an agency called Myuoti & Associates.

20   Q.   Can you spell it for me, please?

21   A.   M-U-Y-O-T-I & Associates.

22   Q.   And this is also in the insurance business?

23   A.   No.

24   Q.   Okay.  What business is this company in?

25   A.   It was in banking --

1    brother -- because my brother died in '85, my mother died in

2    '84.

3    Q.   So not just your five children and your wife, but your

4    relatives were dependent on you?

5    A.   What?

6    Q.   Your relatives were also dependent on you?

7    A.   Dependent on me.

8    Q.   Is that unusual in Kenya, to have one person responsible

9    for a larger part of the family than the immediate family?

10   A.   I --

11          THE COURT:  Please say that again.

12          THE WITNESS:  Mandatory in a position, especially when

13   have a son in a home, he must take care of the rest of the

14   family.

15          BY MR. MUSOLINO:

16   Q.   That's mandatory by who or what?  By culture or by --

17   A.   Apart --

18   Q.   Can you say that again?

19   A.   Our culture also --

20          THE REPORTER:  Please repeat that.

21          THE COURT:  Culture requires that the man be

22   responsible?

23          THE WITNESS:  You must be responsible once you're a

24   male member of the family.

25          THE COURT:  Once you are a male members of the family,

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Odillia Mutaka Mwani, *et al.*                    :
                                                  :
      Plaintiffs                            :
                                                  :
v.                                                :         CA No. 1:99CV00125
                                                  :         Magistrate Judge John M. Facciola
United States of America, *et al.*                :
                                                  :
      Defendants                            :

## DECLARATION OF DIPAK SHAH

    I, Dipak Shah, under penalty of perjury under the laws of the United States, do

hereby declare, swear and affirm that the following is true:

1. I was a witness in this case in Nairobi, Kenya on January 31, 2011.

2. I have been provided with a transcript of my testimony by counsel for plaintiffs in this

case.

3. I have reviewed the transcript in order to complete any testimony which the court

reporter described as unintelligible or otherwise not able to be transcribed and have found

that no changes to my testimony are necessary.


Further declarant saith not.                    *Deepak L Shah*
                                                Dipak Shah

                                                Date: *14 APRIL 2011*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Odillia Mutaka Mwani, *et al.* | : |
| | : |
|     Plaintiffs | : |
| | : |
| v. | :     CA No. 1:99CV00125 |
| | :     Magistrate Judge John M. Facciola |
| United States of America, *et al.* | : |
| | : |
|     Defendants | : |

## DECLARATION OF WILFRED NGUNJIRI NDERITU

I, Wilfred Ngunjiri Nderitu, under penalty of perjury under the laws of the United States, do hereby declare, swear and affirm that the following is true:

1. I was a witness in this case in Nairobi, Kenya on February 1, 2011.

2. I have been provided with a transcript of my testimony by counsel for plaintiffs in this case.

3. I have reviewed the transcript in order to complete any testimony which the court reporter described as unintelligible or otherwise not able to be transcribed.

4. I have set out below each of the corrections by setting out in full my testimony. The corrections set out below are true and accurate. For convenience I have included a reference to the transcript by date, page(s) and line(s).

5. Copies of those pages of the transcript to which corrections are made are attached hereto.

| Page | Line | Original | Correction |
|---|---|---|---|
| 3 | 4 | National Housing Cooperation | National Housing Corporation |
| 3 | 21 | Spent for | Spent |
| 4 | 6-8 | Then I went to high school in the (unintelligible) old cuts of Nairobi at the (unintelligible) land size school which has, had a history of excellence. | Then I went to high school in the outskirts of Nairobi at the Alliance High School which has had a history of excellence. |

| 4 | 15 | course of the past year, towards the end of the past year. | court of the first year towards the end of the first year. |
|---|----|----|----|
| 4 | 20 | a political bar? | a professional bar? |
| 6 | 9-10 | I was then living in a neighborhood known as Kitengela Estates | I was then living in a neighborhood known as Prudential Estates |
| 6 | 16 | passed the bar to your practice as a (inaudible)? | passed the bar to your practice as a lawyer |
| 6 | 18 | to a law firm known as Vohra Gitao | to a law firm known as Vohra & Gitao |
| 7 | 20 | (inaudible) to the refugee camps. | frequent travel to the refugee camps. |
| 7 | 23 | with the bank of | with the firm of |
| 10 | 4 | my on firm. | my own firm. |
| 11 | 13 | My office was a Sola House (ph). | My office was at Solar House. |
| 11 | 18 | I was at Sola House | I was at Solar House |
| 12 | 5 | The courtroom would be | The court yard would be |
| 12 | 8 | in '97 | in '98 |
| 15 | 20 | with ax | with an ax |
| 16 | 1 | my office petitions | my office partitions |
| 16 | 17 | view of the planes | view of the plains |
| 17 | 12 | everybody waiting. | everybody wailing. |
| 18 | 20 | And the, I found | And then, I found |
| 18 | 21 | a arm here, | an arm here, |
| 19 | 15 | were also pleading as much | were also bleeding as much |
| 19 | 18 | That area was strike by bangs. | That area was full of banks. |
| 20 | 13 | I can say I saw much | I can't say I saw much |
| 23 | 6 | driver's assistant is the one who actually gave it with the | driver's assistant is the one who actually pleaded with the |
| 23 | 8 | we call them tan boys, | we call them turn boys, |
| 23 | 9 | the tan boy | the turn boy |
| 24 | 10 | Where you still in pain? | Were you still in pain? |
| 25 | 22 | is a black fog | is a black spot |
| 26 | 1 | tell me about was his friend. | tell me about was also my friend. |
| 26 | 4 | is that Macombi (ph)? | is that Makumi? |
| 26 | 5 | Macombi | Makumi |
| 26 | 8 | Macombi | Makumi |
| 26 | 10 | Macombi | Makumi |
| 30 | 5 | He had been very, very bloody, hit | He had been very, very badly hit |
| 30 | 6 | He was in – the (unintelligible) was at the | He was in the Kenya Bus which was at the |
| 30 | 11 | were you sleep, | were you able to sleep, |
| 35 | 5-6 | The next day I went and saw my doctor, a friend of mine and his wife. And my wife took me to go and see the doctor, | The next day I went and saw my doctor, a friend of mine, his wife, and my wife took me to go and see the doctor, |
| 35 | 8 | antibiotics and anti (inaudible) and so on. | antibiotics and antiseptics and so on. |

| 35 | 19 | here at ATR, | here at UNHCR, |
| 39 | 5 | At ATR, | At UNHCR, |
| 41 | 23 | the genocide, the home blast, | the genocide, the bomb blast, |

Further declarant saith not.

_____

Wilfred Ngunjiri Nderitu

Date: 18th April, 2011

1

```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2      ---------------------------X

 3      ODILLIA MUTAKA MWANI, et.al. ,

 4                   v.                Civil Action No. 99-125

 5      UNITED STATES OF AMERICA

 6                   Defendant

 7      ---------------------------X      Washington, D.C.
                                          Tuesday, February 1, 2011
 8                             9:38 A.M.

 9                             DAY 2
                        TRANSCRIPT OF BENCH TRIAL
10           BEFORE THE HONORABLE JOHN M. FACCIOLA
                  UNITED STATES MAGISTRATE JUDGE
11

12      APPEARANCES:

13

        For the Plaintiff:  Philip Musolino, Esq.
14                          MUSOLINO & DESSEL
                            1615 L Street, NW
15                          Washington, DC 20036
                            202-466-3883
16

17

18

19

20

21      Court Reporter:        Lisa Walker Griffith, RPR
                               U.S. District Courthouse
22                             Room 6507
                               Washington, D.C.  20001
23                             (202) 354-3247

24      Proceedings recorded by mechanical stenography, transcript
        produced by computer.
25
```

1    A    I am familiar with it as a survivor of it.   I --

2    Q    Go ahead.

3    A    Yes.   In 1998, on the 7th of August, I was working from

4    the Offices of the National Housing Cooperation, NHC House,

5    from the 7th floor, which was very, very near the site from

6    which the bomb exploded.

7    Q    All right.   And you were injured as a result?

8    A    I was injured as a result.

9    Q    Let me go back.   I'll go into the details a little later.

10   Let me see if I can go into your background first, okay?

11             You are a lawyer practicing in Kenya?

12   A    I am a lawyer practicing in Kenya.   I entered into the

13   bar in Kenya on the 19th, December 19th, 1989.

14   Q    You are a citizen of Kenya?

15   A    I'm a Kenyan citizen.

16   Q    Tell the Court where you were born and raised first and

17   give the Court a little bit of that background.

18   A    I was born in Nyeri, Kenya.   And I --

19   Q    You're going to have to spell that for our court

20   reporter.

21   A    Yes.   Nyeri is N.Y.E.R.I.   And I spent for the first

22   seven years or so of my life in Nyeri before coming to

23   Nairobi, where I have basically been for the rest of my life.

24   Q    And were you raised by your parents?

25   A    I was raised by my parents.

1   Q   Can you tell us a little bit about your academic

2   background?

3   A   I went, I think my first two years of primary school in

4   Nyeri.  And then I came down to Nairobi for the other five;

5   that is, from class three to class seven, my primary

6   education in Nairobi.  Then I went to high school in the

7   (unintelligible) old cuts of Nairobi at the (unintelligible)

8   land size school which has, had a history of excellence.  And

9   then I went to the University of Nairobi in 1985.  I then

10  graduated with an honors degree in law in 1988.  And then I

11  did a one-year post graduate diploma in the practice of law

12  between 1988 and 1989.

13         In the year 2005, I started on a masters program in

14  international human rights law, but I suspended that in the

15  course of the past year, towards the end of the past year.

16  But currently, I'm doing a masters or a masters of arts

17  degree in international relations.

18  Q   Can you tell the Court a little about the way that the

19  practice of law is organized in Kenya?  Is it a national bar,

20  a political bar?  Can you distinguish it in a way from

21  American practice to British practice?

22         THE COURT:  Just a second, please.  Excuse me, sir.

23         Counsel, your voice is dropping and the reporter is

24  having difficulty.  So please make sure -- the witness is

25  perfect, you are fading in and out.  Please make sure you're

6

1    and three children.

2    Q    And the current ages of your three children?

3    A    My first born is 16 years, a girl.  Then I have a girl

4    who is 13, and our last born is a boy, age eight.

5    Q    And were you living in Nairobi at the time of the Embassy

6    attack?

7    A    Yes, I was living in Nairobi.

8    Q    And what area of Nairobi did you live in?

9    A    I was then living in a neighborhood known as Kitengela

10   Estates in the eastern side of Nairobi.

11   Q    Were you working in Nairobi at the time of the Embassy

12   bombing?

13   A    I was working in Nairobi as a lawyer.  I had my own law

14   practice which I had established about two years previously.

15   Q    Can you take me from the time you got your diploma and

16   passed the bar to your practice as a (inaudible)?

17   A    Yes.  In 1989, when I was admitted to the bar, I was

18   already attached to a law firm known as Vohra Gitao

19   Advocates.  Vohra is V.O.H.R.A., Gitao is G.I.T.A.O.  And I

20   had done my internship there, and they offered me a job in

21   the community after I qualified.  I worked there until the

22   end of 1991, whereupon I was offered another job by a

23   different law firm known as AGN Kamau and Kimani.  Kamau is

24   K.A.M.A.U. and Kimani is K.I.M.A.N.I.

25   Q    In your first couple of years at Gitao, what kind of work

1   did you do?

2   A    It was an all-around practice.   Both the first two places

3   of employment were all-around practices, but with a bias in

4   insurance law.

5   Q    And you got an offer to take a new position, did you

6   accept it?

7   A    I beg your pardon?

8   Q    You said you got an offer for a new position?

9   A    Yes.   And then I took it from January of 1992 until July

10   of 1993, when I was offered a job as a protection officer

11   with the United Nations High Commissioner for Refugees.   And

12   I did it for two years before I gained entry in the new

13   practice.

14   Q    And a protection officer, what did that entail?

15   A    Basically what was, it related to conducting interviews

16   for eligibility determination.   Determining eligibility for

17   asylum by asylum seekers.

18   Q    Into Kenya?

19   A    Into Kenya.   I worked from the Nairobi office with

20   (inaudible) to the refugee camps.

21   Q    And you did that for a couple of years?

22   A    I did that for two years.   Then I then went back into

23   practice in employment as a senior associate with the bank of

24   Maina Murage & Company Advocates.   That is, Maina is

25   M.A.I.N.A.   Murage is M.U.R.A.G.E.   And the only reason I was

1    different level in terms of my career growth.  I could not

2    remain employed forever.  I needed to be able to make more

3    money, and I thought that the only way to make more money

4    would be through establishing my on firm.  Again, there is a

5    way in which having your own firm does earn you a tremendous

6    amount of respect, and especially if you have a firm that is

7    then well run.  So, for me, I saw it as the logical

8    progression in my career.

9    Q    All right.  And did you, when you formed this firm, did

10   you have any partners or employees when you first opened?

11   A    Actually, this started very, very modestly.  I started

12   with one secretary and a shared clerk and myself.  And every

13   other service that I required would be a service that I would

14   seek to go to friends to source from.  But eventually, by the

15   time I was about two years old in practice, there were four

16   in the office.  Four full-time people.

17   Q    All right.  And did you involve yourself in the

18   management of the firm?

19   A    Yes, I was both a manager and practitioner.

20   Q    Did you, could you assess what your organizational skills

21   were at that time?  Were you good in organization, not so

22   good in organization?  Did you consider it a strong suit, a

23   weak point?

24   A    I was very good in organization.  I was very good in

25   looking for business, in doing the business and in organizing

1   how it would be done by the rest of the people in the firm.

2   And I had, what I would say, a very, very focused way of

3   going about it.

4   Q    And did you have a business plan or a business model for

5   what you wanted the firm to do, how you wanted it to grow

6   over time?

7   A    Yes.  And it is something that I, when I started with a

8   very basic business model, it was something that I had

9   thought I would keep on improving on with time as the firm

10  grew.

11  Q    Okay.  Now, where was your office when you first opened

12  your firm?

13  A    My office was at Sola House (ph).  Sola House is actually

14  right next to NHC House where I was now at the time of the

15  blast.  So the two buildings are adjacent.

16  Q    All right.  So you opened your office and it was the same

17  office you were in at the time of the Embassy attack?

18  A    No, no.  I was at Sola House from the 1st of August,

19  1996.  I stayed there for exactly one year.  And the 1st of

20  August, 1997, I then moved to the next building.

21  Q    I'm sorry.  Okay.  And when you moved, can you tell me

22  where it was with respect to the Embassy?

23  A    My office was on the 7th floor of NHC house and it was

24  overlooking the Embassy and the Ufundi Cooperative and the

25  Cooperative House.  I was right at the end of the NHC House

1    as one goes towards the Embassy.

2    Q    And can you give the Court an estimate of how far away in

3    meters you are?

4    A    I would quote it at maybe, I don't know, what the size of

5    the courtroom would be, or the width of it would be.   But

6    maybe about 30 meters at most.

7    Q    Okay.   Now, before we get into the events of the bombing

8    in '97, could you tell me whether you are still practicing in

9    your own firm?

10   A    I am still practicing in my firm.

11   Q    And currently are you doing anything in particular on

12   assignment with the state of Nairobi?

13   A    Yes.   I'm now also a defense counsel at the U.N.

14   International Criminal Tribunal for Rwanda.

15            THE COURT:   I'm sorry, I lost that.   Counsel, I lost

16   that.   Could the witness please say that again?   I just

17   caught the words United Nations.

