# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Odillia Mutaka Mwani, *et al*.          :
                                        :
          Plaintiffs                    :          CA No. 1:99CV00125
                                        :          Judge Colleen Kollar-Kotelly
v.                                      :
                                        :
United States of America, *et al*.      :          CA No. 1:99CV00125
                                        :          Magistrate Judge Facciola- For all purposes
v.                                      :
                                        :
          Defendants                    :

## PLAINTIFFS' RESPONSE TO ORDER TO
## SHOW CAUSE

By order entered April 18, 2013, this court ordered plaintiffs to "show cause in writing by no later than May 20, 2013, why this case should not be dismissed for lack of jurisdiction."

For the reasons set forth below, this court must conclude that it has subject matter jurisdiction over the claims against the remaining defendants, the order to show cause should be discharged, and judgment should be entered in favor of plaintiffs and against the remaining defendants.

## I.   STATEMENT OF PROCEEDINGS, APPLICABLE FACTS AND STANDARDS

### A.  Statement of Trial Court and Appellate Proceedings

This case commenced with the filing by the 523 Kenyan plaintiffs on January 15, 1999 in the United States District Court for the District of Columbia (hereinafter the "trial court") of claims against the United States of America; Afghanistan, as a foreign state; Sudan, as a foreign state; Usama bin Ladin ("UBL") and the terrorist group al Qaeda.  On April 30, 1999, plaintiffs filed a First Amended Complaint (the "Complaint.").  The claims arise out of the August 7, 1998 bombing by UBL and al Qaeda of the American Embassy in Nairobi, Kenya.

On February 12, 1999, Plaintiffs filed a Motion for Leave to Serve Defendants Bin Laden and Al Qaeda by Publication. That motion was granted by order entered August 2, 1999. Plaintiffs perfected service by publication in accordance with the August 2, 1999 Order. *See* Status Report on Service, filed December 3, 1999.

On August 11, 2000, Plaintiffs filed a Motion for Entry of Default Against Defendants Bin Laden and Al Qaeda. That motion was denied without prejudice by order entered March 15, 2001.

On July 16, 2001, Plaintiffs filed a Renewed Motion for Entry of Default Against Defendants Bin Laden and Al Qaeda (the "Renewed Default Motion"). On August 2, 2001, Plaintiffs filed a Supplemental Memorandum in support of the Renewed Default Motion (the Supplemental Filing"). The Supplemental Filing noted only the July 24, 2001 decision of the District Court of Rhode Island in *Estates of Ungar v. The Palestinian Authority* 325 F.Supp.2d 15 (D.R.I. 2001) on the geographic scope of personal jurisdiction analysis in a federal question case.

On September 27, 2001, Plaintiffs filed a Second Supplemental Filing in support of the Renewed Default Motion (the "Second Supplemental Filing"). The Second Supplemental Filing relied on "… the events of September 11, 2001 …(to) … provide dispositive support for the claims and arguments set out in … The Renewed Default Motion." Second Supplemental Filing, #54, at 1.

By order entered September 30, 2002, the trial court denied with prejudice the Renewed Default Motion, and ruled further that the court would not permit further filings in support of the exercise of personal jurisdiction over Defendants Bin Laden and Al Qaeda.

On October 1, 2002, Plaintiffs filed a Motion for Reconsideration, or to Alter or Amend

Order of September 30, 2002, or, in the Alternative, for Certification Pursuant to F.R.Civ.P.

54(b) ("Motion for Reconsideration").    The Motion for Reconsideration relied on excerpts from

three new studies: the September 18, 2002, Senate Select Committee on Intelligence and the

House Permanent Select Committee on Intelligence "Joint Inquiry Staff Statement, Part 1" by

Eleanor Hill, Staff Director, Joint Inquiry Staff ( "the Staff Statement"); *The Cell, Inside the 9/11*

*Plot, and Why the FBI and the CIA Failed To Stop It* (Hyperion Press 2002), by ABC News

reporter John Miller, and Michael Stone, with Chris Mitchell ("The Cell"); and  *Breakdown,*

*How America's Intelligence Failures Led to September 11* (Regnery Publishing 2002), by

Washington Times reporter Bill Gertz ("Breakdown").

On October 11, 2002, Plaintiffs filed a Supplement in support of the Motion for

Reconsideration (the "Reconsideration Supplement"). The Reconsideration Supplement, *inter*

*alia,* added as exhibits evidence from *United States of America v. Hage et.al.* S(7)98 Cr1023

(S.D.N.Y. 98)  ( the New York Criminal Prosecution").

On September 30, 2003, the trial court denied with prejudice the Motion for

Reconsideration.

On January 29, 2004, the Transitional Islamic State of Afghanistan ("Afghanistan") filed

a Motion to Dismiss Claims Against Afghanistan ("Motion to Dismiss"). Following further

briefing, on June 22, 2004 the trial court granted the Motion to Dismiss.

On July 16, 2004 plaintiffs timely noted their appeal to the District of Columbia Court of

Appeals for the District of Columbia Circuit (the "DC Circuit Court").

