**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**ODILLA MUTAKA MWANI**, *et al*.,

     **Plaintiffs,**

     **v.**                            **Civil Action No. 99-125 (JMF)**

**AL QAEDA,**

     **Defendant.**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

From January 31 through February 2, 2011, the Court conducted a "bellwether" trial[1] on damages.[2] Although the total number of plaintiffs in this case is 523,[3] only the claims of the following eight plaintiffs went to trial: 1) Abel Mutego Nijru; 2) Felistus Njeri Thuo; 3) Castro Otiende; 4) Protus Manyasa Buluma; 5) Dipak L. Shah; 6) Wilfred Nderitu; 7) Charles Makori Mogi; and 8) Kioko Muema. Testimony was taken via videoconference from Nairobi, Kenya, and the Court admitted the following exhibits into evidence: 1) Photographs (Plaintiffs' Exhibit ("PX") 1); 2) Video of Bombing Site August 7, 1998 (PX 2); 3) April 9, 1999 Report from the Department of State, captioned "The Bombings of the United States Embassies in Dar Es Salaam, Tanzania and Nairobi, Kenya" (PX 3); 4) January 8, 1999 Accountability Review

---

[1] "In a bellwether trial procedure, a random sample of cases large enough to yield reliable results is tried to a jury. A judge, jury, or participating lawyers use the resulting verdicts as a basis for resolving the remaining cases." Alexandra D. Lahav, Bellwether Trials, 76 Geo. Wash. L. Rev. 576, 577 (2008). A bellwether trial may be binding or not binding on the other plaintiffs. If it is binding, the results of the bellwether trial are extrapolated to the other plaintiffs who have similar factual circumstances and/or injuries. Id. at 581. This method has been used in other multi-plaintiff cases stemming from terrorist-related events. See Dammarell v. Islamic Republic of Iran, 404 F. Supp. 2d 261, 271 n.1 (D.D.C. 2005).

[2] There are three transcripts of the proceedings: 1) Transcript of Proceedings on January 31, 2011 [#119]; 2) Transcript of Proceedings on February 1, 2011 [#118]; and 3) Transcript of Proceedings on February 2, 2011 [#103].

[3] Plaintiffs' Proposed Findings of Fact and Conclusions of Law [#105] at 29.

Board Report (PX 4); 5) Kiema-Ngunnzi Report: "An Assessment of Recovery Strategies of

the 1998 Nairobi Bomb Disaster Victims: A Case Study of Teachers Service Commission" (PX

5); 6) World Psychiatry Study: "Psychological Effects of the Nairobi U.S. Embassy Bomb

Blast on Pregnant Women and their Children" (PX 6); and 7) a drawing of the site (PX 7).

On the basis of that evidence, the court makes the following findings of fact and

conclusions of law.

## FINDINGS OF FACT

I.      **Background**

1.      On August 7, 1998, Usama Bin Laden and Al Qaeda exploded a massive truck

bomb at the United States Embassy in Nairobi, Kenya. Mwani v. bin Laden, 417 F.3d 1, 4 (D.C.

Cir. 2005).

2.      According to the State Department's 1999 Report of the bombing, the incident

took place as follows:

> At approximately 10:30AM on Friday, August 7, 1998, two
> vehicle bombs detonated nearly simultaneously at United States
> embassies in Dar Es Salaam, Tanzania and Nairobi, Kenya.
> The United States Embassy in Nairobi, Kenya was located on a
> half-acre site in downtown Nairobi at the busy intersection of two
> main thoroughfares, Moi and Haille Selassie Avenues. Behind the
> embassy was the four-story Ufundi Cooperative House, with
> numerous offices and a secretarial school, and the 23- story high-
> rise Cooperative Bank building . . .
>
> At the rear of the embassy was a parking lot shared with the
> adjacent Cooperative Bank . . . (After entering the parking area),
> one of the terrorists began shooting at the chancery and the other
> tossed a flash grenade at the guard . . . Approximately 10 seconds
> after the grenade exploded, the bomb in the vehicle detonated . . .
> The explosion killed 213 people, including 44 embassy employees
> . . . Many of these fatalities were due to occupants going to the
> windows after the grenade exploded to see what was happening

outside.

Other casualties were pedestrians and motorists in the crowded streets next to the embassy. Vehicles caught fire; at least eight bus passengers died. In total, 20 persons were blinded, and 50 were severely limited sight from lacerations incurred from flying shards of glass; the actual count of eye injuries is in the hundreds, but the severity of many will not become apparent for some time. The shock of the explosion broke glass in buildings and vehicles within at least a quarter-mile radius. The collapse of the Ufundi building confirms the extreme hazard posed by building collapse. The majority of the fatalities were persons trapped and crushed under the weight of the building after falling several stories . . .

Given the types of injuries most prevalent in these incidents, non-penetrating fragment impact is probably the most appropriate injury model for severe injuries. A radius of 200 feet indicates that all people within a one-half block radius (not protected by buffering walls) were vulnerable to injury from flying debris . . . For glass injuries, the radius is 1000 feet. Reports indicate that injuries due to glass fragments extended somewhat further out than this model predicts.

PX 3 at 9265, 9273, 9275, 9277-80.

## II. **Plaintiffs**

### A. **Abel Mutegi Nijru and Felistus Njeri Thuo**

1.      Njiru was killed in the Embassy bombing. [#119] at 5.

2.      Thuo was also killed in the Embassy bombing. [#118] at 46.

3.      Both Njiru and Thuo were named as plaintiffs in this action, but must be dismissed since they, as deceased individuals, lack the capacity to sue. See Adelsberger v. U.S., 58 Fed. Cl. 616, 618 (Fed. Cl. 2003) ("[A] party must have a legal existence as a prerequisite to having the capacity to sue or be sued.) (citations omitted).

### B. **Castro Otiende**

1.      Otiende is 44 years old, married, and has four daughters. [#103] at 48.

2.      Otiende received a degree in land economics from the University of Nairobi in 1991. Id. at 50-51.  He started work in 1993 in a land appraisal office near the American Embassy. Id. at 52-53.

3.      On August 7, 1998, Otiende heard some gunshots and then a small blast. Id. at 57.  He believes he lost consciousness and then found himself in the stairwell with others trying to leave the building. Id. at 58.  He was bleeding profusely from flying glass that cut his neck and chest. Id. at 57, 59.  He then walked to his family doctor, received stitches and took public transportation home. Id. at 60.

4.      Despite receiving plastic surgery after the bombing, Otiende suffered permanent scarring from the glass cuts. Id. at 62.  He also feels a sharp pain in his ears when he hears a slight noise and is jumpy. Id.

