## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **ODILLIA MUTAKA MWANI, *et al.*** <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **AL QAEDA,** <br><br> **Defendant.** | **Case No. 99-cv-125 (GMH)** |

## <u>MEMORANDUM OPINION AND ORDER</u>

Filed in 1999, this case based on the 1998 bombing of the U.S. Embassy in Nairobi, Kenya, has a long and tortuous procedural history spanning more than 2 decades and 3 presiding federal judges. From November 2014, when the second presiding judge resolved the claims of 380 of the more-than 500 Plaintiffs against the only remaining Defendant—Al Qaeda—which had defaulted, the action lay largely dormant for over 6 years. Then, in 2021, Plaintiffs' counsel attempted to revive the litigation—now before the undersigned—by filing a submission requesting a status conference to discuss an ambitious plan to, among other things, engage in discovery, add new parties, reopen claims against Defendants that had been dismissed, and revisit rulings made years ago.

At the status conference held in June 2021, the Court and Plaintiffs' counsel discussed Plaintiffs' contemplated motions, as well as the need to shepherd this case toward final resolution. As a result of that conference, the Court adopted a schedule allowing Plaintiffs to file motions in two stages—the first batch coming on August 31, 2021, and the second on January 31, 2022—with an eye to resolving all claims in a final judgment in the near term. The first stage of those

submissions, comprising three somewhat intertwined motions, is currently before the Court.[1] However, because none of the motions seeks relief contemplated by the Federal Rules of Civil Procedure or other federal law, they are all denied.

## I.      BACKGROUND

As noted, this case has been pending for over 20 years.  Although not all of its extensive procedural history is strictly relevant to the resolution of the 3 motions before the Court, this section sets out a detailed account that may be useful as the case proceeds to final judgment.

### A.      January 1999 to May 2010—Proceedings before Judge Kollar-Kotelly

This action was filed in January 1999 and originally assigned to Judge Kollar-Kotelly.  ECF No. 1.  The original complaint sought relief from the United States of America, Usama bin Laden ("bin Laden"), Al Qaeda, and the nations of Sudan and Afghanistan on behalf of 40 named Plaintiffs and a putative class of "all Kenyans who were killed or injured in the [1998 bombing of the U.S. Embassy in Nairobi]" and "all businesses which were damaged or which sustained loss or injury" in that bombing.  *Id.* at 9, 11–15.  In March 1999, an amended complaint—the operative complaint—was filed against the same Defendants for the same injuries on behalf of the same putative class and a group of named Plaintiffs that had ballooned to over 500 individuals and businesses.  ECF No. 136-1 at 89, 91–119.[2]  As discussed below, the claims of 380 Plaintiffs against

---

[1] The documents most relevant to the resolution of these motions are (1) "Plaintiffs' Motion for Leave to Conduct Discovery and for Relief Related to Execution on Judgments" (ECF No. 140); (2) "Plaintiffs' Motion for Relief with Respect to the Sudan Clams Resolution Act and with Respect to Assets Held by the Office of Foreign Asset[s] Control" (ECF No. 141); and "Plaintiff's Motion to Sever and for Related Relief" (ECF No. 142).  Page numbers included herein are those assigned by the Court's CM/ECF system.

[2] The Amended Complaint was submitted before the Court's CM/ECF system allowed electronic access to documents filed on the docket.  Therefore, on June 30, 2021, the Court ordered Plaintiffs to file a copy of the operative complaint that would be electronically accessible.  Minute Order dated June 30, 2021.  Plaintiffs did so on July 7, 2021.  ECF No. 136.

Plaintiffs have made conflicting representations about the number of named Plaintiffs included in the Amended Complaint, stating in submissions to the Court in October 2006, March 2010, April 2011, February 2017, and June 2021 that there are 523 Plaintiffs (ECF Nos. 84, 94, 105, 131, 135); in a submission in August 2021 that

the only remaining Defendant, the defaulting party Al Qaeda, have been resolved and are memorialized in two judgments entered in September and November 2014.  However, the claims of over 100 Plaintiffs have not been reduced to judgment.

In November 1999, Judge Kollar-Kotelly dismissed without prejudice the claims against the United States, finding that Plaintiffs had failed to exhaust their administrative remedies and failed to state a claim.[3]  ECF Nos. 37–38.  She dismissed the claims against bin Laden and Al Qaeda for lack of personal jurisdiction in September 2002, *see Mwani v. bin Laden*, No. 99-cv-0125, 2002 WL 34936401 (D.D.C. Sept. 30, 2002), but that decision was reversed on appeal in 2005, *see Mwani v. bin Laden*, 417 F.3d 1, 17 (D.C. Cir. 2005) ("We reverse the dismissal of [Plaintiffs'] claims against bin Laden and Al Qaeda [ ] because [Plaintiffs] have satisfied their burden of showing that the district court can properly exercise jurisdiction over those defendants.").  Plaintiffs voluntarily dismissed Sudan without prejudice in October 2002.  ECF No. 61. Judge Kollar-Kotelly dismissed the claims against Afghanistan in June 2004, and that decision was affirmed on appeal.  *Mwani v. United States*, No. 99-cv-0125, 2004 WL 5042293, at *6 (D.D.C. June 22, 2004), *aff'd sub nom. Mwani v. bin Laden*, 417 F.3d at 17 ("We affirm the district court's dismissal of the plaintiffs' claims against Afghanistan for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act.").  In September 2006, Judge Kollar-Kotelly granted Plaintiffs' motion for entry of default against bin Laden and Al Qaeda, finding that the court had subject-matter jurisdiction over the claims under the Alien Tort Claims Act, 28 U.S.C. § 1380. *Mwani v. bin Laden*, No. CIV A 99-125, 2006 WL 3422208, at *5 (D.D.C. Sept. 28, 2006).  The

---

there are 541 Plaintiffs (ECF No. 142); and in a submission in September 2021 that there are 540 Plaintiffs (ECF No. 147).  The precise number of Plaintiffs is not material to the resolution of the motions currently before the Court.

[3] Counsel for Plaintiffs here re-filed the claims against the United States in December 1999 in a separate case.  Complaint, *Macharia v. United States*, 238 F. Supp. 2d 13 (D.D.C. 1999) (No. 99-cv-3274), *aff'd* 334 F.3d 61 (D.C. Cir. 2003).  Judge Kollar-Kotelly dismissed those claims for lack of jurisdiction and failure to state a claim in July 2002, and her decision was affirmed on appeal.  *Macharia*, 334 F.3d at 63; *Macharia*, 238 F. Supp. 2d at 31.

next month, Plaintiffs informed the Court that they would not seek class certification and would proceed "in the name of and by the named plaintiffs only." ECF No. 84 at 1–2.

In January 2007, Plaintiffs filed a motion seeking (1) entry of default judgments against the two remaining defendants (bin Laden and Al Qaeda) and (2) an order setting a date for an evidentiary hearing before a jury to determine damages. ECF No. 85. In August 2007, Judge Kollar-Kotelly granted that motion in part, ordering an evidentiary hearing on damages but denying Plaintiffs' request for a jury. *Mwani v. bin Laden*, 244 F.R.D. 20, 26 (D.D.C. 2007).

