## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ODILLIA MUTAKA MWANI,** *et al.*

            **Plaintiffs,**

v.

**AL-QAEDA,**

            **Defendant.**

**Case No. 99-cv-125 (GMH)**

## MEMORANDUM OPINION AND ORDER

    This case, which has been pending for more than 20 years, was brought under the Alien Tort Statute (also known as the Alien Tort Claims Act), 28 U.S.C. § 1350, on behalf of over 500 Plaintiffs who claimed to have suffered injuries as a result of the 1998 bombing of the United States Embassy in Nairobi, Kenya. Al Qaeda, the sole remaining Defendant, has defaulted. The judge who previously presided over this case held a bellwether evidentiary hearing to establish appropriate damages for 8 Plaintiffs, which resulted in an award of pain and suffering and punitive damages—totaling more than $150 million each—for 6 of them. He then applied certain findings from that hearing to similarly-situated Plaintiffs and entered an order awarding comparable pain and suffering and punitive damages to 374 more—78 of whom, it later appeared, had not presented proof that they were in the vicinity of the U.S. Embassy at the time of the bombing, such as by claiming that they were physically or psychologically injured by the bombing. Rather, those Plaintiffs seemed to have presented only evidence that they suffered economic injury—for example, lost wages because their workplace was closed in the aftermath of the attack. Recognizing that the appropriateness of an award of damages of over $150 million is questionable for those Plaintiffs who failed to provide proof that they were in the vicinity of the U.S. Embassy at the time of

the bombing, the Court must now decide whether it *can* rescind the award of damages to those Plaintiffs (that is, whether it has the authority to do so) and, if it *can*, whether it *should*. For the reasons that follow, the Court finds that the Court has the authority to revise those awards and that many awards, which are unsupported by evidence, should be vacated and the claims underlying them dismissed with prejudice.[1]

## I.     BACKGROUND

Prior opinions, including one issued contemporaneously with this one, have detailed the long history of this case, which was filed in 1999. *See, e.g.*, *Mwani v. Al Qaeda*, No. 99-cv-125, 2021 WL 5800737 (D.D.C. Dec. 7, 2021). For the purposes of this decision, the first decade or so of proceedings are immaterial. This story begins in 2010.

In that year, after Al Qaeda had defaulted, Judge Facciola held a bellwether evidentiary hearing to determine damages for eight Plaintiffs, with the intention that those damages would serve as a basis for awarding appropriate damages to the remaining Plaintiffs. *See Mwani v. Al Qaeda*, No. 99-cv-125, 2014 WL 4749182, at *1, 13 (D.D.C. Sept. 25, 2014) [hereinafter, *Mwani I*]. As relevant here, Plaintiffs offered the testimony of Dipak L. Shah, who co-owned a menswear shop near the U.S. Embassy in Nairobi. *Id.* at *4. On the day of the bombing (August 7, 1998), he was in the store when he "heard two blasts, and felt a tremor in the floor, like an 'earthquake.'" *Id.* The windows of the shop shattered, the power went out, and he "feared that the building [would] collapse." *Id.* When he went outside, he saw other victims, some with glass embedded in their heads, and "also saw intestines, brains, and eyeballs, and dead bodies." *Id.* Dipak Shah further testified that, since the bombing, he had lost weight, had trouble sleeping, no longer had

---

[1] The documents most relevant to this Memorandum Opinion and Order are (1) the Form 95s filed by Plaintiffs in October 2014 as support for their damages claims (ECF No. 126); (2) the chart filed by Plaintiffs on September 28, 2021 (the "Revised Chart") (ECF No. 145); and (3) the supplemental brief filed by Plaintiffs on February 25, 2022 (ECF No. 156).

interest in social interactions with friends, and feared "going to the movies or other public events." *Id.* He also stated that he had lost his business, which previously made "net annual profits of 500,000 [Kenyan Shillings]." *Id.* at *4, 11. Judge Facciola also credited the testimony of Plaintiffs' expert, Joan Mwendi Kiema-Ngunnzi, who testified at the hearing that

> each victim of the Embassy bombing suffered long-term or permanent psychological injury from the scenes that they observed during the bombing and in its aftermath. She testified that the victims of the bombing suffered the effects of post-traumatic stress disorder. Specifically, she testified that each victim of the Embassy bombing "has sustained material, significant emotional, psychological and financial injury," whether he suffered a physical injury or not.

*Id.* at *8 (internal record citations omitted). In addition, she noted that a "social stigma" attached to the victims of the bombing, even those without physical injuries, and that stigma had not dissipated as of the date of the hearing in 2010. *Id.* at *7. Based on that testimony (and similar testimony from other Plaintiffs), Judge Facciola found that Plaintiffs had established claims for assault and battery because "uncontroverted testimony" showed that the bombing had injured them, "made them apprehensive and fearful of such harm," or both. *Id.* at *10. However, Judge Facciola found that Plaintiffs had not established entitlement to damages for wrongful death for two independent reasons. First, the two Plaintiffs claiming wrongful death were deceased and therefore did not have the capacity to sue. *Id.* at *9. Second, he held that federal common law, which governs the claims in this case, did not recognize the tort of wrongful death. *Id.*

Turning to damages, Judge Facciola found that testimony as to economic damages—similar to Dipak Shah's assertion that he had lost a business that made 500,000 Kenyan Shillings per year—was "insufficient to support an award of economic damages for any of the plaintiffs" because it "both failed to 'reasonably prove' the extent of their past economic losses or prove 'by a preponderance of the evidence' the extent of their future economic losses." *Id.* at *11. However, relying on the testimony of individual Plaintiffs regarding their non-economic injuries, as well as

3

on the expert testimony of Joan Kiena-Ngunnzi, Judge Facciola found that the evidence supported awards of pain and suffering damages for each Plaintiff who claimed assault and/or battery. *Id.* Noting that Dipak Shah claimed psychological injury but no physical injury, Judge Facciola awarded him $5 million. *Id.* at *12. He further awarded prejudgment interest from the date of the attack "until the date of final judgment." *Id.* at *13. Judge Facciola then addressed punitive damages. He considered two cases from this Circuit: one, a case of torture and extra-judicial killings brought under the state-sponsor-of-terrorism exception to the Foreign Sovereign Immunities Act ("FSIA") in which the court assessed punitive damages of $150 million per plaintiff against the Syrian Arab Republic; the other, a similar terrorism case in which the court awarded a lump sum of $1 billion in punitive damages against the Islamic Republic of Iran—calculated as five times Iran's estimated annual expenditure on material support of terrorism. *Id.* at *12 (discussing *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53 (D.D.C. 2008), and *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010)). Judge Facciola awarded punitive damages in the amount of $150 million to each of the six assault and/or battery Plaintiffs, including Dipak Shah. *Id.* at *12. The Court reasoned that the bombing of the U.S. Embassy was "one of the most grotesque and depraved acts imaginable," causing "injury, death, and irreparable emotional harm to hundreds of Kenyan citizens." *Id.* However, in light of the fact that "Al Qaeda's wealth is unknown" and uncertainly as to "whether any award of punitive damages is likely to have any deterrent effect whatsoever," the Court found it could not, "in keeping with requirements of due process, make any greater award without additional expert testimony as to Al Qaeda's wealth and the multiplier necessary to affect Al Qaeda's future conduct." *Id.* Finally, Judge Facciola tackled prejudgment interest. Recognizing that "[t]he decision to award prejudgment interest, as well as how to compute that interest, rests within the discretion of the Court, subject to equitable considerations," he

found that such interest was both "appropriate" and "necessary to fully compensate the victims for the injuries they sustained as a result of Al Qaeda's terrorist act." *Id.* at *13. He therefore awarded prejudgment interest on Plaintiffs' "compensatory, but not punitive, damages" for the time period from 1998 (the year of the bombing) to 2014 (the year of his decision in *Mwani I*). *Id.*

Finally, Judge Facciola observed that, having determined the damages due the bellwether Plaintiffs, "the only issue remaining before the Court [was] the extent to which the Court's analysis and damage award . . . can be applied to the remaining plaintiffs." *Id.* at *13. He agreed with Plaintiffs that the "Form 95, a claim form under the [Federal Tort Claims Act]," which most Plaintiffs had filled out in connection with their claims in this case,[2] could be used "to determine an appropriate damages matrix for the remaining plaintiffs." *Id.* The Court therefore ordered Plaintiffs to file the Form 95s on the docket and to provide Chambers with a chart that listed each Plaintiff with his or her claimed tort and injury and cross-referenced both the location of the corresponding Form 95 and the page number where he or she appeared in the operative complaint. *Id.* at *14. He further set a status conference to discuss the damages issue further. *Id.* The day *Mwani I* was issued, the Court filed a document labeled "Judgment" that recites the damages awarded to six of the eight bellwether Plaintiffs. ECF No. 122 (the "September 2014 Order"). The two wrongful death Plaintiffs are not mentioned in that document. *Id.*

---

[2] Standard Form 95 is "a form prescribed by the Justice Department for presentation of claims" against the United States, which "instructs claimants to describe the incident causing the injury, to state the amount of the claim in dollars, and to provide information regarding witnesses to the incident and insurance coverage." *GAF Corp. v. United States*, 818 F.2d 901, 906 & n.16 (D.C. Cir. 1987); *cf.* 28 C.F.R. § 14.2(a) ("[A] claim shall be deemed to have been presented when a Federal agency receives from a claimant . . . an executed Standard Form 95 or other written notification of an incident . . . ."). The form itself warns that there are civil and criminal penalties for presenting fraudulent claims or making false statements. Claim for Damage, Injury, or Death, U.S. Gen. Servs. Admin., https://www.gsa.gov/forms-library/claim-damage-injury-or-death (follow "SF95-07a.pdf" link). Presumably, counsel for Plaintiffs collected Form 95s because the United States was a defendant before it was dismissed from the case in 1999. *See* ECF Nos. 37–38.