18   BY MR. MUSOLINO:

19   Q    Can you tell us again?

20   A    Yes.   I am also assigned as defense counsel at the United

21   Nations International Criminal Tribunal for Rwanda based in

22   Arusha, Tanzania.   Arusha is A.R.U.S.H.A.

23   Q    And that requires you to travel back and forth to Kenya?

24   A    That requires me to travel back and forth.

25   Q    Now, let me direct your attention to the events of

1  A   It was shortly after that.  I can't quite remember

2  whether I was -- well, I was still on the phone with the

3  client, so it cannot be very much longer after that.  But it

4  was certainly within minutes, yeah.

5  Q   And what do you remember about that moment of the second

6  blast?

7  A   When the second blast came, the only thing that I

8  remember, first of all, of what I would say is simultaneous

9  with the blast or what I felt thereafter, is I saw something

10 glittering in the sky.

11 Q   Glittering?

12 A   Yes.  But it was really a split second because then I

13 felt like somebody had, you know, cut through my head on this

14 side (indicating).

15 Q   And you are indicating your right side?

16 A   The right side where you can see the scarring, yeah, over

17 there (indicating).

18        So, it all happened very, very, very fast.  But I

19 felt like, actually, it's like somebody had cut through me

20 with ax or somebody had just grabbed my head and banged it

21 against a stone.  That was the impact I felt.

22 Q   Was it a sensation you never had before?

23 A   It was nothing -- it was something I had never felt

24 before.  It was just too massive.

25 Q   And what do you remember next?

1   A   I do remember the scene, that my office petitions were no

2   longer there.  Again, all this happened very, very fast.

3   Everything was just down on the floor, it was just splattered

4   all over.  And there was too much light in my eyes.

5          What I did not realize then was that I had lost my

6   glasses at that moment.  And then I knew that I needed to get

7   out of the office.  And I was jumping through, just to try

8   and find my exit.  And there were no doors in the place, but

9   everything, I mean, was in a total mess.

10  Q   Did anything happen to the windows in your office?

11  A   The windows were all shattered.  The window frames were

12  all twisted.  It was, I mean, it a horrible sight.

13  Q   Were you, you said you were on the phone with your

14  client.  Were you near the window when the second blast went

15  off?

16  A   I was near the window.  Actually, I had a very, very

17  commanding view of the planes out of the city because the

18  American Embassy was just about four floors high.  I could

19  see right into the horizon a little, a very, very beautiful

20  view.  So, I had pushed my desk as close as possible to the

21  window so that I used to have a good view.

22  Q   Now, you said you were -- can you tell me how good your

23  vision was after the second blast?  Could you see or not see,

24  having lost your glasses?

25  A   I could see, but not as clearly as I could with my

1    glasses.  But I was in a lot of pain and I was bleeding, I

2    was bleeding all over.  But at that point in time, whether or

3    not you can see, you've got to run.  I mean, that is what was

4    ringing in my head, that I had to run and get out.

5    Q    And was there anybody else in your office at that time?

6    A    Yes, there was.  There was my secretary who also

7    sustained serious facial injuries.  She was there.  And, in

8    fact, when I was trying to look for the door, she came and

9    held me, and she was also as bloody as I was.  And she just

10   said you are not going to leave me here.  And we actually

11   went down the stairs.  The lights were cut off, I don't know

12   by who.  We went down the stairs, everybody waiting.  And we

13   were actually running down hand in hand.

14   Q    Had you ever been bloodied like that before?

15   A    Not before.

16   Q    Had you ever seen anyone bloodied the way your secretary

17   was bloodied, in the past?

18   A    Come again.

19   Q    You looked at your secretary and you saw that she was

20   injured too.  And I think you said she was bleeding?

21   A    Yes.

22   Q    Had you ever seen -- been in a situation where you saw

23   other people in that condition?

24   A    Only from a distance.  Only from a distance.

25   Q    And you said you were in pain.  Can you tell me where you

1   were feeling pain?

2   A   Oh, I was feeling pain all over basically, but the most

3   pain was here (indicating) where you see that scarring.   And

4   then the ear.   And then there was that, there was a pain that

5   just kept on, you know, pumping into me.   Then the back, I

6   sustained lots of, I got some small glass bits that just got

7   embedded into my back.   I have scars to this day which itch.

8   Q   Okay.   Now, you and your secretary started to go down the

9   stairs, I take it?

10   A   Yes.

11   Q   The elevator was not working; is that correct?

12   A   I don't know if it was working, but I suspect it was not

13   working.   But I was not going to take it anyway, no.

14   Q   All right.   You made it downstairs?

15   A   I made it downstairs.   And when I got to the ground

16   floor, there was a clothes shop, Deacons, that was on the

17   ground floor.

18   Q   And can you spell that for me?

19   A   Deacons is D.E.A.C.O.N.S.   They had a clothes store

20   there.   And the, I found mannequins squatted all over.   You

21   know, a arm here, a head there.   And it was at that point in

22   time that I knew that whatever had happened had affected more

23   than just our building, that it was a huge, huge event that

24   had occurred.

25   Q   All right.   Now, when you go out, did you got out through

1   the front door?

2   A   Yes.

3   Q   Okay.  And what's your -- what's the view from your front

4   door?  Could you see the Embassy or not see the Embassy?

5   A   From the front door, one could see the Embassy.  But I

6   don't recall whether I even looked at it because when I got

7   there -- you see, the clothes store that was there now,

8   because it was all, it had glass windows, a glass display

9   window, now it was just an empty hall from which you could

10   just run across into whichever way.  And in my mind, what I

11   wanted to do was to run towards where I used to park my car

12   and see how I could get myself to the hospital.

13   Q   Did you have any fear at that time?

14   A   Oh, yes, because right from the ground floor I saw lots

15   of other people that were also pleading as much as I was, if

16   not more.  So, I was filled with a lot of fear.  At the time

17   actually, there was a bank strike that was going and it had

18   been going on for some time.  That area was striked by bangs.

19   And I thought that whatever had happened was the act of bank

20   workers who were on strike.

21   Q   All right.  And so, what did you do when you got through

22   the front door?  You said you thought about going to where

23   your car was?

24   A   So, I was going towards where my car was parked.  And

25   then I realized that I did not even have my glasses.  And

1   even the way I was bleeding, I now could tell that there was

2   no way I was going to make it driving.  So fortunately, when

3   I crossed the road at Harambee Avenue, which is

4   H.A.R.A.M.B.E.E., when I got to Harambee Avenue, there were

5   the people that, you know, good samaritans that were of

6   assistance.  And there was this one person who opened his car

7   for people to get in.  And I just got onto it and he drove us

8   to the hospital.

9   Q   Were you able to observe the scene before you got into

10  that car, the scene of the Embassy and the Ufundi building,

11  the Cooperative building?

12  A   Yes.  Actually, every building in sight was, you know,

13  was no longer the way it looked before.  I can say I saw much

14  of the American Embassy itself.  But the Ufundi Cooperative,

15  which was more or less, which was closer to me, that, I do

16  remember seeing that, I remember I saw there were no windows

17  at all on the Cooperative House.  All the windows had been

18  shattered.

19  Q   The people who were at the scene at the time, how would

20  you describe what was going on with the people at the scene?

21  A   It was a state of helplessness and utter confusion.  And

22  practically everybody had blood on them and the people were

23  running in all sorts of directions, looking for whatever help

24  they could get.

25  Q   Had you ever seen a scene anything like that?

1    come to drop, it was there to drop in some hospital staff for

2    a shift.

3            And this driver was then stopped by the guard who

4    seemed to know him.  And he was asked to drop me in the city

5    center.  And from the way I was all bandaged, the vehicle

6    driver's assistant is the one who actually gave it with the

7    driver eventually because the driver had wanted to refuse to

8    give me a lift.  And his assistant, we call them tan boys,

9    the tan boy told the driver, just, let's just give him a

10   lift.  If we did not give him, God would not forgive us.

11           And that is how I got into this vehicle, expecting

12   to be taken to the city center.  They actually asked me where

13   I stayed, and I directed them and they took me right to my

14   doorstep.

15   Q    And they asked for no money?

16   A    They asked for no money whatsoever.

17   Q    Before that event happened, you were at the hospital.

18   When you first arrived there from the first (inaudible), can

19   you tell me what the scene was there at the Mater Hospital?

20   A    It was, I mean, the hospital could not cope.  When we got

21   there, people were still waiting and they were being brought

22   in, you know, there people that where coming in, even when we

23   were getting in, there were very many other people that were

24   coming in.

25           I was placed on a stretcher, and after being placed

1    on the stretcher, I expected that I was going to be taken

2    then for further treatment, for treatment.  What happened was

3    apparently the hospital, the staff that was to push me on the

4    stretcher saw somebody who may have been more hurt than me,

5    and then I was left on the stretcher, which was somewhere

6    behind a door.  And for the next several minutes I could hear

7    more people coming in asking for attention.  And I realized

8    that I had been forgotten.  And again, I realized this.

9    Q    At that point, what was your condition?  You had talked

10   about being in pain.  Where you still in pain?

11   A    I was in a lot of pain.  In fact, I was a lot more, my

12   blood loss was a lot more.  So, I realized that if I did not

13   get attention almost immediately, then it was going to be

14   catastrophic for me.  So what I did was I tried to gather

15   whatever strength I could and I then got off the stretcher.

16   And the first person that I saw in the hospital uniform who

17   was a doctor, I stopped him and I told him that I needed his

18   assistance or else I was going to die.  And he listened to

19   me.  And I found myself being taken to the theater.

20   Q    Let me stop you.  Did you believe what you had said to

21   the doctor, that if you didn't get assistance you were going

22   to die?

23   A    I did.  I did.

24   Q    I interrupted you again.  You said he took you to the

25   theater?

1    A    They took me to the theater.

2    Q    Meaning what?

3    A    To the surgery room, yes.

4    Q    It's the operating room?

5    A    The operating room, yeah.

6    Q    And were you still conscious?

7    A    I was semiconscious I would say.  And it's interesting

8    because there is a lawyer friend of mine, just to give you a

9    bit of a background, who had died on the 1st of August, which

10   was the previous Saturday, in a road accident here in town.

11   He was my classmate and he was my neighbor.  He was staying

12   just three doors away.  And he was due to be buried the day

13   after the blast.  And on this day of the blast was to be his

14   funeral service, which I had planned to attend.

15         Now, that morning when I was in court, another

16   colleague who was flipping through the newspapers, he sees in

17   the obituary pages this lawyer, a friend of mine.  And my

18   colleague asked me, you mean Paul is dead?  And I said yes,

19   he is.  What happened?  And then I explained to him, that he

20   died in a road accident last Saturday night.  Where was this?

21   And then I said along Ngong Road.  Ngong is N.G.O.N.G.

22         Now, there was and there still is a black fog along

23   Ngong Road where my friend died.  And this colleague of mine

24   had himself lost a friend a few years earlier.  But I didn't

25   seem to know that this, the person now that he was going to

1    tell me about was his friend.

2           So he tells me, you know, I lost a friend at the

3    same, same spot a few years ago.  He was working for a cement

4    company.  And I asked him, is that Macombi (ph)?  And then he

5    said, you mean you know Macombi?  I said yes, I know Macombi,

6    he was my senior in school.  And then he told me how he was

7    called late in the night.  They had come from a drink and he

8    was told that Macombi had been involved in a road accident

9    and he needed blood.  And so, my colleague went to the

10   hospital to give blood.  And then, Macombi died as my

11   colleague watched.

12          And what my colleague was telling me was, if you

13   ever are in a situation where you are losing blood, do not

14   shut your eyes, just remain alive and remain awake.  And I

15   did not know that two hours later I would actually have to be

16   going through this.

17          And those I think are some of the things that really

18   saved me because in the operating room, it was very, very

19   cold.  It was air conditioned.  I was very cold and I was

20   shivering.  And the doctor asked me if he could cover me, and

21   I was fearing he might cover me and then I feel a bit warm

22   and go.  And I told him no, I'm fine.  And so, he operated on

23   me as I was cold, but I kept awake.

24   Q   So, going through your mind was that advice that you had

25   just gotten hours ago, how to stay awake or you might not

1   the scene in the ward after you got out of the operating

2   room?

3   A    In the ward where I was, we were initially three people.

4   And one of people that I was with in the ward was taken for

5   surgery that afternoon.  He had been very, very bloody, hit

6   in the chest.  He was in -- the (unintelligible) was at the

7   roundabout.  I mean, he didn't look like he was going to

8   survive.  But by the time I was leaving, we were probably six

9   in a ward.  Yeah.

10  Q    Did you make the decision yourself to leave the hospital

11  or did you do it with consultation with any of the treating

12  physicians?

13  A    I laugh because I thought I was very, very smart when

14  going to the hospital.  And what happened was, I decided to

15  sneak out.  And when I was seen sneaking out, I was stopped

16  by one of the hospital staff.  And I then explained that the

17  doctor had said, which was true, that, because there were so

18  many people, if you feel that you would be in a condition to

19  leave the hospital, then you should ask to be discharged.

20         I could tell that I might not make it in terms of an

21  assessment, a positive assessment for being discharged.  But

22  because I knew that there were people that needed to use the

23  beds, and I was saying, after all, I'm not getting the kind

24  of attention that I would want to get medically over here,

25  then let me sneak out.

1   Q    Did you have some anxiety or fear about your medical

2   condition?

3   A    Oh, certainly, certainly.

4   Q    And so the next day, did you go see your own doctor?

5   A    The next day I went and saw my doctor, a friend of mine

6   and his wife.  And my wife took me to go and see the doctor,

7   who then put more stitches on my wounds and put me on

8   antibiotics and anti (inaudible) and so on.

9   Q    And then you returned home?

10  A    Then I returned home.

11  Q    Did you see any other specialist at that time or any

12  other doctor?

13  A    No, I did not.  But I did go for counseling after some

14  time.  I did go for professional counseling.

15  Q    Psychological counseling?

16  A    Psychological counseling.

17  Q    And what triggered that counseling?

18  A    Well, one, I thought it was good for me.  Secondly,

19  because at my previous place of work, here at ATR, we had

20  referred refugees to psychological counselors.  I knew that

21  it would have a positive effect.  So, at that point in time,

22  I went to the offices of a client of mine.  They were

23  offering counseling services and I got counseling.

24  Q    After you saw your doctor, the day after, did you go

25  right back to work?

1   that came with the memory loss and which I still suffer from

2   to this day, is having a short span of concentration.  When,

3   before the blast, I would be able -- I mean, I had lots of

4   energy, I can tell you.  I would sit down and work for hours.

5          At ATR, for example, we used to get, I used to be

6   picked from my house late in the night.  And I would work and

7   I would get home late again, and the next day I would still

8   have the energy to work.  But what I noticed after the blast

9   is that I could only concentrate for so long.  And a lot of

10   things that I used to be able to retain in my mind without

11   having to write down, I found that I had to now keep on

12   writing them down.

13   Q   And can you tell me whether, we talked about your

14   organizational skills, has there been any impact from the

15   Embassy bombing on your perception of your own organizational

16   skills?

17   A   Yes.  I was, I had very, very good organizational skills.

18   And I try so much harder now to maintain that because when

19   you have been through this kind of thing, you do not want

20   people out there to know that you are trying so hard.  And

21   you do not want people to start relating to you differently,

22   to start thinking that you are now less organized than you

23   used to be.  So, you want to keep it your own secret and work

24   so much harder.  So right now, to achieve the same level of

25   organization, to achieve the same level of efficiency, I

1   arbitration, I would, frankly speaking, I should not have

2   gotten the B plus that I got.  I think I was able to -- and

3   in international politics also, where I got a B, I think I

4   should have gotten an A.  Because those are things to me that

5   would not have been very, very difficult.

6         And even when I look at the contents of what I'm

7   supposed to be studying, it doesn't look difficult to me.

8   But when I go into the details, then I find that to cover and

9   retain everything that I need to, then I really, I'm

10   stretching myself a lot more than I used to.