On August 5, 2005, the DC Circuit issued an opinion in *Mwani v. bin Laden*

417 F.3d 1 (D.C.,2005) (the "DC Circuit Opinion") which reversed and remanded the district

court's decision on personal jurisdiction.  As the Circuit Court explained:

In this case, there is no doubt that the defendants engaged in unabashedly malignant actions directed at [and] felt in this forum…. The plaintiffs' allegations and evidence were that bin Laden and al Qaeda orchestrated the bombing of the American embassy in Nairobi, not only to kill both American and Kenyan employees inside the building, but to cause pain and sow terror in the embassy's home country, the United States. Nor were the plaintiffs' allegations and evidence of contacts with the United States limited to the Nairobi bombing. The plaintiffs described an ongoing conspiracy to attack the United States, with overt acts occurring within this country's borders. Putting to one side the acts that took place after the embassy bombing (including the attacks on the World Trade Center and the Pentagon on September 11, 2001), the plaintiffs pointed to the 1993 World Trade Center bombing, as well as to the plot to bomb the United Nations, Federal Plaza, and the Lincoln and Holland Tunnels in New York.

The plaintiffs thus amply made a prima facie showing that bin Laden and al Qaeda purposefully directed their activities at residents of the United States … and that this litigation results from injuries to the plaintiffs that arise out of or relate to those activities…. Bin Laden and al Qaeda therefore had "fair warning" that their activities would subject them to the jurisdiction of the United States….

The fact that injured Kenyans, not injured Americans, are the plaintiffs in this case does not deny the court personal jurisdiction over the defendants….The plaintiff's residence in the forum State is not a separate requirement, and lack of residence will not defeat jurisdiction established on the basis of the defendant's contacts. The defendants' decision to purposefully direct their terror at the United States, and the fact that the plaintiffs' injuries arose out of one of those terrorist activities, should suffice to cause the defendants to "reasonably anticipate being haled into" an American court…. Of course, a plaintiff's citizenship may affect whether the court has subject matter jurisdiction or the plaintiff has a cause of action. Here, however, the plaintiffs have sued under the Alien Tort Claims Act, which the Supreme Court has held to supply both subject matter jurisdiction and a cause of action for a narrow set of claims brought by aliens and involving violation of the law of nations. *See Sosa v. Alvarez-Machain,* 542 U.S. 692, 124 S.Ct. 2739, 2754, 2761-62, 159 L.Ed.2d 718 (2004). The *Mwani* plaintiffs certainly have more than a colorable argument that their claims fall within that narrow set.  At 13-14.

The Court explained further with respect to subject matter jurisdiction under the ATCA

that:

In *Sosa,* the Court determined that the First Congress understood the ATCA to "recognize private causes of action for certain torts in violation of the law of nations," including "violation of safe conducts, infringement of the rights of ambassadors, and piracy." 124 S.Ct. at 2761. It concluded that "courts should require any claim based on the present-day law of nations to rest on a norm of

international character accepted by the civilized world and defined with a specificity comparable to the features of [those] 18th-century paradigms." *Id.* at 2761-62. The plaintiffs' contention that bin Laden and al Qaeda attacked the American embassy intending, among other things, to kill American diplomatic personnel inside, would appear to fall well within those paradigms. *See id.* at 2756 (noting that the 18th-century paradigm included "assault against an ambassador").

*Mwani, supra*, at 14, n.14.

On September 28, 2006, the district court entered a default against Usama bin Ladin and al Qaeda. ECF 80. In the accompanying opinion, the court found that it had subject matter jurisdiction. ECF 81.  As the court explained:

> Based on the arguments presented by Plaintiffs and the relevant statutes and case law, this Court finds that it properly has subject matter jurisdiction over Plaintiffs' claims….(T)he attack on the United States Embassy in Nairobi, Kenya … impinged the diplomatic mission of the United States and directly infringed on the rights of Ambassadors, which was and has been a clear violation of the law of nations since the inception of the ATCA. As such, the Court properly exercises subject matter jurisdiction over Plaintiffs' claims.

ECF 81, at 2, 7-8.

On August 5, 2007, the district court granted in part plaintiffs' motion to set a date for an *ex parte* evidentiary hearing on damages. ECF 87.

With the consent of plaintiffs, this case was referred to Magistrate Judge Facciola for all purposes on May 26, 2010. ECF 97.

On September 21, 2010, at a status hearing, this court scheduled a multi-day evidentiary hearing commencing January 31, 2011.

Plaintiffs filed a Pretrial Statement on January 24, 2011. ECF 100.

This court conducted an evidentiary hearing in this matter from January 31, 2011 to February 3, 2011. [1] The testimony was adduced from Nairobi, Kenya.  Testimony was taken

---

[1] There are four transcripts of the proceedings:  all proceedings on January 31, 2011 ("Transcript I"); all proceedings on February 1, 2011 ("Transcript II"); the morning proceedings on February 2, 2011

from the following witnesses: Jane Kawira Naivasha; Protus Manyasa Buluma; Dipak Shah;

Wilfred Ngunjiri Nderitu; Noah Thuo Kimani; Charles Makori Mogi; Kioko Muema; Castro

Otiende; and Joan Mwendi Kiema-Ngunnzi.  This court admitted into evidence the following

exhibits:  Photographs,(Plaintiffs' Exhibit ("PX") 1; Video of Bombing Site August 7, 1998,

PX2; April 9, 1999 report from the Department of State, PX 3; January 8, 1999 Report,

Accountability Review Board, PX 4; Report: An Assessment of Recovery Strategies of the

1998 Nairobi Bomb Disaster Victims: A Case Study of Teachers Service Commission (TSC)

from Ms. Kiema-Ngunnzi, PX 5; a study "Psychological Effects of the Nairobi U.S. Embassy

Bomb Blast on Pregnant Women and their Children" published in World Psychiatry, PX 6; and

a drawing of the site, PX 7.