5.      Otiende believes that people are afraid of him because of the scarring. Id. at 63. He also believes that some people in Kenya regard him as being unlucky or being bad luck because he was a victim of the Embassy bombing. Id. at 63-64.

**C.      Protus Manyasa Buluma**

1.      Buluma is 51 years old, married, and has five children. [#119] at 55, 65.

2.      Buluma was raised in western Kenya until he was 15. Id. at 56.

3.      Buluma has two brothers and three sisters. Id. at 56-57.

4.      Buluma attended grammar school and completed his "A" level studies in seminary. Id. at 58.  He then went to the Thomas Aquinas Seminary in Nairobi, and then to Nairobi University, where he received a certificate in religious studies. Id.  He subsequently completed certificate courses in management and strategic planning, and community

participation. <u>Id.</u> at 59.

5.      In 1985, Buluma took a position as a project coordinator with a non-governmental organization that focused on improving life in the Nairobi slums. <u>Id.</u> at 62.

6.      From 1990-1996, Buluma worked as an insurance salesman. <u>Id.</u> at 63.

7.      In 1996, Buluma began working for a real estate valuation and property management company. <u>Id.</u> at 64.  His office was directly across the street from the American Embassy. <u>Id.</u>

8.      Buluma took pride in and enjoyed his work. <u>Id.</u> at 67.  He was paid on salary and commissions, so his monthly income fluctuated between 120,000 and 150,000 Kenyan schillings ("KSH"). <u>Id.</u> at 66.  He was the sole provider for his immediate family, and consistent with the African custom of the "extended family," also provided financial support to many other family members. <u>Id.</u> at 67-69.

9.      Prior to the attack on the Embassy, Buluma was happy and healthy. <u>Id.</u> at 87.

10.     At approximately 10:00 a.m. on August 7, 1998, Buluma heard a small blast. <u>Id.</u> at 69.  Along with his co-workers, Buluma went to look out the window of their third floor office. <u>Id.</u> at 70.  When the second blast came, Buluma was knocked down. <u>Id.</u>  Buluma was bleeding from his chest, could not breathe properly, and his eyes "were not working." <u>Id.</u> at 71-72.  There was dust, smoke, and blood everywhere. <u>Id.</u> at 72.  Everything in the office had fallen down and he and others were crawling on the floor to escape. <u>Id.</u> at 71-72.

11.     Approximately 15 to 20 minutes after the second blast, Buluma was pulled out by other people who had been in the building. <u>Id.</u> at 73.  He was in pain and tried unsuccessfully to remove pieces of glass from his body. <u>Id.</u>

12.     As Buluma was getting on the ambulance, he saw other victims of the blast. <u>Id.</u> at 74-75.  About the other victims, he said:  "Some of them were in very bad shape, very bad. Some people had their whole face burned, and you could see meat, nothing else." <u>Id.</u> at 75.  At the hospital, he saw dead people who had been placed in piles. <u>Id.</u> at 76.  He was traumatized by what he saw at the hospital. <u>Id.</u>

13.     At the hospital, Buluma was given painkillers and was told to rest. <u>Id.</u> at 78-79.

14.     As a result of the bombing, Buluma suffers from headaches and worsening vision. <u>Id.</u> at 81.  He has very little vision in his left eye and 20% vision in his right eye, as a result of the glass that was blown into his eyes by the bomb. <u>Id.</u> at 81-82, 95.

15.     Buluma saw a psychiatrist for six months after the bombing. <u>Id.</u> at 84.   He testified:  "Psychological effects is [sic] that actually I feel completely debilitated.  I used to work very hard.  Now I can't work.  I cannot even – nobody can employee me, and I have children I should be supporting." <u>Id.</u> at 85.  He suffers from sleeplessness. <u>Id.</u> at 83-84.

16.     According to Buluma, a social stigma attaches to an individual who has been involved in an incident like the bombing. <u>Id.</u> at 85-86.  He feels he is viewed as being disabled. <u>Id.</u> at 85.

17.     After the bombing, Buluma lost his job and can no longer support his family. <u>Id.</u> at 87.

18.     Buluma sometimes views himself as a "beggar," because he has to ask for assistance. <u>Id.</u> at 88, 93.

**D.    Dipak L. Shah**

1.    Shah was born and raised in Nairobi, and has one brother and one sister. [#119] at 97-98.  He is married and has two children. Id. at 98.

2.    Shah went to the United Kingdom to pursue a degree in "chemicals and business studies." Id. at 97.  Because his father was ill, Shah returned to Nairobi in 1976, before completing his studies. Id. at 97-98.

3.    Upon his return to Nairobi, Shah opened a menswear shop with his brother. Id. at 99.  Each brother had a 50% share in the business, called "Cloud Nine." Id. at 100.  It was located around the corner from the American Embassy. Id. at 100.

4.    In 1997, the business net annual profits of 500,000 KSH. Id. at 104.  In 1998, the business had three employees. Id. at 105.  The business had many regular customers, including prominent officials and their families. Id. at 107.  Neither Shah nor his brother intended to expand, because they were "quite happy" with the business as it was in 1998. Id.

5.    On August 7, 1998, Shah was in the back of the shop. Id. at 108-09.  He heard two blasts, and felt a tremor in the floor, like an "earthquake." Id. at 109-10.  The shop windows shattered, and power immediately went out. Id.  Shah feared that the building was going to collapse. Id. at 110.

6.    After the bombing, Shah was "in a daze." Id. at 111.  When he went outside, Shah saw many other victims of the bombing:  "Most of the injuries were [sic] the faces.  A lot of glass fell from above, like it was a big shower.  Some of the glass was embedded in people's heads, you know.  And a lot of blood." Id. at 118.  He also saw intestines, brains, and eyeballs, and dead bodies. Id. at 118-19.

7.      Since the bombing, Shah has had a problem sleeping. Id. at 120.  In addition, his psoriasis and diabetes have gotten worse, and he has lost 20 kilos over the past 12 years. Id.  He also cannot manage tasks he was able to do before the bombing, such as using a keyboard and texting. Id.  Shah also lost interest in social interactions with friends after the bombing. Id. at 121-22.

8.      Shah lost his business as a result of the bombing. Id. at 122.  He will not go to the movies or other public events because of the fear caused by the bombing. Id.  He thinks of the bombing every day. Id. at 119.

**E.      Wilfred Nderitu**

1.      Nderitu is a Kenyan attorney who is a survivor of the attack on the American Embassy. [#118] at 2-3.  He was born in Nyeri, Kenya. Id. at 3.  He is married and has three children. Id. at 5-6.