Thereafter, Plaintiffs proposed holding a bellwether evidentiary hearing on the claims of a small number of Plaintiffs and then applying the rulings from that hearing to determine the damages for the remaining Plaintiffs. ECF No. 89 at 7–8. In January 2010, Judge Kollar-Kotelly issued an order agreeing with Plaintiffs' proposed plan to hold a "bellwether trial for representative plaintiffs and experts"; she further required Plaintiffs to file a status report "indicating how many Plaintiffs remain a party to this action, the nature of the damages claimed, and the extent to which the Plaintiffs' claims are factually related." ECF No 91 at 2. Plaintiffs filed their status report in March 2010 "on behalf of 523 Kenyan plaintiffs,"[4] all of whom allegedly remained in the case, although counsel had been unable to contact some of them. ECF No. 94 at 1–2. The status report further asserted that Plaintiffs sought compensatory damages of $7 million each for the wrongful death of 15 Plaintiffs; $5 million each for the serious bodily injury of 44 Plaintiffs; and $1 million dollars for the personal injury claims of each the remaining plaintiffs. *Id.* at 2. In addition, they sought $10 million in emotional distress damages for each Plaintiff, $3 million in business loss damages for 117 Plaintiffs, and punitive damages. *Id.* at 2–3. Plaintiffs proposed a bellwether trial geared to developing a "damages matrix" based on the evidence of 11 Plaintiffs—3 seeking

---

[4] As noted in footnote 2, *supra*, Plaintiffs have been inconsistent in their representations about the number of Plaintiffs in this case.

recovery for wrongful death, 2 seeking recovery for serious bodily injury, 2 seeking recovery for emotional distress and stigma, 2 seeking recovery for business losses, and 2 seeking recovery for "other bodily injuries." *Id.* at 7–8.  To aid in determining where on the contemplated damages matrix the non-bellwether Plaintiffs fell, they proposed submitting a Standard Form 95 claim form[5] for each of those Plaintiffs.  *Id.* at 9.

In May 2010, Judge Kollar-Kotelly asked Plaintiffs to consider consenting to the referral of the case to a magistrate judge "for all purposes so that a consolidated damages hearing may be conducted on a more expedited basis."  Minute Order dated May 12, 2010.  Plaintiffs' counsel agreed to confer with his clients to determine if they consented to the jurisdiction of a magistrate judge for all purposes.  *See id*.  Plaintiffs filed a notice of consent later that month and Judge Kollar-Kotelly entered an order referring the case to a magistrate judge pursuant to Local Civil Rule 73.1.  ECF Nos. 95–96.

## B.    May 2010 through December 2014—Proceedings before Judge Facciola

On May 26, 2010, this action was assigned to Magistrate Judge Facciola for all purposes. He held a bellwether evidentiary hearing as to eight Plaintiffs on January 31 through February 2, 2011.  *See Mwani v. Al Qaeda*, No. 99-cv-0125, 2014 WL 4749182, at *1 (D.D.C. Sept. 25, 2014). Two of those Plaintiffs— Abel Mutegi Nijru and Felistus Njeri Thuo—were deceased and claimed damages for wrongful death; the remaining six—Castro Otiende, Protus Manvasa Buluma, Wilfred

---

[5] Standard Form 95 is "a form prescribed by the Justice Department for presentation of claims" against the United States, which "instructs claimants to describe the incident causing the injury, to state the amount of the claim in dollars, and to provide information regarding witnesses to the incident and insurance coverage."  *GAF Corp. v. United States*, 818 F.2d 901, 906 & n.16 (D.C. Cir. 1987); *cf.* 28 C.F.R. § 14.2 ("[A] claim shall be deemed to have been presented when a Federal agency receives from a claimant . . . an executed Standard Form 95 or other written notification of an incident . . . .").  The form itself warns that there are civil and criminal penalties for presenting fraudulent claims or making false statements.  Claim for Damage, Injury, or Death, U.S. Gen. Servs. Admin., https://www.gsa.gov/forms-library/claim-damage-injury-or-death (follow "SF95-07a.pdf" link).

Nderitu, Charles Makori Mogi, Kioko Muema, and Dipak L. Shah—sought damages for assault and battery. *Id.* at *9–10.

Before Judge Facciola issued his findings of fact and conclusions of law, there was further legal wrangling about subject-matter jurisdiction under the Alien Tort Claims Act based on a changing legal landscape and the effect of bin Laden's death on the case.[6]  *See, e.g.*, *Mwani v. United States*, No. 99-cv-0125, 2012 WL 78237 (D.D.C. Jan. 10, 2012); *Mwani*, 947 F. Supp. 2d 1.  Eventually, Judge Facciola dismissed bin Laden (who had been killed in May 2011) and allowed the claims against Al Qaeda to proceed.  *See Mwani*, 302 F.R.D. at 24–25.

Judge Facciola issued findings of fact and conclusions of law in connection with the bellwether evidentiary hearing on September 25, 2014.  *Mwani*, 2014 WL 4749182, at *1–*8 (findings

---

[6] Specifically, in November 2011, the Court noted that Defendant bin Laden had been killed and required Plaintiffs to file a suggestion of death and explain to the Court why bin Laden should not be dismissed from the case.  Minute Order dated Nov. 30, 2011.  Plaintiffs asked the Court to defer dismissal of bin Laden until it ruled on the claims against Al Qaeda, although they recognized that it was unlikely that they would find a proper party to substitute for bin Laden.  ECF No. 107 at 2–3.  Because the case was, for all practical purposes, "a suit between aliens and a[n] organization that is made up of aliens," Judge Facciola questioned whether the Court continued to have subject-matter jurisdiction in light of then-recent legal developments—specifically, a panel decision in *Doe v. Exxon Mobil Corp.*, 654 F.3d 11 (D.C. Cir. 2011), *vacated and remanded*, 527 F. App'x 7 (D.C. Cir. 2013), and the Supreme Court's grant of certiorari in two Alien Tort Claims Act cases, *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010), *aff'd*, 569 U.S. 108 (2013), and *Mohamad v. Rajoub*, 634 F.3d 604 (D.C. Cir. 2011), *aff'd sub nom. Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).  *Mwani v. United States*, No. 99-cv-0125, 2012 WL 78237, at *1 and n.2 (D.D.C. Jan. 10, 2012).  Thereafter, in light of the Supreme Court's 2013 decision in *Kiobel*, Judge Facciola found that this case "touches and concerns the United States with sufficient force that it falls within the narrow category of cases for which the presumption against extraterritorial application of the [Alien Tort Claims Act] is displaced."  *Mwani v. bin Laden*, 947 F. Supp. 2d 1, 5 (D.D.C. 2013).  However, he certified the issue for appeal and ordered Plaintiffs to "submit an application of appeal of th[e] issue to the Court of Appeals under 28 U.S.C. § 1292."  *Id.* at 6.  The D.C. Circuit denied leave to appeal for lack of standing (because the decision on appeal was not adverse to Plaintiffs).  Order, *In re Mwani*, No. 13-8004 (D.C. Cir. Nov. 19. 2013) (denying leave to appeal).