At the follow-up status conference on October 3, 2014 (the "October 2014 Status Confer-ence"), Judge Facciola expressed concern that Plaintiffs who suffered PTSD as well as minor physical injuries had "unique and individual" damages not suitable to application of a damages matrix drawn from the findings of *Mwani I*. ECF No. 153 at 3. He also noted that some of those Plaintiffs claimed economic damages, which Plaintiffs' counsel characterized as "nominal." *Id.* at 3–5. Judge Facciola proposed, and Plaintiffs' counsel agreed, to use Dipak Shah's award as the measure of those Plaintiffs' damages in lieu of attempting to calculate damages on a more individ-ualized basis. *Id.* at 5. That would allow the Court to award damages to Plaintiffs similarly situated to Dipak Shah "without consideration of specific physical injuries and economic damages." *Id.*

Two weeks later, Plaintiffs submitted a "damages matrix chart" (the "Original Chart") via email to Judge Facciola's chambers.[3] *See* ECF No. 125 at 1. Plaintiffs explained that the Original Chart omitted certain Plaintiffs "for various reasons, including duplications or the unavailability of a reliable Form 95." *Id.* Plaintiffs sought judgment "only for those plaintiffs identified on the [Original] Chart." *Id.* In addition, "[f]or completeness only," Plaintiffs included "the names of wrongful death claimants," while noting that the "[w]rongful death claims have been dismissed." *Id.* at 2. One week later, Plaintiffs filed over 900 pages of Standard Form 95s. Those forms described the injuries of most Plaintiffs, although a significant number—over 90 individuals—did not submit such evidence. ECF No. 126; *see also* ECF No. 145-1.

Judge Facciola issued his second findings of fact and conclusions on November 18, 2014, awarding 374 Plaintiffs the same amount that he had awarded Shah, i.e., $5 million in pain and suffering damages plus prejudgment interest (in the identical amount awarded to Shah) and $150 million in punitive damages, for a total award of "$161,309,500 per person." *Mwani v. Al Qaeda*,

---

[3] That chart is not available on the court's electronic docket.

No. 99-cv-125, 2014 WL 6463227, at *1–4 (D.D.C. Nov. 18, 2014) [hereinafter, *Mwani II*].  Relying on *Mwani I*, Judge Facciola did not award damages to the 17 Plaintiffs who claimed damages under a wrongful death theory.  *Mwani II*, 2014 WL 6463227, at *4.  He also declined to award damages to 45 business entities, "since only natural persons can experience pain and suffering as a result of a common law battery or assault" and, presumably, because their economic damages had not been proved; and to 1 Plaintiff who, as a minor, lacked the capacity to sue in his own right. *Id.*  A document labeled "Second Judgment" was entered as to the 374 Plaintiffs who received a damages award (the "November 2014 Order").  ECF No. 129.  Plaintiffs who were dismissed or did not receive an award of damages pursuant to the decision on *Mwani II* were not mentioned.

The case was then largely dormant for over six years, during which time (in 2017) it was transferred to the undersigned, Judge Facciola having retired.  When Plaintiffs' counsel reemerged with a plan to file a number of motions reviving the case, the Court held a status conference.  ECF No. 139.  As relevant here, the Court ordered Plaintiffs to file on the docket a chart (similar to the one they provided Judge Facciola in 2014) that, among other things, cross-referenced each Plaintiff's name, claimed tort(s), and injuries with (1) the location in the record of the corresponding Form 95 and (2) the location in the record of any document memorializing an award of damages. ECF No. 138 at 1–2.  After first filing a non-compliant chart (ECF No. 142 at 12–23), Plaintiffs filed the Revised Chart as directed in late September 2022 (ECF No. 145).

Reviewing the Revised Chart in connection with motions Plaintiff filed in January 2022, the Court became aware that a number of Plaintiffs—78 by the Court's count—are listed as having been awarded damages in the November 2014 Order (as explained in *Mwani II*) notwithstanding that they sought only economic damages.  Inspection of a sample of the Form 95s supporting those Plaintiffs' claims revealed that—at least for those checked—the individuals did not assert that they

had been physically or psychologically injured in the blast; indeed, there were no facts that indicated that they were in the area of the bombing at the time it occurred.  Having discussed the issue at a hearing in late February 2022 (*see* Rough Transcript of February 17, 2022 Hearing at 23–31) ("Feb. 17, 2022 Tr.") (on file with the Chambers of the undersigned), the Court provided counsel a list of the 78 identified individual Plaintiffs and ordered supplemental briefing on, among other things, "the proper way to resolve the claims of those Plaintiffs who sought only economic damages but were nonetheless awarded damages for pain and suffering" pursuant to *Mwani II* and the November 2014 Order and "whether dismissals of the claims of Plaintiffs who failed to provide proof of injuries . . . should be with or without prejudice."  ECF No. 155 at 1–2.  Along with that brief, Plaintiffs filed supplemental declarations from 3 of the 78 identified Plaintiffs that both purport to show that those Plaintiffs were in the vicinity of the U.S. Embassy at the time of the bombing and assert that they each sustained psychological injuries akin to PTSD as a result.  ECF No. 156-1; ECF No. 156-2; ECF No. 156-3.

## II.   DISCUSSION

As noted above, there are three substantive questions to be answered here:  (1) whether the Court has the authority to revisit and revise the November 2014 Order, (2) whether the Court should exercise its discretion to do so, and (3) if certain Plaintiffs' claims are dismissed, whether the dismissal should be with or without prejudice.  In addition, the Court addresses the calculation of prejudgment interest as to Plaintiffs who are awarded damages.  But before addressing those questions, a bit more detail about the 78 Plaintiffs at issue here.

### A.   The Plaintiffs and Their Evidence

As noted, the Court was alerted to this issue when examining the Revised Chart the Plaintiffs' counsel submitted to the Court.  It reflected that there were 78 Plaintiffs who were awarded

damages in *Mwani II* and the November 2014 Order, but who claimed only economic damages. Judge Facciola held in *Mwani I* that the evidence provided by the bellwether Plaintiffs as to economic losses—which included both attestations from Form 95s as to property losses and live testimony as to loss of business, salary, or commissions—was insufficient to prove those economic damages to a reasonable certainty.  *See Mwani I*, 2014 WL 4749182, at *11; *see also, e.g.*, ECF No. 126-1 at 25 (Form 95 of bellwether Plaintiff Wilfred Nderitu claiming property loss of 1,336,333 Kenyan Shillings).  Thereafter, at the October 2014 Status Conference, Judge Facciola and Plaintiffs' counsel had agreed that economic damages (which Plaintiffs' counsel characterized as "nominal") would not be considered in the award of damages for the remaining Plaintiffs.  ECF No. 153 at 4–5.  For that reason, the Court brought those 78 Plaintiffs to the attention of Plaintiffs' counsel, suggesting that the awards of pain and suffering damages to those individuals were inappropriate, as they claimed only economic injuries such as lost salary, destroyed inventory, or damaged office equipment.  *See* Feb. 17, 2022 Tr. at 23–26.

A review of the record, including the Form 95s associated with those 78 Plaintiffs, reveals a number of material details.  One of those Plaintiffs—Charles Mogi, whose entry on the Revised Chart, ECF No. 145-1, can be found at line 189—testified at the bellwether evidentiary hearing as to his physical and psychological injuries from the bombing and was awarded damages in *Mwani I* and the September 2014 Order.  *See Mwani I*, 2014 WL 4749182, at *6, 12, 14; ECF No. 122. His claims are no longer at issue here; thus, there are 77, rather than 78, claims in question.  Seven of those 77 Plaintiffs did not claim damages for an individual, but rather claimed damages on behalf of a business:

> (1)     Margaret Njeri Kibui (ECF No. 145-1, line 125) claimed damages on behalf of Divine Beautyland Salon.  ECF No. 126-2 at 72.

(2) David N. Mwangi (ECF No. 145-1, line 234) claimed damages on behalf of Magomano Bar & Restaurant. ECF No. 126-4 at 21.

(3) Mary Muthoni Nderitu (ECF No. 145-1, line 258) claimed damages on behalf of Mary's Boutique Ltd. ECF No. 126-4 at 62.

(4) Joseph Njogu Ngugi (ECF No. 145-1, line 271) claimed damages on behalf of Pipes Bar and Restaurant. ECF No. 126-4 at 78.

(5) Dr. Delano Akwiri Odingo Othiempo (ECF No. 145-1, line 312) claimed damages on behalf of Choice Ads Ltd. ECF No. 126-5 at 49.

(6) Moses Kariuki Ruita (ECF No. 145-1, line 328) claimed damages on behalf of Datastorm Computer Systems. ECF No. 126-5 at 75.

(7) Ruth Wangombe (ECF No. 145-1, line 352) claimed damages on behalf of "Esdan Salon" or "Esdan Saloon." ECF No. 126-6 at 1.

As noted above, Judge Facciola held that business entities are not entitled to pain and suffering damages. *See Mwani II*, 2014 WL 6463227, at *4.

Plaintiffs have provided new declarations for three of the Plaintiffs at issue. Two of those new declarations are inconsistent with the facts included in the Form 95s, each of which was completed in 1999 and filed in 2014, for those same individuals:

(1) Peter Maina (ECF No. 145-1, line 168) asserted in his Form 95 that he was working as a waiter at Magomano Bar & Restaurant at the time of the bombing and lost salary and commission because the premises closed for two months. ECF No. 126-3 at 31. His new declaration asserts that he was an accounts assistant at the time of the bombing, working in an office on the 13th floor of Cooperative House, a building nearby the U.S. Embassy, and was physically injured in the blast.[4, 5] ECF No. 156-2 at 2–3.