11   Q   And the change is before and after the Embassy bombing?

12   A   Yes.

13   Q   Now, you said you're doing defense work at the criminal

14   court in Arusha?

15   A   Yes.

16   Q   Has the damage that was done by the Embassy bombing, has

17   it, from your perception, affected the way you've been able

18   to perform in that capacity?

19   A   Well, I have really had to work a lot harder.  One of the

20   reasons that I have taken up that job is because I find that

21   to, when I -- let me put it this way, that I would rather not

22   be doing defense work in connection with the genocide.

23   Because to me, the genocide, the home blast, all of those are

24   horror issues to me.

25         But then I find that I would probably be working so

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Odillia Mutaka Mwani, *et al.* | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | CA No. 1:99CV00125 |
| | : | Magistrate Judge John M. Facciola |
| United States of America, *et al.* | : | |
| | : | |
| Defendants | : | |

## DECLARATION OF NOAH THUO KIMANI

I, Noah Thuo Kimani, under penalty of perjury under the laws of the United States, do hereby declare, swear and affirm that the following is true:

1. I was a witness in this case in Nairobi, Kenya on February 1, 2011.

2. I have been provided with a transcript of my testimony by counsel for plaintiffs in this case.

3. I have reviewed the transcript in order to complete any testimony which the court reporter described as unintelligible or otherwise not able to be transcribed.

4. I have set out below each of the corrections by setting out in full my testimony. The corrections set out below are true and accurate. For convenience I have included a reference to the transcript by date, page(s) and line(s).

5. Copies of those pages of the transcript to which corrections are made are attached hereto.

| Page | Line | Original | Correction |
|---|---|---|---|
| 46 | 6 | She was called Felistas Naeni Thuo. | She was called Felistas Njeri Thuo. |
| 46 | 8 | And Naeni is N.A.E.N.I. | And Njeri is N.J.E.R.I. |
| 46 | 12 | About 18 years. | About 8 years. |
| 47 | 5 | joined pretty much school there for Muguru primary school. | joined class 1 there at Muguru primary school. |
| 50 | 1 | A BOB. | A hundred Bob. |
| 51 | 7 | Hotels, do you do any of this manual work. | Hotels, looking for any manual work. |

| 53 | 3 | From there we, when we engaged she (inaudible). | From there we became engaged. |
|---|---|---|---|
| 53 | 25 | (inaudible) position | a memorable occastion. |
| 55 | 1 | attained the (inaudible) certificate like me. | attained the secondary education certificate like me. |
| 58 | 6 | job at Royal Cab, Royal Cab | job at Royal Card, Royal Card |
| 58 | 9 | R.O.Y.A.L., Cab, C.A.B. | R.O.Y.A.L., Card, C.A.R.D. |
| 58 | 23 | designed it and I went on my way. | resigned it and I went on my way. |
| 59 | 6 | hats, me and him. | hands, me and him. |
| 59 | 16 | Just a few meters from the (inaudible). | Just a few meters from the American Embassy. |
| 64 | 1 | She was attending Prenasalee (ph) primary school near, | She was attending pre-primary school near, |
| 64 | 18 | tell me, Danny, wake up, | tell me, Daddy, wake up, |
| 64 | 2 | Danny. | Daddy. |
| 64 | 24 | a metatoo (ph). Metatoo is a fabric. So we go into town and | a matatu. Matatu is a public service vehicle. So we go into town and |
| 65 | 23 | We have a ranch out on | We have a lunch out on |
| 66 | 19 | to go to get her own when she was employed. | to go to get a loan because she was employed. |
| 66 | 20 | agreed that she could take her own. | agreed that she could apply for a loan. |
| 67 | 22 | the income, our own one was -- | the income, our own was not sufficient. |
| 68 | 24 | the curtains were wrong. | the curtains were drawn. |
| 69 | 7 | it was around like -- | it was around like 9:00am. |
| 70 | 7 | was a road of dust. | was a lot of dust. |
| 71 | 4 | The condition died abruptly. | The conversation died abruptly. |
| 72 | 18 | my -- | my wife used to work. |
| 73 | 6 | It was from, | It was from their side, |
| 73 | 9 | were trapped, in the process, I would say American Embassy, | were trapped, to reach I had to pass the American Embassy, |
| 74 | 20 | to – everybody | to ferry everybody |
| 75 | 22 | the walls, those who had (inaudible), | the walls, those who had minor injuries, |
| 76 | 2 | one of our (inaudible), | one of their colleagues, |
| 76 | 3 | in the -- | in the blast, |
| 76 | 6 | I called Andrew, Andrew Murythi. | I called Andrew, Andrew Muriithi. |
| 76 | 21 | I went down, still floating, | I went down, still praying |
| 77 | 12 | I went to look for my house. | I went to my house. |
| 77 | 7-9 | but she was not there. I asked whether she (inaudible) meeting, and the house help tell me yes. And she asked me whether I saw her and I said no. | but she was not there. DELETE. |
| 78 | 8 | to -- | to the hospital. |
| 79 | 18 | And even in bracing | And even in tracing |

| 80 | 2 | identify (inaudible) | identify most of her colleagues. |
|----|----|----|----|
| 81 | 13 | and another colleague of ours. | and another colleague of hers. |
| 85 | 16 | Even the (inaudible) | Even the feeding spoon |
| 85 | 17 | she would throw that in the car. | she would throw that in the trash. |
| 85 | 18 | that in like a nice car. | that in like a nice toy car. |
| 87 | 1-4 | I hope for them for above their years. Coming home, going at it, doing their homework, going to sleep, seeing them to sleep. In the morning, I carry them, and I did that for four years. | I cooked for them for about four years.  Coming home early, doing their homework, going to sleep, seeing them to sleep.  In the morning, I prepare them for school and I did that for four years. |
| 88 | 6 | And that is as a (inaudible). | And that is as a result of drinking. |
| 89 | 2 | (inaudible). | at University. |

Further declarant saith not.

Noah Thuo Kimani

Date: 18/04/2011

1   A   Very much.

2   Q   And can you tell me what your connection is, if any, to

3   that attack?

4   A   During that attack, I lost my wife.

5   Q   And can you tell me what your wife's name was?

6   A   She was called Felistas Naeni Thuo.

7   Q   And can you spell that, please?

8   A   F.E.L.I.S.T.A.S., Felistas.  And Naeni is N.A.E.N.I.

9   Thuo, T.H.U.O.

10  Q   Now, you said you lost her in the Embassy blast.  How

11  long where you two married before she died?

12  A   About 18 years.

13  Q   And did you have children?

14  A   Yes.

15  Q   And can you tell me who the children were?

16  A   We were blessed with two children, two daughters.  At

17  that time of the blast, the first born was eight years old.

18  Q   Eight years old?

19  A   Eight years.  And the second born, a girl, was four years

20  old.

21  Q   And that was at the time that you (inaudible)?

22  A   Yes.

23  Q   Okay.  Let me first go back and ask you a little bit

24  about yourself and where you were raised.  And if you could

25  tell the Court a little bit about that?

1    A    I was raised in a village called Kangema, K.A.N.G.E.M.A.

2    Q    Where is that?

3    A    In central province.  In the central province.  And

4    that's where I went to school.  That is back in 1972.  I

5    joined pretty much school there for Muguru primary school.

6    Muguru is M.U.G.U.R.U.  In 1972.

7    Q    When you started?

8    A    When I started class one.

9    Q    Okay.  And how long were you in that school?

10   A    I stayed there for about eight years.

11   Q    All right.  And did you get, did you graduate from that

12   primary school?

13   A    Yeah, I did.  I did.

14   Q    Okay.  And what happened with, what was your next step?

15   A    From there, that is in 1980 because I had to repeat one

16   class.

17   Q    Okay.

18   A    And in 1980 I passed well, and in that school, I was

19   accepted in that school for Muguru secondary school.

20   Q    Okay.  Same spelling?

21   A    Yes, same spelling.

22   Q    In the same area, same location?

23   A    Same location.

24   Q    Okay.  And did you attend that school?

25   A    Yes, I did attend that school from 1981 to 1984.

1    A    We may have been given some little money.  A BOB.

2    Q    A BOB a day?

3    A    Yeah.

4    Q    And a BOB is a Kenyan schilling?

5    A    Yes.

6    Q    Okay.  And how long were you there for that training?

7    A    At that attachment, I stayed there for only one year.

8    Q    Is that typical of how long they usually are, one year?

9    A    No.

10   Q    They're longer or shorter?

11   A    They're supposed to be three years.  So that you can be

12   given a permanent status.

13   Q    Permanent status?

14   A    Yes.

15   Q    Okay.  And that permanent status --

16   A    It never came.

17   Q    Okay.  Why did you leave after one year?

18   A    Well, reasons, I don't know.

19   Q    You don't know?

20   A    Yeah.

21   Q    If you can tell me, were you living in Nairobi then?

22   A    Yes, oh, yes.  I was staying with my father.

23   Q    Okay.  In Nairobi?

24   A    Yes.

25   Q    After you left that attachment, what did you do?

1   A   I was just hanging around waiting to get a job.

2   Q   Were you looking for a job?

3   A   I didn't get a job.

4   Q   I said were you looking for a job?

5   A   Yes.

6   Q   And where were you looking?

7   A   Hotels, do you do any of this manual work.  Fitting for

8   hotels and that kind of work.

9   Q   Okay.

10  A   To just earn a living.

11  Q   Had you met your future wife by the time that you had the

12  attachment?

13  A   No.

14  Q   When did you first meet her?

15  A   I met her around 1989.

16  Q   And so, can you tell me under what circumstances?

17  A   Well, I was waiting around looking for a job and she was

18  also looking for a job.  So we met and we started comparing

19  notes and, as to where I can go and get a good job.  And in

20  the process we fell in love.

21  Q   Do you remember when you, the first day you met her?

22  A   It was a long time ago.  But I remember it was around

23  1989.

24  Q   Now, did you start dating?

25  A   Yeah.

1    poor man by that time.

2    Q    And so, how long had you and she dated?

3    A    From there we, when we engaged she (inaudible).   And

4    February 16, 1990, we were blessed with our first daughter,

5    Sheila Wangui Thuo.

6    Q    Can you spell her name?

7    A    Sheila is S.H.E.I.L.A.   Wangui is W.A.N.G.U.I.   Thuo is

8    T.H.U.O.

9    Q    And were you there when she was born?

10   A    Yes, I went to see her at the hospital.

11   Q    And was she born healthy?

12   A    Oh, yeah.

13   Q    What hospital was she born in?

14   A    In Thika, Thika.   Our own area.

15   Q    Okay.   Now, eventually you got married?

16   A    Yes, we got married.

17   Q    When did you get married?

18   A    That same year, 1990.

19   Q    Where was the wedding?

20   A    We never had a wedding, but we did, I went to her

21   parents' place.   And we did discuss the marriage, this

22   customary rural wedding.

23   Q    And can you tell the Court what that is?

24   A    Whereby you go and pay dowry to the parents.   And it was

25   (inaudible) position.

1  attained the (inaudible) certificate like me.  And she went

2  to a secretary college where she did a secretary course.  And

3  she obtained her certificate, 60 minutes a word -- 60 words

4  per minute.

5  Q    That was her typing speed?

6  A    Yes.

7  Q    And is that what she wanted to do, did she want to be a

8  secretary?

9  A    Her?

10 Q    Yeah.

11 A    Yes, that's what she wanted to be.

12 Q    But she couldn't find work?

13 A    Yeah, she couldn't get work.

14 Q    After you got married, did you move or did you stay there

15 after you got married?

16 A    We stayed there.  By that time, my father-in-law used to

17 cater where he used to pay for the stay.  Paying for the rent

18 and giving us food.  It was a ritual -- the father-in-law

19 used to kind of chip in and my dad also used to chip in.

20 Q    Well, was it hard to find work for both of you?

21 A    It was very hard, yeah.

22 Q    Can you tell me, and you had your daughter with you at

23 the time, right?

24 A    At the time we --

25 Q    You had your daughter?

1    wife, came, came visiting.  And he asked me would -- and I

2    told him and explained to him that I have course in welding

3    and fitting.  And I was also able to explain that I had the

4    license.  So, he asked me what I want to, do I want a job.

5    And I told him yes because I said we have a baby.  And he

6    told me he got me a job at Royal Cab, Royal Cab

7    International.

8    Q    And you spell that how?

9    A    R.O.Y.A.L., Cab, C.A.B.

10   Q    And what was the job?

11   A    It used to be a debt collector.  I used to go in to

12   collect debt from those who owe the company money.

13   Q    That's not an easy job, is it?

14   A    Yeah.

15   Q    When did you get that job, do you remember?

16   A    It was, I got that job in 1991.

17   Q    Ninety-one?

18   A    Yeah.

19   Q    Okay.  And how long did you have that job?

20   A    I stayed there for one year.

21   Q    Did you like it or didn't?

22   A    I always wanted to be my own employer, yes.  So, I

23   designed it and I went on my way.

24   Q    What did you do?

25   A    I -- this printing, selling stationary and printing.

1  Q    In Nairobi?

2  A    In Nairobi.

3  Q    And how did you get into that business?

4  A    I was introduced by a friend of mine, who told me he will

5  show me how to go, how to go about it.  And now, we joined

6  hats, me and him.  And we used to do it very well.

7  Q    And can you tell me, did you open up an office or did you

8  have a place of business?

9  A    Yes, we had our office.

10  Q    And where was that?

11  A    This was around Mfangano Street.  Mfangano is

12  M.F.A.N.G.A.N.O., Street.

13  Q    And where is that?  That's in Nairobi?

14  A    Yes, it's in Nairobi.

15  Q    Where is that in Nairobi?

16  A    Just a few meters from the (inaudible).

17  Q    And is that, were you running that business on the day of

18  the bomb blast?

19  A    Yes.

20  Q    And were you in the office at the time?

21  A    Yes.

22  Q    And was your wife in her office at the time?

23  A    Yes.

24  Q    Now, let me ask you a few questions about that business.

25  You got it started and can you describe what it was, what

1   A    She was attending Prenasalee (ph) primary school near,

2   just near our home.

3   Q    And who was watching your other child?

4   A    The house help.

5   Q    Now, so I asked you, did you spend every night at home

6   while you were married?

7   A    Yes.

8   Q    And did she spent every night at home while you were

9   married?

10  A    Yeah, yeah, yeah.

11  Q    And in the morning, you would get up together; is that --

12  A    Yes.

13  Q    And if you could just, I know you think this is -- if you

14  could just walk me through the day from the time you would

15  get up in the morning, just how you and your wife related.

16  A    We used to, she used to first go, she used to first go to

17  the bathroom, take a shower.  Then she would come wake me up,

18  tell me, Danny, wake up, go in the shower.

19  Q    And what did she call you?

20  A    Danny.

21  Q    Okay.

22  A    Go and take a shower.  And after that, after getting

23  ourselves ready, we would just walk to the bus station, take

24  a metatoo (ph).  Metatoo is a fabric.  So we go into town and

25  she go to her work and I would go to my office.

1    Q    How far apart were you two?

2    A    Roughly, 300 meters from each other.

3    Q    And even as late as 1998, you would then talk to each

4    other?

5    A    Yeah, yeah, yeah.

6    Q    And did you both leave work at the same time?

7    A    Yeah.  We used to call each other, are you through?  And

8    I would, we would say we have to meet so that we can take our

9    service vehicle home together.

10   Q    So you would go home together?

11   A    Yeah.

12   Q    And then how would you typically, by 1998, spend your --

13   typically on a week night would you spend it at home with

14   each other?

15   A    I didn't get that.

16   Q    Typically on a work week, would the two of you stay at

17   home?