     Plaintiffs submitted proposed findings of fact and conclusions of law on April 18, 2011.

     On January 10, 2012, this court issued a detailed order staying these proceedings pending

a resolution of a then-pending petition for rehearing *en banc* in *Doe v. Exxon Mobil Corp.* 654

F.3d 11 (D.C. Cir. 2011), which involved, *inter alia*, consideration of the application of the Alien

Tort Statute ( "ATS," which has become the acronym of choice instead of "ATCA"). As this

court noted, on November 14, 2011, the DC Circuit in *Doe v. Exxon* stayed the petition for

rehearing *en banc* pending the Supreme Court's disposition of two ATS Supreme Court cases:

*Kiobel v. Royal Dutch Petroleum* 621 F.3d 1114 (DC Cir. 2011), cert. granted 80 U.S.L.

3128(October 17, 2011) and *Mohamad v.Rajoiub* 634 F.3d 604 (2d Cir. 2011), cert.granted  80

U.S.L. 3128(October 17, 2011). 634 F.3d 604 (DC Cir. 2011), cert.granted 80 U.S.L.

3128(October 17, 2011)

---

("Transcript III"); the afternoon proceedings on February 2, 2011 ("Transcript III"); and all proceedings on February 3, 2011 ("Transcript IV").  No evidence was adduced on February 3, 2011.  Pursuant to order of this court, plaintiffs filed with their proposed findings of fact and conclusions of law witness duly-sworn declarations clarifying transcription ambiguities.

On April 18, 2013, this court issued an order which provided as follows:

> This case has been stayed since January 10, 2012, pending the outcome of a rehearing en banc in Doe v. Exxon Mobil Corp., 09-7135 (D.C. Cir. Nov 14, 2011), which itself was stayed pending the decision of two cases before the Supreme Court regarding the reach of the Alien Tort Statute. One of those Supreme Court cases, Kiobel v. Royal Dutch Petroleum Co., No. 10-1491, ___ U.S. ___ (April 17, 2013), [2] was decided yesterday. In its opinion, the Supreme Court held that the presumption against extraterritoriality applies to claims brought under the Alien Tort Statute, and there is nothing in the statute to rebut that presumption. According to this ruling, it appears that the Alien Tort Statute does not grant jurisdiction over claims brought by foreign nationals against other foreign nationals or groups for acts that occurred on foreign soil. It is, therefore, hereby, ORDERED that the plaintiffs show cause in writing by no later than May 20, 2013, why this case should not be dismissed for lack of jurisdiction.

## B.  STATEMENT OF APPLICABLE FACTS [3]

<u>Usama Bin Laden and Al Qaeda Declare and Commence War Against the United States</u>

From 1992 through the present defendants UBL and al Qaeda have pursued a world-wide assault against American military, diplomatic and civilian lives, interests and property.  Their horrific campaign included the brutally-successful bombing on August 7, 1998 of the American Embassy Compound in Nairobi, Kenya. UBL claimed responsibility for attempting to bomb US soldiers in Yemen in late 1992 and for attacks on them in Somalia in 1993.  Al Qaeda was also responsible for the February 1993 bombing of the World Trade Towers.  By 1997, six al Qaeda associates were convicted for their roles in that attack.

Mahmood Abouhalima was convicted on March 4, 1994 in the World Trade Center bombing.

Ahmed Mohammed Ajug was convicted on March 4, 1994 in the World Trade Center bombing.

---

[2] 133 S.Ct.1659

[3] The facts set out in this section were drawn from the record as it existed on appeal.

Nadal Ayyal was convicted on March 4, 1994 in the World Trade Center bombing.

Eyad Ismil was convicted on November 13, 1997 of conspiracy in The World Trade Center bombing.

Mohammad Salameh was convicted on March 4, 1994 in the World Trade Center bombing.

Ramzi Yousef was convicted on November 13, 1997 for conspiracy in The World Trade Center bombing.

Alexander, Y. and Swetnam, *MS  Usama bin Laden's al Qaida: Profile of A Terrorist Network* (Transnational Publications 2001), at  pp.34-36.

Al Qaeda associate Sheik Omar Abdel-Rahman was convicted on October 1, 1995 in connection with the plot to blow-up the United Nations, Federal Plaza, and the Lincoln and Holland tunnels. *Id.*

> (Al Qaeda)…has been blamed for: November 13, 1995 car bomb explosion outside the American-operated Saudi National Guard training center in Riyadh, Saudi Arabia, killing five Americans and two Indians; the June 25, 1996 car bombing attack at Khobar Towers, a U.S. Air Force housing complex in Dhahran, Saudi Arabia, killing 19 soldiers and wounding hundreds more….

*Alexander, supra,* at *viii.*

In May 1996, UBL left Sudan for Afghanistan.  Report of the National Commission on Terrorist Attacks Upon the United States, at pp. 160, 248.  "Bin Laden provided approximately $10-$20 million per year to the Taliban in return for safe haven." Id., at 248. "Afghanistan was the incubator for al Qaeda…." *Id*., at 528.