2.      At age 7, he and his family moved to Nairobi. Id. at 3.  In 1985, he began attending the University of Nairobi. Id. at 4.  In 1998, he received an honors degree in law. Id. He completed one year of post-graduate education in 1989. Id.

3.      Nderitu was admitted to the Law Society of Kenya in 1989. Id. at 5.  That year, he accepted a position at the Nairobi law firm of Vohra & Gitao. Id. at 6.  In 1991, he moved to the firm of AGN Kamao and Kimani. Id.  Both firms were general practice law firms that specialized in insurance law. Id. at 7.  In 1993, he accepted a position with the UN High Commissioner for Refugees, and he remained there for two years. Id.  He then accepted a position as a senior associate with the law firm of Maina Murage & Company Advocates, where he focused on corporate law and property transactions. Id. at 7-8.  In 2005, he

commenced post-graduate studies in international human rights law. Id. at 4.

4.      Up to that point in his legal career, Nderitu believes he was regarded as hard-working, honest and well-respected. Id. at 8.  He had no problems with memory or concentration. Id. at 8-9.

5.      Nderitu opened his own practice in 1996. Id. at 9.  Initially, he started with a secretary and a shared clerk. Id. at 10.  Within two years, his practice had grown to four full-time employees. Id.  Nderitu was both the manager and a practitioner. Id.  He was, by his own estimate, very focused and very good at organization. Id. at 10-11.  In addition to his work with his firm, he has been assigned as defense counsel at the UN International Criminal Tribunal for Rwanda, based in Arusha, Tanzania. Id. at 12.

6.      In 1997, Nderitu moved his firm's offices to the seventh floor of the NHC House, overlooking the American Embassy and the Ufundi Cooperative, not more than 30 meters from the Embassy. Id. at 11-12.

7.      On August 7, 1998, Nderitu was in his office, on the phone with a client, when he heard a loud explosion. Id. at 14.  Immediately after he heard a second blast, he "saw something glittering in the sky." Id. at 15.  At that moment, he felt like somebody had cut through the right side of his head:  "So, it all happened very, very, very fast.  But I felt like, actually, it's like somebody had cut through me with [an] ax or somebody had just grabbed my head and banged it against a stone." Id.  The windows, window frames and partitions in his office were destroyed and the power had gone off. Id. at 15-17.  After the explosions, he experienced great pain in his ear and also in his back, where pieces of glass had either cut him or were embedded. Id. at 17-18.  He was filled with fear. Id. at 19.

8.	Nderitu eventually made it downstairs and out of the building. Id. at 18.  At that point, he saw other bleeding victims. Id. at 19.  A good Samaritan drove him to a hospital, but the hospital could not cope with the flood of patients from the Embassy bombing. Id. at 20- 23.

9.	Nderitu was placed on a stretcher, but after some time passed, he concluded that he had been forgotten. Id. at 23-24.  He was losing blood, and was in great pain, so he got off the stretcher and told a nearby doctor that without any assistance he was going to die. Id. at 24. He was then taken to the operating room, where he received stitches to his head and to his ear, without anesthetic. Id. at 27. The stitching did not stop all of his bleeding. Id. at 28-29.

10.	After Nderitu's operation, he was returned to a ward. Id. at 29.  However, he was unable to rest because of the overpowering smell of blood and because people searching for missing loved ones kept disturbing him. Id.

11.	By the time Nderitu left the hospital, there were six patients in his ward. Id. at 30.  Because he wasn't being treated, he snuck out of the hospital and returned home. Id. at 30-31.  Blood was seeping through his bandages while he was being driven home. Id. at 31-32. When his one year old daughter saw him, she began crying. Id. at 34.

12.	After the bombing, Nderitu was in constant pain and was anxious about his medical condition. Id. at 34-35.  He received additional stitches from a private doctor and was unable to work for over a month. Id. at 35-36.  He could not rebuild his practice, which was netting about $2,000 USD per month in profits. Id. at 36-37.

13.	As a result of the bombing, Nderitu suffered loss of memory, loss of the ability to retain information, and loss of the ability to concentrate. Id. at 37-39.  His administrative abilities are also weaker; he is less efficient, and he must work much harder to perform tasks he

performed easily before the bombing. Id. at 39.

14.     Nderitu also finds that he is more irritable and more aggressive since the bombing. Id. at 42.

**F.      Charles Makori Mogi**

1.      Mogi is a Kenyan citizen. [#118] at 90.  He was born and raised in Kisii, Kenya, which is a small town located approximately 350 kilometers from Nairobi. Id. at 91.  When he was 22, he went to India to pursue degrees in economics and labor welfare. Id. at 92.  In 1984, he returned to Kenya. Id.  First, he worked odd jobs and then he started a successful stationery supply business. Id. at 93.

2.      By 1997, Mogi had two full- time employees, had built a house and purchased two cars with the profits from his new business. Id. at 94-95.  His office was across the street from the American Embassy. Id. at 95.  He was very proud of his business, and planned to expand the business by importing computer parts. Id.  In 1998, he lived with his wife and two children in a four bedroom home in Nairobi. Id. at 96.

3.      On August 7, 1998, Mogi was in the lobby of his office building when a loud explosion knocked him down. Id. at 99.  He saw people bloodied from the explosion running from the Embassy. Id. at 98-99.  As a result of the explosion, he was bleeding profusely from his face and was in great pain. Id. at 100.

4.      Mogi was carried to a car with others and taken to a hospital, where he was eventually treated and released. Id. at 99-101.  As a result of the bombing, he has scarring on his head and chin. Id. at 102.

5.      Mogi's business was destroyed by the bombing. Id. at 103.  His monthly income

has dropped from $5,000 to $1,000. Id. at 105.  His health deteriorated and his marriage to his

first wife ended. Id. at 105.  He must expend 4,000 KSH per month for medication for his high

blood pressure and cannot get health insurance. Id. at 103-05.

**G.  Kioko Muema**

1.      Muema is a 37-year-old native of Nairobi. [#103] at 3.  He and his brother and

four sisters were raised by their parents. Id. at 4.  In 1998, Muema was in his fourth year at the

University of Nairobi. Id. at 5.

2.      On the morning of August 7, 1998, Muema was on a public minibus stopped at a

traffic light at an intersection by the American Embassy. Id. at 6-7.  While waiting for the light

to turn green, he heard a small blast, and turned to look in that direction. Id. at 8.  After a few

moments, he saw blasts of fire. Id.  He then felt sharp pain, and felt that something was "very

wrong." Id. at 9.  The bus engine switched off, and there was momentary silence. Id. at 9.  He

began to lose his eyesight and ultimately was the only passenger to leave the minivan. Id.