In December 2013, Judge Facciola issued an order stating that federal common law would govern the claims in this case, relying on the Supreme Court's decision in *Kiobel*.  ECF No. 113 at 1 (quoting *Kiobel*, 569 U.S. at 114–15).  However, he also issued an order to show cause why the remaining defendants—bin Laden and Al Qaeda—should not be dismissed; bin Laden because he was dead, and Al Qaeda because it was not clear that it has the capacity to be sued.  ECF No. 114 at 2–3.  Judge Facciola ultimately dismissed bin Laden because Plaintiffs had not timely filed a motion for substitution under Rule 25(a) of the Federal Rules of Civil Procedure; he chose not to dismiss Al Qaeda at that time on the strength of the D.C. Circuit's decision in this case "that service had been effected against Al Qaeda and that the exercise of jurisdiction over it was constitutional and consistent with the due process clause of the Constitution" and Judge Kollar-Kotelly's 2006 order entering a default against Al Qaeda "based on a finding that the Court had both subject matter and personal jurisdiction over [it]."  *Mwani v. bin Laden*, 302 F.R.D. 22, 24–25 (D.D.C. 2014) (citing *Mwani*, 417 F.3d at 11–15, and ECF No. 81).

of fact); *8–*14 (conclusions of law). He dismissed all claims brought by Nijru and Thuo because, "as deceased individuals, [they] lack[ed] the capacity to sue." *Id.* at *2. He proceeded to analyze the "tort claims against Al Qaeda for 1) wrongful death; 2) assault; and 3) battery . . . under the federal common law." *Id.* at *9. As to wrongful death, Judge Facciola held that, even if such claims had been brought by the estates of Nijru and Thuo, they would be dismissed because "the federal common law does not recognize a wrongful death cause of action." *Id.* at *9. But he found that Al Qaeda was liable for battery against five of the remaining Plaintiffs—Otiende, Buluma, Nderitu, Mogi, and Muema—and for assault against one—Shah. *Id.* at *10.

Moving on to damages, Judge Facciola found that the evidence offered to prove economic damages was "insufficient to support an award . . . for any of the plaintiffs" because it "failed to reasonably prove the extent of their past economic losses or prove by a preponderance of the evidence the extent of their future economic losses." *Id.* at *11 (internal quotation marks omitted). For pain and suffering, the Court imposed a baseline award of $5 million and departed upward for more serious injuries, so that Plaintiff Shah was awarded the baseline $5 million based on expert testimony showing that he had PTSD; Plaintiffs Otiende, Nderitu, and Mogi, who suffered from both PTSD and permanent scarring, were awarded $6 million each; and Plaintiffs Buluma and Muema, who had both PTSD and vision problems (Buluma had decreased vision in both eyes, Muema lost an eye), were awarded $7.5 million each. *Id.* at *12. Judge Facciola awarded $150 million per Plaintiff in punitive damages, finding that he could not, "in keeping with requirements of due process, make any greater award without additional expert testimony as to Al Qaeda's wealth and the multiplier necessary to affect Al Qaeda's future conduct." *Id.* He also awarded prejudgment interest calculated from the date of the bombing to the date of the award. *Id.* at *13.

Judge Facciola then addressed "the extent to which the Court's analysis and damages award as to the . . . six plaintiffs can be applied to the remaining plaintiffs." *Id.* He accepted Plaintiffs' proposal to submit a Standard Form 95 for each Plaintiff "to enable the Court to determine an appropriate damages matrix for the remaining plaintiffs." *Id.* Along with those forms, Plaintiffs were to submit a chart with each Plaintiff's name, the nature of his or her injury and tort claim, and the nature of the damages sought, among other things. *Id.* at *14. A document labeled "Judgment" was entered that same day (the "September 2014 Order") awarding damages to six bellwether Plaintiffs (that is, the eight Plaintiffs minus the two who did not have the capacity to sue because they were deceased).[7] ECF No. 122. The deceased Plaintiffs—Nijru and Thuo—are not mentioned in the judgment. *Id.*

In a status conference in October 2014, Plaintiffs "agreed to use the damages awarded to [Plaintiff] Shah," who had been awarded $5 million in pain and suffering damages plus interest and $150 million in punitive damages, "as a bellwether for damage awards to the remaining plaintiffs." *Mwani v. Al Qaeda*, No. 99-cv-125, 2014 WL 6463227, at *1 (D.D.C. Nov. 18, 2014). They thereafter lodged a "damages matrix chart" with Judge Facciola's chambers, which identified the Plaintiffs for whom judgment was then sought.[8] ECF No. 125 at 1. That chart omitted certain Plaintiffs "for various reasons, including duplications or the unavailability of a reliable Form 95."

---

[7] As discussed below, that document does not meet the definition of a judgment under Rule 54(a) of the Federal Rules of Civil Procedure.

[8] Prior to lodging the damages matrix chart, Plaintiffs filed a motion for leave to register the September 2014 Order in other district courts pursuant to 28 U.S.C. § 1963, which allows registration of a judgment that "has become final by appeal or expiration of the time for appeal or when ordered by the court that entered judgment for good cause shown." ECF No. 123 at 8 (quoting 28 U.S.C. § 1963). Judge Facciola denied the motion, reasoning that, "[s]ince no appeal was filed within thirty days of the entry" of the September 2014 Order, "[P]laintiffs are free to register their judgment with any other court without leave." ECF No. 127 at 1–2. As discussed below, however, the September 2014 Order was not and is not final because it has not been certified pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

*Id.* One week later, Plaintiffs filed nearly 1,000 pages of Standard Form 95s that purportedly relate to the Plaintiffs listed in the damages matrix chart.  ECF No. 126.

On November 18, 2014, Judge Facciola issued his second findings of fact and conclusions of law, which awarded each of 374 Plaintiffs the same amount that he had awarded Shah—that is, $5 million for pain and suffering plus prejudgment interest and $150 million in punitive damages. *Mwani*, 2014 WL 6463227, at *1–4.  Noting that Plaintiffs had "concede[d]" that the Court "cannot . . . make any award of damages" to Plaintiffs who filed claims for wrongful death, Judge Facciola did not award damages to the 17 Plaintiffs who claimed damages under that theory.[9]  *Id.* at *4.  He also declined to award damages to the 45 Plaintiffs that were business entities, "since only natural persons can experience pain and suffering as a result of a common law battery or assault" and to 1 Plaintiff who, as a minor, lacked the capacity to sue in his own right.  *Id.*  A document labeled "Second Judgment" was entered as to the 374 Plaintiffs who received a damages award on November 18, 2014 (the "November 2014 Order").[10]  ECF No. 129.  The Plaintiffs who were dismissed or did not receive an award of damages are not mentioned in the judgment.  Thus, judgment has been entered as to 380 Plaintiffs awarding damages of nearly $60 billion, exclusive of prejudgment interest.

In December 2014, Plaintiffs filed a motion for leave to register the September 2014 Order and the November 2014 Order in other districts pursuant to 28 U.S.C. § 1963.  ECF No. 130.

---

[9] Notwithstanding the fact that their claims were addressed in the September 2014 Findings of Fact and Conclusions of Law, Judge Facciola appears to have listed among the 17 wrongful death Plaintiffs in the November 2014 Findings of Fact and Conclusions of Law both Nijru and Thuo, although Nijru is identified by his first and second names, "Abel Mutegi," rather than his full name, "Abel Mutegi Nijru."  *See Mwani*, 2014 WL 6463227, at *4 (listing, among the 17 wrongful death Plaintiffs who received no damages award, "Abel Mutegi" and "Felistus Njeri Thuo"); *Mwani*, 2014 WL 4749182, at *2, *9 (finding that deceased Plaintiffs Abel Mutegi Nijru and Felistus Njeri Thuo did not have the capacity to sue and were not entitled to damages for wrongful death under federal common law).

[10] Like the September 2014 Order, the November 2014 Order does not meet Rule 54(a)'s definition of a judgment.

Judge Facciola retired in December 2014 without ruling on that motion and there was a lull in these proceedings for over two years.

### C.    February 2017 to the Present—Proceedings before the Undersigned

On February 22, 2017, this case was transferred to the undersigned. Two days later, Plaintiffs filed a status report calling attention to their pending motion for leave to register the judgments in other districts. ECF No. 131. The Court granted leave in March 2017 (ECF No. 132), and all was quiet for almost four years.