---

[4] *See* Remembering the 1998 Embassy Bombings (Aug. 3, 2018), https://www.state.gov/remembering-the-1998-embassy-bombings-2/#rememberniroba; *see also* Nairobi Bombing Map, *available at* https://washingtonpost.com/wp-srv/inatl/longterm/eafricabombing/maps/nairobimap.htm (last visited Mar. 15, 2022).

[5] There is another Plaintiff named Peter Maina Ngure. ECF No. 145-1, line 508. He claimed physical injuries from the bombing in his Form 95, so he is not the Plaintiff at issue here. ECF No. 126-8 at 39. Nor is there any indication that he is the Plaintiff who submitted the new declaration. Peter Maina Ngure claimed that he suffered "multiple cuts over the right leg[,] . . . cuts of both hands[,] [and] cuts on the lips caused by flying objects." *Id.* While Peter Maina's declaration claims general "facial and body injuries," it also asserts that the blast "affected [his] eyesight." ECF No. 156-2 at 1. Later, he emphasizes "impaired eyesight"—with no mention of cuts or lacerations—as his injury. *Id.* at 3. Thus, it appears form the Form 95s and the new declaration that Peter Maina Ngure and Peter Maina are different people who alleged different injuries.

    (2)    Mary Wanjiku Kinuthia (ECF No. 145-1, line 483) asserted in her Form 95 that at the time of the bombing she worked at the Solar House next to the Ufundi Co-operative[6] in a job that paid her "an average of 20,000 on commission basis." ECF No. 126-7 at 124. Her new declaration (under the name "Mary Wanjiru Kinuthia") asserts that she was employed as a trade development officer and was at her work station in the Cooperative Building when the bombing occurred. ECF No. 156-3 at 3.

One of the new declarations is *not* inconsistent with the corresponding Form 95, but asserts for the first time psychological injuries arising from the bombing. Rose Wanjiru asserted in her Form 95 that she worked in a stall selling clothing near the U.S. Embassy. ECF No. 126-6 at 7. The bomb damaged the premises and forced it to close for two months, causing her to lose her income. *Id.* In her new declaration, she first states that she left blank the section on her Form 95 regarding personal injuries because she "misunderstood what constituted an injury." ECF No. 156-1 at 1. She then states that, at the time of the bombing, she heard a loud noise and began walking toward the U.S. Embassy in a daze. *Id.* She lost her father in the bombing. *Id.* at 2. Since the event, she is frightened of loud noises and suffers from anxiety and depression. *Id.*

    Of the remaining 67 Plaintiffs, the Form 95s of 24 of them, generously read, indicate that they were at their jobs near the U.S. Embassy when the bombing occurred and that their places of business were damaged in the bombing. However, none asserts any physical or psychological injury as a result of the incident. Rather, each asserts only economic injury, such as loss of property or loss of salary/commission. These 24 Plaintiffs are as follows:

    (1)    Duncan Maina Chege (ECF No. 145-1, line 70). ECF No. 126-1 at 105.
    (2)    Mary Nyambura Gaita (ECF No. 145-1, line 78). ECF No. 126-2 at 1.
    (3)    Ejidiah Gathoni (ECF No. 145-1, line 81). ECF No. 126-2 at 5.

---

[6] Ufundi Cooperative or Ufundi House—a different building than Cooperative House—was also near the U.S. Embassy. *See* Remembering the 1998 Embassy Bombings (Aug. 3, 2018), https://www.state.gov/remembering-the-1998-embassy-bombings-2/#rememberniroba; *see also* Nairobi Bombing Map, *available at* https://washingtonpost.com/wp-srv/inatl/longterm/eafricabombing/maps/nairobimap.htm (last visited Mar. 15, 2022). Solar House is a different building across the street from the U.S. Embassy. *See* James C. McKinley Jr., "Two U.S. Embassies in East Africa Bombed," N.Y. Times (Aug. 8, 1998), *available at* https://archive.nytimes.com/www.nytimes.com/library/world/africa/080898africa-bombing.html (last visited Mar. 10, 2022).

(4)     Luliet Wanjiru Githinji (ECF No. 145-1, line 96).  ECF No. 126-2 at 25.
(5)     James Gichumu Karuiru (ECF No. 145-1, line 123).  ECF No. 126-2 at 68.
(6)     Geoffrey Guchure Kimani (ECF No. 145-1, line 128).  ECF No. 126-2 at 78.
(7)     Julius Gikonyo Kimani (ECF No. 145-1, line 129).  ECF No. 126-2 at 80.
(8)     Julius Kalili Kithikii (ECF No. 145-1, line 132).  ECF No. 126-2 at 84.
(9)     Simon Wachira Kimata (ECF No. 145-1, line 143).  ECF No. 126-2 at 102.
(10)    Christine W. Kingori (ECF No. 145-1, line 146).  ECF No. 126-2 at 108.
(11)    Joseph Kikonyo Kiruthi (ECF No. 145-1, line 150).  ECF No. 126-3 at 1.
(12)    Julius Karunda ECF No. 145-1, line 154).  ECF No. 126-3 at 9.
(13)    Michael Githimbo Miringu (ECF No. 145-1, line 185).  ECF No. 126-3 at 56.
(14)    Gerald Stephen Mwangi Mucanga (ECF No. 145-1, line 193). ECF No. 126-3 at 70.
(15)    Josphat Kambi Mwangi (ECF No. 145-1, line 239).  ECF No. 126-4 at 31.
(16)    Rosemary A. Mwango (ECF No. 145-1, line 246).  ECF No. 126-4 at 46.
(17)    Muniu Gichunro Natera (ECF No. 145-1, line 254).  ECF No. 126-4 at 56.
(18)    Peter Miringu Nganpu (ECF No. 145-1, line 262).  ECF No. 126-4 at 64.
(19)    John Ndirangu Wahome (ECF No. 145-1, line 337).  ECF No. 126-5 at 85.
(20)    David Waithangi (ECF No. 145-1, line 339).  ECF No. 126-5 at 89.
(21)    George Njogu Wakibi (ECF No. 145-1, line 341).  ECF No. 126-5 at 93.
(22)    Lucia Kaswii Wambua (ECF No. 145-1, line 344).  ECF No. 126-5 at 99.
(23)    John Ibrahim Wamenjuu (ECF No. 145-1, line 346).  ECF No. 126-5 at 101.
(24)    Gastone Kiziihi Yongo (ECF No. 145-1, line 362).  ECF No. 126-6 at 17.

The remaining 43 Plaintiffs have presented no evidence showing that they were near the U.S. Embassy at the time of the bombing.  Rather, the most asserted is that they were employed at businesses located nearby and claim lost property, business, or salary/commissions from the bombing.  That is, there are no representations to suggest that they were at their places of work at the time of the bombing.

(1)     Mary Achieng Bondi (ECF No. 145-1, line 67).  ECF No. 126-1 at 101.
(2)     Stanley K. Gacuru (ECF No. 145-1, line 77).  ECF No. 126-1 at 118.[7]
(3)     James Irungu Gathogo (ECF No. 145-1, line 80).  ECF No. 126-2 at 3.
(4)     James Kuria Gichiru (ECF No. 145-1, line 87).  ECF No. 126-2 at 11.
(5)     Peter Mwai Gikaara (ECF No. 145-1, line 89).  ECF No. 126-2 at 13.
(6)     Joseph Gathere Gitau (ECF No. 145-1, line 92).  ECF No. 126-2 at 19.
(7)     Patrick K. Githri (ECF No. 145-1, line 98).  ECF No. 126-2 at 27.
(8)     Stephen Nderi Githuthwa (ECF No. 145-1, line 99).  ECF No. 126-2 at 29.
(9)     Petera Agori Isauwa (ECF No. 145-1, line 105).  ECF No. 126-2 at 40.

---

[7] There is no Form 95 for Stanley Gacuru in the record.  Rather, Plaintiffs have submitted a copy of a letter from Plaintiffs' counsel to an Attorney Advisor at the Department of State to which a Form 95 was apparently once attached.  ECF No. 126-1 at 115.  The letter indicates that someone named Stanley Kamau Gaichuru claimed business/property loss from the bombing, but there are no details as to the claim.  *Id.* at 118.