18   A    Yeah.

19   Q    And did you get along in the evenings?

20   A    Oh, yeah.  Yeah.

21   Q    And did you talk about your futures together?

22   A    Yes, yes, yes.  We used to, that was, we had set aside a

23   day whereby we used to go out.  We have a ranch out on

24   Sundays with our two children.  And by that time, I had

25   bought a car, a small car.  So I used to take them somewhere,

1   we eat, Nyama Choma.

2   Q   And could you spell it, please?

3   A   Nyama is N.Y.A.M.A.   Choma is C.H.O.M.A.

4   Q   It was a Sunday tradition?

5   A   Yeah, we do this together.   Yeah.

6   Q   By 1998, how would you describe what your life with your

7   wife was like?

8   A   Like I said before, a bed of roses.   It was good.

9   Q   Was it a happy marriage?

10  A   Yes, it was.   It was.

11  Q   A happy family?

12  A   Oh, yeah.

13  Q   How in August of 1998 did you see your future with your

14  family?

15  A   We used to think of always as to how we were going to

16  acquire our own building, to build our own home and stop

17  paying rent.   We used to compare notes.   I used to go and

18  take a look.   We buy a plot.   With her, it's too easy for her

19  to go to get her own when she was employed.   And then we had

20  agreed that she could take her own.   And after buying the

21  plot, I would be buying materials, using materials, whenever

22  I get enough money to buy.

23  Q   So, your plans was that your wife would buy the land and

24  you would be in charge of building the house?

25  A   Yes.

1   Q   That's not unusual, is it, in Kenya, where people buy

2   land and then they build a house as they get the money?

3   A   Yeah.

4   Q   That's not unusual, right?

5   A   It is not unusual.

6   Q   And that was your dream?

7   A   Yeah, that was our dream.

8   Q   And did you talk about the type of house you might want

9   together?

10  A   In fact, we even went ahead to get services from

11  architect to give us a drawing as to a very simple house.  We

12  didn't have a lot of money, so we wanted a small house, a

13  three-bedroom house.  My two girls would have their two

14  bedrooms.  Me, we would have the other one.

15  Q   And this was what you and your wife had agreed to?

16  A   That is what we had planned to do.

17  Q   And even though you had originally talked about only

18  having two children, were you talking about having any more

19  children?

20  A   No, we never wanted to have any more children.

21  Q   Because?

22  A   The income, our own one was --

23  Q   Now, how were your girls doing by 1998?  Were they doing

24  well with their health?

25  A   They were very healthy girls.

1    Q    And were they happy?

2    A    They were very happy.  Very happy girls.

3    Q    Did you spend time with your daughters?

4    A    Like I said, we used to go out every Sunday.  When we get

5    out of church -- we used to go to church together and come

6    back home, change to weekend wear, and then get in the car

7    and go to have fun somewhere.  For them to go to swing,

8    swinging, those swings.  And this big, I don't know what you

9    call it.

10   Q    Swings and something else on the playground?

11   A    Yes, yes.

12   Q    Okay.  That changed?

13   A    Yes, it changed.  All of this changed.

14   Q    August 7th, 1998, you remember that day, right?

15   A    It is like it happened yesterday.

16   Q    Can you tell the Court how that day started out, and then

17   walk us through those events?

18   A    That is a very painful, it is very painful to revisit

19   that last time.  I will try as much as I can.  It was, I

20   remember it was around eight in the morning.  As usual, as we

21   used to do every morning, she had to go to the bathroom

22   first, I then go second and we prepare ourselves.  Then she

23   was the first to get ready.  And when she was ready, she came

24   in front of me and the curtains were wrong.  And she asked

25   me -- can I stand?  She asked me, darling, how do I look?

1    (Demonstrating.)

2          And I told her, you look marvelous.  You look good.

3    You are very smart.  And she went, she just told me to find

4    her in town later.  And when she went, I followed her.  I

5    went to my office, she went to hers.  We were not on the same

6    bus then.

7          And to make it to the office, it was around like --

8    or something to that.  A long time.  And she told me, are you

9    in the office?  Are you all right?  I told her yes.  She told

10   me now, do this, do this:  Come to my office, I have some

11   very beautiful ties.

12   Q    She told you she had some what?

13   A    Some beautiful ties, neckties.  And I told her how much

14   are they selling for?  And she told me it was about 200, 200

15   Kenyan schillings.  And in the process, she told me to just

16   come quickly because this guy is just here.  That was around

17   some minutes to now 10:00 or thereabouts.

18         And I was in the process of -- my phone, I was still

19   talking to her (demonstrating).

20   Q    You had the phone on your shoulder?

21   A    My shoulder, in the way you would because both hands were

22   occupied.  I had to hold it on my shoulder.  Then I pull out

23   the drawer and looked because I wanted to remove some money.

24   I go buy those ties.

25         And in the process, something happened, something

1    I've never heard before.  It became like a very, very severe

2    wind, very strong wind.  I cannot be able to explain.  But it

3    came and the way it lifted, it lifted everything as in the

4    office partitions, what do you call it?  This piping, water

5    pipes, water pipe also came out, and you could be able to see

6    from this end (indicating) to this other end, though there

7    was a road of dust.  We all looked like ghosts because, you

8    know, the ceiling was coming down, partitions coming down.

9    It was a very, very, very, very loud, very loud sound, blast.

10   Q    And what floor of the building were you on?

11   A    What?

12   Q    Which floor were you on?

13   A    The first floor.

14   Q    Okay.  Were there windows or no windows?

15   A    There are windows.

16   Q    Did anything happen to the windows?

17   A    Yes, it came down.  Everything came down and we were left

18   with only a hall.

19   Q    Everything inside the office was blown away?

20   A    Oh, yeah.

21   Q    And there was dust?

22   A    There was dust and the water gushing out.

23   Q    Who else was in your office?

24   A    I was alone by that time.

25   Q    Okay.  All right.  And you had the phone before this

1    happened on your shoulder?

2    A    Yeah.

3    Q    What happened?

4    A    It went dead.  The condition died abruptly.  It was poof.

5    Q    Did you get knocked down by the --

6    A    No, no, no.  But the partition was next to me, came

7    falling on me.  But I was never hurt.  I was not injured.

8    Q    Now, did you try to speak to your wife more on the phone?

9    A    I tried, but it was dead.  So, I stayed there now, but

10   that hall, before it was a hall there were offices.  I saw

11   people running, people running all directions on that floor.

12   So me, I also went out and I decided I'm going to tell my

13   wife what had happened in the office.  Only to reach on the

14   ground --

15   Q    How far away is your office?

16   A    It was about, I'd say about 300 meters or thereabout.

17   Q    How far away was your wife's office from the Embassy?

18   A    They were adjacent.

19   Q    She was in which building?

20   A    The building which collapsed.

21   Q    So you went outside?

22   A    Went outside.

23   Q    Tell me what you first -- your plan was to go to your

24   wife and talk to her?

25   A    Yeah, that's what I planned to do.

1  Q   You did not think at the time that something had happened

2  to her?

3  A   I thought it was in our office.  I thought it would be

4  some gas leak or some gas that had gone off.  So, I wanted to

5  go and inform her what has happened, what had happened.

6      But on reaching down there, then that is when I get

7  eyes, it was not only in my office where that thing had

8  happened because I saw people running all directions.

9  Everybody was running with blood all over their bodies, on

10 the face.

11 Q   When you say bodies, what do you mean bodies?

12 A   Everybody, everybody.  I mean, I'm saying I saw people

13 running in all directions with blood, blood covering their

14 faces.  And I was like, what is happening?  I still wanted to

15 go and tell my wife what has happened.  So, me, while I go

16 from this side to this (indicating), and me, I was going to

17 this direction and they're coming toward me.  That is where

18 my --

19 Q   You were running in the opposite direction?

20 A   Yeah, I was running in the opposite because that's where

21 my wife's office was.

22 Q   Did you see any other injuries other than the people with

23 blood on them?

24 A   On reaching the roundabout near the American Embassy, I

25 saw how the building housing American Embassy was completely

1   destroyed.  That's when -- and to look a bit further, I could

2   not see their building.  Actually, I saw, I mean, I was in a

3   very big dream.

4          And I pushed on.  I pushed on.  I wanted to go and

5   tell me wife what is happening down there.  But I came to

6   realize it never -- it was not from our side.  It was from,

7   when I saw their building has come down, and I saw people

8   trying to run up the rubble to go and try to free people who

9   were trapped, in the process, I would say American Embassy,

10  that's when I came across a few bodies lying on the tarmac

11  out there.  One was burned beyond recognition.  I don't know

12  where he has come.

13  Q    Burned beyond recognition?

14  A    Yes.  And he was like, eyes up and hands were like this

15  (indicating).  And he was all black.  You could not even tell

16  who that is.

17  Q    Had you ever seen anything like that?

18  A    Never, no.  It was something you do not want to see.

19  Then next to it, next to him, I'm assuming it was a man, next

20  to him, there was another person who had this piece of wood

21  which had gone through his body from around from behind from

22  front towards here (indicating).  And that's when I realized

23  things are not good.

24         And I decided then, then that I have to go up there

25  and look for my wife.  So, I went up there and that, that

1    building, up the rubble.  And I could hear people crying

2    inside there, but I could not be able to help.  The concrete

3    was just too heavy.  I hurt my fingers trying to remove where

4    I could hear people crying, but I am not able to help.  Then

5    we go to the hospital because I believe my wife is there in

6    the hospital.

7    Q   Why did you believe that?

8    A   Because I didn't want to believe that she was in there.

9    I wanted to believe that she was only hurt.  I wanted to

10    believe she was still alive.

11    Q   That she was only hurt?

12    A   Yeah, she was only hurt.  And I kept on praying to God to

13    give her another chance.

14    Q   So, what did you do?

15    A   So, I started to go to the hospital to look for her.  And

16    I had to walk about 10 or so kilometers from the rubble site

17    to the Kenyatta National Hospital.

18    Q   Why did you have to walk?

19    A   Because there were no vehicles.  There were no vehicles

20    to -- everybody, it was chaos everywhere.  It was chaos.

21    Glasses, everything.  No houses in the grass.  It all had

22    come down.

23    Q   Kenyatta is spelled how?

24    A   Kenyatta is spelled K.E.N.Y.A.T.T.A.

25    Q   And why did you pick that hospital?

1   A   Because it is a national hospital.  That is where most

2   people are.  For any accident, that's where most people are

3   taken.

4   Q   And you walked there?

5   A   I walked there.  I walked there.  And on reaching there,

6   I found so many people had been there.  I was assuming she

7   would have been brought there.  And it was a real tough task

8   looking for somebody because there were so many people at the

9   casualty.

10  Q   How did you go about it?

11  A   I went looking for her by removing the covers which they

12  had been covered with, this covers, to see if I could see

13  her.  And I went -- and the hospital has about nine floors.

14  And it has a capacity of so many beds.  It's about a 700-bed

15  capacity.  So I went floor to floor to floor looking whether

16  I could see, to see what I can get to see her.  But I didn't.

17  Q   What did you see there?

18  A   I saw so many people hurt, so many people hurt.  There,

19  nurses and doctors who are all in disarray as in -- they were

20  all, they were all rushing to help those people who had been

21  brought.  To help them, assist those who are injured, against

22  the walls, those who had (inaudible), they were seated and

23  discharged.

24          And I looked for my wife.  I didn't get her.  I went

25  to another hospital, Memorial Hospital, which it does for, is

1    armed forces.  I went there, bed to bed.  And I only found

2    one of our (inaudible), the only survivor, the only person

3    who survived in the -- their colleague.

4    Q    You found someone at Memorial Hospital who worked with

5    your wife?

6    A    Yeah.  I called Andrew, Andrew Murythi.  And he did not

7    recognize me, so I let him go.  I left him because he was put

8    on machines.

9    Q    And how do you spell Andrew's last name?

10   A    Murythi, M.U.R.Y.T.H.I.

11   Q    You did not speak to him?

12   A    He could not speak very well.  He was not conscious.

13   Q    So you went through Memorial Hospital?

14   A    And then after that, after checking there, I found that I

15   didn't see her, I went back to the other hospital where I

16   come from earlier.  And I said, I said to the surgeon,

17   surgeon, again, still (inaudible).  There are those people

18   who were injured who were also taken there and to other

19   hospitals also.  I went there, I asked whether -- and I was

20   shown where those who were brought were.  And I asked them to

21   check and she was not there.  I went down, still floating,

22   still hopping, there was no vehicles.  I went down to Mater

23   Hospital.

24   Q    M.A.T.E.R.?

25   A    M.A.T.E.R. Hospital.  And also there I didn't get, I

1   didn't see her.  So, and it was getting late.  It was now

2   around 1:00 in the morning.  I was already tired and just

3   very frustrated I didn't see her.

4           So, somebody, a good samaritan give me a lift to

5   town.  And then from town, I went to look for my house.  I

6   was thinking maybe if I go home, maybe I will find her there

7   but she was not there.  I asked whether she (inaudible)

8   meeting, and the house help tell me yes.  And she asked me

9   whether I saw her and I said no.  So, the following day --

10  Q   Let me ask you, were the children asleep by the time you

11  got home?

12  A   Yes, they were.  I was given a -- my friend give me his

13  car so that I can be able to move.  And when I was still

14  driving, I cried a lot, asking God, please God, please,

15  please God, give her another chance.  Let me just get her.

16  Let me see her alive.

17          And I'm driving and I'm enraged because they had

18  that spray, I don't know where it came from.  But I wanted to

19  see her.  And went back to those hospitals that I mentioned

20  before and I didn't get her.  I went to another place called

21  Kiambu.  Kiambu is K.A. -- K.I.A.M.B.U.  Because people were

22  also taken there for treatment.  I went there and didn't get

23  her.

24          So, I came back home.  And that is when my daughter

25  took my hand, she was a very young girl.  She was only eight

1  years old, but she could understand because people had

2  started coming to our place to know whether we have seen

3  where she is or whether that she has been there and admitted

4  to any hospital.  And she asked me, Daddy, Daddy where is

5  Mommy?  And I told her, Mommy will come home.  But it never

6  happened.

7        So, I still had the car from my friend.  I went

8  to -- by that time, so many bodies had been removed from the

9  rubble.  And I could follow from what television, the media

10 channel, they were telling us that there were still some

11 people trapped down there who are still crying for help.  And

12 my hope was that she was one of them.

13       So, I went to Nairobi Hospital to wait and see

14 whether she was one of them.  And, in fact, one person came

15 telling me, one of our colleagues, a driver, came running and

16 told me, your wife is -- I heard her cry out for help and I

17 know she will come, she will come.  And I said thank God, she

18 will come.  If she's hurt, I will help her.  And I knew I

19 would.

20       So, it was never to be.  We waited, we waited.  At

21 around Sunday, we had to come on Sunday, Sunday now.  At

22 around 1:00 in the afternoon, that is when one of our

23 colleagues I also had prayed with, he came with a piece of

24 cloth.  Gave me a piece of garment.  And he asked me whether

25 I have ever seen something like that before.  And I said yes,

1   it is what she was wearing.  And she told me that -- the guy

2   didn't break the news, he just went, he just went away.  He

3   wouldn't be able to tell me what happened because he had seen

4   her.

5          So, they both were there with me.  They were both

6   there, both of them, with their employer was there with me.

7   And he called that driver and he asked him, where do you get

8   this piece of cloth?  And he whispered to him, because he

9   didn't want me to know what was happening.  And that's when

10  they both say that it has all gone to the mortuary, to

11  Nairobi to the mortuary.  And we went there.  And he had

12  informed, they both, that that is where the body of my wife

13  is.

14         We arrived there and we entered the cold rooms where

15  the bodies are kept.  And it was a scene you would not want

16  to ever see again.  It was a scene, it's something even today

17  which makes somebody shiver with fear.  Those bodies were

18  aligned in rows.  Others were heaped.  And even in bracing

19  your next of kin, it was very, very, very hard task.