In August 1996, Bin Laden and al Qaeda issued a statement outlining his organization's goals: drive US forces from the Arabian Peninsula, overthrow the Government of Saudi Arabia, "liberate" Muslin holy sites in "Palestine," and support Islamic revolutionary groups around the

world.  To these ends, his organization sent trainers throughout Afghanistan as well as to

Tajikistan, Bosnia, Chechnya, Somalia, Sudan and Yemen and trained fighters from numerous

other countries including the Philippines, Egypt, Libya, and Eritrea.   Bin Laden also has close

associations with the leaders of several Islamic terrorist groups and probably has aided in

creating new groups since the mid-1980s.  He has trained their troops, provided safe haven and

financial support, and probably has helped them with other organizational matters.

Since August 1996, Bin Laden became increasingly vocal in expressing his approval of

and intent to use terrorism.  In November 1996 he called the 1995 and 1996 bombings against

US military personnel in Saudi Arabia "praiseworthy acts of terrorism."  At the same time, he

called for further attacks against US military personnel, saying: "If someone can kill an

American soldier, it is better than wasting time on other matters."

On August 23, 1996, Bin Laden and al Qaeda issued a fatwah that efforts should be

pooled worldwide to kill Americans.  Specifically, defendants Bin Laden and al Qaeda issued a

Declaration of Jihad entitled "Message from Usamah Bin – Mohammad Bin – Laden to his

Muslim Brothers in the Arabian Peninsula: Declaration of Jihad Against the Americans

Occupying the Land of the Two Holy Mosques; Expel the Heretics from the Arabian Peninsula."

In an interview on Al Jazira television, UBL declared that: "our enemy is every American male,

whether he is directly fighting us or paying taxes."  In two interviews broadcast on US television

in 1997 and 1998 he referred to the terrorists who carried out the earlier attacks on the 1993

World Trade Center as "role models," and exhorted his followers "to take the fighting to

America." Third Supplemental Filing, # 55, at 2.  The negotiations for the 1998 interview took

place, at least in part, in the District of Columbia. Reconsideration Supplement, #59, at 4-5.

In a February 23, 1998 pronouncement al-Qaeda and UBL mandated, in part, as follows:

The ruling to kill the Americans and their allies --- civilian and military ---is an individual duty for each Muslim who can do it in any country in which it is possible to do it….
We…. Call on every Muslim who believes in God and wishes to be rewarded to comply with God's order to kill the American and plunder their money wherever and whenever they find it(emphasis added).

By 1997 or 1998, UBL and al Qaeda had determined to attack the U.S. on its own soil. Motion for Reconsideration, # 58, at 4-7. Al Qaeda cells were in place in the U.S. as early as 1990, and infrastructure was set up by 1998. *Id*., at 2-11.  UBL's fatwahs were distributed and published in periodicals in the United States and, in particular, in the District of Columbia. Renewed Default Motion, # 51, at Plaintiffs' Exhibit ("PX") 3a, and see Reconsideration supplement, #59, at 5-6.

It was quite clear that UBL and al Qaeda intended to attack the United States in its own territory.   A captured terrorist cautioned against "… doubting the success of Islamist spectacular strikes in and against the United States.  'Don't worry, they'll come when the time is right,' he quipped."  Bodansky, Y.,  Bin Laden:  *The Man Who Declared War On America* (Prima 1999), at p. 387.   "Al-Qaida being a truly international network with links in some 55 countries, is not limited to a specific area of operations. It has vowed to strike against its adversaries around the world."  Alexander, *supra* at p.31. The "….network's operation …." includes the United States. *Id* .  Indeed, accessories for the satellite phone used by UBL and al Qaeda were shipped to al Qaeda associate Tarik Hamdi in Herndon, Virginia.  Reconsideration Supplement, #59, at 5.

The 1998 Attack on the Embassy

Consistent with al Qaeda's fatwah , "…(i)n late October 1997 Hosni Abu Nimreh … and Mustafa Mahmud Said Ahmad had surveyed and took pictures of the U.S. … (embassy) in

Nairobi.  Nimreh … made general plans to destroy the U.S. Embassy with powerful bombs in an attack involving three vehicles."  Bodansky, *supra*, at p. 245. In 1998, videotapes extolling violence against the United States were distributed by al Qaeda.  Third Supplemental Filing, #55, at 3.

By March 1998, the initial operational plans were ready and included "a general estimate of the strength of the buildings and sketch maps of the areas surrounding the key objectives; the maps included all roads around the area that would provide easy access, effective points of bomb detonation and escape routes.  The US Embassy topped the list of potential targets." Bodansky, *supra*, at p. 245.

Mohammad Sadeek Odeh ("Odeh") was an agent and operative for UBL and al Qaeda in all matters related to the bombing attack.  On or about August 1, 1998, Odeh was advised that all al Qaeda members had to leave Kenya by Thursday, August 6, 1998, the day before the embassy bombing.  On or about August 2, 1998, Odeh traveled from Mombassa, Kenya to Nairobi for a meeting with other members of al Qaeda, including an explosives expert and the leader of al Qaeda's Kenyan cell.  Odeh, who was using a false passport, stayed with the other al Qaeda members at the Hilltop Hotel.  On or about August 5, 1998, Odeh prepared to travel to meet with Bin Laden.