3.      Muema began running on the street, away from the Embassy. Id. at 12.  He was

afraid that he would be hit by a vehicle. Id.  A good Samaritan took him by car to a hospital,

where he waited quite a while to be treated. Id. at 13, 15.  Horns were blaring and it was

"pandemonium." Id. at 14.

4.      By the time Muema arrived at the hospital, he still had not regained his eyesight.

Id. at 15.  He was worried about the extent of his injuries because he could not personally

assess them and other people kept saying, "I'm sorry," as they passed by. Id.

5.      The hospital notified Muema's parents and when they arrived, they took him to

another hospital. Id. at 16.  He was admitted immediately upon his arrival but not seen by a

doctor until the following day. Id. at 17-18.  Although he could still not see, he could hear his sister crying nearby. Id. at 118.  After he was discharged from the second hospital, the doctors recommended that he see an American eye specialist who was working at a different hospital. Id. at 20-21.

6. After being discharged from the second hospital, Muema was examined by the American eye specialist at a third hospial. Id. at 24.  The following day, he underwent exploratory eye surgery. Id. at 25.  He recalls that it was "the most excruciating pain" he had ever felt. Id. at 26.  While under a local anesthetic, he thought:  "[T]hree days ago I was perfectly well and right now people are opening up my eye." Id. at 27.

7. The following day, Muema was informed by his father that his left eye could not be saved, because pieces of glass had entered that eye. Id. at 27-28, 29.  He began to think that he would have been better off if he had been killed, because he did not know how he could survive as a blind man. Id. at 29.

8. On August 24, 1998, Muema's left eye was removed. Id. at 34.  While at the hospital, he developed asthma as a result of the trauma. Id. at 36-37.  After several months, he regained vision in his right eye. Id. at 38.  Ultimately, he was fitted for a prosthetic, but it is not a permanent solution. Id. at 38, 41.

9. Currently, Muema lacks depth perception and now cannot read without glasses. Id. at 40.  He considers himself to be disfigured and feels that his future is less promising as a result of the bombing. Id. at 45-46.

III. **Expert Witness**

1. Joan Mwendi Kiema-Ngunnzi was accepted by the Court as an expert in the

field of sociology, with a particular emphasis on the impact on social groups or individuals of disasters. [#103] at 91.

2.     Kiema-Ngunnzi received her bachelor degree in literature and English at Moi University. Id. at 75.  She then attended the University of Nairobi, where she studied sociology with an emphasis in disaster management. Id.  As part of her master's academic work, she focused her research on the effect of the Embassy attack on employees of the Teachers Service Commission, whose offices were nearby and were destroyed in the bombing. Id. at 76-77.

3.     Kiema-Ngunnzi prepared a comprehensive report captioned "An Assessment of Recovery Strategies for the 1998 Nairobi Bomb Disaster Victims:  A Case Study of the Teachers Service Commission Employees." Id. at 85; PX 5.  She concluded that survivors of the bombing suffered post-traumatic stress disorder, a finding that was consistent with the conclusions of another report on the psychological effects of the bombing on pregnant women. Id. at 89; PX 6.

4.     According to Kiema-Ngunnzi, a social stigma attached to the victims of the bombing and that stigma remains today. Id. at 95.  She further concluded that even victims who did not suffer physical injuries also felt devalued. Id. at 96.  Furthermore, victims of the bombing are referred to, in a demeaning sense, as "bomb people." Id. at 96.

5.     Kiema-Ngunnzi testified that victims of the Embassy bombing are regarded as bad omens, who bring bad fortune to those in contact with them, and that the notion of a bad omen is consistent with certain aspects of Kenyan culture and belief. Id. at 97-98.  In other words, victims of the Embassy bombing are viewed by other Kenyans in a negative light simply because of their status as victims. Id. at 98, 101.

6.     Kiema-Ngunnzi testified that the bombing adversely affected the victims' "economic and psychological situation." Id. at 106.  She also opined that the children of victims of the Embassy bombing are also viewed in a negative light by other Kenyans. Id. at 106-07.

7.     Kiema-Ngunnzi testified that each victim of the Embassy bombing suffered long-term or permanent psychological injury from the scenes that they observed during the bombing and in its aftermath. Id. at 122-23.  She testified that the victims of the bombing suffered the effects of post-traumatic stress disorder. Id. at 129-33.  Specifically, she testified that each victim of the Embassy bombing "has sustained material, significant emotional, psychological and financial injury," whether he suffered a physical injury or not. Id. at 134.

## CONCLUSIONS OF LAW

### I.     Jurisdiction

#### A.     Subject Matter Jurisdiction

Plaintiffs' claims are brought pursuant to the Alien Tort Claims Act ("ATCA" or "ATS"), which provides that district courts "shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.  To establish jurisdiction under the ATS, a plaintiff must allege facts "sufficient to establish that: (1) they are aliens; (2) they are suing for a tort; and (3) the tort in question has been committed in violation of the law of nations or a treaty of the United States." Mwani v. Bin Laden, No. 99-CIV-125, 2006 WL 3422208, at *2 (D.D.C. Sept. 28, 2006) (citing Kadic v. Karadzic, 70 F.3d 232, 238 (2d Cir. 1996); Doe I. v. Exxon Mobil Corp., 393 F. Supp. 2d 20, 24, 28 (D.D.C. 2005); and Burnette v. Al Baraka Inv. & Dev. Corp., 274 F. Supp. 2d 86, 99-100 (D.D.C. 2003)).

On September 28, 2006, Judge Kollar-Kotelly concluded that subject matter jurisdiction existed for the plaintiffs' claims because "the attack on the United States Embassy in Nairobi, Kenya alleged in Plaintiffs' Complaint impinged the diplomatic mission of the United States and directly infringed on the rights of ambassadors, which was and has been a clear violation of the law of nations since the inception of the ATCA." Mwani, 2006 WL 3422208, at *4. Therefore, the three jurisdictional elements of the ATS have been met.