Then, at the beginning of 2021, Plaintiffs filed a motion seeking a status hearing. ECF No. 133. The submission was skeletal, asking the court for a hearing to discuss setting a briefing schedule for motions "on the following issues":

1.    the effect of the Sudan Claims Resolution Act[,] [Pub. L. 116-260, 124 Stat. 3291 (2020) (set out as note under 28 U.S.C. § 1605A)] . . . on the rights and entitlements of Plaintiffs;

2.    reconsideration of the denial of wrongful death and survivor claims as a consequence of subsequent rulings in other terrorism-related litigation;

3.    the initiation of post-judgment discovery, including discovery directed at or related to foreign states such as the Republic of Sudan and the Islamic Republic of Iran, and certain commercial banks;

4.    the initiation of pre-filing discovery, including discovery directed at or related to foreign states such as the Republic of Sudan, and certain commercial banks;

5.    the reopening of claims against foreign states, such as the Republic of Sudan;

6.    leave to amend the complaint to add additional defendants, including foreign states and certain commercial banks, on the basis of newly-disclosed evidence, and for other reasons;

7.    the jurisdiction of this Court over claims related to proceeds frozen by the Office of Foreign Assets Control; and

8.      the justification for certification of class actions for claims against new de-
fendants.

*Id.* at 4–5.  The Court asked for a supplemental submission providing "more detail about the legal and factual bases" for the proposed motions.  ECF No. 134 at 2.  Plaintiffs' response to that Order "organized" the "eight areas of relief" listed in their motions "into three procedural categories: post-judgment discovery and execution; prospective new or reopened claims arising out of the [1988 bombing of the American Embassy in Nairobi] itself or the improper sheltering of assets; and[ ] the resolution of the remaining claims, including claims of surviving spouses or family members."  ECF No. 135 at 2.

As to the first category, Plaintiffs stated that they "expect[ed] to seek discovery from foreign states and from agencies of the United States with respect to assets—including but not limited to Al Qaeda assets[—]subject to attachment to secure partial satisfaction of the judgments."  *Id.* Included among the assets Plaintiffs contemplated proceeding against was $335 million paid by the Republic of Sudan to settle claims pursuant to the Sudan Claims Resolution Act and approximately $4 million in "Al Qaeda funds frozen by" the Office of Foreign Assets Control ("OFAC"). *Id.* at 4 & n.9.

In the second category, Plaintiffs placed motions "to initiate new claims" and "to seek to reopen claims which were not subject to a judgment or order," whether those claims arise out of the bombing of the U.S. Embassy in Nairobi "or out of events subsequent to that attack which hindered execution on the judgment."  *Id.* at 6.  Their explanation includes a rather gnomic reference to Rule 27 of the Federal Rules of Civil Procedure—which governs depositions to perpetuate testimony—that urges the Court to consider "expand[ing] the scope of Rule 27" to include any requests that might not fall within "the limits" of that rule.  *Id.*

Finally, the third category included potential "relief in the form of a Rule 54(b) determina-

tion of finality,"[11] unidentified "relief directed at the claims of [ ] [P]laintiffs who have not yet

secured a judgment," and revision of Judge Facciola's holding that wrongful death claims, like

those of deceased Plaintiffs Nijru and Thuo, "were not available." *Id.*

The Court held a hearing on June 30, 2021 (ECF No. 139) and thereafter directed Plaintiffs

to file a proposed schedule to govern the proceedings in this case going forward, as well as a copy

of the Amended Complaint so that it would be available electronically (Minute Order dated June

30, 2021).  Plaintiffs timely filed both submissions and the Court entered an order that, as proposed

by Plaintiffs, required them to file by August 31, 2021:

> (a)     any request for relief with respect to the Sudan Claims Resolution Act, as-
> sets held by [OFAC] . . . , post-judgment discovery, or execution, or pre-
> filing discovery (the "First Stage Motions");

> (b)     notice of the filing of any request for or consent to referral to a magistrate
> judge in *Macharia v. United States*, 334 F.3d 61, 69 (D.C. Cir. 2003), *cert.
> denied*, 40 U.S. 1149 (2004); and

> (c)     any motion for severance or the creation of a new docket, with a new case
> number, for disposition of the First Stage Motions and any subsequent mo-
> tions, with a specific designation of the filings, including the First Stage
> Motions, to be included in the new docket. Any such motion will include
> proposed provisions for finality to, among other things, facilitate appeals, if
> any[.]

ECF No. 138 at 1.  That same order required Plaintiffs to file by January 31, 2022, the so-called

"Second Stage Motions," comprising "any motion to add parties or to reinstate claims or parties"

and "any motion for entry of judgment in favor of Plaintiffs in whose favor no judgment has yet

been entered, or against whom no judgment or dismissal has been entered."[12]  *Id.* at 2.

---

[11] Rule 54(b) allows a court to "direct entry of a final judgment as to one or more, but fewer than all, claims or parties"
upon a finding that "there is no just reason for delay."

[12] In addition, that Order required Plaintiff to file a chart (similar to the one lodged with Judge Facciola in 2014), that
identified as to each Plaintiff "the current status as to the entry of any judgment or the application of any ruling

On August 31, 2021, Plaintiffs filed the three motions that are currently before the Court:

(1)     a motion for leave to conduct discovery, which seeks an order allowing Plaintiffs to conduct (a) pre-claim discovery pursuant to Rule 27 of the Federal Rules of Civil Procedure, which governs depositions to perpetuate testimony and (b) post-judgment discovery pursuant to Rule 69(a)(2) of the Federal Rules of Civil Procedure (ECF No. 140);

(2)     a "Motion for Relief with Respect to the Sudan Claims Resolution Act and with Respect to Assets Held by the Office of Foreign Asset[s] Control" (ECF No. 141); and

(3)     a motion to sever certain proceedings from this action into a separate action (ECF No. 142).

The following discussion addresses each of those motions, although in a different order.

## II.     DISCUSSION

### A.     Motion to Sever—ECF No. 142

Plaintiffs bring this motion pursuant to Rule 21 of the Federal Rules of Civil Procedure (and, perhaps, Rule 54(b), but more on that later).  *See* ECF No. 142 at 1.  However, the motion seeks relief that Rule 21 does not authorize and therefore must be denied.

Rule 21 provides that "[m]isjoinder of parties is not a ground for dismissing an action.  On motion or on its own, the court may at any time, on just terms, add or drop a party.  The court may also sever any claims against a party."  Fed. R. Civ. P. 21.  "Although Rule 21 deals primarily with misjoinder or nonjoinder of parties, th[e] Rule also 'authorizes the severance of any claim, even without a finding of improper joinder, where there are sufficient reasons for ordering a severance.'" *Pasem v. USCIS*, No. 20-cv-344, 2020 WL 2514749, at *4 (D.D.C. May 15, 2020) (some internal quotation marks omitted) (quoting *Am. Oversight v. Dep't of Veterans Affairs*, 326 F.R.D. 23, 27

---

declining the entry of judgment," as well as details including the nature of each Plaintiff's injury and of the damages sought.  ECF No. 138 at 1–2.  Plaintiffs filed such a chart on August 31, 2021.  ECF No. 142 at 12–23.  However, that chart was neither accurate nor compliant with the Court's Order.  *See* ECF No. 144.  Plaintiffs therefore filed an amended chart on September 28, 2021.  ECF No. 145.

(D.D.C. 2018)).  "Severed claims become independent actions that proceed separately and result in separate judgments."  *M.M.M. ex rel. J.M.A. v. Sessions*, 319 F. Supp. 3d 290, 295 (D.D.C. 2018); *see also Brooks v. Dist. Hosp. Partners, L.P.*, 606 F.3d 800, 806 (D.C. Cir. 2010) (noting that Rule 21 "authorizes severance of claims into distinct actions"); *Gaffney v. Riverboat Services of Ind.*, 451 F.3d 424, 441 (7th Cir. 2006) ("As a general matter, Rule 21 severance creates two discrete, independent actions, which then proceed as separate suits for the purpose of finality and appealability.").