(10)    Joyce Ngjeri Kahoro (ECF No. 145-1, line 109).  ECF No. 126-2 at 47.
(11)    Anne Wanjiru Kamau (ECF No. 145-1, line 112).  ECF No. 126-2 at 54.
(12)    Paul Mbutha Kiiru (ECF No. 145-1, line 126).  ECF No. 126-2 at 74.
(13)    Julius Muturi Kihara (ECF No. 145-1, line 127).  ECF No. 126-2 at 76.
(14)    Joseph M. Njenga (ECF No. 145-1, line 133).  ECF No. 126-2 at 86.
(15)    George Nunene Kago (ECF No. 145-1, line 134).  ECF No. 126-2 at 88.
(16)    Samuel Ndirangu Kihanga (ECF No. 145-1, line 140).  ECF No. 126-2 at 98.
(17)    Sarah Njoki Maima (ECF No. 145-1, line 167).  ECF No. 126-3 at 29.
(18)    Julia K. Majan (ECF No. 145-1, line 170).  ECF No. 126-3 at 35.
(19)    Laban Kanyi Muchanya (ECF No. 145-1, line 194).  ECF No. 126-3 at 74.[8]
(20)    Winnie Njoki Mugoh (ECF No. 145-1, line 202).  ECF No. 126-3 at 84.
(21)    Bernard Kisaingu Musyoka (ECF No. 145-1, line 219).  ECF No. 126-3 at 111.
(22)    Boniface Muthee (ECF No. 145-1, line 223).  ECF No. 126-4 at 3.
(23)    Francis Ngei Mutua (ECF No. 145-1, line 227).  ECF No. 126-4 at 7.
(24)    David Thuo Mwangi (ECF No. 145-1, line 236).  ECF No. 126-4 at 25.
(25)    Duncan Githuna Mwangi (ECF No. 145-1, line 237).  ECF No. 126-4 at 27.
(26)    Moffatkaguamba Mwaingi (ECF No. 145-1, line 241).  ECF No. 126-4 at 35.
(27)    Perminus M. Mwangi (ECF No. 145-1, line 243).  ECF No. 126-4 at 39.
(28)    Ann Wanjugu Ndegwa (ECF No. 145-1, line 257).  ECF No. 126-4 at 60.
(29)    Charles Githaiga Nguku (ECF No. 145-1, line 272).  ECF No. 126-4 at 80.
(30)    Giaraph G. Ngumba (ECF No. 145-1, line 274).  ECF No. 126-4 at 87.[9]
(31)    Winfre A. Njeri (ECF No. 145-1, line 279).  ECF No. 126-4 at 93.
(32)    Judy Njoki (ECF No. 145-1, line 283).  ECF No. 126-4 at 104.[10]
(33)    James Kariuki Njombou (ECF No. 145-1, line 284).  ECF No. 126-5 at 1.
(34)    Susan Muthoni Njuguma (ECF No. 145-1, line 289).  ECF No. 126-5 at 13.[11]
(35)    John Kimathi Wambar (ECF No. 145-1, line 342).  ECF No. 126-5 at 95.
(36)    Marion Wambu (ECF No. 145-1, line 343).  ECF No. 126-5 at 97.
(37)    Anastacia Grace Wanjiku (ECF No. 145-1, line 353).  ECF No. 126-6 at 3.
(38)    Beatrice Wanjiru (ECF No. 145-1, line 354).  ECF No. 126-6 at 5.
(39)    Ireri (Elijah) N. Ireri ECF No. 145-1, line 434).  ECF No. 126-6 at 27.

---

[8] There is no Form 95 for Laban Kanyi Muchanya in the record.  Rather, Plaintiffs have submitted a copy of a letter from Plaintiffs' counsel to an Attorney Advisor at the Department of State to which a Form 95 was apparently once attached.  ECF No. 126-3 at 72.  The letter indicates that someone named Laban Kanyi claimed business/property loss from the bombing, but there are no details as to the claim.  *Id.* at 74.

[9] There is no Form 95 for Giaraph G. Ngumba in the record.  Rather, Plaintiffs have submitted a copy of a letter from Plaintiffs' counsel to an Attorney Advisor at the Department of State to which a Form 95 was apparently once attached.  ECF No. 126-4 at 84.  The letter indicates that someone named Gidraph Gikonyo Ngumba claimed business/property loss from the bombing.  *Id.* at 87.

[10] There is no Form 95 for Judy Njoki in the record.  Rather, Plaintiffs have submitted a copy of a letter from Plaintiffs' counsel to an Attorney Advisor at the Department of State to which a Form 95 was apparently once attached.  ECF No. 126-4 at 101.  The letter indicates that someone named Judy Njoki claimed business/property loss from the bombing.  *Id.* at 104.

[11] There is no Form 95 for Susan Muthoni Njuguma in the record.  Rather, Plaintiffs have submitted a copy of a letter from Plaintiffs' counsel to an Attorney Advisor at the Department of State to which a Form 95 was apparently once attached.  ECF No. 126-5 at 10.  The letter indicates that someone named Susan Muthoni Njuguna claimed business/property loss from the bombing.  *Id.* at 13.

(40)    Jennifer Njeri Mwangi (ECF No. 145-1, line 446).  ECF No. 126-6 at 51.
(41)    Joe Kiroga (ECF No. 145-1, line 448).  ECF No. 126-6 at 55.
(42)    Lazarus Kipkemboi (ECF No. 145-1, line 471).  ECF No. 126-6 at 100.
(43)    Milka Wangui Kariuki (ECF No. 145-1, line 488).  ECF No. 126-6 at 134.

Thus, there are five groups of Plaintiffs:  (1) Plaintiffs who claimed damages only on behalf of businesses, (2) Plaintiffs who filed new declarations that are factually inconsistent with their Form 95s, (3) a Plaintiff who filed a new declaration that is not inconsistent with her Form 95, (4) Plaintiffs whose Form 95s claim only economic damages and also indicate that they were in the vicinity of the U.S. Embassy at the time of the bombing, and (5) Plaintiffs who claim only economic damages and have presented no evidence that they were in the vicinity of the U.S. Embassy at the time of the bombing.  The Court will consider each group in turn after first considering whether it has the authority to alter the November 2014 Order and, if it does, whether it should do so.

### B.    Whether the Court has the Authority to Revisit the November 2014 Order

Rule 54(b) provides:

> When an action presents more than one claim for relief . . . or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b).  The rule "can be divided into two operative parts":  the first allows a court "to certify for immediate appeal by entering final judgment on a portion of a case and expressly determining 'that there is no just reason for delay[ing]' the appeal of the issue"; the second "authorizes [a court] to revise an interlocutory order." *Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am. Inc.*, No. 4:08-cv-451, 2019 WL 4805917, at *3 (E.D. Tex. Oct. 1, 2019)

(quoting Fed. R. Civ. P. 54(b)).  More, the first part defines how an otherwise non-final order becomes a final judgment:  a court must issue an order that resolves one or more, but not all, claims for relief included in the case; "the order must be 'final' with respect to [those] claim[s]; and "the district court must permissibly determine that there is 'no just reason for delay' in entering judgment."  *Attias v. CareFirst, Inc.*, 969 F.3d 412, 417 (D.C. Cir. 2020).  "[U]nless a district court specifically: (1) enters judgment *and* (2) finds there is no just reason for delay, then, regardless of how it designates any order disposing only of some of the claims in an action, that order is not a final judgment."  *Clarke v. Mindis Metals, Inc.*, 99 F.3d 1138 (6th Cir. 1996); *see also In re Domestic Airline Travel Antitrust Litig.*, 3 F.4th 457, 460 (D.C. Cir. 2021) (noting that Rule 54(b) requires the district court to direct entry of judgment and to "expressly determine[ ] that there is no just reason for delay" (quoting Fed. R. Civ. P. 54(b))); *Blackman v. District of Columbia*, 456 F.3d 167, 175 (D.C. Cir. 2006) (stating that a proper certification under Rule 54(b) requires both an express determination there is no just reason for delay and an express direction for entry of judgment).  The second part embodies in a rule a court's inherent power to reconsider or revise any non-final order, *see, e.g.*, *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011) ("Rule 54(b) . . . recognizes [a court's] inherent power to reconsider an interlocutory order as justice requires." (internal quotation marks omitted))—including any order resolving some but not all claims that has not been certified as final under Rule 54(b), *see, e.g.*, *Ahuruonye v. United States Dep't of Interior*, No.16-cv-1767, 2018 WL 11382921, at *2 (D.D.C. Nov. 1, 2018) (stating that, "[u]nder Federal Rule of Civil Procedure 54(b), any order or decision that does not constitute a final judgment 'may be revised at any time'" prior to entry of a final, appealable judgment (footnote omitted) (quoting Fed. R. Civ. P. 54(b))).  A court may exercise the

power to revise or reconsider a non-final order *sua sponte*. *See, e.g.*, *Fayetteville Inv'rs v. Commercial Builders*, 936 F.2d 1462, 1472 (4th Cir. 1991); *Livonia Pub. Sch. v. Selective Ins. Co. of the S.E.*, __ F. Supp. 3d __, __, 2020 WL 728540, at *5 (E.D. Mich. 2020); *Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 381 F. Supp. 3d 185, 209 n.36 (N.D.N.Y. 2019), *aff'd*, 7 F.4th 50 (2d Cir. 2021).

Here, although the November 2014 Order resolved some, but not all, of the claims in the case and was "final" as to those claims, it is not a final judgment because Judge Facciola did not certify it as such by expressly finding that there was no just reason for delaying its entry as an appealable order. Plaintiffs have repeatedly conceded that the November 2014 Order did not dispose of each and every claim. *See, e.g.*, ECF No. 130 at 5; ECF No. 135 at 6; ECF No. 139 at 21; ECF No. 140 at 6; ECF No. 142 at 6 & n.4; ECF No. 148 at 1–2; ECF No. 156 at 1. It is therefore an interlocutory order that may be "reconsider[ed] and revise[d] . . . 'as justice requires,' or if there are other good reasons for doing to."[12] *Jordan v. U.S. Dep't of Labor*, 308 F. Supp. 3d 24, 38 (D.D.C. 2018) (quoting *Lemmons v. Georgetown Univ. Hosp.*, 241 F.R.D. 15, 21 (D.D.C. 2007)).