20         So, I went from one side to the other looking for

21  her.  And on the way, there were hundreds and hundreds of

22  bodies badly mutilated.  Badly, badly, badly mutilated.  Some

23  had no, some had no limbs, some had no heads, some had their

24  stomachs opened.  Some had, some were crushed to something

25  very tiny.

1       So, I went looking for her and I couldn't be able to

2   identify (inaudible).  And at the end, as I was going looking

3   at the bodies, at the end I saw that's where she was.  And

4   the garment which was brought there at the other hospital,

5   she was still having that like a blouse, the blouse over her.

6   Q   The one you complimented her on in the morning?

7   A   What?

8   Q   The one you complimented her on in the morning?

9   A   Yeah, the one I complimented her on in the morning.  And

10  I could only recognize her with her feet because her toes

11  were well done, were pedicured.  It was well done.  So, I --

12  and then one of her toes, this big one, she had no nail.  So,

13  it had come out.  And I said she is the one because I would

14  not have recognized her was it not for that toe.  Because her

15  head was crushed like this (indicating), where you could not

16  tell, could not have recognized her at all.

17  Q   Who was with you when you first saw her?

18  A   I was with my sisters and my brothers who had come to

19  accompany me in looking for her.

20  Q   And you found her?

21  A   Yeah, we found her.  And then we did, we said that we

22  we're going to transfer her from that place to another.

23  Q   Tell me what your reaction was, what your emotions were

24  when you finally found her?

25  A   I just went out screaming because this is not what I

1   expected.  I didn't expect her to, I didn't expect to find

2   her lying somewhere like that.  I expected her to be in a

3   bed, in a hospital bed.  That's what I expected.  I expected

4   to see her.  I expected to talk to her.  But it was not to

5   be.

6   Q   Now, you have to go about the arrangements?  You had to

7   now make the arrangements?

8   A   Yeah.  We went out of there, and the place was smelling

9   so bad.  Dead bodies and some had stayed there for a few

10  days.  They had stayed there for about two days, so you can

11  imagine that the smell was quite bad.

12          So we made arrangements to transfer her body.  We

13  transferred hers and another colleague of ours.  We put them

14  in one vehicle.  Transferred them to Chiromo Mortuary.

15  Chiromo is C.H.I.R.O.M.O. Mortuary.  That's where we moved

16  her.  And from there, we made the arrangements for the body.

17  It took us about one week, five days, and then we buried her

18  the next Saturday.

19  Q   And the day you found her, did you tell your children?

20  A   Yes, I did.  When I went home, my daughter came up out of

21  the house and she came and told me, Daddy, please, tell me

22  what has happened to Mommy.  And I told her Mommy has gone to

23  be with the Lord.  It was the most painful time to break the

24  news to that girl.  She was devastated.  And she told me, why

25  didn't you come back home with her?  And I tried, I really

1    drinking.  And I realize that I had really denied them

2    something very great, my presence at home.

3         Because I wanted to be away from that home as much

4    as possible, you know, as far as possible.  I wanted to be

5    away from that place.  I didn't want to be there.  I didn't

6    want to be in that place.  I didn't want to.  So, when I

7    realize, my senses come back, I realized that I'm doing my

8    children some injustices.  So, and then also, they came and

9    asked me why, Daddy, why did you let Mommy die?  I told them

10   no, not me.  But you are never home.  I told them not me, it

11   is not me.  I'm also feeling very bad because Mommy is not

12   here.

13        From there, that girl of mine would not be the same

14   again.  She started behaving in a really mystery.  If you

15   sent her to go and put sandwich in the trash, in the trash

16   basket, she would throw even the plate.  Even the (inaudible)

17   which would be there, she would throw that in the car.  Throw

18   that in like a nice car.  She continued, then she told me

19   Mommy had, before Mommy died, she had promised me that she

20   would take me to a boarding school.

21   Q    Boarding school?

22   A    Yeah, a boarding school.  And I told her, that's exactly

23   what I am going to do.  I am going to fulfill what your

24   mother wanted you to do.  And I took her to a boarding

25   school.

1          I hoped for them for above their years.  Coming

2   home, going at it, doing their homework, going to sleep,

3   seeing them to sleep.  In the morning, I carry them, and I

4   did that for four years.  Four years.  And although it really

5   affected her, they have come to accept it.  Not accept that,

6   accept that it happened and they're growing out of it.

7   Q    Have you accepted it also?

8   A    Not very.  On my side, we're talking about 10 years,

9   maybe 12 years down the road now.  And although I am married

10  to another woman.

11  Q    And that was?  What year was that?

12  A    That was in 2005.  Yeah, 2005.  That's when I met her.

13  And it was only somebody to help me because an old man, still

14  that is, it was very hard for me to take care of the kids.

15  So, I wanted somebody to help me and share.  But I would say

16  the relationship we are having is not that we had when I had

17  been married to her.  It has never been the same.  It will

18  never be the same.

19  Q    Do you still think about her and miss her?

20  A    Oh, yeah.  A lot.

21  Q    Now, what changed with you, if anything, psychologically

22  from what you went through?  Not just losing your wife, all

23  the things you saw as you searched for her?  Has that stayed

24  with you?

25  A    That experience of going to the mortuary, that will never

1    go.  It was the most devastating time in my life.  I have

2    never seen something like that.  And I don't want -- I will

3    not wish, even in my worse enemy, I would not wish he would

4    go through what I went through.  It was very devastating.

5    Q    Your business, what is left of your business?

6    A    My business came down.  And that is as a (inaudible).  At

7    the same time, having nobody for ride, I just wanted to -- so

8    my business came down.  Where I used to bring my supplies, my

9    market guys, they call me, I'm not there.  So they had to go

10   to some other people for the same.  So, it came down.  And I

11   have never recovered even today.  And I'm hoping.

12   Q    What are you doing for income now?

13   A    I'm still doing the same sort of work, trying to get my

14   customers again.

15   Q    Are you making any money at all?

16   A    Well, very little money, very little money.  By God's

17   grace we are, although right now as I'm talking to you here,

18   I don't have fare to go home.  And you are the one who is

19   going to give me fare to go home.  I don't like it being like

20   that.

21   Q    Your bed of roses, what's that?

22   A    Who?

23   Q    Your bed of roses?

24   A    My bed of roses?  I had to even change that bed.  I had

25   to buy another one.  Though I also, I still go home for my

1   children, though now they're big and in school, the one is

2   (inaudible).  I'm struggling very hard to see that she

3   finishes her degree.  She is doing a big home.  And I'm

4   trying.  I'm trying.

5               MR. MUSOLINO:  No further questions, Your Honor.

6               THE COURT:  Thank you very much.

7               The witness is excused.

8               Let's proceed.

9   (Plaintiff witness, Charles Makori Mogi, was sworn.)

10                      DIRECT EXAMINATION

11  BY MR. MUSOLINO:

12  Q    Could you state and spell your full name, please?

13  A    My name full name is Charles Makori Mogi.

14  Q    And spell it for us, please.

15  A    C.H.A.R.L.E.S., M.A.K.O.R.I., M.O.G.I.

16  Q    Can you speak up?

17  A    Well, my name is Charles Makori Mogi.

18               (There was a pause in the proceedings.)

19  BY MR. MUSOLINO:

20  Q    All right.  Now, can you once again just recite your

21  name?  We'll see how the sound is.

22  A    My name is Charles Makori Mogi.

23  Q    All right.  And can you tell me how old you are, sir?

24               THE COURT:  He's got to spell his name, please.

25               THE WITNESS:  C.H.A.R.L.E.S., M.A.K.O.R.I., M.O.G.I.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Odillia Mutaka Mwani, *et al.*       :

       :

     Plaintiffs           :

       :

v.                           :      CA No. 1:99CV00125

       :      Magistrate Judge John M. Facciola

United States of America, *et al.*    :

       :

     Defendants        :

## DECLARATION OF CHARLES MAKORI MOGI

I, Charles Makori Mogi,  under penalty of perjury under the laws of the United States, do hereby declare, swear and affirm that the following is true:

1.  I was a witness in this case in Nairobi, Kenya on February 1, 2011.

2. I have been provided with a transcript of my testimony by counsel for plaintiffs in this case.

3.  I have reviewed the transcript in order to complete any testimony which the court reporter described as unintelligible or otherwise not able to be transcribed or needed clarification or correction.

4.  I have set out below each of the corrections. The corrections set out below are true and accurate. For convenience I have included a reference to the transcript by date, page(s) and line(s).

5.  Copies of those pages of the transcript to which corrections are made are attached hereto.

| Page | Line | Original | Correction |
|------|------|----------|------------|
| 90 | 18 | I was working out of the office and I heard a very loud | I was walking out of the office and I heard a very loud |
| 92 | 7 | I went to (inaudible) then on to high school up from six | I went to primary school then to high school up to form six |
| 92 | 22 | I left in 1984 | I left in 1994 |
| 93 | 14 | I was a security guard for Norwegian TA, NTA | I was a security guard for Norwegian NCA (Norwegian Church Aid) |
| 93 | 20 | 4,000 | 40,000 |
| 94 | 4-7 | Because I didn't have associates, so I didn't know how to expand because I didn't have associates. But I build up the associates after 1996. But now, I work in an office and I'm creating my business to go into sales and services. | Because I didn't have resources, so I didn't know how to expand because I didn't have resources. But I build up the resources after 1996. But now, I work in an office and I'm creating my business to go into ICT sales and service. |
| 96 | 8 | no, I was living in South Peak (PH). | no, I was living in South B. |
| 96 | 19 | that I didn't go to school educated, | I went to school, got good education , |
| 97 | 4 | about 400 dollars in the month. | about 4,000 in the month. |
| 97 | 6 | That's net. The stub I had, one was full-time pay and | That's net. The staff members I had, one was full-time pay and |
| 97 | 7-8 | And so, my many customers were minimum and I was the boss. | And so, my operational costs were minimal and I was the boss. |
| 98 | 18-19 | I has the bag and I fell down. | I heard the bang and I fell down |
| 98 | 21-22 | Where even the car we were putting, they were putting me, people were badly injured. | The car we were ferried in to the hospital was bloody and the other people being placed in the car were badly injured as well. |
| 99 | 22 | used a little force because I was (inaudible) and put in the | used a little force because I was moving around wildly and put me in the |
| 100 | 21 | I had severe pains from my face. | I had severe pains from my face, head and the rest of my body. |
| 102 | 8 | because it was flatted. | because it was destroyed. |
| 102 | 17 | stand any bad noise. | stand any loud noise. |

| 102 | 25 | Yes, my head and chin. (Inaudible) a better face. | Yes, my head and chin. I used to have a good looking face. |
| 103 | 14 | I spent about 4,000 schillings a month to buy a potential | I spent about 4,000 schillings a month to buy an essential |
| 104 | 12 | She left, one, I was a (inaudible) | She left, one, I was sickly |
| 105 | 14 | have to go to those for my money which is very hard to get. | have to go to hospital and spend my hard earned money on medicine. |

Further declarant saith not.

Charles Makori Mogi

Date: 14.4.2011

1

1                 UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA
2    ----------------------------X

3    ODILLIA MUTAKA MWANI, et.al. ,

4              v.              Civil Action No. 99-125

5    UNITED STATES OF AMERICA

6              Defendant

7    ----------------------------X      Washington, D.C.
                                     Tuesday, February 1, 2011
8                          9:38 A.M.

9                          DAY 2
                    TRANSCRIPT OF BENCH TRIAL
10          BEFORE THE HONORABLE JOHN M. FACCIOLA
               UNITED STATES MAGISTRATE JUDGE
11

12   APPEARANCES:

13

14   For the Plaintiff:   Philip Musolino, Esq.
                         MUSOLINO & DESSEL
15                        1615 L Street, NW
                         Washington, DC 20036
16                        202-466-3883

17

18

19

20

21   Court Reporter:          Lisa Walker Griffith, RPR
                            U.S. District Courthouse
22                           Room 6507
                            Washington, D.C. 20001
23                           (202) 354-3247

24   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
25

1   BY MR. MUSOLINO:

2   Q   And you're 42 tomorrow?

3   A   Tomorrow I will be 43.

4   Q   Forty-three, okay.  And can you tell, you're a Kenyan

5   citizen?

6   A   I am a Kenyan citizen.

7   Q   Where do you live now?

8   A   I live in Raui.

9   Q   And can you spell that, please?

10  A   R.A.U.I.

11  Q   Okay.  And are you familiar at all with the August 1998

12  bombing of the U.S. Embassy?

13  A   Yes, I am.

14  Q   And can you tell me just briefly, we'll get back to it,

15  how you are familiar with it?

16  A   I was running a business and we were, our office was

17  directly opposite the American Embassy.  And on that very

18  day, I was working out of the office and I heard a very loud

19  bang.  And I couldn't say where it was coming from, but what

20  the effect was, there was some glass that spiked my face and

21  head.  And some people came to me from just outside my office

22  and took me to the hospital.

23  Q   So, you suffered injuries as a result of the Embassy

24  bombing?

25  A   Yes, I did.

1   A   In the town.

2   Q   And tell me how long you were raised there?

3   A   I was there for 21 years.

4   Q   Okay.  And you went through your schooling there?

5   A   Yes.

6   Q   Can you tell us what your schooling was there?

7   A   I went to (inaudible) then on to high school up from six.

8   Then I went to India for graduate and masters.

9   Q   You went to where?

10  A   India.

11  Q   India?

12  A   Yes.

13  Q   Okay.  How old were you then?

14  A   I went there when I was 22.

15  Q   Okay.  And what graduate or masters degrees did you

16  pursue?

17  A   I did a bachelors in economics and a masters in labor

18  welfare.

19  Q   In labor welfare?

20  A   Yeah.

21  Q   Okay.  And when did you finish?

22  A   I left in 1984.

23  Q   Did you finish with any degrees, diplomas or

24  certificates?

25  A   I did have a first class in bachelors and a first class

1    in masters.

2    Q    Okay.  And did you return to Kenya?

3    A    Yes, we did.

4    Q    And where in Kenya?

5    A    Nairobi.

6    Q    And is this the first time you had been in Nairobi?

7    A    Actually, it was the first time.

8    Q    And why did you go to Nairobi from India?

9    A    To look for a job.

10   Q    And were you successful?

11   A    Never.

12   Q    Okay.  So what did you do?

13   A    I went doing odd jobs, odd jobs here.  Particular what I

14   did, I went, I was a security guard for Norwegian TA, NTA.

15   Q    NTA, okay.  And how long did you have that job?

16   A    I did that for one month.

17   Q    Okay.  Did you like it or not?

18   A    I didn't like it, but I didn't have an option.

19   Q    Did you do something after that?

20   A    After that, the check I got from there, that 4,000

21   schillings, Kenyan money, is the money I used to start

22   business.

23   Q    And which business was that?

24   A    I started doing stationary supplies.

25   Q    Stationary supplies.  And did you have an office?

1   A   At that time I didn't have an office.

2   Q   How did you run your business without an office?

3   A   I had one client particularly where I used to go and pick

4   an order.  Because I didn't have associates, so I didn't know

5   how to expand because I didn't have associates.  But I built

6   up the associates after 1996.  But now, I work in an office

7   and I'm creating my business to go into sales and services.

8   Q   And that was when in 1996, do you remember?

9   A   What?

10   Q   When in 1996?

11   A   At the end of the year.

12   Q   Did you have a partner when you upgraded?

13   A   I upgraded with my brother.

14   Q   And was he working with you from 1996 forward in your new

15   business?

16   A   Yeah, he was.

17   Q   And how was that business going by, say 1997?

18   A   It was, it had an upward mobility.  It was moving up

19   fast.

20   Q   And can you tell me, by the end of 1997, how much the

21   business was roughly grossing?

22   A   If I continue what I've done, I build a house and I have

23   two cars from the proceeds of the business.