Prior to leaving Kenya, Odeh was told by other al Qaeda members that members of the terrorist organization located in Afghanistan were in the process of relocating to avoid retaliation from the United States.

On August 7, 1998, at approximately 10:30 a.m. local time, agents for UBL and al Qaeda driving in a truck detonated a large bomb in the rear parking area, near the ramp to the basement garage, of the American Embassy in Nairobi.  No fewer than 213 people were killed, of whom

44 were American Embassy employees.  Over 200 Kenyan civilians were killed and over 4000 were injured by the blast in the vicinity of the embassy

At least six al Qaeda associates – most of whom were connected in some respect to the Embassy Bombings, had been active and present in the United States on terrorist operations. Motion for Reconsideration, # 58, at 7-10.

<u>Between The Embassy Attacks and September 11, 2001</u>

That the United States remained al Qaeda's target after the Embassy attacks is clear. One captured Islamist terrorist commander proclaimed that: "… the two anti-American attacks in Kenya and Tanzania were not simply advertisements … Jihad will continue because the fight against the United States … will never cease." Bodansky, at 387. cautioned against "… doubting the success of Islamist spectacular strikes in and against the United States.  'Don't worry, they'll come when the time is right,' he quipped."  *Id*.

Al Qaeda associate Bouabide Chamchi, while entering the United States with an illegal passport, was arrested on December 19, 1999 in Vermont.

Al Qaeda associate Khalil Sa'id Deek was arrested in Pakistan on December 17, 1999 for conspiring to bomb an American-owned hotel in Amman.

Al Qaeda associate Abdal Ghani Merkini, who traveled from New York City to Seattle with forged identification to meet Bouabide Chamchi, was arrested December 30, 1999 in Brooklyn.

Al Qaeda associate Ahmed Ressam was arrested on December 14, 1999 in Washington State while trying to smuggle illegal explosives and timers into the United States and Canada. Alexander, *supra*, at 34-36.  Ressam admitted that he had received training at al Qaeda camps in Afghanistan and had been instructed to "go abroad and kill US civilians and military personnel."

Third Supplemental Filing, #55, at 3.

On August 7, 2000, the two year anniversary of the Embassy bombing, the U.S. Department of State ("DOS") issued a fact sheet which stated:

> While the effort to apprehend these terrorists is ongoing, they and others associated with Osama bin Laden's network remain a serious international threat. Information indicates continued terrorist activity and planning for future attacks. . . . Additional attacks were prevented elsewhere including the United States. We must keep up our guard.

Second Supplemental Filing, #54, at 2.

On October 12, 2000, al Qaeda mounted the suicide bombing of the USS Cole, killing 17 and wounding 39 American sailors in Aden harbor, Yemen. Prior to September 11, 2001, the executive branch repeatedly recognized that UBL and al Qaeda targeted the United States at home.

On February 2, 1999, George J. Tenet, as Director of the CIA, stated for the Senate Armed Services Committee Hearing on Current and Projected National Security Threats that:

> First, there is not the slightest doubt that Usama bin Laden, his worldwide allies, and his sympathizers, are planning further attacks against us. Despite progress against his networks, Bin Laden's organization has contacts virtually worldwide, including in the United States.

On February 2, 2000, J. Stapleton Roy, as Assistant Secretary for Intelligence and Research stated before the Senate Select Committee on Intelligence that bin Laden and his ".....transnational network..." are ".... the primary threat to U.S. interests at home and abroad."

On May 18, 2000, President Clinton disclosed that UBL and al Qaeda were behind efforts to plant bombs in the United States in the weeks before millennial celebrations.

The President acknowledged that:

> Last December, working with Jordan, we shut down a plot to place large bombs at locations where Americans might gather on New Year's Eve.... We learned this plot was linked to terrorist camps in Afghanistan and the organization created by

Usama Bin Laden.

The September 11, 2001 Attacks

On September 11, 2001, Usama bin Laden and al Qaeda undertook egregious acts of international terrorism and mass murder in New York and in Virginia.  A British government investigation concluded that: "The attacks of 11 September 2001 are entirely consistent with the scale and the sophistication of the planning which went into the attacks on the East African Embassies," and identified at least three September 11 hijackers who played key roles in the Embassy and Cole bombings.  Third Supplemental Filing, #55, at 3.

 As the United States, speaking through the President, immediately declared:

> Americans have many questions tonight.  Americans are asking: who attacked our country?  The evidence we have gathered all points to a collection of loosely affiliated terrorist organizations known as al Qaeda.  They are the same murderers, indicted for bombing American embassies in Tanzania and Kenya, and responsible for bombing the USS Cole….
>
> The terrorists' directive commands them to kill Christians and Jews, to kill all Americans, and make no distinction among military and civilians, including women and children.
>
> This group and its leader, a person named Osama bin Laden, are linked to many other organizations . . . . There are thousands of these terrorists in more than 60 countries.

President George W. Bush, Address to a Joint Session of Congress, September 20, 2001. Second Supplemental Filing, # 54, at 1-2.

The September 11, 2001 attack was described by Secretary of State Colin Powell as part of a continuing pattern of terrorism.  *Id.*, at 2.