On April 17, 2013, the Supreme Court issued its opinion in Kiobel v. Royal Dutch Petroleum Co., 133 S.Ct. 1659 (2013). After reviewing the Kiobel decision, this Court noted that "the majority of Justices agreed that, except where the claims 'touch and concern the territory of the United States' with 'sufficient force,' the ATS *could not* be used to establish jurisdiction in a United States Court for a dispute between foreign nationals for conduct that occurred on foreign ground." Memorandum Opinion [#110] at 3-4 (citations omitted) (emphasis added). Based on its interpretation of the Kiobel decision, this Court then concluded that "a terrorist attack that 1) was plotted in part within the United States, and 2) was directed at a United States Embassy and its employees" was sufficient to "displace the presumption against extraterritorial application of the ATS" because it "'touched and concerned' the United States with 'sufficient force.'" Id. at 6-7.

**B.      Personal Jurisdiction and Service of Process**

On August 5, 2005, the Court of Appeals concluded, in the instant case, that this Court's exercise of personal jurisdiction over Bin Laden and Al Qaeda was justified under the Due Process Clause of the Fifth Amendment because of the sufficiency of their contacts with the United States:

> In this case, there is no doubt that the defendants "engaged in
> unabashedly malignant actions directed at [and] felt in this forum."
> Id. The plaintiffs' allegations and evidence were that Bin Laden
> and Al Qaeda orchestrated the bombing of the American embassy
> in Nairobi, not only to kill both American and Kenyan employees
> inside the building, but to cause pain and sow terror in the
> embassy's home country, the United States. Nor were the
> plaintiffs' allegations and evidence of contacts with the United
> States limited to the Nairobi bombing. The plaintiffs described an
> ongoing conspiracy to attack the United States, with overt acts
> occurring within this country's borders. Putting to one side the acts
> that took place after the embassy bombing (including the attacks
> on the World Trade Center and the Pentagon on September 11,
> 2001), the plaintiffs pointed to the 1993 World Trade Center
> bombing, as well as to the plot to bomb the United Nations,
> Federal Plaza, and the Lincoln and Holland Tunnels in New York.
>
> The plaintiffs thus amply made a prima facie showing that Bin
> Laden and Al Qaeda "'purposefully directed' [their] activities at
> residents" of the United States, Burger King, 471 U.S. at 472, 105
> S.Ct. 2174 (quoting Keeton, 465 U.S. at 774, 104 S.Ct. 1473), and
> that this litigation results from injuries to the plaintiffs "that 'arise
> out of or relate to' those activities," id. (quoting Helicopteros
> Nacionales, 466 U.S. at 414, 104 S.Ct. 1868). Bin Laden and Al
> Qaeda therefore had "fair warning" that their activities would
> "subject [them] to the jurisdiction" of the United States. Id.
> (quoting Shaffer, 433 U.S. at 218, 97 S.Ct. 2569).

Mwani, 417 F.3d at 13.

In concluding that the district court could exercise personal jurisdiction over the

defendants, the court of appeals also confirmed that service of process, made in this case through

publication pursuant to Rule 4(f) of the Federal Rules of Civil Procedure, was authorized. Id. at

11, 14.

## II.     Analysis of Plaintiffs' Tort Claims

In Kiobel, the Supreme Court also held that the appropriate substantive tort law to apply

to plaintiffs' ATS claims was the federal common law:  "The [Alien Tort Statute] provides

district courts with jurisdiction to hear certain claims, but does not expressly provide any causes of action. . . . The grant of jurisdiction is instead 'best read as having been enacted on the understanding that the common law would provide a cause of action' . . . federal courts may 'recognize private claims [for such violations] under federal common law.'") Kiobel, 133 S. Ct. at 1663 (citing Sosa v. Alvarez-Machain, 542 U.S. 692, 724, 732 (2004)). Thus, plaintiffs' tort claims against Al Qaeda for 1) wrongful death; 2) assault; and 3) battery, will be analyzed under the federal common law. See First Amended Complaint [#13] ¶¶ 113-119.

### A.     Wrongful Death

As noted above, although Njiru and Thuo were named as plaintiffs in this action, they lack the capacity to sue because they are deceased. In any event, even if suit had been brought by their estates, the federal common law does not recognize a wrongful death cause of action. As stated by the Third Circuit, "[t]he right to recover damages for wrongful death is purely statutory since no such right was given by the common law." Williams v. Dowling, 318 F.2d 642, 643 (1963). Accord Der Weer v. Hess Oil Virgin Islands Corp., No. SX-2005-CIV-274, 2014 WL 1387371, at *5 (V.I. Super. Mar. 21, 2014) ("Like survival actions, wrongful death actions did not exist at common law."); Ceja v. Rudolph & Sletten, Inc., 302 P.3d 211, 214 (Cal. 2013) ("In California, wrongful death actions are statutory in origin and exist only so far and in favor of such person as the legislative power may declare." (internal quotation marks and citation omitted)); Ecker v. Town of W. Hartford, 530 A.2d 1056, 1060 (Conn. 1987) ("With only a few exceptions, courts in America have almost universally accepted, and continue to accept, the rule that a civil action for wrongful death was not recognized at common law, and that no such cause of action may be maintained except under the terms and

authority of a statute." (internal quotation marks and citation omitted)); <u>Capone v. Philip Morris USA, Inc.</u>, 116 So.3d 363, 374 (Fla. 2013) ("Under Florida common law, a cause of action did not exist for wrongful death. An action for wrongful death is solely a creation of the Legislature."); <u>Sanders v. Ahmed</u>, 364 S.W.3d 195, 203 (Mo. 2012) (en banc) ("Missouri does not recognize a common-law claim for wrongful death. This Court has reaffirmed time and time again that a claim for damages for wrongful death is statutory; it has no common-law antecedent.") (internal quotations and citations omitted)). Plaintiffs, therefore, have no right to recover under this theory.

### B.     Assault and Battery

In Count VI of the <u>First Amended Complaint</u>, the remaining plaintiffs (Otiende, Buluma, Shah, Nderitu, Mogi, and Muema) asserted claims of common law assault and battery. [#113] ¶¶ 113-119. Al Qaeda is liable for assault in this case if, when it bombed the American Embassy in Nairobi, Kenya, it 1) acted "intending to cause a harmful or offensive contact with . . . or an imminent apprehension of such a contact" by those attacked; and 2) those attacked were thereby "put in such imminent apprehension." <u>See</u> Restatement (Second) of Torts § 21. Al Qaeda is liable for battery in this case if it 1) acted "intending to cause a harmful or offensive contact . . . or an imminent apprehension of such a contact" with those attacked; and 2) "an offensive contact with [those attacked] directly or indirectly results." <u>See</u> Restatement (Second) of Torts § 18. Harmful contact is that which results in "any physical impairment of the condition of another's body, or physical pain or illness." <u>Id.</u> § 15.