By its terms, Rule 21 allows severance only of "claims."  In legal proceedings, "a 'claim' is a '[c]ause of action,' and the '[m]eans by or through which [a] claimant obtains possession or enjoyment of [a] privilege or thing.'"  *United States v. Novo A/S*, 5 F.4th 47, 55 (D.C. Cir. 2021) (alterations in original) (quoting *Claim*, Black's Law Dictionary 224 (5th ed. 1979)); *see also Rundgren v. Wash. Must. Bank, FA*, 760 F.3d 1056, 1061 (9th Cir. 2014) (noting that the "ordinary meaning" of the term "claim" is "a cause of action or the aggregate of facts that gives rise to a right to payment or an equitable remedy." (citing Black's Law Dictionary 281–82 (9th ed. 2009))); *cf. Motion to Sever*, Black's Law Dictionary (11th ed. 2019) (defining a "motion to sever" in the context of civil procedure as "[a] party's or defendant's request to have all or some of its claims or defenses tried separately from those of coparties or codefendants").

At the status hearing on June 30, 2021, Plaintiffs described a motion that would fall within the bounds of Rule 21.[13]  Plaintiffs' counsel asserted that he would file "within 60 days" a motion to "sever . . . for all purposes" those claims "where there already is a judgment" (that is, the claims enumerated in the September 2014 Order and the November 2014 Order) and those claims in

---

[13] It was based on the representations made at that status hearing that the Court signed Plaintiffs' proposed order (with a few additions not relevant here) setting a briefing schedule.  Even so, the Court was clear at the hearing that it would look carefully at the merits of any motion filed and might well deny any such motion.  ECF No. 139 at 8, 29–30, 33, 37.

which an adverse judgment could be entered (that is, the wrongful death claims, the claim brought on behalf of the minor, and the claims of the business entities).  ECF No. 139 at 23–24, 27–29. But that is not the motion Plaintiffs have filed.

Here, Plaintiffs do not seek to sever any *claims* to create a new action.  Rather, they ask the Court to "transfer to a new docket" (1) what they call the "First Stage Motions," which comprise the two other motions filed on August 31, 2021—that is, the motion for leave to conduct discovery (ECF No. 140) and the motion regarding the Sudan Claims Resolution Act and the OFAC funds (ECF No. 141); (2) the so-called "Second Stage Motions," which comprise contemplated motions (to be filed in January 2022) to "add parties or to reinstate claims or parties" and to enter judgment "in favor of Plaintiffs in whose favor no judgment has yet been entered, or against whom no judgment or dismissal has been entered" (ECF No. 138 at 2), as well as (3) any "[r]elated [m]otions."  ECF No. 140 at 4.  They contend that "[t]he first Stage Motions and the Second Stage Motions are easily separable for analysis, and severance would simplify the proceedings."  ECF No. 142 at 7.  That is, Plaintiffs are not seeking to sever claims, but rather to sever specific motions or, perhaps, to sever all proceedings post-dating the putative grant of this motion from all proceedings pre-dating that wished-for grant.

Plaintiffs' proposed order confirms that they do not seek to split the claims included in the Amended Complaint into two separate cases, one including the claims that have been (or could be, based on rulings made by Judge Facciola) reduced to judgment and the other including those that have not.  Rather, the proposed order they submitted would require, in relevant part,

    (1)    the Clerk of Court to "create a new docket with the caption of this case" and include on that docket the following filings:  the Amended Complaint, Judge Facciola's Memorandum Opinion dated August 22, 2014—found at ECF No. 120 and at 302 F.R.D. 22—which dismissed the claims against bin Laden; the September 25, 2014 Judgment; the November 18 Judgment; the Court's Order of July 8, 2021, which

set out the schedule for motions to be filed on August 31, 2021, and January 31, 2022; and the First Stage Motions;

(2)     Plaintiffs to file in the newly-created case the Second Stage Motions, which, as noted above, are "motions to add parties or to reinstate claims or parties, and to seek judgments on behalf of certain [P]laintiffs for whom no judgment has been entered" (ECF No. 138 at 2); and

(3)     the Court to decide the First Stage Motions, Second Stage Motions, and any related motions in the newly-created case.

ECF No. 142 at 10.  That is, the "new docket" would necessarily encompass not only the claims that were reduced to judgment in 2014, but also other extant claims that have not yet been reduced to judgment, as well as potential new claims that have not yet been alleged—in short, all extant and contemplated claims in this case.  Such relief is not encompassed in any reasonable reading of the plain language of Rule 21 and Plaintiffs cite no case law indicating that such a "severance" is proper under that rule.

Plaintiffs include another section in their brief, entitled, "There Is No Just Reason for Delay in Finding That Judgments Entered In this Case Are Final."  ECF No. 142 at 8.  That section corresponds to two paragraphs in the proposed order:  the first decrees that "the judgments entered on September 25, 2014, and November 18, 2014, are final for all purposes, including but not limited to execution and the right to pursue post-judgment discovery, there being no just reason for delay in the entry of those judgments as final"; and the second decrees that "the claims of the following Plaintiffs are dismissed with prejudice for the reasons set out in the Memorandum Opinion:  [intentionally left blank by Plaintiffs], and such dismissals are final, there being no just reason for delay in the entry of those final judgments."  ECF No. 142 at 10–11.

There, Plaintiffs use the terminology of Rule 54(b), which governs finality in cases with multiple claims or parties.  Pursuant to that rule, in such cases, any order or decision that "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties" is not final

unless (as noted above) the court "direct[s] entry of a final judgment as to one or more, but fewer than all, claims or parties" upon a finding that "there is no just reason for delay."  Fed. R Civ. P. 54(b).  But Plaintiffs do not identify Rule 54(b) as a basis for their motion (*see* ECF No. 142 at 1) and their brief merely mentions it in passing (*see* ECF No. 142 at 5, 6 & n.4).  Nor do they address in any detail the factors courts should consider before finding "no just reason for delay."  *See, e.g.*, *Seed Co. Ltd. v. Westerman*, No. CV 08-355, 2019 WL 3222412, at *3 (D.D.C. July 17, 2019) (listing factors).  Therefore, the Court finds that Plaintiffs have forfeited, at this time, any argument that the Court should enter judgment pursuant to Rule 54(b) that it might have intended to make.[14] *See, e.g.*, *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("Mentioning an argument 'in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones' is tantamount to failing to raise it." (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005))); *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (finding an argument made in a conclusory fashion forfeited).

### B.    Motion for Discovery—ECF No. 140

In this motion, Plaintiffs seek leave to conduct (1) "claims discovery" prior to filing the Second Stage Motions and (2) "post-judgment discovery."  This motion will also be denied.