### B.    Whether the Court Should Exercise its Discretion to Revise the November 2014 Order

Revision of an interlocutory order is "within the discretion of the trial court." *Id.* (quoting *Lemmons*, 241 F.R.D. at 21). There is some guidance for that discretion, however. "Justice may require revision when the Court has," among other things, "'made an error not of reasoning but of

---

[12] Plaintiffs assert that they are "entitled to reasonable notice and an opportunity to present the type of evidence that the Court deems to have been lacking." ECF No. 156 at 13. Although Plaintiffs do not cite any of it, there is precedent indicating that one judge should not *sua sponte* revisit the "rulings in the same case by another judge of coordinate jurisdiction" without providing "sufficient notice that one judge is revisiting the decision of a prior judge and the opportunity to be heard with respect to the new ruling." *Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1251 (10th Cir. 2011). But Plaintiffs have had such notice here. As they admit, the Court alerted them to this problem in the February 17, 2022 hearing. ECF No. 156 at 1, 6. The Court gave them the opportunity to brief the issues, which they have done. *See id.* at 6–13. Plaintiffs have even provided additional evidence as to three of the Plaintiffs at issue. ECF Nos. 156-1 through 156-3. They are entitled to no further notice or opportunity to be heard.

apprehension,'" such as where it has failed to consider "'controlling decisions or data, that might reasonably be expected to alter the conclusion reached by the court.'" *Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (first quoting *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004), then quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)).  Additionally, a court's discretion to alter a non-final ruling is "limited by the law of the case doctrine and 'subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'"  *Id.* (quoting *In re Ski Train Fire in Kaprun, Austria, on Nov. 11, 2004*, 224 F.R.D. 543, 546 (S.D.N.Y. 2004)); *but see Rimbert*, 647 F.3d at 1251 (stating that the law of the case doctrine does not apply to "rulings revisited prior to entry of a final judgment").  The law of the case need not control later decisions where "there is an intervening change in the law or if the previous decision was 'clearly erroneous and would work a manifest injustice.'"  *Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999) (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc)).  A decision is clearly erroneous "if it is 'without substantial evidentiary support or if it was induced by an erroneous application of the law.'"  *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 928 F.3d 1102, 1113 (D.C. Cir. 2019) (quoting *Air Line Pilots Ass'n Int'l v. E. Air Lines, Inc.*, 863 F.2d 891, 894 (D.C. Cir. 1988)).  Manifest injustice is present where there is a "direct, obvious, and observable error in a trial court."  Manifest Injustice, *Black's Law Dictionary* (11th ed. 2019).  More, "[i]t is the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," and, presumably, to judgment.  *Ross v. Klesius*, 715 F. App'x 224, 227 (4th Cir. 2017) (alteration in original) (quoting *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (holding that the law of the case doctrine was not offended when the district court reconsidered and reversed a ruling that would have allowed an unsupported claim to

survive summary judgment).  Here, justice requires certain revisions and the law of the case doctrine imposes no obstacle to doing so.

To begin, Rule 55 of the Federal Rules of Civil Procedure sets out a two-step process to obtain a default judgment.  *See, e.g.*, *Fanning v. AMF Mech. Corp.*, 326 F.R.D. 11, 13 (D.D.C. 2018).  First, a party requests entry of default against a defendant that "has failed to plead or otherwise defend."  Fed. R. Civ. P. 55(a).  "Upon entry of default . . . the 'defaulting defendant is deemed to admit every well-pleaded allegation in the complaint,'" except those regarding damages.  *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. ABC Window Cleaning Co.*, 278 F. Supp. 3d 455, 458 (D.D.C. 2017) (quoting *Int'l Painters & Allied Trade Indus. Pension Fund v. R.W. Amrine Drywall Co.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002)).  "Liability is not deemed established simply because of the default," however; rather, "the court, in its discretion, may require some proof of the facts that must be established to determine liability."  10A Mary Kay Kane, *Federal Practice & Procedure* § 2688.1 (4th ed.).  Rule 55(b) governs the second step, "authoriz[ing] a court to enter against the defendant a default judgment for the amount claimed and costs."  *Boland v. Elite Terazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 67 (D.D.C. 2011).  A court must "make an independent determination of the [damages] to be awarded."  *Fanning v. Permanent Sol. Indus., Inc.*, 257 F.R.D. 4, 7 (D.D.C. 2009).  At that step, although a court has "considerable latitude" in making that decision—for example, it may "hold a hearing or rely on detailed affidavits or documentary evidence"—it is still incumbent on the party seeking default judgment to "prove that they are entitled to the requested damages."  *Boland*, 763 F. Supp. 2d at 67–68.  Thus, the burden remains on a plaintiff seeking a default judgment to establish both liability and entitlement to the requested damages.

Here, the Clerk of Court entered default against Al Qaeda in 2006.  ECF No. 82.  At the bellwether evidentiary hearing, Judge Facciola took testimony as to both liability and damages and ruled in *Mwani I* on both issues.[13]  As relevant here, Dipak Shah—the Plaintiff whose damages were applied to all 77 of the Plaintiffs at issue—testified that he was near the U.S. Embassy at the time of the bombing, witnessed its aftermath, and thereafter suffered psychological trauma.  2014 WL 4749182, at *4.  Plaintiffs' expert, Joan Kiema-Ngunnzi, testified that "the survivors of the bombing suffered post-traumatic stress disorder and that a unique social stigma attached to these Kenyan victims, a stigma that remains today" and that "each victim of the Embassy bombing," whether physically injured or not, sustained "significant" emotional and psychological injury" from "the scenes that they observed during the bombing and in its aftermath." *Id.* at *8, 11.  Based on that testimony, Judge Facciola found that Al Qaeda was liable for assault on Dipak Shah, because it "acted 'intending to cause a harmful or offensive contact with . . . or an imminent apprehension of such a contact' by those attacked" and that "those attacked were thereby 'put in such imminent apprehension.'" *Id.* at *10 (quoting Restatement (Second) of Torts § 21).  Judge Facciola also noted that, in a "binding bellwether [evidentiary hearing]"—as this one was—"the results . . . are extrapolated to the other plaintiffs who have similar factual circumstances and/or injuries." *Mwani I*, 2014 WL 4749182, at *1 n.1.  At the status hearing following issuance of *Mwani I* and the September 2014 Order, Judge Facciola proposed using Dipak Shah's damages as the

---

[13] To be sure, *Mwani I* asserts that the evidentiary hearing was "on damages."  2014 WL 4749182, at *1.  However, the opinion of Judge Kollar-Kotelly (who presided over this case before Judge Facciola was assigned) that approved entry of default addressed only whether the Court had subject-matter jurisdiction over the claims under the Alien Tort Statute; it did not address whether Plaintiffs had sufficiently alleged liability.  *See generally Mwani v. Bin Laden*, No. 99-cv-125, 2006 WL 3422208 (D.D.C. Sept. 28, 2006).  Thus, at the bellwether evidentiary hearing, Judge Facciola took testimony and made both findings of fact and conclusions of law that went to liability—that is, whether Plaintiffs had shown that Plaintiffs were victims of the torts of assault and/or battery.  *See Mwani I*, 2014 WL 4749182, at *2–7 (outlining the testimony from fact witnesses), 10 (analyzing whether the evidence established the torts of assault and battery).  The undersigned assumes those findings and conclusions were both intentional and necessary to Judge Facciola's ultimate decision to grant default judgment and award damages.

basis for other similarly-situated Plaintiffs—that is, those who were victims of assault (through the bombing) and did not submit proof of significant physical injuries.  ECF No. 153 at 5.  Judge Facciola did not indicate that he intended to award pain and suffering damages to those Plaintiffs who have not alleged, much less proven, assault or that he intended to award economic damages to any Plaintiff.  Indeed, as noted above, he found in *Mwani I* that the kind of evidence provided not only by the Form 95s, but also by the bellwether Plaintiffs' live testimony was not sufficient to prove economic damages.  2014 WL at 4749182, at *10–11.  And, of course, in *Mwani II* he held that pain and suffering damages were unavailable when sought for business entities rather than for natural persons.  2014 WL 6463227, at *4.  It thus appears that, in awarding pain and suffering damages to at least some of the 77 individuals or entities at issue here, Judge Facciola made an "error . . . of apprehension" by failing to consider evidence "that might reasonably be expected to alter [his] conclusion."  *Singh*, 383 F. Supp. 2d at 101.  Reconsideration is therefore appropriate.

That does not mean that the damages awards at issue should be vacated.  Courts may grant reconsideration and still adhere to their original decisions.  *See, e.g.*, *Raymond A. Semente, D.C., P.C. v. Empire Healthchoice Assurance, Inc.*, 523 F. Supp. 3d 269, 283 (E.D.N.Y. 2021) (granting reconsideration of an order but adhering to the original decision); *In re Citigroup Inc. Sec. Litig.*, 199 F. Supp. 3d 845, 854 (S.D.N.Y. 2016) (same); *Allied Erecting & Dismantling Co. v. U.S. Steel Corp.*, 76 F. Supp. 3d 691, 696 (N.D. Ohio 2015) (same).  The Court will therefore analyze whether, taking into account the law of the case doctrine, alteration is merited for each of the five categories of Plaintiffs identified above, beginning with the simplest ones.

1.      Rose Wanjiru

As noted, Rose Wanjiru submitted a new declaration asserting that she was present in the vicinity of the bombing at the time of the blast and that she has suffered from emotional and psychological injuries since that day.  ECF No. 156-1.  She is thus similarly situated to those existing Plaintiffs who, although they failed to file a Form 95 in 2014, have since filed a declaration detailing their experience of the bombing and the ensuing psychological injuries.  In the Memorandum Opinion and Order issued contemporaneously with this one, those Plaintiffs are awarded damages of $5 million in pain and suffering plus interest and $150 million in punitive damages.  Those are the same damages awarded to Rose Wanjiru in *Mwani II*.  *Mwani II*, 2014 WL 6463227, at *3.  Consistency militates in favor of adhering to Judge Facciola's decision awarding her those damages.