24   Q   And that was by the end of 1997?

25   A   Yes.

```
 1    A    Yes.

 2    Q    And can you tell me about the family?

 3    A    By that time, I had two children and one wife.  And they

 4    were in school.  One of them was in school.

 5    Q    The children?

 6    A    Yes.

 7    Q    Okay.  And where were you living?

 8    A    I was living in -- no, I was living in South Peak (PH).

 9    Q    And can you describe, was it your own house or a rental

10    or what?

11    A    South Peak was a rental.

12    Q    And describe the house you were living in.  Was it

13    suitable for your family?

14    A    It was four bedrooms.  Master end suite, all compound,

15    parking for two and seven quarters.

16    Q    So, by the beginning of 1998, how would you describe what

17    state your life was in personally and professionally?

18    A    I was happy with what I was doing.  I called it lucky

19    that I didn't go to school educated, at least I was making

20    money.  And my family, my children were in good schools.  And

21    my wife had gone back to university taking course.

22    Q    Your wife went back to the university to take a degree

23    course?

24    A    Yes.

25    Q    And can you tell the Court, I know you were having
```

1  trouble estimating it, but month by month in 1998, was your

2  business still doing well?

3  A   It was doing well because I would estimate like I was

4  making about 400 dollars in the month.

5  Q   Is that gross or net?

6  A   That's net.  The stub I had, one was full-time pay and

7  the salesperson was a commission.  And so, my many customers

8  was minimum and I was the boss.  So I was making a bit of

9  money.

10  Q   Did you take some pride in the fact that you built this

11  business yourself?

12  A   So much so.  It's even known by my name.

13  Q   And the name of the business was?

14  A   Charm, C. H. A. R. M.  Charm.

15  Q   And tell me, by August, before the Embassy bombing, what

16  was your daily routine at work like?

17  A   I come to the office by 7:00 A.M. in the morning and

18  leave at 4:00.  And during the day, because I was the owner

19  of the business, I'd go doing sales, looking for business to

20  bring to the office.

21  Q   All right.  And on August 7th, was -- did that day begin

22  any differently from any other day?

23  A   That Friday.

24  Q   That Friday?

25  A   The biggest plan I had was Cooperative Bank.

1    Q    The Cooperative Bank?

2    A    Yes.

3    Q    Okay.

4    A    So that particular day, I was waiting for a call from

5    them to go and pick and look over this order from Cooperative

6    Bank.  So, as I was walking there, I just come from office.

7    And so, as I was walking down --

8    Q    Just so the Court knows, the Cooperative Bank's office is

9    where?

10   A    There immediately to the American Embassy.

11   Q    This was a short walk for you?

12   A    It was across the road, 20 meters.  Yes.

13   Q    So you were walking out to do what?

14   A    To go and pick up a local purchase order.

15   Q    To go pick up a purchase order, okay.

16   A    Yeah.

17   Q    And tell me what happened?

18   A    So, as I just landed on the floor, on the ground floor, I

19   had the bag and I fell down.  Then I was picked up there

20   also.  But as I was picked up, I would see bodies, bloody

21   faces, people running.  Where even the car we were putting,

22   they were putting me, people were badly injured.  And the

23   hospital, the same scenario was there.

24   Q    Let me go back a little bit.  I know you want to move

25   along, but you say just as you entered the lobby of your

1  building?

2  A   No, I just landed on the ground floor.

3  Q   Of which building?

4  A   Ken Banco.

5  Q   Okay.  Of your building, the building you had your office

6  in.  And the ground floor, did it face the Embassy?

7  A   Yes, yes.

8  Q   And that's when you heard the bang and you got knocked

9  down?

10 A   Yes.

11 Q   Can you tell me whether you lost consciousness at all?

12 A   For, I think for a while I couldn't tell what was

13 happening.

14 Q   Describe what you saw in that lobby area after you were

15 knocked down?

16 A   When I came, I saw people running from the direction of

17 the Embassy towards the lower part of Nairobi.  And the place

18 I was going to was rubble of concrete.  There was no

19 building.  There was rubble.  What I saw is people down

20 there, people hurt bad, who had injuries, others had no

21 limbs.  Before I could connect, I was picked up.  Someone

22 used a little force because I was (inaudible) and put in the

23 car.

24 Q   Had you ever seen anything like it?

25 A   Never.

1   Q   Have you been able to get it out of your mind since then?

2   A   It cannot go away.  Even at night, some bloody accident,

3   I don't enjoy it.  I don't want to view it again.

4   Q   So, you ended up put in a car by a stranger?

5   A   Yes.

6   Q   Along with others, some of whom were badly injured.  And

7   tell me, where did the car go?

8   A   Pardon?

9   Q   Where did the car go?

10   A   It took us to the hospital.

11   Q   And which hospital?

12   A   Guru Nanak.

13   Q   And could you spell that hospital, please?

14   A   G.U.R.U.  N.A.N.A.K.

15   Q   And where is that hospital in Nairobi?

16   A   It is in Parklands.

17   Q   Okay.  It's in Parklands in this neighborhood?

18   A   Yes, yes.

19   Q   Tell me how you were feeling physically as you were in

20   the car?  Were you in pain?

21   A   I had severe pains from my face.  I think some people had

22   stepped on me.  And with my back.

23   Q   Were you bleeding?

24   A   Profusely from the face, yes.

25   Q   Was your vision affected?

1   A    I didn't leave home for three days because sleeping was a

2   big problem.  Because those, those -- the scene there, it

3   kept on flashing, it kept on flashing every time I would see

4   people running, blood, and see dead bodies.  Sleeping was not

5   there.  I had lights on for those three days.

6        When I came back to town, because I was still on the

7   vacation, when I came to town, I couldn't look at my office

8   because it was flatted.  There was no partition.  I could

9   only say it was that corner.  There was nothing.

10  Q    So, the inability to sleep, how long did that last?

11  A    Pardon?

12  Q    The problems you were having sleeping, how long did that

13  last?

14  A    It went I think for over three years, yes.

15  Q    And is it better now?

16  A    Now it is better, but there is one thing, that I cannot

17  stand any bad noise.

18  Q    Any loud noise?

19  A    I can't stand that.  From the moment that has happened,

20  you see sweat coming from my body.

21  Q    And the physical pain, how long did that last?

22  A    I think it lasted about six months or so.

23  Q    Did you have any scarring from any of the cuts that you

24  sustained?

25  A    Yes, my head and chin.  (Inaudible) a better face.

1   Q   Now, what happened to your business as a result?

2   A   It died.  My business died.

3   Q   And can you tell the Court why the blast killed that

4   successful business of yours?

5   A   I really think it was very unfortunate to break a future

6   of someone who has never been employed, who has spent so much

7   money in school and had expectations of good future.  And 30

8   years, for almost 30 years you are able to take your children

9   to good schools, you are able to feed them, you are able to

10   take them out.  You are the envy of the neighborhood.

11   Q   Has that changed?

12   A   I cannot even begin.

13   Q   So tell me how it has changed.

14   A   I spent about 4,000 schillings a month to buy a potential

15   medicine.  Because after I was going through therapy,

16   constant therapy, the doctor discovered I had high blood

17   pressure.

18   Q   And had you ever been diagnosed with high blood pressure

19   before?

20   A   Never.  When he went through my body to examine to find

21   out, of course he didn't find.  So, I think he called in

22   secondary, you know, intensive.  So, I spent money every

23   month, every month 4,000 schillings buying medicine because I

24   have to take a tablet every day.  We did that.  My wife in

25   the year 2005, I think it is the effect of the medicine and

1    the fact that I didn't have the resources that I used to, so

2    she left.  And I had to look for another lady to take care of

3    me.

4    Q    So, after the blast you lost your business?

5    A    I lost completely.  I was unemployed.

6    Q    You lost your family?

7    A    Yes.

8    Q    And you feel that that's the result of everything that

9    happened on August 7th?

10   A    Why would she leave and she had the car, she had the

11   house, she had the very, very good cooks?  Why would she

12   leave?  She left, one, I was a (inaudible); two, I didn't

13   have the resources that she was used to; three, I must have

14   missed on meeting her conjugal demands.  And I think --

15            THE COURT:  I'm sorry, we had difficulty.  Could the

16   witness please repeat that?

17   BY MR. MUSOLINO:

18   Q    You must have missed meeting?

19   A    Conjugal demands.

20            MR. MUSOLINO:  Oh, conjugal as we would say, Your

21   Honor.

22   BY MR. MUSOLINO:

23   Q    So, your life with your wife had turned completely bad?

24   A    Exactly.

25   Q    And your business had gone and turned completely bad?

1    A    The business died and not even the problems with the

2    wife.

3    Q    And your health, as you described, it was worse?

4    A    Yes.

5    Q    Well, how has that attack on August 7th, how has it

6    changed your life?

7    A    I think it has changed my life to the worse because I

8    can't, I was earning close to $5,000 a month from a business,

9    which I can't meet now.  I make close to a thousand dollars.

10   I had my own vehicles, now I'm using the company car during

11   the day.  I cannot afford insurance for my children and even

12   for my own health.  Given that I have permanent illness,

13   hypertension, no insurance company want to take me in.  So, I

14   have to go to those for my money which is very hard to get.

15          I've lost my wife, first wife.  We separated.  After

16   that, now I have almost two-year kid at 43.  And my plan was

17   to stop, I thought, which I had done anyway, two children

18   before that, I was home.  So now, I have to start again now

19   having that kind of mess in the house.

20   Q    So, the plan you had on the 1st day of August 1998, what

21   is left of that plan?

22   A    Exactly.

23   Q    Nothing?

24   A    Nothing.

25   Q    Is there anything left of that plan?

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Odillia Mutaka Mwani, *et al*.                    :
                                                  :
        Plaintiffs                                :
                                                  :
v.                                                :        CA No. 1:99CV00125
                                                  :        Magistrate Judge John M. Facciola
United States of America, *et al*.                :
                                                  :
        Defendants                                :

## DECLARATION OF KIOKO MUEMA

I, Kioko Muema, under penalty of perjury under the laws of the United States, do hereby declare, swear and affirm that the following is true:

1. I was a witness in this case in Nairobi, Kenya on February 2, 2011.

2. I have been provided with a transcript of my testimony by counsel for plaintiffs in this case.

3. I have reviewed the transcript in order to complete any testimony which the court reporter described as unintelligible or otherwise not able to be transcribed.

4. I have set out below each of the corrections by setting out in full my testimony. The corrections set out below are true and accurate. For convenience I have included a reference to the transcript by date, page(s) and line(s).

5. Copies of those pages of the transcript to which corrections are made are attached hereto.

| Page | Line | Original | Correction |
|------|------|----------|------------|
| 5 | 17 | I was a professional student in the university by then, yes. | I had been working during school recesses, yes. |
| 6 | 13 | No. We have minibuses that can gold maybe 18 passengers. | No. We have minibuses that can hold maybe 18-25 passengers. |
| 9 | 12 | there was a movement. | there was no movement. |

| 13 | 10 | I told my brother, | I told somebody, |
|----|----|---|---|
| 26 | 14 | I was under a lot of anesthetic. | I was under a local anesthetic. |
| 28 | 6-7 | The right eye they found scars, but operating it was whole. | The right eye they found scars; operating on it was ruled out. |
| 34 | 19 | noted to my dad that that's the day I lose my eye. | noted to my diary that that's the day I lose my eye. |

Further declarant saith not.

Kioko Muema

Date: 15/04/11

```
 1                    UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2

 3   ODILLIA MUTAKA MWANI, et al., :  Civil Action
                                   :  No. 1:99CV00125
 4             Plaintiffs,         :
                                   :  9:10 a.m.
 5   v.                            :  February 2, 2011
                                   :
 6   UNITED STATES OF AMERICA, et  :  Washington, D.C.
     al.,                          :
 7                                 :
               Defendants.         :
 8   ..............................:

 9

10                   TRANSCRIPT OF TRIAL PROCEEDINGS
                  BEFORE THE HONORABLE JOHN M. FACCIOLA
11             UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

12   APPEARANCES:

13   For the Plaintiffs:      Mr. Philip M. Musolino
                              Musolino & Dessel PLLC
14                            1615 L Street, NW, Suite 440
                              Washington, D.C.  20036
15                            (202) 466-3883
                              pmusolino@musolinoanddessel.com
16                            (appearing by video conference)

17   Court Reporter:          Ms. Lisa Schwam, CSR, CRR, RMR
                              Official Court Reporter
18                            Room 4702-A, U.S. Courthouse
                              Washington, D.C.  20001
19                            (202) 354-3238
                              LisaSchwam@aol.com
20

21

22

23

24

25   Proceedings reported by machine shorthand, transcript
     produced by computer-aided transcription.
```

1   A   Yes.

2   Q   When did you start at Nairobi University?

3   A   I started Nairobi University around 1993, 1994.

4   Q   And were you taking any particular courses or any particular

5   field of interest?

6   A   Yes.  I was studying economics and political science.

7   Q   All right.  And how far along had you gotten by 1998?

8   A   I was in my fourth year, yes.

9   Q   Okay.  Can you tell us a little bit about your work

10  background before the attack on the embassy.

11  A   I was -- given my background study of economics, I was

12  always interested in doing consultancy work in economic

13  development and business management so I had already started in

14  that field when the blast occurred.

15  Q   Right.  And had you had any professional positions by the

16  time that the blast occurred?

17  A   I was a professional student in the university by then, yes.

18  Q   All right.  Can you tell me were you working or studying or

19  in school on the day of the attack.

20  A   I was on recess the day of the attack, but I was following

21  up business at that time.

22  Q   All right.  Do you remember in particular what business you

23  were following up?

24  A   I was doing some consultancy for a client, and he had called

25  me to go and see a different place in Nairobi, but I had to

1    connect through town.

2    Q    You had to connect through town?

3    A    Yes.

4    Q    Okay.  You did not work in the area of the embassy,

5    correct?

6    A    No.

7    Q    Okay.  So when you say you had to connect through town, were

8    you driving or taking public transportation?

9    A    I was in public transportation.

10   Q    And can you tell the Court a little bit about what public

11   transportation is available in Nairobi at the time.

12        There were no trains or subways, correct?

13   A    No.  We have minibuses that can hold maybe 18 passengers.

14   And the one I happened to be in was very -- it was one that was

15   used to view tourist sites around so it had very wide windows.

16   Q    All right.  And about what time did you get on that bus?  Do

17   you remember?

18   A    I lived in a place in Nairobi called South B.

19   Q    Okay.

20   A    And I left South B around 10:00 a.m. in the morning.

21   Q    Okay.  And you got on one of these minibuses?

22   A    Yes.  Usually a 20-minute ride, yes.

23   Q    Okay.  And can you tell me whether the minibus at any point

24   passed by the area of the embassy.

25   A    We were -- we reached the embassy building around 10:20,

1  A    No, I didn't hear, but I saw the fire.

2  Q    Okay.  And at the moment you saw the fire, did you feel any

3  pain or injury of any kind?

4  A    I felt sharp pain, but I could not exactly pinpoint where,

5  but I could feel -- I could feel something is very wrong, yes.

6  Q    Okay.  And can you tell me, were you sitting down at the

7  time?

8  A    I was sitting down, but I was looking out.  Immediately I

9  noticed my eyesight started going.

10  Q    Your eyesight started going?

11  A    Yes.  And there was smoke all over and the bus, the bus --

12  there was a movement.  I think the bus was -- something

13  happened.  The bus engine switched off.  There was an eery

14  silence.  And I decided -- it had come to a standstill, and my

15  eyesight was going very fast.  This is happening very fast.

16  Q    When you say your eyesight is going, you're losing your

17  eyesight?

18  A    Yeah, I'm losing my eyesight.  I can't see.  Something

19  terrible is going on, and I need to get out of here.  So I could

20  just picture -- I pictured the way out, how I needed to get out,

21  because I didn't know how far I was to the door of the bus.