On September 29, 2001, President Bush described actions on the financial front, disclosing that the U.S. "froze whatever assets they had here in the United States and we blocked them from doing business with people, companies or banks in our country."  Third Supplemental Filing, #55, at 2.

14

**C.  Standards Applicable to the Matter Before the Court**

1. The Determination of Subject Matter Jurisdiction

     In *Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.*, 127 S.Ct. 1184, 1186, 167 L.Ed. 2d 15 (2007), the Supreme Court noted that "a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the cause (subject-matter jurisdiction) and the parties (personal jurisdiction)…." A court can raise *sua sponte* the question of subject matter jurisdiction at any time in a proceeding. *NetworkIP, LLC v. F.C.C.* 548 F.3d 116, 120 (D.C. Circ. 2008).

     Whether initiated by an adverse party by motion pursuant to Fed.R.Civ.P. 12(b)(1), or *sua sponte* by the court, the disposition of a subject matter jurisdiction question can be undertaken by a facial challenge on the pleadings, or a challenge to the factual underpinning of jurisdiction, and "how the district court proceeds …depends upon whether the motion presents a factual challenge." *Phoenix Consulting Inc. v. Republic of Angola,* 216 F.3d 36, 40, 342 U.S.App.D.C. 145, 149 (D.C. Cir. 2000).

     Here, the fact record has been established and is set out in both the DC Circuit Opinion, and the September 28, 2006 opinion of Judge Kollar-Kotelly, ECF 81, and is set out in detail in the section I.B., *supra*.

2. The Application of Law of the Case to Subject Matter Jurisdiction

     "(T)his court and other courts of appeal routinely apply law-of-the-case preclusion to questions of jurisdiction." *LaShawn v. Barry* 87 F.3d 1389, 1394 (D.C. Circ. 1996). "The law-of-the-case doctrine rests on a simple premise: 'the *same* issue presented a second time in the *same case* in the *same court* should lead to the *same result*.' (internal citation omitted, emphasis in original)." *Kimberlin v. Quinlan* 199 F.3d 496, 500 (D.C. Cir. 1999).  At the trial level, of course,

"so long as the court has jurisdiction over an action, it should have complete power over interlocutory orders made therein and should be able to revise them when it is consonant with equity to do so(internal brackets, quotation marks omitted)."  *Langevine v. District of Columbia* 106 F.3d 1018, 1023 (D.C. Circ.1997).

> Although courts are eager to avoid reconsideration of questions once decided in the same proceeding, it is clear that all federal courts retain power to reconsider if they wish. Law-of-the-case principles in this aspect are a matter of practice that rests on good sense and the desire to protect both court and parties against the burdens of repeated reargument by indefatigable diehards. In one classic statement, Justice Holmes noted that law-of-the-case doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." Many decisions repeat the theme. Because the court's power is not limited, failure to advance a law-of-the-case objection may mean that the objection is forfeit, just as failure to plead res judicata may forfeit the protections of preclusion.
>
> The standards announced for departing from the law of the case commonly demand strong justification. A much-quoted statement was provided by Judge Orrie Phillips of the Tenth Circuit, sitting by designation on the Fifth Circuit in White v. Murtha. The law of the case:
>
> > must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court, unless the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice.

18 Charles Alan Wright Et Al., Federal Practice And Procedure § 4478 (1981), cited with approval in *Langevine, supra,* at 1023.

But the District of Columbia Circuit has made clear that "second hearings" on questions of subject matter jurisdiction are disfavored. As the majority wrote in its denial of a petition for rehearing *en banc* in *Hohri v. U.S.*  793 F.2d 304, 315 (D.C. Cir. 1986).

> We note finally the dissenters' apparent misperception of Restatement black letter. The Restatement (Second) of Judgments §§ 11, 12 (1982), discourages second hearings even on questions of "subject matter jurisdiction," and warns against expansive reading of the subsections set out by the dissenters. *See* diss. at 312. Suffice it to say that the question of D.C. Circuit or Federal Circuit review with which we deal entails no "[m]anifest defect[ ]" such as the granting of a divorce by a justice of the peace, a federal court entertaining what is plainly a common

law tort action between citizens of the same state, intrusion upon the jurisdiction of a tribunal of legally superior authority, improper judicial interference with a non-judicial agency, or disturbance of other interests that genuinely warrant classification as "fundamental." *See id.* at § 11 comment e; § 12 Reporter's Note.

*Hohri,* at 315.

3. The Effect of A Referral For All Purposes

    28U.S.C. § 636 (c) provides:

**(c)** Notwithstanding any provision of law to the contrary—

**(1)** Upon the consent of the parties, a full-time United States magistrate judge or a part-time United States magistrate judge who serves as a full-time judicial officer may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court or courts he serves….

**(3)** Upon entry of judgment in any case referred under paragraph (1) of this subsection, an aggrieved party may appeal directly to the appropriate United States court of appeals from the judgment of the magistrate judge in the same manner as an appeal from any other judgment of a district court. The consent of the parties allows a magistrate judge designated to exercise civil jurisdiction under paragraph (1) of this subsection to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.

## II. ARGUMENT

As is more fully set forth below, this court has subject matter jurisdiction over the claims against UBL and al Qaeda.