In this case, it is clear that Al Qaeda intended to cause harmful contact and the immediate apprehension thereof because "acts of terrorism are, by their very nature, intended to harm and to

terrify by instilling fear of further harm." <u>Fain v. Islamic Republic of Iran</u>, 856 F. Supp. 2d 109, 122 (D.D.C. 2012) (citing <u>Valore v. Islamic Republic of Iran</u>, 700 F. Supp. 2d 52, 76 (D.D.C. 2010)).  Accepting, as the Court has above, plaintiffs' uncontroverted testimony that the attack 1) caused them injury; or 2) made them apprehensive and fearful of such harm; or 3) both, the Court concludes that defendants are liable.  The following chart illustrates Al Qaeda's liability as to each of the remaining plaintiffs.

|    | Plaintiff | Injury | Tort[4] |
|----|-----------|--------|---------|
| 1. | Otiende | Permanent scarring from the glass cuts to his neck and chest; psychological damage | Battery |
| 2. | Buluma | Little vision in his left eye and 20% vision in his right eye; psychological damage | Battery |
| 3. | Shah | Fear of being in public and reluctance to interact with other people; psychological damage | Assault |
| 4. | Nderitu | Permanent scarring from the glass cuts to his head, ear, and back; psychological damage | Battery |
| 5. | Mogi | Permanent scarring on his head and chin; psychological damage | Battery |
| 6. | Muema | Loss of his left eye; psychological damage | Battery |

## III.   **Damages**

### A.   **Compensatory Damages**

#### 1.   **Economic Damages**

Under the Restatement (Second) of Torts ("the Restatement"), "[c]ompensatory damages for harm involving pecuniary loss include compensation for (a) harm to property, (b) harm to earning capacity, and (c) the creation of liabilities." Restatement (Second) of Torts § 906.  The comment to this section of the Restatement suggests the following approach to calculating such

---

[4] Although some plaintiffs may have suffered both assault and battery, because plaintiffs cannot recover twice, the Court need only find liability upon one tort theory, rather than multiple theories.  <u>See</u> <u>Haim</u>, 784 F. Supp. 2d at 13 (The prohibition against double recovery "prevents a plaintiff from receiving damages that exceed actual losses by

damages:

> In determining the measure of recovery, aside from harm to body, emotions or reputation, a balance sheet is in effect set up by the court in which are stated the items of assets and liabilities which have been affected by the tort, (a) before the tort, and (b) as they appear at the time of trial. In this are put on one side such assets of the injured person as have been affected by the tort, including his capacity to make profitable use of his time, and on the other side, the same assets at the time of the trial and any existing or prospective liabilities imposed upon him as a result of the tort. The difference, to the extent that it results from the tort, constitutes the theoretical measure of recovery. In this comparison damages are allowed for harm which has matured before trial and that which probably will result after the trial.

Id. at § 906 cmt. a.

Furthermore, in cases involving acts of terrorism, such as the instant action, courts have consistently relied upon the testimony of experts to aid in their calculation of economic damages. See Baker v. Socialist People's Libyan Arab Jamahirya, 775 F. Supp. 2d 48, 78 (D.D.C. 2011) (basing calculation of economic damages in Foreign Sovereign Immunities Act case upon the testimony of economic expert); Burton v. U.S., 668 F. Supp. 2d 86, 110-13 (D.D.C. 2009) (basing calculation of economic damages in Federal Tort Claims Act case upon the testimony of economic expert); Wachsman ex rel. Wachsman v. Islamic Republic of Iran, 603 F. Supp. 2d 148, 161-62 (D.D.C. 2009) (basing calculation of economic damages under Israeli law upon the testimony of economic expert). For example, in Baker, plaintiffs' expert made detailed calculations with respect to a victim who had been injured in the hijacking of EgyptAir Flight 648 in 1985. Baker, 775 F. Supp. 2d at 79-80. First, the expert calculated the victim's life expectancy prior to the hijacking, based on his age at the time of the hijacking. Id. at 79. Second,

---

either bringing several actions or articulating multiple theories of recovery concerning the same event.").

the expert calculated the victim's "statistically expected worklife, based on his age and education," and his age of retirement, considering U.S. social security regulations. Id. Third, the expert produced tables showing average earnings for people with the victim's current and projected levels of education and compared those figures with the victim's current earnings. Id. at 80. Finally, the expert calculated the victim's post-retirement pension. Id.

In Burton, a Federal Tort Claims Act ("FTCA") case, plaintiffs' expert calculated the economic damages due the spouse of an individual who had died as a result of medical malpractice on the part of his treating physician. Burton, 668 F. Supp. 2d at 110-13. First, the expert calculated the pre-tax present value of the decedent's lifetime pension payments and his lifetime Social Security benefits. Id. at 111. Second, the expert deducted any federal and state income taxes that would have been due. Id. Third, the expert deducted an amount that the decedent would have spent on personal maintenance (personal food, clothing, entertainment, and transportation). Id. at 111-12. At this point, the Court deducted prejudgment interest, based on the expert's calculations, in light of the FTCA's prohibition on awards of prejudgment interest. Id. at 112. Fourth, the expert calculated the value of household services the decedent would have provided had he lived—based on those tasks he performed before he died. Id. at 112-13. Finally, the court awarded funeral expenses as part of the decedent's spouse's economic damages. Id. at 113.

The following chart summarizes the evidence regarding plaintiffs' economic damages in this case.

|   | Plaintiff | Economic Damages |
|---|-----------|------------------|
| 1. | Otiende | No figures provided. |
| 2. | Buluma | His monthly income at the time of the bombing fluctuated |

| | | between 120,000 and 150,000 KSH but he has not been able to work since. |
|---|---|---|
| 3. | Shah | In 1997, his menswear business net annual profits of 500,000 KSH but he lost his business as a result of the bombing. |
| 4. | Nderitu | Prior to the bombing, his law practice was netting about $2,000 USD per month in net profits. He could not rebuild the business after the bombing. |
| 5. | Mogi | His monthly income from his stationery supply business dropped from $5,000 to $1,000. He now has to expend 4,000 KSH per month for medication for his high blood pressure and cannot get health insurance. |
| 6. | Muema | No figures provided. |

As is clear from the above chart, however, the evidence before this Court is insufficient to support an award of economic damages for any of the plaintiffs. In other words, plaintiffs have both failed to "reasonably prove" the extent of their past economic losses or prove "by a preponderance of the evidence" the extent of their future economic losses.