---

[14] The Court assumes that this vagueness is strategic.  At the June 30 hearing, Plaintiffs' counsel recognized that designating the decision on certain claims final and appealable would effectively remove them from the action in this Court and, as a consequence, prevent those Plaintiffs from taking advantage of any later rulings that might, for example, allow amendment of the operative complaint to include new Defendants or new claims.  *See* ECF No. 139 at 28–29.  It does not appear, then, that Plaintiffs truly seek an order directing entry of final judgment as to the 380 Plaintiffs whose claims are encompassed in the September 2014 Order and the November 2014 Order or of the Plaintiffs whose claims were denied by Judge Facciola.  Therefore, although the Court could direct entry of judgment *sua sponte, see, e.g.*, *Bank of Lincolnwood v. Fed. Leasing*, 622 F. 2d 944, 947, 952 (7th Cir. 1980) (affirming the district court's *sua sponte* entry of final judgment pursuant to Rule 54(b)); *Mitchell v. Lyons Pro. Servs., Inc.*, 727 F. Supp. 2d 116, 119–20 (E.D.N.Y. 2010) ("[T]he Court has broad discretion in determining whether to make the required certification [to direct entry of final judgment under Rule 54(b)] and may do so *sua sponte*." (internal citation omitted)); *Guinan v. A.I. duPont Hosp. for Children*, Civil Action No. 08-0228, 2009 WL 2877595, at *3 (E.D. Pa. 2009) (explaining that "[a] district court may *sua sponte* direct entry of final judgment under Federal Rule of Civil Procedure 54(b)" and collecting cases), it will not do so at this time.

      1.    "Claims Discovery"

Plaintiffs seek discovery

> on ties to, support for and knowledge of the activities of Al Qaeda of Sudan and its agents and instrumentalities, and the al-Shamal Islamic Bank in Khartoum, Pakistan-based Habib Bank, and Saudi Arabia-based Al-Rajhi Bank[,] [all of which reportedly have ties to Al Qaeda]. Plaintiffs seek discovery from those parties, as well as from the United States. Plaintiffs also seek discovery from and about Mr. Saleh Gosh, the former head of the Sudanese National Intelligence and Security Service, who is reputed to have long-standing relationships—reaching from the 1990's to the present—with Western governments including the United States.

ECF No. 140 at 4 & n.3. They appear to rely on Rule 27(b) of the Federal Rules of Civil Procedure as the authority for this branch of the motion. *Id.* at 4 n.2 (asserting that Rule 27(a) "is neither procedurally nor substantively applicable" because it is not "a means of discovery to search for evidence that would undergird a possible lawsuit," but that Rule 27(b) "does not include the same procedural barriers" (quoting *Melohn v. Stern*, No. 20-CV-5536, 2021 WL 1178132, at *2 (S.D.N.Y. Mar. 26, 2021))).

Rule 27(b) provides for depositions to perpetuate testimony pending appeal, and states:

(1)    *In General*. The court where a judgment has been rendered may, if an appeal has been taken or may still be taken, permit a party to depose witnesses to perpetuate their testimony for use in the event of further proceedings in that court.

(2)    *Motion*. The party who wants to perpetuate testimony may move for leave to take the depositions, on the same notice and service as if the action were pending in the district court. The motion must show:

    (A)    the name, address, and expected substance of the testimony of each deponent; and

    (B)    the reasons for perpetuating the testimony.

(3)    *Court Order*. If the court finds that perpetuating testimony may prevent a failure or delay of justice, the court may permit the depositions to be taken and may issue orders like those authorized by Rule 34 and 35. The depositions may be taken and used as any other deposition taken in a pending district-court action.

Plaintiff's motion is both substantively and procedurally deficient under this Rule.

First, Plaintiffs candidly admit they seek such discovery to uncover "information pertinent to the Second Stage Motions," particularly the anticipated motion to amend the complaint to add or reinstate parties or claims. ECF No. 140 at 4–5 & n.2. However, as a case that Plaintiffs themselves cite in support of their application observes, "it is well-established that Rule 27 . . . should not be used to determine whether a cause of action exists, and, if so, against whom the action should be instituted." *Melohn*, 2021 WL 1178132, at *2 (quoting *Falco v. Santoro*, No. 17-MC-0440, 2017 WL 4480759, at *2 *E.D.N.Y. Sept. 29, 2017)). Plaintiffs assert that restriction applies only to Rule 27(a), which governs depositions to perpetuate testimony before an action is filed. ECF No. 140 at 4 n.2; Fed. R. Civ. P. 27(a). However, although that issue almost certainly comes up most often in connection with pre-filing applications to take a deposition to perpetuate testimony, the cases do not support Plaintiffs' position that, when proceeding under Rule 27(b), a litigant may engage in discovery that would be prohibited if it occurred prior to filing an action pursuant to Rule 27(a). *See, e.g.*, *19th St. Baptist Church v. St. Peters Episcopal Church*, 190 F.R.D. 345, 348 (E.D. Pa. 2000) ("The same policy considerations that inform the court's judgment under Rule 27(a) also govern the court's discretion under Rule 27(b). In other words, Rule 27(b), like its Rule 27(a) counterpart, is also not a substitute for discovery . . . ." (internal citation omitted) (quoting Fed. R. Civ. P. 27(b))); *see also In re Certain Investor in EFT Holdings Inc. to Perpetuate Testimony of Mr. Jack Qin under FRCP Rule 27*, No. CV 13-0218, 2013 WL 3811807, at *4 (C.D. Cal. July 22, 2013) ("[I]t is well settled that 'Rule 27 simply authorizes the *perpetuation* of evidence, not the discovery or uncovering of it.'" (quoting *In re Landry-Bell*, 232 F.R.D. 266, 267 (W.D. La. 2005))); *In re Petition of Banks*, No. 93 C 6914, 1993 WL 502379, at *1 (N.D. Ill. Dec. 6, 1993) ("It has long been established that 'perpetuation' means the perpetuation

of known testimony, and that Rule 27 may not be used as a substitute for discovery to determine if a cause of action exists.").  Indeed, *both* subsections require the individual seeking the discovery to show the "expected substance of the testimony," Fed. R. Civ. P. 27(a)(1)(E); (b)(2)(A), making it clear that litigants moving for relief under either subsection of Rule 27 "must already know the substance of the evidence that [they] seeks to perpetuate" and cannot use the process to uncover unknown evidence.  *Melohn*, 2021 WL 1178132, at *2 (quoting *Bryant v. Am. Fed'n of Musicians of the U.S. & Canada*, No. 14-cv-2598, 2015 WL 3644075, at *7 (S.D.N.Y. June 1, 2015)).  In fact, Plaintiffs have previously indicated that they are aware that Rule 27 does not countenance the discovery they seek:  in the supplemental submission filed prior to the June 30 status hearing, they "recognize[d] the limits . . . of Rule 27" and stated that they might "urge the Court to expand the scope of [the] Rule."  ECF No. 135 at 6.  Plaintiffs here have made no argument that the Court should—or, more importantly, *could*—"expand the scope" of this or any other Federal Rule of Civil Procedure.

Second, the motion is formally deficient.  Plaintiffs have failed to include in their motion not only the "expected substance of the testimony" they seek to perpetuate (likely because they do not know it), but also the address of each deponent and "the reasons for perpetuating the testimony," which requires a showing that evidence is likely to be lost if it is not promptly perpetuated.  *See, e.g.*, *Norex Petroleum Ltd. v. Access Indus., Inc.*, 620 F. Supp. 2d 587, 590 (S.D.N.Y. 2009) ("By its express language, a motion made pursuant to Fed. R. Civ. P. 27(b) 'must show,' *inter alia,* the address of the person to be deposed.  [The movant's] motion fails to show the address of Irving, the contemplated deponent.  Therefore, [the movant's] motion is defective.  This alone militates against granting the motion."); *Mass. Union of Public Housing Tenants, Inc. v. Pierce*, Civil Action No. 78-1895, 1983 WL 150, at *1 (D.D.C. Oct. 19, 1983) (denying Rule 27(b) motion

where the plaintiffs "made *no* assertions that any testimony is in danger of being lost"); 8A Richard