2.      Business Entities

As noted, Plaintiffs have sought damages for seven business entities.  The Form 95 for each of these is completed for a named Plaintiff "trading as"—abbreviated to "t/a"— or "for" a business:  Divine Beautyland Salon (ECF No. 126-2 at 72), Magomano Bar & Restaurant (ECF No. 126-4 at 21), Mary's Boutique Ltd. (*id.* at 62), Pipes Bar and Restaurant (*id.* at 78), Choice Ads Ltd. (ECF No. 126-5 at 49), Datastorm Computer Systems (*id.* at 75), and "Esdan Salon" or "Esdan Saloon" (ECF No. 126-6 at 1).  In *Mwani II*, Judge Facciola used the "trading as" abbreviation to identify a number of Plaintiffs who, although listed as individuals, were actually seeking damages on behalf of their businesses.  *See Mwani II*, 2014 WL 6463227, at *4 (refusing to award pain and suffering damages to "Dipak L. Shah and Sunil Shah t/a Cloud Nine," "Musa Kivuvani (T/A Watamu Industries Kenya)," "Miriam Nekja Mobombe t/a Kenrick Saloon & Fashion De-

signs," "Livingstone G. Muigai (T/A Thimbigua Provision Store)," Jane W. Mugure (T/A Lypa-

toons Investments)," James G. Mwangi (T/A New Kiiri-Ini Night Club)," and "Madrine Wangiri

Rugano (T/A Coffee Systems Consult)").  In addition, a review of the Form 95s for Caleb Bondi

Atieno and James Njoroge Chege—who were also denied pain and suffering damages as business

entities, although the t/a identifier is not appended to their names in the *Mwani II* opinion—shows

that they, too, were claiming damages on behalf of a business.  *See* ECF No. 126-1 at 91 ("Caleb

Bondi Atieno T/A Yala Hair & Beauty Parlour"), 107 ("James Njoroge Chege T/A New Thim-

bigua Provision Store").  That is, Judge Facciola denied an award of damages—pain and suffering,

economic, or punitive—to Plaintiffs who were similarly situated to these seven business entities.

The law of the case doctrine presents no barrier to vacating the award of pain and suffering

damages to the seven identified businesses.  Indeed, it arguably requires it, as Judge Facciola ruled

in *Mwani II* that businesses were not entitled to damages.  *Mwani II*, 2014 WL 6463227, at *4.

Alternatively, the decision to award pain and suffering damages to those entities was clearly erro-

neous because it was "without substantial evidentiary support," *Air Line Pilots Ass'n Int'l*, 863

F.2d at 894, and constituted a "direct, obvious, and observable error in a trial court," Manifest

Injustice, *Black's Law Dictionary* (11th ed. 2019).  *See also Ross*, 715 F. App'x at 227 ("[I]t is the

affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from

proceeding to trial . . . .").  It was also legally erroneous.  As Judge Facciola noted, and as discussed

below, the tort of assault requires the victim to be "put in . . . imminent apprehension" of harmful

or offensive contact.  *Mwani I*, 2014 WL 4749182, at *10 (quoting Restatement (Second) of Torts

§ 21).  Plaintiffs have not asserted that a business entity can be put in such apprehension and courts

have held that "as a matter of law . . . there can be no tort of assault against a [business]." *Ntron*

*Int'l Sales Co. v. Carroll*, 714 F. Supp. 335, 339 (N.D. Ill. 1989).  Indeed, the Restatement (Second) of Torts characterizes assault as infringing on "the interest in freedom from apprehension of a harmful or offensive *bodily contact*."  Restatement (Second) of Torts ch. 2, intro. note (emphasis added).  Thus, Plaintiffs cannot establish that the tort of assault was committed against those business entities.  There is therefore no basis on which to award them damages of any kind.

   3.   Peter Maina and Mary Wanjiru Kinuthia

   These two Plaintiffs provided sworn declarations in February 2022 that contradict their Form 95s, both of which were completed in 1999, in material ways.  Peter Maina's Form 95 states that he worked as a waiter at the Magomano Bar & Restaurant in the vicinity of the U.S Embassy at the time of the bombing (ECF No 126-3 at 31);[14] his new declaration asserts that he was an account assistant in an office on the thirteenth floor of the Cooperative Building at that time (ECF No. 156-2 at 3).  Mary Kinuthia's identification of her workplace on her Form 95 is not fully legible, but it appears to be "Satis Ladies Point," which she asserts was located "at Solar House next to Ufundi Cooperative."  ECF No. 126-7 at 124.  Her new declaration asserts that she was a trade development officer who worked at the Cooperative Building at the time.[15]  ECF No. 156-3 at 3.  That is, there are clear discrepancies between these Plaintiffs' identification of their places of work in their Form 95s and in their new declarations.  That is important because their employment at a business near the U.S. Embassy is the basis for their claims of damages.

   The Court, sitting as finder of fact, concludes that the new declarations are not credible in light of the discrepancies between them and the Form 95s.  Crucially, those Form 95s were completed within a year of the bombing rather than two decades later; more, those Form 95s were

---

[14] The Form 95 filled out on behalf of Magomano Bar & Restaurant asserts that the establishment was located on Tom Mboya Street in Nairobi.  ECF No. 126-4 at 21.

[15] As noted, *supra* note 6, the Cooperative Building, Ufundi Cooperative, and Solar House are three separate buildings.

completed prior to the February 17, 2022 hearing at which the Court informed counsel for Plaintiffs that it questioned the award of pain and suffering damages to individuals who were not physically present in the vicinity of the U.S. Embassy at the time of the bombing or did not claim physical or psychological injury.

The Court is therefore left with Form 95s for Peter Maina and Mary Kithunia, neither of which includes any representation that the Plaintiffs were present near the U.S. Embassy at the time of the bombing or that they were physically or psychologically injured. *See* ECF No 126-3 at 31, ECF No. 126-7 at 124. Plaintiffs contend that does not matter: Judge Facciola, they assert, was "entitled on the record before him to conclude that Plaintiffs[ ] who did not suffer an instantaneous impact or who were not otherwise present for the moment of the blast[ ] nonetheless[ ] suffered non-economic injuries such as emotional distress, fear[,] and stigma." ECF No. 156 at 9 (initial capitalizations omitted). But, the Restatement (Second) of Torts—the source on which Judge Facciola relied for the content of federal common law regarding assault—requires that the defendant "act[ ] 'intending to *cause a harmful or offensive contact with . . . or an imminent apprehension of such a contact*' by those attacked"; and that "those attacked were thereby 'put in such *imminent apprehension.*'" *Mwani I*, 2014 WL 4749182, at *10 (ellipses in original) (emphasis added) (quoting Restatement (Second) of Torts § 21). The comments make clear that, in order for a defendant to be liable for assault, the intentional act must "cause apprehension of an *immediate* contact." Restatement (Second) of Torts § 21, comment c (emphasis added). Plaintiffs have not explained how that tort could be committed against individuals who were not present at the time of the bombing. How, for example, could individuals not near the U.S. Embassy at the time of the blast be put in "imminent apprehension" of "immediate contact" from the blast? They could not. *See, e.g.*, 6 Am. Jur. 2d Assault and Battery § 1 ("An assault is a demonstration of an unlawful

intent by one person to inflict immediate injury or offensive contact on the person of another *then present*." (emphasis added)).

But Plaintiffs have a rejoinder.  Looking to precedent regarding intentional infliction of emotional distress in cases proceeding under the terrorism exception to the FSIA, they contend that "[i]f the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents liability." ECF No. 156 at 11 (quoting *Valore*, 700 F. Supp. 2d at 80).  Assuming that federal common law recognizes a cause of action for intentional infliction of emotional distress in a case brought under the Alien Tort Statute, *see McManaway v. KBR, Inc.*, No. 4:10-cv-1044, 2015 WL 13310061, at *7–8 (S.D. Tex. Aug. 9, 2015) (discussing whether federal common law recognizes the tort of intentional infliction of emotional distress in a diversity case brought by British and American soldiers claiming they were injured by a toxic chemical while providing military protection at a water treatment plant in Iraq), Plaintiffs have neither pleaded such a claim nor sought leave to amend the operative complaint to assert one.  Had they sought leave, it would likely have been denied for the reasons discussed in the Memorandum Opinion and Order issued contemporane-ously with this one.  Perhaps more importantly, however, the precedent Plaintiffs cite, even if applicable, would still not entitle those Plaintiffs not present at the time of the bombing to recover damages.  As discussed in *Valore*, the tort of intentional infliction of emotional distress allows recovery for absent individuals only if they are members of the immediate family of a victim or, perhaps, if they resided in the same household with or were legal guardians of the victim.  700 F. Supp. 2d at 78–80.  There are no such allegations here.  Moreover, the rule Plaintiff urges—that, where there is an act of terrorism that results in injury to some, even those who are neither injured nor present can recover for infliction of emotional distress—would threaten to impose the kind of

"nearly infinite and unpredictable liability" that the Supreme Court has warned against.  *Consol. Rail Corp. v Gottshall*, 512 U.S. 532, 546 (1994).  Thus, even if Plaintiffs' expert's expansive testimony that all "victims" or "survivors" of the bombing suffered post-traumatic stress disorder could be read to embrace individuals who were not present—which, in light of Judge Facciola's characterization of her testimony as asserting that "each victim of the Embassy bombing suffered long-term or permanent psychological injury from the *scenes that they observed during the bombing and in its aftermath*," *Mwani I*, 2014 WL 4749182, at *8 (emphasis added), is a stretch[16]—that would not entitle them to recovery for intentional infliction of emotional distress.  As such, the award of damages to Peter Maina and Mary Kinuthia was clearly erroneous because it was both "without substantial evidentiary support" and an incorrect application of the law, *Air Line Pilots Ass'n Int'l*, 863 F.2d at 894; additionally, the error was "direct, obvious, and observable," Manifest Injustice, *Black's Law Dictionary* (11th ed. 2019).  *See also Ross*, 715 F. App'x at 227 ("[I]t is the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial . . . .").