22       And after just seeing that, I lost my eyesight.  But then I

23  had already started going out and I walked out.  And I was the

24  only one who walked out.  There was nobody else who walked out.

25  I made it out alone.

1    A    I think at that time I went numb.

2    Q    Numb?

3    A    Yes.

4    Q    Were you bleeding?  Do you know?

5    A    Profusely.

6    Q    Can you tell me where you were bleeding from.

7    A    I was bleeding from my face.  This I came to realize when I

8    saw the -- later, somebody asked somebody to take a picture of

9    my clothing when I went to -- when they asked me for my clothes,

10   I told my brother, "Please don't go and wash my clothes.  I want

11   to see how they were."

12       So I later saw the pictures of my clothes, and they were

13   drenched with blood.

14   Q    Your shirt and your slacks?

15   A    I was wearing a suit, yeah.

16   Q    And when you saw that photograph, was that the first time

17   you realized the extent of the bleeding?

18   A    Yes.

19   Q    What was your reaction to that photograph?

20   A    I could not believe it was me.

21   Q    Now, can you tell me what you did once you were on Haile

22   Selassie running blind away from the blast.

23   A    Luckily, a good samaritan -- people noticed I was going

24   around Haile Selassie.  A good samaritan came and picked me, and

25   they put me on a vehicle and returned me to the hospital.

1   Q   And he didn't say we have a better chance than one eye with

2   the other?

3   A   No.

4   Q   So you checked into the hospital, correct?

5   A   Yes.

6   Q   And your parents were there with you?

7   A   Yes.

8   Q   All right.  And did this, in fact, exploratory surgery take

9   place the following day?

10  A   It did.

11  Q   And do you remember anything about it?

12  A   Painful.

13  Q   Were you under any anesthetic at that time?

14  A   I was.  I was under a lot of anesthetic.

15  Q   Tell the Court, if you could, what the procedure was like,

16  as best you remember it.

17  A   It was the most excruciating pain I ever felt.  Although

18  there was localized, I don't know if it worked or not.  But it

19  was very painful.

20  Q   And you were fully aware of what was going on?

21  A   Yes.  Because it was local, yes.

22  Q   And which doctor performed the procedure?

23  A   The Dr. Graiden.

24  Q   It was Dr. Graiden?

25  A   And there was also another doctor.

1   pieces of glass.  When they were doing the exploration, they

2   found pieces of glass inside the eye.

3   Q   The left eye?

4   A   Yes.

5   Q   What about the right eye?

6   A   The right eye they found scars, but operating it was

7   whole.

8   Q   In the period of time when you were put back in the ward

9   after surgery and the time you spoke with your parents, what was

10  your physical condition?

11  A   I'm telling you that I usually don't like to go back to that

12  period because it was painful.  The entire experience was -- in

13  fact, for quite a while I have not talked about it because I

14  usually try to block it out.

15  Q   Okay.  But can you -- let me ask you.  Were you in physical

16  pain after the surgery?

17  A   I had to use painkillers, and in my life, I've never been

18  one to use painkillers.  For some reason, I don't have -- I

19  never suffered headaches or anything, but I'm telling you, I

20  took -- I used to have to take painkillers -- the strongest

21  painkillers -- one could take.

22  Q   Not just in the hospital but after?

23  A   Yes.

24  Q   Emotionally, in that one-day period, can you tell me what

25  you were thinking or feeling.

1   A   Yes.

2   Q   After you got the second opinion, did that help you make a

3   decision on removing your left eye?

4   A   Yes.

5   Q   What decision did you make?

6   A   We decided it was in my best interest.

7   Q   All right.  To remove it?

8   A   Yes.

9   Q   Okay.  So how did that get done?

10  A   We were booked for an appointment for Eye Hospital, but I

11  remember it was on August -- 24th of August.

12  Q   24th of August?

13  A   Yes.

14  Q   That same year, 1998?

15  A   The same month, yes.

16  Q   And can you tell me how that took place.

17  A   I went there the previous day.  I was admitted.  And

18  basically, I started psyching myself up for it.  I remember I

19  noted to my dad that that's the day I lose my eye.

20  Q   By the time you checked in, how was your vision in your

21  right eye?

22  A   I still couldn't see.

23  Q   So you were still totally blind?

24  A   Yes.

25  Q   Did your parents take you to the hospital?

34

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Odillia Mutaka Mwani, *et al.*                    :

     Plaintiffs                          :

v.                                                :        CA No. 1:99CV00125
                                                  :        Magistrate Judge John M. Facciola
United States of America, *et al.*                :

     Defendants                          :

### DECLARATION OF CASTRO OTIENDE

     I, Castro Otiende, under penalty of perjury under the laws of the United States, do

hereby declare, swear and affirm that the following is true:

1. I was a witness in this case in Nairobi, Kenya on February 2, 2011.

2. I have been provided with a transcript of my testimony by counsel for plaintiffs in this

case.

3. I have reviewed the transcript in order to complete any testimony which the court

reporter described as unintelligible or otherwise not able to be transcribed and have found

that no changes to my testimony are necessary.


Further declarant saith not.                      _____

                                                  Castro Otiende

                                                  Date: __11__/__4__/__2011__

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Odillia Mutaka Mwani, *et al.*    :
            :
  Plaintiffs       :
            :
v.           :  CA No. 1:99CV00125
            :  Magistrate Judge John M. Facciola
United States of America, *et al.*   :
            :
  Defendants      :

## DECLARATION OF JOAN MWENDE KIEMA-NGUNNZI

  I, Joan Mwende Kiema-Ngunnzi, under penalty of perjury under the laws of the United States, do hereby declare, swear and affirm that the following is true:

1. I was a witness in this case in Nairobi, Kenya on February 2, 2011.

2. I have been provided with a transcript of my testimony by counsel for plaintiffs in this case.

3. I have reviewed the transcript in order to complete any testimony which the court reporter described as unintelligible or otherwise not able to be transcribed.

4. I have set out below each of the corrections by setting out in full my testimony. The corrections set out below are true and accurate. For convenience I have included a reference to the transcript by date, page(s) and line(s).

5. Copies of those pages of the transcript to which corrections are made are attached hereto.

| Page | Line | Original | Correction |
|------|------|----------|------------|
| 77 | 11 | properly known as the bellbottom house, | popularly known as the bellbottom house, |
| 77 | 20 | Yes. About 600 of them were injured. 30 of them died in | Yes. About 600 of them were injured. 13 of them died in |
| 80 | 21 | I alighted from the Metro, from the van I was | I alighted from the Matatu, from the van I was |
| 81 | 8 | I stopped to go into the Cooperative House at 10 o'clock when I | I stopped going into the Cooperative House at 10 o'clock when I |

| 85 | 16 | I used forecast group discussions, | I used focus group discussions, |
|---|---|---|---|
| 87 | 17 | that their kids would be worse than the | that their kids would be worse off than the |
| 88 | 13 | recent findings on them with a lot of the events that I see in | research findings on them with a lot of the events that I see in |
| 90 | 17 | more than a hundred thousand in fees part-time. | more than a hundred thousand in fees first term. |
| 90 | 17 | She is a senior | She is a junior |
| 96 | 22 | blast survivors are a cast, | blast survivors are accursed |
| 96 | 23 | must be a cast. | must be a curse. |
| 97 | 13 | probably wrong to the gods. | probably wronged the gods. |
| 102 | 19 | to try to mix the standard that has been set by those that are | to try to meet the standard that has been set by those that are |
| 102 | 22 | to avoid the cognitive dissonance, so would try to lead | to avoid the cognitive dissonance, so would try to live |
| 103 | 16 | you try to live up to the balance your psychology to what the | you try to live up to it to balance your psychology to what the |
| 104 | 9 | if I look at the world organization | if I look at the World Health Organization |
| 105 | 16 | intrust you to run for me a company? | entrust you to run a company for me? |
| 111 | 2 | can you give me an estimate of how many nonTSA | can you give me an estimate of how many Non TSC |
| 118 | 25 | they want to be aware, and any interruption anyplace you go, | they want to be ware, and any interaction anyplace you go, |
| 119 | 3-4 | they want to find the people who want to find out was this one in the bomb blast because they have all of this feeling that the | The people want to find out if they are survivors of the bomb blast because they all have this feeling that the |
| 122 | 5 | lieu of the other | law of the other |
| 124 | 22 | where there was a tire bust. | where there was a tire burst. |
| 125 | 4 | So there was one time a tire bust on Moi Avenue, | So there was one time a tire burst on Moi Avenue, |

Further declarant saith not.

Joan Mwende Kiema-Ngunnzi

Date: 16/4/2011

1               UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
2

3    ODILLIA MUTAKA MWANI, et al., :  Civil Action
                                   :  No. 1:99CV00125
4            Plaintiffs,           :
                                   :  9:10 a.m.
5    v.                            :  February 2, 2011
                                   :
6    UNITED STATES OF AMERICA, et  :  Washington, D.C.
     al.,                          :
7                                  :
             Defendants.           :
8    ...........................:

9
                     TRANSCRIPT OF TRIAL PROCEEDINGS
10          BEFORE THE HONORABLE JOHN M. FACCIOLA
            UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
11

12   APPEARANCES:

13   For the Plaintiffs:      Mr. Philip M. Musolino
                              Musolino & Dessel PLLC
14                            1615 L Street, NW, Suite 440
                              Washington, D.C.  20036
15                            (202) 466-3883
                              pmusolino@musolinoanddessel.com
16                            (appearing by video conference)

17   Court Reporter:          Ms. Lisa Schwam, CSR, CRR, RMR
                              Official Court Reporter
18                            Room 4702-A, U.S. Courthouse
                              Washington, D.C.  20001
19                            (202) 354-3238
                              LisaSchwam@aol.com
20

21

22

23

24

25   Proceedings reported by machine shorthand, transcript
     produced by computer-aided transcription.

1

1  bomb blast survivors, the 1998 bomb blast survivors.

2  Q   Can you tell me when you started work for your master's

3  degree.  When did you start work?

4  A   In 2000, September.  Actually, just almost immediately after

5  I joined the Secretariat.  This was motivated by what I came

6  face to face with in the Commission.

7  Q   All right.  Well, first, can you tell the Court what

8  connection, if any, your employer had to the embassy bombing.

9  A   Before 1998 -- before August 7, 1998 -- the Teachers Service

10  Commission was housed at the Cooperative House, which is

11  properly known as the bellbottom house, which was next to the

12  American Embassy building.

13  Q   And that bellbottom house, there is a picture there in front

14  of you there, Exhibit 1-A, I believe.

15  A   I think it's the one next to the rubble on the left.

16  Q   Now, the TSC, you said, was housed in that building?

17  A   Yes, it was.

18  Q   And as a consequence, was the TSC or its employees, were

19  they affected unusually by the embassy blast?

20  A   Yes.  About 600 of them were injured.  30 of them died in

21  the blast.

22  Q   And that became an area of study for you?

23  A   Yes.  As I said, out of curiosity, and out of what I came

24  face to face when I joined the Secretariat -- maybe I could

25  explain?

1   Q   Can you repeat your last sentence.  You said you felt

2   indebted to them.

3   A   I felt indebted to them and felt that I needed to do

4   something about them, about their plight.

5   Q   At the time, you had your undergraduate degree?

6   A   I had my undergraduate degree in 1990.

7   Q   Can you tell us whether your academic training, getting that

8   undergraduate degree, whether that was a factor in letting

9   you -- convincing you you could do this work?

10  A   It was.

11  Q   Can you tell me in detail what that academic training was to

12  get your undergraduate degree.

13  A   I did literature and English.  And literature focuses a lot

14  on people, people's behavior, people's attitudes and just

15  getting to know what people communicate, whether written or in

16  speech or in mannerisms, et cetera.

17      So okay.  Maybe a bit of additional information.  On August

18  7th, '98, I was personally headed for the Cooperative House at

19  around 10 o'clock.  I was going to see a friend who worked

20  there, but by some what I believe is fate or some act of God, I

21  dropped from -- I alighted from the Metro, from the van I was

22  traveling in, just somewhere around the National Hospital.

23      After this day, I have never been able to tell what made me

24  alight so I ended up not going to the Cooperative House at that

25  time.  I would have been caught in that bomb blast.  And I began

1   to think maybe God spared me so that I'd be of use to somebody.

2   And as a result, when I saw all that was happening in the

3   Commission, I decided to do some service to society,

4   particularly for the sake of those bomb blast survivors and

5   especially because God spared me the same trauma that they went

6   through.

7       There was absolutely no reason why I alighted from the van.

8   I stopped to go into the Cooperative House at 10 o'clock when I

9   should have gone to see a friend.

10  Q    Okay.

11  A    Yes.

12  Q    Did your decision to do some work with respect to the

13  bombing, did that play a role in your master's studies?

14  A    It did because at that particular time, the master's -- the

15  University of Nairobi was offering a master's degree in disaster

16  management, which was in the department of sociology.  So I got

17  this strong motivation.  I felt a strong drive to just find out

18  what is it with these people and how can they be helped because

19  I could sense they actually needed help.

20  Q    And you said you got your master's?

21  A    Yes, I did.

22  Q    In those two fields, right, sociology and disaster

23  management?

24  A    Yes.  Disaster management was within the department of

25  sociology so I did sociology with special focus on disaster

81

1    Q    All right.  And it's captioned "An Assessment of Recovery

2    Strategies for the 1998 Nairobi Bomb Disaster Victims:  A Case

3    Study of the Teachers Service Commission Employees," correct?

4    A    Yes.

5    Q    And did you prepare this report yourself?

6    A    Yes, I did.

7    Q    And can you tell me what steps you took to prepare -- to

8    research for and prepare and complete this report.

9    A    Okay.  First, this was academic.

10   Q    This was academic?

11   A    It was academic.  And there were -- I took the normal steps

12   for an academic research, but I'd say briefly that I used both

13   quantitative and qualitative approaches whereby I sampled from

14   the Teachers Service Commission employees 150 of them.  59 of

15   those I gave questionnaires.  For the balance, the rest of them,

16   I used forecast group discussions, and I also did in-depth

17   interviews with some of them.

18        And then after that, the information that I gathered, the

19   data, I carried out an analysis using the SPSS computer

20   program.

21   Q    Which is what?

22   A    Social Statistics --

23   Q    I don't need to know what the acronym is.  What did it do,

24   the computer software?

25   A    The computer software does analysis in treating the data as

```
 1   because I imagine that -- let's take, for instance, Peter as an
 2   example.  And Peter has walked out of his office or is from some
 3   other place like the gentleman who testified before me, and he
 4   has been injured on Haile Selassie Avenue.  Nobody knows him
 5   there.  Everything is happening by chance.
 6        But for the Teachers Service Commission survivors, there was
 7   an administration that was responsible directly to the employees
 8   and, therefore, even when they were taken to hospital, there was
 9   the Teachers Service Commission administration to follow up to
10   check who is in hospital, who is coming to work, who needs
11   further help.  And that is how some of them ended up getting
12   more support than other people maybe who were out there would
13   have got.
14        At the same time, these were people in employment.  There
15   were thousands of other people out there who were injured, who
16   were not in employment, for instance.  If that happened, then it
17   is, needless to say, that their kids would be worse than the
18   ones of the bomb blast survivors of the Commission.
19   Q    I'm paraphrasing.  Your findings and conclusions from your
20   report from the TSC, it's your opinion, are applicable to
21   everyone else?
22   A    Yes.
23   Q    Except that everyone else is probably worse off?
24   A    Yes.
25   Q    Than the TSC people?
```

1   A   Yes, that is my conclusion.

2   Q   Okay.  Now, do you know if anyone else has done -- let me

3   ask you this:  How long did it take you to complete this report,

4   including all the research, in days, weeks, months?