### Summary of Argument

The Supreme Court decision in *Kiobel* is not "contrary" to Judge Kollar-Kotelly's subject matter determination ruling. Rather, the *Kiobel* decision confirms the correctness of the 2006 ruling. As the Supreme Court made clear in the final paragraph of the Opinion of the Court: "On these facts, all the relevant conduct took place outside the United States. And even *where the*

*claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritoriality* (emphasis added)." *Kiobel*, at1669.

Since the conclusions of both the D.C. Circuit Opinion and Judge Kollar-Kotelly's opinion clearly show that plaintiffs' claims touched and concerned the territory of the United States with horridly powerful force, the test set out by the Supreme Court in *Kiobel* court is satisfied, and subject matter jurisdiction exists.

**A. The Majority Opinion and the Concurring Opinions in *Kiobel* Adopt A Test Which Is Satisfied by Plaintiffs' Claims In this Case**

The *Kiobel* Court did not conclude that claims arising from acts on foreign soil could not support an ATS action. As with its refining approach in *Sosa*, the Supreme Court in *Kiobel* set out a test to be applied to the facts of an ATS claim arising out of ostensibly-extraterritorial acts. The majority opinion ruled that an ATS plaintiff must show that "the claims touch and concern the territory of the United States …with sufficient force to displace the presumption against extraterritoriality." *Kiobel*, at 1669.

In his concurrence, Justice Kennedy wrote:

The opinion for the Court is careful to leave open a number of significant questions regarding the reach and interpretation of the Alien Tort Statute…. Other cases may arise with allegations of serious violations of international law principles protecting persons, cases covered neither by the TVPA nor by the reasoning and holding of today's case; and in those disputes the proper implementation of the presumption against extraterritorial application may require some further elaboration and explanation.

*Kiobel*, at 1669 (Kennedy, concurring).

In his concurrence, in which Justice Thomas joined, Justice Alito wrote:

I concur in the judgment and join the opinion of the Court as far as it goes. Specifically, I agree that when Alien Tort Statute (ATS) "claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." *Ante,* at 1669. This

formulation obviously leaves much unanswered, and perhaps there is wisdom in the Court's preference for this narrow approach.

*Kiobel*, at 1669-70 (Alito, concurring).

And in Justice Breyer's concurrence, in which Justice Ginsburg, Justice Sotomayor and Justice Kagan joined, Justice Breyer wrote:

I agree with the Court's conclusion but not with its reasoning….

Unlike the Court, I would not invoke the presumption against extraterritoriality. Rather, guided in part by principles and practices of foreign relations law, I would find jurisdiction under this statute where (1) the alleged tort occurs on American soil, (2) the defendant is an American national, *or (3) the defendant's conduct substantially and adversely affects an important American national interest*…(emphasis added).

*Kiobel*, at 1670-71 (Breyer, concurring).

None of the four *Kiobel* opinions rejects all extraterritorial ATS claims.  To the contrary, each of the four opinions provides for a fact-based analysis of an ATS claim. Justice Roberts, Justice Scalia, Justice Kennedy, Justice Alito and Justice Thomas adopted the requirement that "the claims touch and concern the territory of the United States …with sufficient force to displace the presumption against extraterritoriality."

Justice Breyer, Justice Ginsburg, Justice Sotomayor and Justice Kagan adopted a formulation which provided for ATS subject matter jurisdiction where "the defendant's conduct substantially and adversely affects an important American national interest."

The claims in this case easily satisfy both formulations.

As the DC Circuit Opinion stated:

In this case, there is no doubt that the defendants engaged in unabashedly malignant actions directed at [and] felt in this forum…. The plaintiffs' allegations and evidence were that bin Laden and al Qaeda orchestrated the bombing of the American embassy in Nairobi, not only to kill both American and Kenyan employees inside the building, but to cause pain and sow terror in the embassy's

home country, the United States. Nor were the plaintiffs' allegations and evidence of contacts with the United States limited to the Nairobi bombing. The plaintiffs described an ongoing conspiracy to attack the United States, with overt acts occurring within this country's borders…. The plaintiffs thus amply made a prima facie showing that bin Laden and al Qaeda purposefully directed their activities at residents of the United States … and that this litigation results from injuries to the plaintiffs that arise out of or relate to those activities….

*Mwani, supra*, at 13.   In her determination that this court had subject matter jurisdiction, Judge Kollar-Kotelly wrote:  "(T)he attack on the United States Embassy in Nairobi, Kenya … impinged the diplomatic mission of the United States…" ECF 81, at 7.

Both the opinion of the D.C. Circuit on appeal in this case, and the findings and conclusions of the district court, bring plaintiffs' claims in this case well within the standards fixed by the Supreme Court for the exercise of subject matter jurisdiction under the ATS. *Kiobel* explicitly authorized ATS claims on facts which the DC Circuit Opinion and the district court have found to have been sufficiently alleged and supported in this case.

Moreover, the facts of this case do not invoke the concern underlying the *Kiobel* court's call for constraint – "the danger of unwarranted judicial interference in the conduct of foreign policy," *Kiobel*, at 1664.  While the destructive impact in and on the United States of the conduct on which plaintiffs' claims and subject matter jurisdiction rest is irrefutable, there is no evidence of any "foreign policy" impact from the jurisdictional grant. No foreign state or international organization has sought *amicus* status, *see* and *compare Morrison v. National Australia Bank Ltd.,* 561 U.S. ——, ——, 130 S.Ct. 2869, 2885-86, 177 L.Ed.2d 535 (2010). No statement of interest has been filed by the government of the United States,  *see* and *compare Sosa,* 542 U.S. at 733, 124 S.Ct. 2739 n.21., and the voice of Kenya's citizenry is exclusively heard through the requests of the Kenyan plaintiffs urging this court to adjudicate their claims.