## 2. **Pain and Suffering**

Under the Restatement, "[o]ne whose interests of personality have been tortiously invaded is entitled to recover damages for past or prospective (a) bodily harm and emotional distress; (b) loss or impairment of earning capacity; (c) reasonable medical and other expenses; and (d) harm to property or business caused by the invasion." Restatement (Second) of Torts § 924. "Thus the rule is applied in actions for assault, battery, false imprisonment, malicious prosecution when the plaintiff is put under restraint, insulting conduct amounting to a tort, and all other acts constituting a tort because intended or likely to cause bodily harm or emotional distress, whether the harm is negligently, recklessly or intentionally caused or results from an abnormally dangerous activity." Id. at § 924 cmt. a.

In support of their claim for pain and suffering, plaintiffs state the following:

> Plaintiffs also seek damages for injuries associated with serious
> bodily injury for 44 plaintiffs. Those injuries are comprised of loss
> of vision or hearing, internal injuries and one miscarriage.
> Plaintiffs also seek emotional distress damages on behalf of all
> plaintiffs, and, in particular, plaintiffs seek damages resulting from
> the social stigma which attaches in Kenya to each plaintiff's status
> as a victim of the bombing.

[#105] at 30.

As noted above, the Court accepted the testimony of Kiema-Ngunnzi as an expert in the field of sociology with a particular emphasis on the impact on social groups or individuals of disasters. Based on her studies and testimony, the Court further accepts Kiema-Ngunnzi's conclusion that the survivors of the bombing suffered post-traumatic stress disorder and that a unique social stigma attached to these Kenyan victims, a stigma that remains today.

In similar cases brought by victims of terrorist acts, the courts have considered various factors in determining an appropriate amount of compensation for pain and suffering. As noted by this Court in Baker, such factors include "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." Baker, 775 F. Supp. 2d at 82 (internal citations omitted). The Court further noted the following:

> In Peterson,[5] the Court granted a baseline award of $5 million to
> individuals suffering injuries such as compound fractures, broken
> jaws, severe flesh wounds, continuing back and shoulder injuries,
> and continuing psychological and substance abuse problems
> stemming from the attack. Peterson, 515 F. Supp. 2d at 54–56.
> The court departed upward from the baseline in several cases,
> including to $7.5 million for an individual who lost sight in one
> eye and ruptured an eardrum, in addition to experiencing lasting
> psychological problems; to $8 million for an individual who was
> mistaken for dead, placed in a body bag, and left in a morgue for

---

[5] Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25 (D.D.C. 2007).

four days; and as high as $12 million for an individual who suffered a broken neck, resulting in permanent quadriplegia. Id. The court departed downward from the baseline in cases where injuries were minor, including injuries from being hit by shrapnel from the explosion. Id.

Id.

In this case, the Court concludes that the following awards are appropriate:

|    | Plaintiff | Injury | Award |
|----|-----------|--------|-------|
| 1. | Otiende | Permanent scarring; PTSD | $6M |
| 2. | Buluma | Little vision in his left eye and 20% vision in his right eye; PTSD | $7.5M |
| 3. | Shah | PTSD | $5M |
| 4. | Nderitu | Permanent scarring; PTSD | $6M |
| 5. | Mogi | Permanent scarring; PTSD | $6M |
| 6. | Muema | Loss of his left eye; PTSD | $7.5M |

**B.    Punitive Damages**

The Restatement describes punitive damages as follows:

(1) Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future.

(2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.  In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

Restatement (Second) of Torts § 908.

In Gates, an action brought under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 et seq., the court awarded $150,000,000 to the estates of two individuals who were first tortured and then murdered by Al Qaeda in Iraq, which acted with the support of Syria. Gates,

580 F. Supp. 2d at 74. The court explained its award as follows:

> Here, Syria's conduct was most reprehensible. While punitive damages are awarded in an amount far in excess of compensatory damages for economic loss, pain and suffering, and solatium, the size of the award here is commensurate with that awarded in other FSIA[6] cases filed by the families of those tortured and killed by terrorists. See, e.g., Weinstein, 184 F. Supp. 2d at 25 (family members and estate awarded $150,000,000 in punitive damages); Elahi, 124 F. Supp. 2d at 114 (family members and estate awarded $300,000,000 in punitive damages).

Id. at 74 n.19.

In Valore, an FSIA case brought against Iran by survivors of the bombing of the United States Marine barracks in Beirut, Lebanon, the court awarded plaintiffs a total of $1 billion in punitive damages, to be apportioned among the plaintiffs in proportion to their compensatory damages awards. Valore, 700 F. Supp. 2d at 90. In making such an award, the court found the following: 1) "[t]he nature of the defendants' acts and the nature and extent of the harm defendants intentionally caused are among the most heinous the Court can fathom;" 2) "[t]he defendants' demonstrated policy of encouraging, supporting and directing a campaign of deadly terrorism is evidence of the monstrous character of the bombing that inflicted maximum pain and suffering on innocent people;" and 3) "the amount of Iran's annual expenditures on terrorist activities" multiplied by five would yield an amount with "the desired deterrent effect." Id. at 87-89.

The instant action, the bombing of the United States Embassy in Nairobi, Kenya, like the bombing of the Marine barracks, is one of the most grotesque and depraved acts imaginable. While it caused injury, death, and irreparable emotional harm to hundreds of Kenyan citizens, Al

---

[6] Foreign Sovereign Immunities Act.

Qaeda's wealth is unknown. Furthermore, it is unclear to this Court whether any award of

punitive damages is likely to have any deterrent effect whatsoever. Thus, although this incident

is similar to the bombing in <u>Valore</u>, the Court will follow the per-victim standard utilized in

<u>Gates</u> and award each of the six plaintiffs identified above $150 million in punitive damages.

The Court simply cannot, in keeping with requirements of due process, make any greater award

without additional expert testimony as to Al Qaeda's wealth and the multiplier necessary to

affect Al Qaeda's future conduct.

### C.      <u>Prejudgment Interest</u>

It is within the Court's discretion to award prejudgment interest from the date of the

attack on August 7, 1998, until the date of final judgment. <u>See</u> <u>Pugh v. Socialist People's Libyan</u>

<u>Arab Jamahiriya</u>, 530 F. Supp. 2d 216, 263 (D.D.C. 2008). The decision to award prejudgment

interest, as well as how to compute that interest, rests within the discretion of the Court, subject

to equitable considerations. <u>Id.</u> (citations omitted). "Courts in this Circuit have awarded

prejudgment interest in cases where plaintiffs were delayed in recovering compensation for their

injuries—including, specifically, where such injuries were the result of targeted attacks

perpetrated by foreign defendants." <u>Id.</u> Although it is unclear whether plaintiffs will ever

recover their damages in this case, prejudgment interest is nevertheless appropriate in this case,

and necessary to fully compensate the victims for the injuries they sustained as a result of Al

Qaeda's terrorist act. In an exercise of its discretion, therefore, the Court will award

prejudgment interest as an element of plaintiffs' compensatory, but not punitive damages. <u>See</u>

<u>Pugh</u>, 530 F. Supp. 2d at 264) ("In contrast to punitive damages, which can not be imposed

against foreign sovereign defendants in FSIA cases, '[p]rejudgment interest is an element of

complete compensation.'") (quoting West Virginia v. United States, 479 U.S. 305, 310, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987)).