L. Marcus, *Federal Practice & Procedure* § 2076 (3d ed.).

Third, the motion is premature. "It is beyond argument that the language of Rule 27(b)

anticipates the filing of a motion or petition and the service of notice thereof after rendition of

judgment." *Shore v. Acands, Inc.*, 644 F.2d 386, 389 (5th Cir. 1981). There has been no judgment

entered in this case, as discussed above and as Plaintiffs admit.[15] *See* ECF No. 139 at 21 ("We do

not have a final judgment in the sense of an appealable final judgment . . . ."); ECF No. 140 at 6

("Plaintiffs [ ] have not secured judgments, or other disposition of all the claims in this case."); *see*

*also* Fed. R. Civ. P. 54(a) (defining a "judgment" for the purposes of the Federal Rules of Civil

Procedure as "a decree and any order from which an appeal lies"); *see also, e.g.*, *La. Real Estate*

*Appraisers Bd. v. FTC*, Civil Action No. 19-214, 2020 WL 1817297, at *2 (M.D. La. Apr. 9, 2020)

("Rule 27(b) only applies where a final judgment has been entered. No judgment has been entered

in this action . . . . Accordingly, Rule 27(b) is inapplicable." (internal citation omitted)). Plaintiffs

have noted elsewhere that this Court has issued an order allowing them to register the September

2014 Order and the November 2014 Order in other district courts in anticipation of execution and

have suggested that order might serve as a basis to allow them post-judgment discovery. ECF No.

139 at 21–22 ("[W]e do have an order permitting certification elsewhere, [so] the first question

---

[15] Indeed, although the denial of a motion to perpetuate testimony under Rule 27(b) is generally immediately appeal-able, *see, e.g.* 8A Richard L. Marcus, *Federal Practice & Procedure* § 2076 (3d ed.), the D.C. Circuit has dismissed an appeal of such a denial where the movant filed the motion prior to judgment being entered in the court below, reasoning that the motion was "in effect a routine motion for discovery, which is not appealable on an interlocutory basis." *Reshard v. Pena*, No. 94-5129, 1994 WL 549515, at *1 (D.C. Cir. Sept. 14, 1994) (per curiam).

that arises is can post-judgment discovery occur when there hasn't been a complete and final disposition of all claims[.]").  However, they have not made that argument here, and the Court will therefore not address it.[16]

        2.       "Post-Judgment Discovery"

In this branch of their motion, Plaintiffs seek what they call "post-judgment discovery" pursuant to Rule 69(a)(2), which provides that "[i]n aid of the judgment or execution, the judgment creditor or a successor in interest whose interest appears of record may obtain discovery from any person—including the judgment debtor—as provided in these rules or by the procedure of the state where the court is located." Fed. R. Civ. P. 69(a)(2).  "The scope of discovery under Rule 69(a)(2) is constrained principally in that it must be calculated to assist in collecting on a judgment." *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012), *aff'd sub nom. Republic of Argentine v. NML Capital, Ltd.*, 573 U.S. 134 (2014).

Rule 69(a)(2) does not require permission from the district court to engage in post-judgment discovery.  The motion is therefore technically unnecessary.  *See, e.g.*, *Chevron Corp. v. Donziger*, 325 F. Supp. 3d 371, 377 (S.D.N.Y. 2018) (noting that "leave of court [is] not required to conduct post-judgment discovery with respect to enforcement of the monetary portion of [a] judgment"); *see also First Tech. Cap., Inc. v. Aurborne, Inc.*, 380 F. Supp. 3d 217, 221 (W.D.N.Y. 2019) (refusing to "opine upon whether post-judgment discovery is appropriate, or, assuming *arguendo* that it is, what the proper scope of such discovery might be in this case" because "any future discovery disputes will be decided as they arise").  Plaintiffs are aware of that.  At the June 30 status hearing, counsel recognized that he might have begun issuing discovery requests but was

---

[16] In any case, as explained in the Order to Show Cause issued contemporaneously with this Memorandum Opinion and Order, the Court is considering vacating the order allowing Plaintiffs to register their judgments in other districts.

reluctant because it was unclear whether the Federal Rules of Civil Procedure permitted such discovery without a final judgment; he therefore suggested that he would bring the issue before the Court to get a ruling.  ECF No. 139 at 22–23.  The time for that ruling has now come.

As noted above, no judgment has been entered in this case.  Neither of the documents labeled "judgment" and filed on September 25, 2014, and November 18, 2014 (ECF Nos. 122, 129) is a "judgment" according to the Federal Rules of Civil Procedure because neither is an "order from which an appeal lies," Fed. R. Civ. P. 54(a), a fact that Plaintiffs admit (ECF No. 140 at 6 ("Plaintiffs [ ] have not secured judgments, or other disposition of all the claims in this case.")).  Rule 69(a)(2) therefore does not permit them to engage in "post-judgment" discovery.[17]  *See, e.g.*, *United States v. Chazen*, No. 3:08-CV-2314, 2019 WL 113722, at *2 (D.N.J. Jan. 4, 2019) ("[A] judgment creditor is defined as '[a] person having a legal right to enforce execution of a judgment for a specific sum of money.'  It is axiomatic, therefore, that a person [cannot] be a judgment creditor without their being a judgment." (second alteration in original) (quoting *Judgment Creditor*, Black's Law Dictionary (7th ed. 1999))); *Parallel Iron LLC v. NetApp, Inc.*, 84 F. Supp. 3d 352, 362 (D. Del. 2015) ("[D]iscovery may not be requested before judgment is entered." (quoting Moore's Federal Practice and Procedure § 26.102)).

### C.   "Motion for Relief with Respect to the Sudan Claims Resolution Act and with Respect to Assets Held by the Office of Foreign Asset[s] Control"—ECF No. 141

This motion is something of a puzzler.  The "relief" it seeks is not a ruling from this Court that Plaintiffs are entitled to recover funds pursuant to the Sudan Claims Resolution Act or funds frozen by OFAC; instead, it asks for "preliminary relief" in the form of an order from this Court

---

[17] Again, Plaintiffs do not contend that the order allowing them to register judgments somehow transforms the non-final September 2014 Order and November 2014 Order into final judgments sufficient to support post-judgment discovery.

"inviting" the federal government to provide Plaintiffs with "disclosures sufficient to enable Plaintiffs to assert their claims" to such funds.  ECF No. 141 at 4.  A little context may be helpful.

### 1.   The Sudan Claims Resolution Act

The Sudan Claims Resolution Act was enacted in December 2020.  In essence, it embodies in a federal statute an agreement between the governments of the United States and the Republic of Sudan to settle claims against Sudan alleged in certain identified actions (filed in this District or in the Permanent Court of Arbitration in The Hague) related to the 1989 bombings of the U.S. Embassies in Nairobi, Kenya and Dar-es-Salaam, Tanzania and the 2000 bombing of the U.S.S. Cole.  *See* Claims Settlement Agreement Between the Government of the United States of America and the Government of the Republic of Sudan of October 30, 2020 (entered into force Feb. 9, 2021) (the "Sudan Claims Settlement Agreement"), *available at* https://www.state.gov/sudan-21-209 (click link to download); *see also* Sudan Claims Resolution Act, Pub. L. 116-260, 124 Stat. 3291 (2020) (set out as note under 28 U.S.C. § 1605A).  The statute provides that, once Sudan remits its payment of $335 million promised in the Sudan Claims Settlement Agreement, the Secretary of State will certify that, among other things, the government has received funds "sufficient to ensure . . . compensation through a fair process to address compensation for terrorism-related claims of foreign nationals for wrongful death or physical injury arising out of" the embassy bombings.[18]  Sudan Claims Resolution Act, § 1704(a)(2)(C)(3).  The Secretary of State made that certification on March 20, 2021.  Certification Under Section 1704(A)(2) of the Sudan Claims Resolution Act Relating to Funds for Settlement of Claims Against Sudan, 86 Fed. Reg. 19,080 (Mar.