4.      Plaintiffs Who Offer No Evidence Supporting Their Presence at the Time and Place of the Bombing

The analysis here mirrors that above.  None of these 43 Plaintiffs has presented evidence to support a finding that he or she was present at the time of the bombing or its immediate aftermath.  Rather, these Plaintiffs merely indicate, as a general matter, that on the date of the bombing, they were employed by businesses near the U.S. Embassy.  *See, e.g.*, ECF No. 126-1 at 101 ("The

---

[16] Jane Kiema-Ngunnzi testified that those who "saw the grotesque scenario of the bomb blast," including rescue workers at the bomb site, medical professionals, and mortuary personnel, were impacted psychologically.  ECF No. 103 at 120–21.  There is no evidence that Peter Maina or Mary Kinuthia—or, indeed, any of the Plaintiffs whose damages are addressed here—engaged in such work.  In any case, Plaintiffs have provided no support for the proposition that those who witness the aftermath of a disaster but are not present for the disaster itself are victims of the tort of assault and the discussion above establishes that they are not.

property damaged by the blast was situated at the Kenya Bankers Building along Moi Avenue Nairobi opposite the American Embassy. The business was the only hope of earning a living and paying for the school fees of our four children."); ECF No. 126-2 at 3 ("I am an employee of [illegible] Bar & Restaurant along Tom Mboya Street. The same was badly damaged by the bomb blast."), 11 ("I work as a waiter at a New Kiigi-ini Bar and Rest; situated a few metres from American Embassy. Bomb blast destroyed the business and therein stock, making the place closed for two months.").[17] There is no evidentiary basis on which to find that they were victims of the tort of assault (as was Dipak Shah) and no basis to award them pain and suffering damages equivalent to Dipak Shah's as victims of that tort. Doing so was clearly erroneous and worked a manifest injustice.[18]

5.     Plaintiffs Whose Form 95s Support a Finding that They were Present at the Time and Place of the Bombing

These 24 Plaintiffs present a more difficult question. They all either assert directly or strongly suggest that they were at their places of employment near the U.S. Embassy at the time of the bombing. For example, Duncan Maina Chege asserts that on the day of the bombing he was "at [his] place of work at Magomano Bar and Grill," which was damaged "due to effects of the bombing," forcing it to close for two months. ECF No. 126-1 at 105. Mary Nyambura Gaeta asserts that "on the material day, [she] was at [her] place of work, at Divine Beautyland Salon, working as a hair stylist and a beautician." ECF No. 126-2 at 1. "As a result of the bomb blast,

---

[17] The Court does not belittle these economic harms, some of which reportedly had lasting effects on the lives of the individuals claiming them. However, Judge Facciola ruled that the bellwether Plaintiffs' economic harms were not sufficiently established to justify an award of damages and the evidence presented as to these Plaintiffs is similar. *Mwani I*, 2014 WL 4749182, at *10–11.

[18] Plaintiffs argue that the Court should extrapolate from the three declarations submitted with their supplemental brief—that is, the declarations of Rose Wanjiru, Peter Maina, and Mary Kinuthia—to find that all the other Plaintiffs at issue here have sufficiently proven their entitlement to pain and suffering damages. They cite no authority supporting that technique and, in light of the suspect nature of two of those declarations, the less said about this argument the better.

the business . . . was closed for three months." *Id.* Ejidiah Gathoni asserts that "[o]n this material

day, I worked as a cook . . . at Magomano Bar and Rest. Due to the effects of the bomb blast, the

business was closed for two months." *Id.* at 5. Simon Wachira Kimata asserts that "[o]n this

material day, I was at my place of work, New Thimbigua Provision Store where I work as a shop

attendant . . . . As bomb exploded, it damaged the entire stock therein. The business was closed

for three month[s]." *Id.* at 102. However, none of them states that he or she was injured in any

way—physically or psychologically—by the bombing.

  The Court finds that, even with that deficiency, the law of the case doctrine counsels in

favor of letting stand the damages awards as to these Plaintiffs. First, Plaintiffs' expert opined that

those who witnessed the blast suffered from long-lasting psychological damage. *See Mwani I*,

2014 WL 4749182, at *7–8; ECF No. 103 at 121. Judge Facciola credited that testimony. *Mwani*

*I*, 2014 WL 4749182, at *11. There was no error in that determination. These Plaintiffs have

provided evidence that they were at their places of business near the U.S. Embassy at the time of

the blast and that the blast damaged or destroyed those premises. There is therefore evidence to

support a finding that these Plaintiffs witnessed the incident such that they suffered psychological

damage. The fact that their Form 95s do not identify psychological injuries cannot be dispositive

here. Although some Plaintiffs claimed such injuries (*see, e.g.* ECF No. 126-1 at 9 (claiming,

among other injuries, "traumatic shock")), many did not (*see, e.g.*, *id.* at 7 (claiming "chest pains,

deformed finger"), 33 (claiming "deep cut on the fore-head" and "deep cuts on the left arm by

sharp objects and glass shrapnels"). Judge Facciola apparently relied on the expert's testimony to

find that those who witnessed the bombing suffered compensable psychological trauma, even in

the absence an explicit claim of such injury on their Form 95s. The undersigned does not find that

decision clearly erroneous or manifestly unjust.

\*        \*        \*        \*        \*        \*        \*

The Court holds that the award of damages to the 7 identified business entities, to Peter Maina and Mary Kinuthia, and to the 43 Plaintiffs who provided no proof that they were in the vicinity of the U.S. Embassy at the time of the bombing must be vacated.  To the extent that Judge Facciola found that those Plaintiffs were victims of assault and entitled to damages, that finding was clearly erroneous and worked a manifest injustice.[19]

### C.    Whether the Dismissals Should be With or Without Prejudice

Plaintiffs argue that, if any claims are to be dismissed because they are unsupported by evidence, that dismissal should be without prejudice.  ECF No. 156 at 15–16.  They rely on Local Civil Rule 83.23, which governs dismissals for failure to prosecute and provides that "[a]n order dismissing a claim for failure to prosecute shall specify that the dismissal is without prejudice, unless the Court determines that the delay in prosecution of the claim has resulted in prejudice to an opposing party."  LCvR 83.23.  Because the opposing party here has defaulted, the argument goes, there can be no prejudice against it, so any dismissal must be without prejudice.  ECF No. 156 at 16.

The Court is baffled as to why Plaintiffs think that the dismissals of claims that have not been proved would be for lack of prosecution.  Plaintiffs have prosecuted this case—spottily, to

---

[19] Plaintiffs also briefed the question of whether, if certain Plaintiffs' pain and suffering damages were vacated, an award of purely economic damages could be the foundation for a punitive damages award.  ECF No. 156 at 14–15.  That question is irrelevant, however, for two independent reasons.  First, economic damages were not awarded to any plaintiff and Judge Facciola found that the bellwether Plaintiffs, who offered live testimony similar to the representations included in the Form 95s for the Plaintiffs addressed here, did not sufficiently prove economic damages.  *Mwani I*, 2014 WL 4749182, at \*11.  Under that ruling, the Form 95s will therefore not support awards of economic damages.  Second, the damages awards are being vacated here because the relevant Plaintiffs' claims that they were the victims of a tort are legally barred (for the business entities) or lack evidentiary support (for the 43 individual Plaintiffs whose Form 95s do not show that they were near the U.S. Embassy at the time of the bombing).  There is therefore no basis for an award of any damages, whether economic, pain and suffering, or punitive.

be sure—for over 20 years.[20]  There has been a bellwether evidentiary hearing, a decision follow-ing that evidentiary hearing, and a subsequent decision applying the findings of the prior decision to the remaining Plaintiffs.  Since those decisions in 2014, Plaintiffs have had the opportunity to bolster their evidence and, indeed, have done so by providing declarations in 2022 for more than 20 existing Plaintiffs who had failed to submit Form 95s in 2014.  *See* ECF No. 150-3; ECF No. 154-1; ECF No. 156-1 through 156-3; ECF No. 157-1 through 157-3.  All of the Plaintiffs in this case have had the opportunity to present their evidence to the Court; their omission is not a failure to prosecute, it is a failure of proof.  Thus, any dismissals will be with prejudice.  *See, e.g.*, *U.S. ex. rel. McCandliss v. Sekendur*, No. 03 C 807, 2007 WL 551567, at *12 (N.D. Ill. Feb. 20, 2007) (dismissing counterclaims with prejudice "for failure of evidence" after a bench trial); *Lake v. Baker*, 662 F. Supp. 392, 407 (D.D.C. 1987) (dismissing a complaint with prejudice "for failure of proof"); *see also, e.g.*, *Franco v. Bd. of Cty. Comm'rs for the Cty. of Roosevelt*, No. 13-714, 2014 WL 11430974, at *8 (D.N.M. July 17, 2014) (dismissing claims with prejudice on summary judgment "[g]iven [the] [p]laintiff's absolute failure to produce any evidence" supporting her claims"), *aff'd*, 609 F. App'x 957 (10th Cir. 2015); *Berry v. Kuhlman Corp.*, No. 3:04-cv-134, 2007 WL 951594, at *4 (S.D. Miss. Mar. 27, 2007) ("[I] is clear from the record that they lack ev-idence essential to proving their claims in this case, [therefore] it is ordered that their complaint is dismissed with prejudice."), *aff'd sub nom. Berry v. BorgWarner*, 291 F. App'x 592 (5th Cir. 2008).