5   A   I would say roughly three months, but I would also hesitate

6   to say that from the time I got -- I came face to face with

7   these people, I had been remotely researching.  But the actual

8   study took much shorter.

9       At the time, between 2002 when I concluded my study and now,

10  I have also continued indirectly to observe, to study the same

11  people, although informally since I'm not doing any formal study

12  on them.  And therefore, in a way I have been able to relate my

13  recent findings on them with a lot of the events that I see in

14  their daily lives.  I have also been able to draw many other

15  conclusions on their social lives based on the interactions that

16  I have had with them for the last ten years now.

17  Q   All right.  And can you tell me whether you've searched to

18  find out if there are any reports of comparable detail with

19  respect to the embassy bombing itself?

20  A   Come again.

21  Q   Let me ask you:  So far as you know, is this the most

22  comprehensive research that's been done on this subject, the

23  embassy bombing and its effect on the victims?

24  A   I'd say so because I haven't heard of another, I haven't

25  seen another, except I saw something on pregnant women -- the

1   got some children that had social abnormalities like hyperactive

2   children and, you know, socially hyperactivity is also an issue

3   because nobody wants their children to interact or to play with

4   hyperactive children because anything can happen.  And these

5   kind of children also even when they go to school, their

6   teachers have issues with them.

7        I am aware of one such child, actually, one of my colleagues

8   has an hyperactive child.  I think the child is around -- was

9   born -- the child was born after the bomb blast.  And this

10  child, the last several years now, the mother has been looking

11  up and down looking for a school that would accept her child.

12  But everywhere, a few days down the line people say, no, no, no,

13  take your child home.  Take away your child.  He cannot survive

14  here.

15       The last time we talked, she was saying she was taking him

16  to a school and -- a certain school and they were asking for

17  more than a hundred thousand in fees part-time.  She is a senior

18  officer so it is not practical.

19  Q    This report, Exhibit 6, on pregnant women, it was done after

20  your report, correct?

21  A    Uh-huh.

22  Q    Your answer is yes?

23  A    Uh-huh.

24  Q    You have to say "yes" instead of "uh-huh."

25  A    Yes, yes, yes, yes.

1   individuals who were in the bomb blast themselves so that

2   there's some kind of self-devaluation of quality.  Like the

3   ratings scale.  It's come down.

4       So even if I was in the bomb blast, whether I have physical

5   injuries or not, whether I have any kind of, you know, injury, I

6   still feel like I'm of a lower value than the other person.  And

7   how is this expressed?  At their place of work, for instance,

8   there will be an argument, for instance, in the board room, and

9   people are expressing different opinions on a subject.  And what

10  I have realized is that if the other side is losing, the one who

11  is not the bomb blast survivor, he will say, "I forgive you for

12  your opinion," for instance.  "After all, you were injured in

13  the bomb."  If not so, other people will say the same to the

14  person who is not in the bomb blast, "Leave that one alone, you

15  know, that is a bomb blast talking."

16      And they have acquired this title, the bomb blast survivors,

17  they have acquired a new title, the bomb people, so that

18  sometimes even when people want to give assignments like

19  superiors, supervisors want to give assignments, they want to

20  check whether there is a person of the bomb or is the other

21  person.  And this happens partly because of the belief that bomb

22  blast survivors are a cast, you know.  The reason they were in

23  that bomb blast must be a cast.

24  Q   Let me stop you for a second.

25  A   Yes.

1  Q   You were present for the testimony today but not earlier,

2  correct?

3  A   Yes.

4  Q   And one witness referred to the phrase "bad omen."

5  A   Yes.

6  Q   And you're using the phrase "curse."

7  A   Yes.

8  Q   Is that a similar concept?

9  A   It is similar.  It amounts to the same thing, but some

10  people call it a curse.  Others will call it bad omen.  But it

11  amounts to the same thing; that there is something uniquely bad

12  about you, probably something inherently bad about you.  You

13  probably wrong to the gods.  Otherwise, how do you explain

14  having been on Haile Selassie Avenue at 10:30?

15  Q   And this outlook, is it your opinion that it's a widely

16  shared outlook in Kenya?

17  A   It is a widely shared outlook.

18  Q   And is it your -- can you tell me how it ties into the

19  culture of Kenya in Africa.

20      Is it consistent with some tradition or cultural outlook?

21  A   It is consistent.  Incidentally, when it come to disaster

22  issues, apart from these -- the normal disasters like famine

23  disasters, other kinds of disasters, particularly this bomb

24  blast having been unique, having been a different kind of

25  disaster, it cause a lot of people to think differently because

97

1    Have you in your research come across a relationship between

2    a perception, accurate or not, that if you're in the bomb blast,

3    you must have a disability even if it's not apparent as you're

4    sitting there talking to the bomb blast victim?

5    A   Yes, there is that perception.  And that is both -- even by

6    the bomb blast survivors themselves and other people who are not

7    bomb blast survivors.  And what I have -- my impression is that

8    those who were not in the bomb blast, over the years it's like

9    they have got them around to believing that they are not as

10   good; there must be something wrong with them.

11   And, you know, in social psychology, there's something

12   called "cognitive dissonance."  So in the process of people

13   hearing a lot of people -- a lot of those that were not in the

14   bomb blast saying, "You're not good enough.  There must be

15   something funny with you.  You're not reasoning properly.  You

16   are not as good as" -- you know, in the process, over the years,

17   it is normal, according to studies in sociology, that the

18   individual against whom this kind of attitude is focused begins

19   to try to mix the standard that has been set by those that are

20   focusing that kind of attitude.

21   In other words, the bomb blast survivor would try to

22   balance, to avoid the cognitive dissonance, so would try to lead

23   up to the expectations or the statements of those that say they

24   are not good enough, and that is why earlier on I said that they

25   also began to call themselves people of the bomb.  And people of

1   the bomb, my observation has been that when they fail to do, for

2   instance, certain assignments at their place of work, they would

3   always excuse it as people of the bomb.  When they did not want

4   to do deployment or when they wanted to deploy somebody to

5   another maybe lesser unit, in quotes, they would say that one is

6   a person of the bomb.

7        Similarly, when they did not want to promote you, they would

8   say, okay, fine, we have three candidates here, but this one,

9   the one in the middle, is a person of the bomb and, therefore,

10  if you give this kind of assignment, you never know.  And this

11  "you never know," the unsensitivity around -- you know, that has

12  been created around bomb blast survivors, it also causes much of

13  or larger social injuries in the sense that when people don't

14  have much trust in you or when people don't think that you're

15  good enough, then eventually you become not good enough because

16  you try to live up to the balance your psychology to what the

17  expressions are.

18       At the same time, bomb blast survivors, with time -- and

19  this is really with time because between the time I did my study

20  in 2002 and now, there's quite some time -- there is that

21  feeling of being lesser, like the self-worth has been lowered.

22  Q    What was lowered?

23  A    The self-worth.  If you live with people -- if you ever work

24  with somebody who has a lower worth, who rates themselves lower

25  than they actually are, it becomes very difficult eventually to

1   transact business.  And I would imagine that, okay, based on my

2   study, many of the survivors became antisocial.  They felt less

3   interested to interact with other people.

4        Now, what does that mean?  What is the implication of the

5   less interest in interacting?  The social capital issue, the

6   issue of, you know, being able to relate with this or the other

7   person for purposes of social development, for purposes of

8   economic development and even for the social well being, which

9   is very important, if I look at the world organization

10  definition of health, the complete well being.

11       So to me, the social factor has larger effects on the bomb

12  blast survivors than anything else, than probably even the

13  physical injuries.  It is possible to walk to a hospital to say,

14  "I suffer trauma, I need help," but it is impossible to go to

15  any hospital to say, "I'm suffering social effects.  Everyone

16  laughs at me.  Everyone calls me names.  Everyone thinks I'm

17  less worthy."  So I see this as a bigger problem than the

18  problem of someone in a wheelchair, for instance.

19  Q   Let me ask you, you saw both witnesses today, correct?

20  A   Yes, I did.

21  Q   One who is blind and had his eye removed and another

22  testified that he had some temporary physical cuts and

23  lacerations.  Totally different ranges of physical injury,

24  correct?

25  A   Yes.

1  Q   Is it your opinion that with respect to the sociological

2  treatment in the Kenya culture, that they will each suffer the

3  same stigma?

4  A   They will suffer the same stigma because as I said earlier,

5  having been in that bomb blast, whether you were injured or not,

6  there is a tag that has been put to it.

7  Q   There is a tag?

8  A   A tag, yes.  That you can never, ever be good enough.  You

9  can never, ever measure up.  And this also is tied to some of

10 the things that happened several years later like I was quoting

11 the case of my typist who said, "I have glass popping out of my

12 right thigh."

13     So if you have glass popping out of your right thigh to

14 1998, '99, 2000, how can I trust you to do your assignment for

15 me?  How can I take you on to be my spouse tomorrow?  How can I

16 intrust you to run for me a company?  How can I?  How can I?

17 Q   These are rhetorical questions; these are what you view as

18 the mindset of the Kenyan culture?

19 A   Yes.

20 Q   Let me ask you this:  Are you saying to a reasonable degree

21 of professional certainty that the bomb blast victims are viewed

22 differently by the majority of Kenyans as a result of Kenyan

23 culture, religious background and other issues?

24 A   Yes.

25 Q   And are you saying to a reasonable degree of professional

1   Q    And in the course of your participation in that

2   organization, can you give me an estimate of how many nonTSA

3   employee bombing victims you've spoken to?

4   A    I may not have the figures as such because when I speak to

5   them, I speak to them informally so I don't record.  But I have

6   spoken to many, and I meet lots of them.  They are almost in

7   every other place you go to in Nairobi.

8   Q    You testified earlier that while it's your opinion that your

9   findings and conclusions with respect to the TSC employee

10  research, those findings and conclusions are applicable to all

11  bombing victims?

12  A    Yes, they are.

13  Q    It's also your conclusion that to the extent that there is a

14  difference, nonTSC employee victims are likely to be worse off

15  than the TSC victims for all the reasons you expressed, right?

16  A    Yes.

17  Q    Is that opinion based to a reasonable degree of professional

18  certainty on both your research and your participation in this

19  organization?

20  A    Yes.

21  Q    Now, let me ask you before we get to the report and the

22  report you did, whether you were able to assess whether or not

23  there was significant difference in economic performance among

24  bomb victims versus the community at large; in other words, were

25  you able to determine whether, generally speaking, they were

1   that affects all bomb blast victims?

2   A    It is.  Because they hear it expressed every other day.  And

3   even though it is a different situation, I believe in another

4   setup it should be worse.

5       Why do I say this?  Because the Commission employee is

6   educated people.  If they can hold these kind of feelings and

7   beliefs against their own, how about the person out there?  How

8   about the person who does not know you well?  How about the

9   person who is just seeing you for the first time and seeing the

10  scars?

11      It is important also here to mention that this perception --

12  remember earlier I said the Commission has about 600 bomb blast

13  survivors, although quite a number of them by now have passed

14  on.  I was actually checking the statistics and I found we lost

15  between 2005 and now and last year, December, last year, about

16  79 people.

17  Q    Out of 600?

18  A    Yes.

19      Okay.  All of them may not be bomb blast survivors, but a

20  great percentage of those are bomb blast survivors.  If health

21  is about being socially healthy or having the social wellness,

22  well, then, as I said earlier, this is a very serious issue that

23  the bomb blast survivor may not be able to enjoy the complete

24  health because in a social setup, people want to be weary of --

25  they want to be aware, and any interruption anyplace you go, if

1   you want to engage in serious business -- and I've seen this

2   happen like when people are looking for guarantors for loans,

3   they want to find the people who want to find out was this one

4   in the bomb blast because they have all of this feeling that the

5   life of the bomb blast survivor is much shorter.  It's likely to

6   be much shorter than the other person's life.  That something

7   terrible is likely to happen.  It's like there's a dark cloud

8   that hangs over their heads.

9        And that's -- you know, there's nothing anybody can do about

10  it because it is difficult to change culture, cultural beliefs,

11  societal perceptions.  It is very difficult, and that's why I

12  earlier said that while it is possible to go for surgery to

13  remove the scars, this is one area where nobody can purport to

14  be able to manage.

15  Q   According to your report, some of the flights of imagination

16  and suspicion about bomb blast victims are so wild that you

17  report one gentleman who says of, I think, his wife, "She got a

18  blood transfusion.  I'm sure she got HIV and she is going to

19  die."

20       And you report that incident?

21  A   Yes.

22  Q   And that's an example of how the culture assumes the worse?

23  A   Yes.

24  Q   Is that a fair statement, assumes the worst about bomb blast

25  victims?

1   Q    They did what?

2   A    They stood from their seats to check through the window.

3   But one was just slightly behind the other.  The one who was

4   ahead of the other was so badly injured -- this is the sister in

5   lieu of the other -- she was so badly injured, and this lady

6   said when she came back -- she doesn't remember what happened

7   after that, but when she came back to her office the next day,

8   the seat was in shreds.

9        That to her was -- became a nightmare because the sister was

10  in hospital for months.  Today she is one of those who -- that

11  the lady who called her a guitar face.  But this one she did not

12  sustain -- she didn't even get a scratch.  They were in the same

13  room at the same time.  How does one explain that in a room like

14  this one we are in a meeting, I am taking minutes, and the next

15  minute I'm not there, and there are people who walk out of that

16  room?

17       It's complicated.  I think what compounds the matter is the

18  fact that this was the worst -- a disaster of the highest

19  magnitude that we had experienced.

20  Q    "We," meaning?

21  A    We as Kenyans.  We as Kenyans, yes.

22  Q    So can you say to a reasonable degree of professional

23  certainty that any bomb blast victim who was subjected to these

24  gruesome scenes has suffered further psychological trauma?

25  A    I would say so.

1   who has not testified?

2   A   Yes, she did not testify.  But many of them, they have

3   hearing issues.  And many of them said they had memory problems.

4   I think the trauma and the impact, like if they had head

5   injuries, would also have affected their memory.  But I would

6   say to a great extent that many of them have memory issues.

7        Now, when there is a memory issue, there is also a social

8   issue there because if I discuss with you that we meet tomorrow

9   at 11:00 and you don't show up tomorrow at 11:00, and then I

10  discover that it has to do with your memory -- you forgot that

11  we were going to meet or when -- and I go over and I say that

12  quite often.  They did mention in the study that they were

13  having those issues also.

14  Q   Issues of sleeplessness?

15  A   Yes.

16  Q   Issues of nightmares?

17  A   Nightmares.

18  Q   Flashbacks?

19  A   Sleeplessness, flashbacks, startled responses.

20  Q   Startled responses?

21  A   Yes.  And when that happens, you also have avoid -- I

22  remember in one incident where there was a tire bust.  At that

23  time, the Teachers Service Commission was housed at the Bazaar

24  Plaza.

25  Q   Spell that.

1   A   Bazaar, B-a-z-a-a-r.

2   Q   "Zed" is Z?

3   A   Z, yes.

4       So there was one time a tire bust on Moi Avenue, and there

5   were lots and lots of bomb blast survivors.  They thought it's

6   another bomb blast.  And anything -- any sound that comes

7   through that is similar to, you know, they'll just jump to

8   conclusion that it must be another disaster happening.

9   Q   Is it your opinion then to a reasonable degree of

10  professional certainty that a common symptom of the bomb blast

11  victims, common symptoms include memory loss?

12  A   Yes.

13  Q   Sleeplessness?

14  A   Yes.

15  Q   Nightmares?

16  A   Yes.

17  Q   Flashbacks?

18  A   Yes.

19  Q   And being easily startled and frightened by sudden noises?

20  A   Yes.

21  Q   I interrupted you, but those are typical symptoms.

22      Are they long term?

23  A   They are typical and, of course, depending on what the

24  survivor -- what support the survivor has been able to access or

25  not -- whether the survivor has been able to access support in