Therefore, both the explicit language of *Kiobel* and its underlying rationale warrant the exercise of subject matter jurisdiction in this case.

**B. Plaintiffs' Claims Are Not "Extraterritorial" Within the Meaning of *Kiobel* [4]**

Petitioners in *Kiobel* were residents of Ogoniland, Nigeria. As the Kiobel Court explained:

> When the complaint was filed, respondents Royal Dutch Petroleum Company and Shell Transport and Trading Company, p.l.c., were holding companies incorporated in the Netherlands and England, respectively. Their joint subsidiary, respondent Shell Petroleum Development Company of Nigeria, Ltd. (SPDC), was incorporated in Nigeria, and engaged in oil exploration and production in Ogoniland. According to the complaint, after concerned residents of Ogoniland began protesting the environmental effects of SPDC's practices, respondents enlisted the Nigerian Government to violently suppress the burgeoning demonstrations. Throughout the early 1990's, the complaint alleges, Nigerian military and police forces attacked Ogoni villages, beating, raping, killing, and arresting residents and destroying or looting property. Petitioners further allege that respondents aided and abetted these atrocities by, among other things, providing the Nigerian forces with food, transportation, and compensation, as well as by allowing the Nigerian military to use respondents' property as a staging ground for attacks.

*Kiobel*, at 1662-63. The Court then concluded: "On these facts, all the relevant conduct took place outside the United States*." Id*., at 1669. No similar finding – that "all the relevant conduct took place outside the United States" – can be made on the facts presented by plaintiffs in this case. First, "relevant conduct" must include the successful intent to inflict harm on the United States and in the United States, and specifically on the government of the United States.

---

[4] Whether a U.S. Embassy is "territory" of the United States for purposes of the extraterritoriality of a U.S. statute is unsettled law. Recently, in *Souryal v. Torres Advanced Enterprise Solutions,* LLC 847 F.Supp.2d 835, 840 (E.D.Va.,2012), the district court concluded that a U.S. embassy was not "within the territorial jurisdiction of the United States" for purposes of determining the extraterritorial application of a U.S. statute. In doing so, the *Souryal* court rejected as *dicta* the Fourth Circuit's opinion in *United States v. Erdos,* 474 F.2d 157, 159 (4th Cir.1973) that U.S. embassies abroad are "part of the territory of the United States." But *Erdos* should not be dismissed so easily as "outmoded." *Souryal*, at 841, n.4. In *United States v. Corey* 232 F.3d 1166, 1177-78 (9th Cir. 2000), the Ninth Circuit embraced *Erdos*, and applied a "concurrent" rather than an "exclusive" jurisdiction analysis to conclude that .

As noted above, the DC Circuit in *Mwani* observed that plaintiffs relied on conduct that took place within the United States.  The Circuit Court wrote: "(n)or were the plaintiffs' allegations and evidence of contacts with the United States limited to the Nairobi bombing. The plaintiffs described an ongoing conspiracy to attack the United States, with overt acts occurring within this country's borders." *Mwani, supra*, at 13.

These evidence and the facts supporting these allegations are beyond dispute. "Overt acts occurring within the country's borders" over a decade were at the malignant heart of a conspiracy that led to the destruction of the U.S. Embassy in Nairobi and the death and injury of thousands of innocent Kenyans. Those "overt acts" in the territory of the United States alone establish subject matter jurisdiction without regard to the need to establish the extraterritorial reach of the ATS.

Concomitantly, the DC Circuit in *Mwani* also made clear that:

> In this case, there is no doubt that the defendants engaged in unabashedly malignant actions directed at [and] felt in this forum…. The plaintiffs' allegations and evidence were that bin Laden and al Qaeda orchestrated the bombing of the American embassy in Nairobi, not only to kill both American and Kenyan employees inside the building, but to cause pain and sow terror in the embassy's home country, the United States.

In  *U.S. v. Philip Morris USA Inc.* 566 F.3d 1095, 1130 (D.C Circ.,2009) the Court wrote: "Because conduct with substantial domestic effects implicates a state's legitimate interest in protecting its citizens within its borders, Congress's regulation of foreign conduct meeting this "effects" test is "*not* an *extraterritorial* assertion of jurisdiction."

Because the "effects" test is satisfied, the conduct in issue is not extraterritorial and subject matter jurisdiction attaches.

**CONCLUSION**

For the reasons set forth above, this court should discharge the order to show cause, and conclude that there is subject matter jurisdiction over the claims in this case, and should enter a judgment in favor of plaintiffs and against defendants Usama bin Laden and al Qaeda.

Respectfully submitted,

_____/s/_____

Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*:  (202) 466-3883
*Fax*:    (202) 775-7477
*Email*:  pmusolino@musolinoanddessel.com

**CERTIFICATE OF SERVICE**

I certify that an electronic copy of this motion was served on all ECF parties through the ECF system this 20th day of May 2013.

_____/s/_____

Philip M. Musolino