The next issue is to determine how best to measure and calculate prejudgment interest. In Doe v. Islamic Republic of Iran, 943 F. Supp. 2d 180 (D.D.C. 2013), a case involving the calculation of damages under the FSIA, the court first noted that the appropriate measure of prejudgment interest is the prime rate, *i.e.*, the rate banks charge for short-term unsecured loans to credit-worthy customers. Id. at 184 (citing Forman v. Korean Air Lines Co., Ltd., 84 F.3d 446, 450 (D.C. Cir.), cert. denied, 519 U.S. 1028 (1996)). The court then explained why using the average prime rate for each year was a more precise method of calculating damages than simply using the average prime rate over the entire period at issue:

> [Using the prime rate for each year] measures how much the award would have grown between 1983 and 1984 using the 1984 interest rate, then measures how much that total would have grown between 1984 and 1985 using the 1985 interest rate, and so on. The difference is substantial where, as here, prime rates were vastly higher longer ago. Because prime rates in the 1980s and 1990s were several times higher than they are today, using the average rate for the whole 185 period does not reflect the rapid initial growth of an amount received in 1983 or 1984, growth that itself would have been compounded. Just as the prime rate is a more accurate measure of the true cost to plaintiffs than is the more conservative Treasury Bill rate, employing the prime rate for each year is more accurate than using the average prime rate for the whole period.

Doe, 943 F. Supp. 2d at 184.

In this case, assuming annual compounding and starting with $1 for the first year, the multiplier is therefore calculated as follows:

| Year | Average Annual Prime Rate | Total |
|---|---|---|
| 1998 | n/a | $1.0000 |
| 1999 | 8 | $1.0800<br><br>(= Total from 1998 + Total from 1998 x 1999 Average Annual Prime Rate ÷ 100) |
| 2000 | 9.23 | $1.1797 |
| 2001 | 6.91 | $1.2612 |
| 2002 | 4.67 | $1.3201 |
| 2003 | 4.12 | $1.3745 |
| 2004 | 4.34 | $1.4341 |
| 2005 | 6.19 | $1.5229 |
| 2006 | 7.96 | $1.6441 |
| 2007 | 8.05 | $1.7765 |
| 2008 | 5.09 | $1.8669 |
| 2009 | 3.25 | $1.9276 |
| 2010 | 3.25 | $1.9902 |
| 2011 | 3.25 | $2.0549 |
| 2012 | 3.25 | $2.1217 |
| 2013 | 3.25 | $2.1907 |
| 2014 | 3.25 | $2.2619 |

Thus, for damages incurred in 1998 and awarded in 2014, a multiplier of 2.2619 will be applied.

**D.  The Effect of the Bellwether Trial on The Remaining Plaintiffs**

A bellwether trial having been held, the only issue remaining before the Court is the extent to which the Court's analysis and damage award as to the above six plaintiffs can be applied to the remaining plaintiffs. In its March 12, 2010 status report, plaintiffs noted that each plaintiff in this case had completed a Department of State Form 95, a claim form under the FTCA, which "sets out the civil and criminal penalties for presenting fraudulent claims and for making false statements." Plaintiffs' Status Report Pursuant to Order of January 7, 2010 [#94] at 9. Plaintiffs then proposed that these form be submitted to the Court after the bellwether trial

had concluded in order to enable the Court to determine an appropriate damages matrix for the remaining plaintiffs. The Court agrees and hereby orders the following:

1.  Plaintiffs shall provide the Court with an electronic copy (submitted via e-mail) and a hard copy of each plaintiff's Form 95. Each form shall be numbered for ease of reference. [7]

2.  Plaintiffs shall create and provide the Court with an electronic copy (submitted via e-mail) and a hard copy of an Excel spreadsheet, which contains the following information in the format shown below:

| Number | Name of plaintiff as it appears in the First Amended Complaint [#13] | Page number where plaintiff's name appears in First Amended Complaint | Number associated with plaintiff's Form 95 | Nature of plaintiff's injury | Nature of plaintiff's tort claim | Nature of damages sought |
|--------|--------|--------|--------|--------|--------|--------|
| 1. | John Doe | Page 4 | Form No. 5 | Scarring; PTSD | Battery | Compensatory – Pain and Suffering; Punitive |

3.  A status conference in this matter will be held on October 3, 2014, at 3:00 p.m., at which time the Court will hear further from plaintiffs on the creation of a damages matrix.

## IV.    Conclusion

For the foregoing reasons, final judgment against Al Qaeda will be entered for the above six plaintiffs by way of a separate Judgment Order in the amounts set forth in the summary chart below.

| Plaintiffs | Compensatory Damages | | | D. Punitive Damages | Total Award (A + C + D) |
|---|---|---|---|---|---|
| | A. Economic | B. Pain & Suffering | C. Prejudgment Interest | | |

---

[7] Although plaintiffs previously submitted copies of their Form 95, the copies were not numbered and therefore difficult for the Court to correspond with individual plaintiffs. See Reply to Dedendant's [sic] Opposition to Plaintiff's Motion for Recertification at Appendix Volumes 1-7.

|    |         |     |        | (B x 2.2619)  |        |               |
|----|---------|-----|--------|---------------|--------|---------------|
| 1. | Otiende | n/a | $6M    | $13,571,400   | $150M  | $163,571,400  |
| 2. | Buluma  | n/a | $7.5M  | $16,964,250   | $150M  | $166,964,250  |
| 3. | Shah    | n/a | $5M    | $11,309,500   | $150M  | $161,309,500  |
| 4. | Nderitu | n/a | $6M    | $13,571,400   | $150M  | $163,571,400  |
| 5. | Mogi    | n/a | $6M    | $13,571,400   | $150M  | $163,571,400  |
| 6. | Muema   | n/a | $7.5M  | $16,964,250   | $150M  | $166,964,250  |

JOHN M. FACCIOLA
U.S. MAGISTRATE JUDGE