---

[18] Notwithstanding the breadth of that certification, the Sudan Claims Resolution Act states that the $335 million is to be paid out, pursuant to a process set out in the Sudan Claims Settlement Agreement, to foreign nationals who asserted claims against Sudan in four identified actions in this District.  Sudan Claims Resolution Act, § 1707(c); Sudan Claims Settlement Agreement, Annex, § 1.c.  This action—in which the claims against Sudan were voluntarily dismissed in 2002 (ECF No. 61)—is not among those listed in the Sudan Claims Settlement Agreement.

20, 2021).  Meanwhile, from January 2021 through May 2021, counsel for Plaintiffs has contacted

various officials in the Department of State and the Department of Justice asserting his clients'

"rights to participation in the 'fair process'" mentioned in the statute and the certification "and to

compensation [pursuant] to that process."  ECF Nos. 141-1 at 2; 141-2 at 3; 141-3 at 2, 5.  He has

not received any response to his overtures.  ECF No. 141 at 5.

Because the government has not responded to those inquiries, Plaintiffs ask for "a judicial

invitation to the United States to respond to [their] legitimate requests."  *Id.* at 6.  Plaintiffs fail to

identify any legal basis for their request.  For example, Plaintiffs have not issued a subpoena to the

United States and been rebuffed (nor would such a subpoena directed to issues related to execution

of any judgment likely be appropriate at this time, *see supra*, Section II.B).  The only support they

offer for their request is a paragraph from *In re Islamic Republic of Iran Terrorism Litig.*, where

Judge Lamberth wrote:

> To assist this Court in these matters going forward, the Court will invite the United
> States to participate in these actions by filing a brief in response to the many issues
> addressed in this opinion. The Court encourages the United States to express its
> views regarding this litigation, but, more importantly, the Court hopes the Govern-
> ment might take this opportunity to give due consideration to whether there might
> be a more viable system of redress for these tragic and difficult cases.

659 F. Supp. 2d 31, 38 (D.D.C. 2009).  There, the court was proceeding pursuant to 28 U.S.C. §

517, which allows the federal government to participate in pending litigation to which it is not a

party in order to "attend to the interests of the United States."  Courts may use that statute to seek

the input of the government on pending motions or issues before them.  *See, e.g.*, *Practical Con-

cepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1545 n.2 (D.C. Cir. 1987) (noting that the court

invited the federal government to express its views regarding defenses asserted by Bolivia); *Klay-

man v. Obama*, 125 F. Supp. 3d 67, 73 (D.D.C. 2015) (noting that the court had invited the federal

government to submit a statement of interest as to the diplomatic immunity of the Secretary General of the United Nations, who had been sued by the plaintiffs); *Wyatt v. Syrian Arab Republic*, 83 F. Supp. 3d 192, 193–94 (D.D.C. 2015) (noting that the court had invited the federal government to submit a statement of interest regarding a motion for condemnation and recovery of garnished Syrian funds and a motion to intervene filed by attorneys for Syria who claimed an interest in the funds).  That is, the statute is used when there are issues before a court that could affect an interest of the United States.

Here, no such issues are properly before the Court.  As noted, Plaintiffs have not argued here that they are entitled to seek funds paid by Sudan as part of the Sudan Claims Settlement Agreement and, in any case, such arguments would be premature in the absence of an enforceable judgment.  Rather, Plaintiffs seek to use the authority of this Court to encourage the United States to "respond" to informal requests regarding the process to claim such funds that Plaintiffs' counsel has made outside the context of this litigation.  That, the Court will not do.

2.      Al Qaeda Funds held by OFAC

As to funds held by OFAC, it appears that Plaintiffs would proceed pursuant to the Terrorism Risk Insurance Act of 2001 ("TRIA"), Pub L. 107-297, 116 Stat. 2337 (set out as note under 28 U.S.C. § 1610), against Al Qaeda assets frozen by that office.  *See* ECF No. 141 at 6–7 (quoting the statute).  Pursuant to section 201 of the TRIA, unless there has been a presidential waiver necessary in the national security interest, "in every case in which a person has obtained a judgment against a terrorist party on a claim based on an act of terrorism . . . the blocked assets of that terrorist party . . . shall be subject to execution or attachment in aid of execution in order to satisfy such judgment."  TRIA, § 201(a).  A "blocked asset" is any asset "seized or frozen by the United

States under section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act ["IEEPA"] (50 U.S.C. § 1701, 1702)" that is not "subject to a license issued by the United States Government for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such license has been specifically required by statute other than the [IEEPA] or the United Nations Participation Act."  TRIA, § 201(d)(2).

"By its terms, TRIA allows victims of terror to execute only on *blocked* assets."  *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 622 (7th Cir. 2015). That term has a specific definition.  First, the funds must have been "blocked by the government pursuant to one of two statutes"—the IEEPA or the Trading with the Enemy Act.  *United States v. Holy Land Found. for Relief & Dev.*, 722 F.3d 677, 685 (5th Cir. 2103).  Second (and somewhat counter-intuitively), to be reachable by a victim of a terrorist attack, the frozen assets must *not* have been *unblocked* by the issuance of a license.  The Fifth Circuit has glossed this requirement by stating that the TRIA does not "reach those funds which the government has been given authorization to control through another means."[19]  *Holy Land Found.*, 722 F.3d at 685.

---

[19] The statutory scheme is a bit more complicated than that.  Only licenses that meet specific requirements will "unblock" funds and thus make them unreachable.  The statute

> excludes from its definition of blocked assets property that is subject to a license that meets four specific criteria: the license must be 1) issued by the United States Government; 2) for final payment, transfer, or disposition; 3) for a transaction by or to a person subject to the jurisdiction of the United States; and 4) specifically required by a statute *other than* IEEPA or [United Nations Participation Act].

*R.J. O'Brien*, 783 F.3d at 629 (Manion, J., concurring in part and dissenting in part); *see also id.* at 623–24 (majority opinion); *Kirschenbaum v. 650 Fifth Ave.*, Nos. 09-cv-165 et al., 2017 WL 8640248, at *6–9 (S.D.N.Y. May 15, 2017) (finding that the assets of the defendants had not been "unblocked" (and were thus available for attachment by the judgment creditors) for two independent reasons:  because they were not subject to a license for "final payment, transfer, or disposition" and because the licenses they were subject to were required by the IEEPA).  But for present purposes, the Fifth Circuit's explanation is sufficient.

Admittedly, the scheme is complicated and a response from the government as to "whether current blocked assets are subject to TRIA and, if so, in what amounts" might be useful to Plaintiffs.  ECF No. 141 at 7.  However, like the relief sought above, Plaintiffs' request is procedurally improper.  The government has not failed to respond to a properly-issued discovery request; indeed, discovery as to execution is premature, as is any determination as to whether assets held by OFAC are available for execution, as there are not, as yet, any final judgments.  More, encouraging the federal government to respond to Plaintiffs' informal requests outside the context of this litigation is not a proper use of 28 U.S.C. § 517.

Plaintiffs' motion is denied.

### III.    CONCLUSION

For the foregoing reasons, each of Plaintiffs' motions—the motion for discovery (ECF No. 140); the motion related to the Sudan Claims Resolution Act and funds held by OFAC (ECF No. 141); and the motion to sever (ECF No. 142)—are **DENIED**.


**SO ORDERED.**


Date: December 7, 2021                                    _____

                                                                    G. Michael Harvey
                                                                    United States Magistrate Judge