---

[20] Indeed, if the Court were inclined to dismiss for failure to prosecute, it would consider dismissing the entire case based on Plaintiffs' "lengthy period of inactivity" between 2017 (when the Court granted, in error, Plaintiffs' motion for leave to register judgments (*see* ECF No. 149)) and 2021, when Plaintiffs' counsel reappeared seeking to file a profusion of new motions.  *Smith-Bey v. Cripe*, 852 F.2d 592, 594 (D.C. Cir. 1988) ("A lengthy period of inactivity may also be enough to justify dismissal [for failure to prosecute].").

### D.     Prejudgment Interest

Judge Facciola ruled, in the exercise of his discretion, that prejudgment interest on each Plaintiff's compensatory damages award was appropriate and necessary to compensate them for their injuries.  *Mwani I*, 2014 WL 4749182, at *13.  To calculate the amount of prejudgment interest, Judge Facciola took the average annual prime rate for each year between 1999 and 2014 and, "assuming annual compounding and starting with $1 for the first year," computed a multiplier to be used to assess the amount of prejudgment interest.[21]  *Id.*  Using that technique, Judge Facciola ultimately calculated a multiplier of 2.2619 for damages awarded in 2014.  *Id.*  On a compensatory damages award of $5 million, that resulted in prejudgment interest in the amount of $11,309,500, which is the amount of prejudgment interest awarded to Shah, and, thereafter, to the Plaintiffs awarded damages in *Mwani II*.  *See Mwani I*, 2014 WL 4749182, at *13–14; *Mwani II*, 2014 WL 6463227, at *1.

None of the numerous motions filed by Plaintiffs since counsel resurfaced in 2021 has mounted an argument that the prejudgment interest calculation should be updated.  If any had done so, such a request would likely have been denied.  As the Supreme Court noted in *Osterneck v. Ernst & Whinney*, in determining whether to award prejudgment interest,

> a district court will consider a number of factors, including whether prejudgment interest is necessary to compensate the plaintiff fully for his injuries, the degree of personal wrongdoing on the part of the defendant, the availability of alternative investment opportunities to the plaintiff, whether the plaintiff delayed in bringing or prosecuting the action, and other fundamental considerations of fairness.

---

[21] That is, Judge Facciola used a base of $1.00 in 1998.  The average annual prime rate for 1999 was 8 percent.  Thus, he multiplied 1.00 by 0.08 (to get 0.08) and added that to the base amount of $1.00 to get an initial multiplier of 1.08 (*Mwani I* notates this calculation as the "Total from 1998 + Total from 1998 x 1999 Average Annual Prime Rate ÷ 100").  2014 WL 4749182, at *13.  The average annual prime rate in 2000 was 9.23 percent.  *Id.*  So, 1.08 multiplied by .0923 equals 0.0997; add that to 1.08, and the multiplier is 1.1797.  *Id.*  The average annual prime rate for 2001 was 6.91 percent.  *Id.*  1.1797 multiplied by .0691 equals 0.0815; added to 1.797, that provides a multiplier of 1.2612.  *Id.*  Using this technique, Judge Facciola ultimately calculated a multiplier of 2.2619 for damages awarded in 2014.  *Id.*  On a compensatory damages award of $5 million, that results in prejudgment interest in the amount of $11,309,500 ($5 million multiplied by 2.2619 equals $11,309,500).  *Id.*

489 U.S. 169, 176 (1989).  Indeed, "[t]he 'most obvious' reason for denying prejudgment interest [entirely], is 'the plaintiff's responsibility for "undue delay in prosecuting the lawsuit,"' *i.e.*, 'when the plaintiff himself is responsible for the delay in recovery.'"  *Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 75, 96 (D.D.C. 2019) (first quoting *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 196 (1995), then quoting *Wickham Contracting Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 835 (2d Cir. 1992)).  While no one should contend that the degree of Al Qaeda's wrongdoing is anything less than astronomical, the fact remains that any increase in the amount of prejudgment interest awarded by Judge Facciola would derive from Plaintiffs' own "delay[ ] in . . . prosecuting th[is] action."  *Id.* at 89; *see also, e.g.*, *Ruff v. Cty. of Kings*, No. CV-F-05-631, 2009 WL 4572782, at *4 (E.D. Cal. Nov. 30, 2009) (excluding time traceable to delay by the plaintiff from the calculation of prejudgment interest).  An increase in prejudgment interest is therefore neither necessary nor appropriate here.  Thus, the damages awards reflected in the September 2014 Order and the November 2014 Order will be incorporated into the final judgment in this case.[22]

### III.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that the award of damages to the following Plaintiffs is **VACATED**:

(1)   Mary Achieng Bondi
(2)   Stanley K. Gacuru
(3)   James Irungu Gathogo
(4)   James Kuria Gichiru
(5)   Peter Mwai Gikaara
(6)   Joseph Gathere Gitau
(7)   Patrick K. Githri
(8)   Stephen Nderi Githuthwa

---

[22] As discussed in the Memorandum Opinion and Order issued contemporaneously with this one, Plaintiffs who were not awarded damages in 2014 but have shown an entitlement to damages in recent submissions to the Court will also receive the same amount of prejudgment interest as did Shah and the *Mwani II* Plaintiffs who established their tort claim and damages.

(9)     Petera Agori Isauwa
(10)    Joyce Ngjeri Kahoro
(11)    Anne Wanjiru Kamau
(12)    Paul Mbutha Kiiru
(13)    Julius Muturi Kihara
(14)    Joseph M. Njenga
(15)    George Nunene Kago
(16)    Samuel Ndirangu Kihanga
(17)    Sarah Njoki Maima
(18)    Julia K. Majan
(19)    Laban Kanyi Muchanya
(20)    Winnie Njoki Mugoh
(21)    Bernard Kisaingu Musyoka
(22)    Boniface Muthee
(23)    Francis Ngei Mutua
(24)    David Thuo Mwangi
(25)    Duncan Githuna Mwangi
(26)    Moffatkaguamba Mwaingi
(27)    Perminus M. Mwangi
(28)    Ann Wanjugu Ndegwa
(29)    Charles Githaiga Nguku
(30)    Giaraph G. Ngumba
(31)    Winfre A. Njeri
(32)    Judy Njoki
(33)    James Kariuki Njombou
(34)    Susan Muthoni Njuguma
(35)    John Kimathi Wambar
(36)    Marian Wambu
(37)    Anastacia Grace Wanjiku
(38)    Beatrice Wanjiru
(39)    Ireri (Elijah) N. Ireri
(40)    Jennifer Njeri Mwangi
(41)    Joe Kiroga
(42)    Lazarus Kipkemboi
(43)    Milka Wangui Kariuki
(44)    Margaret Njeri Kibui
(45)    David N. Mwangi
(46)    Mary Muthoni Nderitu
(47)    Joseph Njogu Ngugi
(48)    Dr. Delano Akwiri Odingo Othiempo
(49)    Moses Kariuki Ruita
(50)    Ruth Wangombe
(51)    Peter Maita
(52)    Mary Wanjiku Kinuthia

It is further

**ORDERED** that, on or before May 11, 2022, Plaintiffs shall file a proposed final judgment in this case.  That proposed final judgment shall include a numbered list naming (1) each Plaintiff awarded damages in the September 2014 Order (ECF No. 122); (2) each Plaintiff awarded damages in the November 2014 Order (ECF No. 129) whose award of damages has not been vacated in this Memorandum Opinion and Order; and (3) each Plaintiff awarded damages in the Memorandum Opinion and Order issued contemporaneously with this one.  It shall also include, for each Plaintiff awarded damages, the total amount of damages and prejudgment interest to be awarded.[23] That proposed judgment shall also state both that the claims of all other Plaintiffs are dismissed with prejudice and that it is a final, appealable judgment.  It shall include an appropriate signature block (*see, e.g.*, ECF Nos. 122, 129).  It is further

**ORDERED** that the proposed judgment described above shall be accompanied by an affidavit from Plaintiffs' counsel (1) attaching a text-searchable chart that lists for each Plaintiff awarded damages:  (a) the name and corresponding number from the proposed judgment of each Plaintiff, (b) the amount of damages awarded, (c) the corresponding line number from the Revised Chart, (d) the ECF document number and page number on which his or her name appears in the operative complaint, (e) the ECF document number(s) and page number(s) on which evidence supporting his or her claims appears, and (f) the ECF document number and page number on which his or her name appears in the September 2014 Order or the November 2014 Order; and (2) attesting to the accuracy of the representations in the chart.

---

[23] The Court recognizes that the amount of compensatory damages, prejudgment interest, and punitive damages will be identical—$5 million in compensatory damages, $11,309,500 in prejudgment interest on that amount, and $150 million in punitive damages—for each Plaintiff awarded damages other than the following Plaintiffs who will recover greater damages as awarded in *Mwani I*:  Castro Otiende, Wilfred Nderitu, and Charles Mogo, who were each awarded $13,571,400 in compensatory damages (including interest calculated up to 2014) for permanent scarring and PTSD and $150 million in punitive damages, for a total of $163,571,400; and Protus Buluma and Kioko Muema, who were each awarded $16,964,250 in compensatory damages (including interest calculated up to 2014) for injuries to their eyes and PTSD and $150 million in punitive damages, for a total of $166,964,250.  *See Mwani I*, 2014 WL 4749182, at *12, 14.

**SO ORDERED**

Date: April 20, 2022

_____

G. Michael Harvey
United States Magistrate Judge